## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| ex rel. YOASH GOHIL | : | |
| | : | |
| Plaintiff/Gohil, | : | NO. 02-CV-2964 |
| | : | |
| v. | : | |
| | : | |
| SANOFI-AVENTIS U.S. INC., AVENTIS INC., | : | |
| AVENTIS PHARMACEUTICALS INC., | : | |
| and JOHN DOES #1-50, FICTITIOUS | : | |
| NAMES, | : | |
| | : | |
| Defendants. | : | |

## REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

## INTRODUCTION

Defendants sanofi-aventis U.S. Inc., Aventis Inc., and Aventis Pharmaceuticals Inc., (collectively "Aventis") established in their December 15, 2010 Motion to Dismiss that Gohil's Second Amended Complaint ("SAC") should be dismissed. Neither Gohil's Brief in Opposition ("Opp.") nor the Federal government's Statement of Interest ("SOI") compels a different result. The fact remains that Gohil knowingly and voluntarily relinquished his right to pursue this action. Moreover, despite having more than eight years to investigate his claims against Aventis and more than ample opportunity to attempt to cure the fatal deficiencies in his SAC, Gohil has not and cannot: (1) establish that he is an original source of his pre- and post-employment claims; (2) plead his FCA claims with particularity as required by Fed. R. Civ. P. 9(b); (3) demonstrate that any claim for reimbursement for Taxotere® was rendered false by virtue of Aventis's supposed off-label promotion; or (4) state an actionable claim for civil conspiracy against Aventis and any "John Doe" defendant. Accordingly, the SAC should be dismissed with prejudice.

# TABLE OF CONTENTS

**Page**

I.     GOHIL RELINQUISHED HIS INDIVIDUAL RIGHTS TO PURSUE THE CLAIMS PRESENTED IN THE SECOND AMENDED COMPLAINT………………………..1

II.    THERE CAN BE NO CLAIMS IN THIS ACTION PERTAINING TO THE MARKETING OF ANZEMET®, BECAUSE SUCH CLAIMS WERE EITHER NOT INTENDED BY THE SAC, OR HAVE BEEN RELEASED………………………....2

III.   THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER GOHIL'S CLAIMS SPANNING FROM 1996 THROUGH 1999 (PRE-EMPLOYMENT) AND FROM JUNE 2002 TO 2004 (POST-EMPLOYMENT)…………………………......3

IV.   THE SAC FAILS TO MEET THE REQUIREMENTS OF RULE 9(B) AND SHOULD BE DISMISSED…………………………………………………………………..…6

V.    COUNTS III AND IV SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(6) TO THE EXTENT THEY ARE BASED ON ALLEGATIONS THAT HEALTH CARE PROVIDERS SUBMITTED FALSE CLAIMS FOR REIMBURSEMENT AS A RESULT OF PRESCRIBING TAXOTERE® FOR OFF-LABEL TREATMENTS.............................................................................................................10

VI.   COUNTS II, III AND IV SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(6) TO THE EXTENT THEY ARE BASED ON ALLEGATIONS THAT AVENTIS CAUSED HEALTH CARE PROVIDERS TO IMPROPERLY CERTIFY COMPLIANCE WITH FEDERAL LAW………………………………………….11

VII.  GOHIL HAS NOT AND CANNOT PLEAD A CONSPIRACY TO VIOLATE THE FCA………………………………………………………………………………14

VII.  CONCLUSION…………………………………………………………………..15

# TABLE OF AUTHORITIES

**Page**

CASES

*Allison Engine Co., Inc. v. United States ex. rel. Sanders,*
128 S. Ct. 2123 (2008) .......................................................................................... 14

*Rodriguez v. Our Lady of Lourdes Med. Ctr.,*
552 F.3d 297 (3d Cir. 2009) ............................................................................. 11, 12

*United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co.,*
473 F.3d 506 (3d Cir. 2007) ................................................................................... 3

*United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co.,*
2000 WL 1207162 (E.D. Pa. Aug. 24, 2000) ....................................................... 14

*United States ex rel. Barmak v. Sutter Corp. and Orthologic Corp.,*
2002 WL 987109 (S.D.N.Y. May 14, 2002) ......................................................... 13

*United States ex rel. Franklin v. Parke-Davis,*
2003 WL 22048255 (D. Mass. Aug. 22, 2003) ..................................................... 15

*United States ex rel. Grubbs v. Kanneganti,*
565 F.3d 180 (5th Cir. 2009) ................................................................................... 7

*United States ex rel. Hopper v. Anton,*
91 F.3d 1261 (9th Cir. 1996) ................................................................................. 13

*United States ex rel. Jones v. Brigham and Women's Hosp.,*
2010 WL 4502079 (D. Mass. Nov. 10, 2010) ....................................................... 11

*United States ex rel. Kosenske v. Carlisle HMA, Inc.,*
554 F.3d 88 (3d Cir. 2009) ..................................................................................... 14

*United States ex rel. Piacentile v. Aventis,*
2010 U.S. Dist. LEXIS 137895 (D.N.J. Dec. 31, 2000) ....................................... 6-8

*United States ex rel. Quinn v. Omnicare,*
 382 F.3d 432 (3d Cir. 2004) ................................................................................... 6

*United States ex rel. Rost v. Pfizer,*
2010 WL 3554179 (D. Mass. Sept. 14, 2010) ....................................................... 13

*United States ex rel. Schmidt v. Zimmer, Inc.*,
2005 WL 1806502 (E.D. Pa. July 29, 2005).............................................................6-7

*United States ex rel. Thomas v. Bailey*,
2008 WL 4853630 (E.D. Ark. Nov 6, 2008) .............................................................. 13

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
125 F.3d 899 (5th Cir. 1997) ..................................................................................... 13

*United States ex rel. Underwood v. Genentech*,
720 F. Supp. 2d 671 (E.D. Pa. 2010) ......................................................................... 10

*United States ex rel. Wilkins v. United Health Group, Inc.*,
2010 WL 1931134 (D.N.J. May 13, 2010) ................................................................. 10

## STATUTES

31 U.S.C. § 3729(a)(1)................................................................................................. 15

31 U.S.C. § 3729(a)(2)................................................................................................. 15

31 U.S.C. § 3730(b)(1) ................................................................................................... 1

# I. GOHIL RELINQUISHED HIS INDIVIDUAL RIGHTS TO PURSUE THE CLAIMS PRESENTED IN THE SECOND AMENDED COMPLAINT

Gohil released his FCA claims against Aventis as part of the settlement of his state law CEPA employment claims against Aventis; this Court should therefore dismiss his SAC with prejudice.[1] In his Opposition, Gohil does not dispute the existence of the CEPA release, nor does he dispute that a release in connection with another action can result in the relinquishment of an individual's right to bring a *qui tam* action. Instead, Gohil's only argument pertains to the timing of his CEPA release vis-à-vis the operative date of the initiation of the instant FCA action.[2] Notably, the United States does not challenge any aspect of Aventis' argument pertaining to the scope and effect of Gohil's release, except for an overarching statement that dismissal of the SAC should be without prejudice to the United States.[3]

Ultimately, Gohil's argument comes down to a contention that there can be no negotiated release of an individual's right to pursue *qui tam* claims once any form of FCA action is initiated. Neither the statute nor underlying policy supports such a contention. First, the statutory language cited by Gohil, specifically 31 U.S.C. § 3730(b)(1), addresses only the voluntary dismissal of a filed FCA action. Although the United States has not consented to a voluntary dismissal of this action, that is not the issue before this Court. Rather, the question is whether Gohil's knowing, voluntary, and counseled decision to relinquish his *individual* right to pursue this action as a *qui tam* relator should be accorded full force and effect. Indeed, Gohil's decision to release his individual claims against Aventis did not operate to bar the United States' ability to pursue this matter, and Aventis has not so argued.

---

[1] *See generally* Aventis's *Brief in Support of Defendants' Motion to Dismiss Plaintiff's Second Am. Qui Tam Compl.* ("Aventis Brief") at 5-10.

[2] *See* Opp. at 7-12.

[3] *See* SOI at n.1.

Second, Gohil attempts to argue that public policy interests prevent his voluntary and knowing settlement and release of claims. Gohil's policy argument –to allow the Government to uncover fraud that it would not otherwise be able to discern (Opp. at 9) – is not relevant here, where the purported fraud uncovered by Gohil was already known to the Government prior to Gohil's execution of the release. When faced with these facts, courts have upheld release agreements and extinguished the individual's rights to pursue claims as a *qui tam* relator. *See* Aventis Brief, at 8-10. This result is even more appropriate in a situation such as that faced here, where the SAC is markedly different from both *qui tam* complaints that preceded it. The SAC was filed almost five years after the initial complaint; Gohil sought permission to file the SAC based upon "new evidence;" and the SAC adds fifty (50) new defendants (John Does #1-50), a wholly new conspiracy claim, and completely shifts the focus in products for which allegations of improper sales and marketing practices are made. The SAC is, for all practical purposes, a separate FCA action filed five years after Gohil signed his CEPA settlement agreement and release. His attempt to piggyback this FCA action upon an abandoned first filing should not be permitted.

## II. THERE CAN BE NO CLAIMS IN THIS ACTION PERTAINING TO THE MARKETING OF ANZEMET[®], BECAUSE SUCH CLAIMS WERE EITHER NOT INTENDED BY THE SAC, OR HAVE BEEN RELEASED

In its Motion to Dismiss, Aventis contended that any allegations made by Gohil concerning the marketing, promotion, and sale of Anzemet[®] fail to state a claim upon which relief may be granted because the government has already settled any such claims. *See* Aventis Brief, at 10-11. Now, Gohil states that there are no claims in the SAC that "seek[] to hold Aventis liable for the unlawful marketing and sale of Anzemet." Opp. at 12, 13 ("none of the claims in the SAC seek to hold Aventis liable for damages for the unlawful marketing and sale of Anzemet."). That being the case, Aventis agrees that it is not necessary to consider the August

30, 2007 settlement agreement between Aventis and the United States, and its release of claims related to the marketing of the "spread" with respect to Anzemet®, nor is it necessary to respond to the United States' concerns on this issue. SOI at 15-16. Gohil is clearly taking the position that there are no damages being sought with respect to claims for reimbursement pertaining to Anzemet® prescriptions.

## III. THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER GOHIL'S CLAIMS SPANNING FROM 1996 THROUGH 1999 (PRE-EMPLOYMENT) AND FROM JUNE 2002 TO 2004 (POST-EMPLOYMENT)

In its Motion to Dismiss, Aventis asserted that this Court lacked subject matter jurisdiction over Gohil's claims pertaining to conduct allegedly occurring from 1996 through 1999 and from June 2002 to 2004, because those allegations are based upon information previously publicly disclosed as to which Gohil has no direct and independent knowledge. *See* Aventis Brief, at 11-19. The subject matter jurisdiction analysis is two-fold: (a) whether the claims are based upon public disclosures; and, if so, (b) whether the relator is an "original source" of the information upon which the claims are based. *See United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co.,* 473 F.3d 506, 519 (3d Cir. 2007).

Gohil first argues that there has been no public disclosure. In so doing, however, Gohil concedes that certain records were indeed public disclosures, specifically "the internal Baffone disciplinary records and DDMAC letters," and that he did not obtain these records during the course of his employment. Opp. at n.18. At a minimum, this Court does not have subject matter jurisdiction over any allegations based upon these categories of documents.

Gohil next contends that Aventis has not conducted a claim-by-claim analysis to support its assertion of public disclosure. Opp. at 16. Gohil then purports to conduct that claim-by-claim analysis himself. The better test, however, is to rely on the words of Gohil's counsel prior to the

filing of the SAC when attempting to persuade the federal government to intervene. On May 18, 2005, Gohil's counsel provided a copy of the entire Statement of Facts, with appended exhibits, of his CEPA state law action to the Federal government.[4]  In a subsequent 11-page letter, Gohil's counsel informed the federal government that:

> [T]hrough our employment lawsuit on behalf of relator Yoash Gohil, we have discovered information responsive to your subpoena that refers to Aventis' use of substantial grants to influence medical professional to purchase Aventis' products. This letter will briefly discuss some of the discovery that documents Aventis' improper and widespread use of "unrestricted" and "educational grants." … *We should point out that this information was learned through the discovery we obtained in the context of our employment lawsuit.*[5]

It is hard to imagine an admission that could be more clear concerning the source of information used to support the allegations contained within Count II of the SAC of improper payment of remuneration to healthcare providers to purchase and/or recommend goods and services.[6]  As a result, the Court should find that all of the allegations of Count II were the subject of public disclosures.

Counts III and IV of the SAC address Gohil's allegations related to the prescription of Taxotere® for unapproved FDA uses as a result of either kickbacks or off-label promotion.[7]  To the extent these Counts are based upon kickbacks, the above discussion as to the source of Gohil's information pertaining to an alleged use of grants to influence prescribing decisions applies.  To the extent these Counts are based upon a program to promote products for unapproved FDA uses (*i.e.,* off-label promotion), these types of allegations were publicly disclosed as early as September 15, 1997, with the publication of a *Wall Street Journal* article

---

[4]  *See* May 18, 2005 letter from Carl Poplar to AUSA Paul Shapiro, Department of Justice, Aventis Brief **Exhibit 9**.

[5]  *See* July 20, 2005 letter from Carl Poplar to AUSA Paul Shapiro, Department of Justice, Aventis Brief **Exhibit 10.** (emphasis added).

[6]  Gohil himself summarizes the essential elements of Count II as being the payment of illegal kickbacks resulting in inappropriate prescriptions.  *See* Opp. at 18.

[7]  This, again, comes from Gohil's own summarization of Counts III and IV.  *See* Opp. at 19-20.

discussing a lawsuit filed by four former employees five years before Gohil first filed his FCA claims. Gohil's argument that the article's mention of Taxotere® had nothing to do with allegations of purported off-label promotion draws too fine a line. The gravamen of the article, when read as a whole, was that Rhone Poulenc Rorer (a predecessor company to Aventis) was engaged in alleged improper off-label promotion of several of its products, including Taxotere®. Gohil again tries to piggyback upon that public report as to claims pre-dating his employment as a Taxotere® sales representative commencing in 2000.

Gohil has also not provided sufficient facts to show he is the original source with direct and independent knowledge for the nine-year period of time for which he seeks to obtain a percentage of damages as a *qui tam* relator. There are two time periods at issue: before he was employed by Aventis and after his employment with Aventis. Gohil argues that he can support a four year period of alleged fraud that occurred prior to his employment based solely on having been told by others (*i.e.,* hearsay) how people used to be trained and a single grant payment to the University of Pennsylvania for which he only was involved at the very end, and for which Gohil has not been able to present any information that said grant resulted in any improper prescribing of a product, or any improper claim for remuneration by a Federal health care program for any such product. This simply cannot be the type of "direct and independent knowledge" contemplated as consistent with the notion of an original source under the FCA; at best, it is derivative information obtained from others.

Gohil then contends that he has "direct and independent knowledge" of marketing practices utilized by Aventis from June 2002 to 2004, based upon an apparent assumption that marketing practices, once put into place, never change. *See* Opp. at 26-27. His only "real knowledge," however, is based solely on publicly available DDMAC letters and a single

promotional pamphlet that Gohil supposedly observed in the waiting room of a doctor's office. *See, e.g.* SAC at ¶¶ 56-88. This is not the sort of "insider knowledge" to be expected from a whistleblower; it is "outside" knowledge based upon public and government documents. Those paragraphs of the SAC that are based upon publicly disclosed information for which Gohil is not an original source should be dismissed.[8]

## IV. THE SAC FAILS TO MEET THE REQUIREMENTS OF RULE 9(B) AND SHOULD BE DISMISSED

In its Motion to Dismiss, Aventis stated that established Third Circuit law required an FCA plaintiff to specifically identify at least one single actual false claim, and further that Fed. R. Civ. P. 9(b) requires, at a minimum, that the "who, what, when, where, and how of the events of issue" be adequately alleged. Aventis Brief at 19-27. In response, Gohil argues that a more lenient Rule 9(b) standard should be adopted that would permit his SAC to proceed. Opp. at 31-40. The United States also argues that the Third Circuit should adopt a relaxed Rule 9(b) standard for FCA cases, but expressly refrains from arguing that the SAC would satisfy even that suggested relaxed standard. SOI at 2-4.

Following the submission of Aventis's brief in the instant case, the United States District Court for the District of New Jersey issued an instructive opinion in *United States ex rel. Piacentile v. Aventis,* 2010 U.S. Dist. LEXIS 137895 (D.N.J. Dec. 31, 2000) (copy attached as **Exhibit A**). The *Piacentile* court noted that the Third Circuit in *United States ex rel. Quinn v. Omnicare*, 382 F.3d 432, 440 (3d Cir. 2004), held that a plaintiff in an FCA action must identify "at least one specific claim" and even though the case "was decided on summary judgment, the point still stands: 'relators must identify with particularity the precise claims submitted to the government that are alleged to be false or fraudulent.' *United States ex rel. Schmidt v. Zimmer,*

---

[8] *See* Aventis Brief at 18 for a list of these affected paragraphs.

*Inc.,* 2005 WL 1806502, at *1 (E.D. Pa. July 29, 2005) (Schmidt II)." *Piacentile,* at *19-20. Because Piacentile, like Gohil, failed to do so, his complaint was dismissed. In so holding, the *Piacentile* court reiterated that *Quinn* was the seminal case within the Third Circuit on what must be pled to satisfy Rule 9(b) requirements, and that the standard applied whether the issue was being decided at the motion to dismiss or at the summary judgment stage.[9]

The *Piacentile* court also noted that even applying a more lenient pleading standard (as urged by the relator in that case) "a relator [still] must provide particular details —of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Piacentile,* at *21 (citing *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 190 (5th Cir. 2009)).

The court acknowledged that Piacentile did plead details concerning the defendants' alleged fraudulent *scheme,* but he failed to plead with particularity the details of the allegedly false *claims* submitted to the government and the basis that the prescriptions were, in fact, off-label.[10] Dismissing Piacentile's complaint, the court found that "Piacentile claims that Aventis and Sanofi promoted their drugs off-label and paid kickbacks to doctors in the form of free drug samples, overfilled prescriptions, educational grants, and speaker's fees. Yet his allegations of the claims that were submitted to the government are conclusory, as are his allegations that the doctors actually prescribed Aventis's and Sanofi's drugs off-label to patients covered by government health programs." *Piacentile,* at *22.

---

[9] Gohil's only argument with the *Piacentile* opinion is that Judge Hayden applied a standard that Gohil believes should be reserved for a later stage of the case, *i.e.,* motions for summary judgment. Where, as here, the relator has had nearly eight years since the filing of his initial FCA complaint, and has had the opportunity within that time to peruse or otherwise access the federal government's repository of healthcare claims files as a part of the joint investigation conducted by the relator and federal government while the case is sealed, one has to wonder how substantive proof of an actual false claim that has not materialized in that period of investigation will suddenly appear when one reaches the summary judgment stage of a case.

[10] A copy of the operative complaint from *United States ex rel. Piacentile v. Aventis* is attached as **Exhibit B** to this brief.

In other words, even if a relator does not have to present evidence of an actual claim by bringing forward the claim itself (a position that is contrary to the Third Circuit's expressed view), the relator still must allege details about the alleged *claim*: what the claim was, who submitted the claim, when it was submitted, where it was submitted, and so forth. Gohil, like Piacentile, details Aventis' alleged schemes, but he too fails to plead with particularity anything about the claims themselves. For example, like Piacentile, Gohil alleges that every claim for the pharmaceutical product at issue submitted to a Federal government reimbursement program was false. *Compare Piacentile*, at *22-23 *with* SAC, at ¶ 187. Gohil also uses conclusory allegations that the alleged "False Marketing Scheme" resulted in false claims. *See, e.g.*, SAC at ¶¶ 185-186 ("Defendant Aventis' [sic] Fraudulent Marketing Scheme caused healthcare providers to prescribe Taxotere® for both on and off-label treatments of cancer who would not have otherwise done so but for Defendant's Fraudulent Marketing Scheme. Consequently, Defendant Aventis' Fraudulent Marketing Scheme caused a substantial number of healthcare providers to submit claims for reimbursement to Government medical reimbursement systems for the use of Taxotere®, which would not have otherwise been paid had the Government reimbursement programs known of Aventis' Fraudulent Marketing Scheme."). Gohil, like Piacentile, simply assumes that the existence of the alleged Fraudulent Marketing Scheme somehow caused the submission of a claim for reimbursement for an off-label prescription to the Federal government but never details the causation. Rule 9(b) requires more than such an assumption, it requires pleading with particularity.

Furthermore, Gohil, like Piacentile (*Piacentile,* at 14), provides somewhat detailed allegations concerning providers and physicians who received speaker's fees and were otherwise subject to the alleged "False Marketing Scheme," but there are no such detailed allegations in the

SAC that the scheme resulted in a single off-label prescription or otherwise inappropriate prescription that in turn resulted in a claim for reimbursement. Gohil merely assumes that such prescriptions must have been written (and claims for reimbursement of such prescriptions must have been submitted to Medicare). While Gohil does present allegations that some providers' use of Taxotere® rose, he never specifically alleges that the usage rose because of any off-label prescriptions. *See, e.g.*, SAC at ¶ 131 (stating that Aventis's business at a hospital rose "over 45%" in the year following marketing activities but failing to allege that any of this increase was for Taxotere®, much less that a single prescription was for an off-label use, or that any of the prescriptions were submitted for reimbursement to the Federal government).

In addition to his vague, conclusory allegations that fail to tie Aventis's actions to a single off-label prescription, the alleged success of Aventis's alleged off-label marketing is undermined by Gohil's own SAC. Gohil quotes from Aventis's documents that show that Aventis's marketing did not work: he alleges that a 2002 business plan "drafted by the Eastern Regional Sale Manager for Aventis' [sic] Oncology Department" stated that "[t]he return on investment at [Group Practice C] has not been demonstrated" and that "the corporate support we provided to [Hospital B] as part of a five-year commitment has not had any value in development relationships and no impact on Taxotere usage." *See* SAC at ¶ 138D. Such conclusory allegations that are so paper thin as to be internally contradicted within the SAC itself are not plead with sufficient particularity to survive dismissal.

In the Third Circuit, to bring a viable FCA action the plaintiff must identify a specific false claim. This Gohil has admittedly failed to do. Even if this Court were to find that an actual claim is not required, Gohil still has not provided an adequate alternative means of injecting precision into his allegations of fraud (such as the "factual or statistical evidence" the United

States asserts is necessary, SOI, at 4).  *See also United States ex rel. Underwood v. Genentech,* 720 F. Supp. 2d 671, 676 (E.D. Pa. 2010) (relator still required to use some alternative means of injecting precision and some measure of substantiation into his allegations of fraud).  Gohil's various allegations, whether as to supposed off-label promotion or the provision of improper remuneration to healthcare providers, fail to raise the potential of actual false claims being submitted to the government for reimbursement beyond the realm of mere speculation.  The who, what, where, when and how of the alleged false *claims* are nowhere to be found in Gohil's SAC.

**V.      COUNTS III AND IV SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(6) TO THE EXTENT THEY ARE BASED ON ALLEGATIONS THAT HEALTH CARE PROVIDERS SUBMITTED FALSE CLAIMS FOR REIMBURSEMENT AS A RESULT OF PRESCRIBING TAXOTERE® FOR OFF-LABEL TREATMENTS**

Counts III and IV of Gohil's SAC are based on the erroneous assumption that claims submitted for off-label uses of Taxotere® could not also be claims for "medically accepted indications" and therefore, must be ineligible for reimbursement <u>and</u> false.[11]  In his Opposition, Gohil argues that although the off-label uses he alleges Aventis promoted are in the compendia, Aventis still violated the FCA because the claims were not eligible for reimbursement as some of their dosages may not have been listed in the compendia or because it engaged in marketing of that "off-label" use.  Opp. at 40-43.  Gohil's argument fails to recognize that prescriptions for indications that appear in the compendia are not, by statute or regulation, ineligible for reimbursement.  *See generally* Aventis Brief, at 27-32.  The SAC, moreover, contains only the most general of allegations that the dosages prescribed were not listed in the compendia.  Such bare, conclusory allegations are insufficient to survive under either Rule 9(b) or Rule 12(b)(6).

---

[11]  SAC at ¶¶ 16, 44-45, 52-53, 155, 177, 191.

The off-label uses that Gohil alleges Aventis "fraudulently" promoted were not factually false claims - they were properly reimbursable as they appeared in the compendia. Furthermore, questions concerning the accuracy or interpretation of scientific data do not equate to "falsity" for purposes of supporting an FCA claim. *See e.g., United States ex rel. Jones v. Brigham and Women's Hospital*, Civ. A. No. 07-11481-WGY, 2010 WL 4502079, *6-7 (D. Mass. Nov. 10, 2010) (a statement must be objectively false to support an FCA claim; expressions of opinion or statements as to which reasonable minds may differ are not "false" for purposes of the FCA). Gohil does not allege that the hospitals and/or physicians failed to provide the government with accurate information concerning the diagnoses and/or dosages of Taxotere® – there is no allegation that the claims submitted were factually false in any respect. No court has found that the mere submission of a truthful claim for a medically accepted, albeit off-label, use of a pharmaceutical product or medical device creates FCA liability of any kind for any entity.

## VI. COUNTS II, III AND IV SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(6) TO THE EXTENT THEY ARE BASED ON ALLEGATIONS THAT AVENTIS CAUSED HEALTH CARE PROVIDERS TO IMPROPERLY CERTIFY COMPLIANCE WITH FEDERAL LAW

FCA claims can either be "factually" false or "legally" false, with the legally false claims being the result of either an express certification or an implied certification. Aventis Brief at 32-37. Perhaps recognizing that the Third Circuit "has never adopted *either* version of false certification liability,"[12] both Gohil and the United States posit that the claims submitted under Gohil's alleged off-label theory are factually false. Opp. at 48-49; SOI at 5-6. But both then hedge their bets by arguing that at least the claims tainted by alleged anti-kickback violations[13]

---

[12] *United States ex rel. Wilkins v. United Health Group, Inc.,* No. 08-3425, 2010 WL 1931134, at *4 (citing *Rodriguez v. Our Lady of Lourdes Med. Ctr.,* 552 F.3d 297, 303-04 (3d Cir. 2009) and *Quinn,* 382 F.3d at 441).

[13] Gohil alleges that Aventis caused doctors to prescribe Taxotere® and/or Anzemet® for off-label uses by: (1) promoting off-label uses; and (2) providing alleged kickbacks. Of note, Gohil and, to a much less degree, the United States, conflate the two (Gohil most often does this under the guise of the supposed "Fraudulent Marketing

are false under an implied certification theory.  SOI at 9-13; Opp. at 44-46.  The off-label uses

that Gohil alleges Aventis "fraudulently" promoted, however, are not factually false claims; -

they were properly reimbursable as they appeared in the compendia.  Furthermore, as noted

above, questions concerning the accuracy or interpretation of scientific data do not equate to

"falsity" for purposes of supporting an FCA claim.  Gohil also does not allege that any hospitals

and/or physician failed to provide the government with complete and accurate information

concerning the diagnoses and/or dosages of Taxotere$^®$ they administered – there is no allegation

that any claim submitted for reimbursement was factually false in any respect.

The SAC also fails to state a claim under Rule 12(b)(6) for the claims pertaining to

supposed payments to providers in violation of the Anti-Kickback Statute ("AKS").  Both Gohil

and the United States argue that these claims can be false under an "implied certification theory."

Opp. at 44-46; SOI at 9-13.   Although the Third Circuit has not accepted the "implied

certification theory" of FCA liability, it has stated that any use of the implied false certification

theory would, if accepted, require "not only a receipt of federal funds and a failure to comply

with applicable regulations, but also that payment of the federal funds was in some way

conditioned on compliance with those regulations."[14]   Accordingly, the implied certification

theory of FCA liability simply does not extend to a third-party payer of alleged kickbacks (such

as a drug manufacturer) where the person who submitted the claims for payment or

reimbursement to the government was not involved in and/or had no knowledge of the AKS

---

Scheme") or use whichever theory fits best into a particular argument (for example, Gohil does not mention his off-label allegations in the implied certification portion of his Opposition).  This Court should not be fooled by this; they are separate theories that have different claims and for which there are separate bodies of FCA jurisprudence.

[14] *Rodriguez*, 552 F.3d at 304.

violation.[15]  In this case, the cost report certification is not a condition of payment on individual claims, but only, at most, a condition of continued participation in the Medicare program. Aventis Brief at 34-35.[16]  As such, it cannot be the basis for an implied certification theory cause of action.[17]

---

[15]  *See Rost*, 2010 WL 3554719 at * 10; *United States ex rel. Thomas v. Bailey*, No. 06-cv-00465, 2008 WL 4853630, *9 (E.D. Ark. Nov 6, 2008) ("The Court agrees that a hospital's act of submitting a claim for payment to the government impliedly certifies that the hospital has complied with the Anti-Kickback Statute . . . but, it is another matter to say that a hospital's act of submitting a claim for payment is an implied certification that a person who is not employed by the hospital ... complied with the Anti-Kickback Statute.")  *See also United States ex rel. Barmak v. Sutter Corp. and Orthologic Corp.*, No. 95-7637, 2002 WL 987109, *5-6 (S.D.N.Y. May 14, 2002) ("I have no reason to believe, nor have the parties provided me any, that Congress intended to subvert the DOJ's exclusive jurisdiction over the anti-kickback statute by grafting the FCA's qui tam provisions onto it.  I am further unwilling to presume ... that a violation of the anti-kickback statute is *ipso facto* a violation of the FCA.").

[16]  Neither the United States nor Gohil contested Aventis' position that the Provider Agreement is not false under the FCA.  Any dispute over the *materiality* of the Provider Agreement is moot since there is no dispute over its *falsity*.

[17]  The United States argues that the recent amendment to the AKS as part of the Patient Protection and Affordable Care Act ("PPACA") merely "clarifies" that "an underlying violation of the AKS renders a subsequent claim false."  *See* SOI at 11.  This is incorrect.  The amendment to which the government refers is not a mere clarification – it is a *prospective* legislative overruling of the above-cited well-reasoned decisions of various courts that had found that it was not enough for a *qui tam* relator to merely allege a violation of federal law or regulation (such as the AKS).  As stated above, these courts determined that the FCA required the relator to also demonstrate that the entity or individual who submitted the claim made a false certification, express or (in some jurisdictions) implied, that they complied with the AKS and that compliance was a condition of payment.  *See also United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88 (3d Cir. 2009) ("Falsely certifying compliance with the . . . Anti-Kickback Act[] in connection with a claim submitted to a federally funded insurance program is actionable under the FCA"); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) ("[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA."); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) ("claims for services rendered in violation of a statute do not necessarily constitute false or fraudulent claims under the FCA").

Recently, the District of Massachusetts refused to apply the PPACA amendment to the AKS retroactively and in the process made clear that prior to the amendments, alleged AKS violations did <u>not</u> necessarily render subsequent claims false:

> Neither the government nor the parties have cited any cases that have stretched an implied certification theory to reach back to impose FCA liability on a payer of kickbacks where the person who submitted the claim was innocent of wrongdoing *and* where (a) the claim itself was not factually false, (b) the claim was not legally false due to an express certification of compliance with the AKS or (c) compliance with the federal statute was not an expressly stated precondition of payment.  As other courts have stated, the implied certification theory should be applied with caution in only limited circumstances.

*United States ex rel. Rost v. Pfizer*, --F. Supp. 2d--, No. 03-11084, 2010 WL 3554179, *10 (D. Mass. Sept. 14, 2010).

## VII.  GOHIL HAS NOT AND CANNOT PLEAD A CONSPIRACY TO VIOLATE THE FCA

Gohil argues that Aventis's assertion that the SAC alleges a conspiracy between Aventis and its sales force and "outside consultants" is a "red herring" because that is not the "focus" of the SAC.  Opp. at n.53.  Regardless of whether it is the "focus" of the conspiracy allegations, it is there and Relator does not deny it is there.  The intra-conspiracy doctrine bars such a claim, a point also undisputed by Relator.  Accordingly, this Court should dismiss any such allegations contained in Count I of the SAC.

Gohil asserts that he adequately pled a conspiracy between Aventis and third parties as they were not "duped" by Aventis but "induced" to participate in a conspiracy.  Opp. at 50-51.  Regardless of the semantics used, there is no allegation within the SAC or any argument within Gohil's Opposition that there was a meeting of the minds to engage in any activity beyond the alleged acceptance of improper reimbursement in exchange for a prescribing decision.  *See* Opp. at 51.  Gohil's SAC does not include any allegations to support the existence of a conspiratorial agreement between Aventis and any healthcare provider to submit false claims.[18]  Nor did Gohil include any allegations that Aventis and the unnamed healthcare providers "intended to defraud the government" or that "the conspirators had the purpose of 'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim."[19]  The SAC, further, is absent any allegations that the alleged conspirators "agreed that the false record or statement would have a material effect on the government's decision to pay the false or

---

[18]  *See United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co.*, 2000 WL 1207162, *7, 11-12 (E.D. Pa. Aug. 24, 2000) (holding that an agreement between two or more persons is essential to a conspiracy under the FCA and dismissing plaintiff's complaint for failing to allege facts sufficient to support such a conspiratorial agreement to defraud).

[19]  *Allison Engine Co., Inc. v. United States ex. rel. Sanders*, 128 S. Ct. 2123, 2130 (2008).

fraudulent claim."[20]  Gohil has alleged none of these required elements and his conspiracy claim

(Count I) should be dismissed.[21]

## VII.   CONCLUSION

For the foregoing reasons, and the reasons stated in Defendants' Brief in Support of their

Motion to Dismiss, Defendants respectfully request this Court enter an Order dismissing Gohil's

Second Amended Complaint with prejudice.  Defendants also request an opportunity to present

oral argument in support of their motion.


Dated: February 2, 2011                    Respectfully submitted,


                                           _____*s/ Richard L. Scheff*_____
                                           Richard L. Scheff (PA I.D. # 35213)
                                           Michael Hayes (PA I.D. # 84985)
                                           MONTGOMERY, MCCRACKEN,
                                            WALKER & RHOADS, LLP
                                           123 South Broad Street
                                           Philadelphia, PA  19109

                                           Robert J. McCully
                                           SHOOK, HARDY & BACON, LLP
                                           2555 Grand Boulevard
                                           Kansas City, MO  64105
                                           (816) 559-2191

                                           *Counsel for Defendants sanofi-aventis U.S., Inc.,*
                                           *Aventis, Inc., and Aventis Pharmaceuticals Inc.*

---

[20] *Id.* at 2130-31.

[21]  Additionally, the United States makes a confusing argument that the FCA does not contain a "double falsehood" requirement.  SOI at 13-14.  This is only partially correct --the United States is correct that 31 U.S.C. § 3729(a)(1) only requires the showing of a false claim.  However, Counts II and IV of the SAC are brought pursuant to 31 U.S.C. § 3729(a)(2), which imposes liability on any person who knowingly uses a "false … statement to get a false or fraudulent claim paid or approved by the Government."[21]  For Gohil to proceed on either of his two (a)(2) claims, he needs both a false statement and a false claim.  *See generally United States ex rel. Franklin v. Parke-Davis*, No. 11651, 2003 WL 22048255, at *2 (D. Mass. Aug. 22, 2003) (Section 3729(a)(2) contains a "double-falsehood requirement ….")

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically and is available for viewing and downloading from the ECF system; it has been sent to the following persons via the Court's electronic filing system on this 2nd day of February 2011:

Susan Bricklin
Paul Shapiro
Assistant United States Attorneys
United States Attorney's Office
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Virginia.gibson@usdoj.gov
Susan.bricklin@usdoj.gov
Paul.shapiro@usdoj.gov

Stephen M. Orlofsky
Nicholas Harbist
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998
orlofsky@blankrome.com
harbist@blankrome.com

Carl D. Poplar
Carl D. Poplar, P.A.
1010 Kings Highway South, Building 2
Cherry Hill, NJ 08034
cpoplar@poplarlaw.com

 s/ Richard L. Scheff
Richard L. Scheff

# Exhibit A



LEXSEE 2010 U.S. DIST. LEXIS 137895

**UNITED STATES OF AMERICA, et al., EX REL. JOSEPH PIACENTILE, Plaintiff, v. SANOFI SYNTHELABO, INC. and AVENTIS PHARMACEUTICALS, INC., Defendants.**

**Civ. Action No. 05-2927 (KSH)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2010 U.S. Dist. LEXIS 137895*

**December 31, 2010, Decided**
**December 30, 2010, Filed**

**NOTICE:** NOT FOR PUBLICATION

**COUNSEL:** [*1] For **JOSEPH PIACENTILE,***Ex Rel., United States of America, California, Delaware, Florida, Hawaii, Illinois, Louisiana, Massachusetts, Nevada, New Hampshire, New Mexico, Tennessee, Texas, Virginia, District of Columbia,*Plaintiff:**DAVID S. STONE,***LEAD ATTORNEY,* BOIES, SCHILLER & FLEXNER, LLP., SHORT HILLS, NJ; **ROBERT A. MAGNANINI,***LEAD ATTORNEY,* Stone & Magnanini LLP, SHORT HILLS, NJ.

For **SANOFI SYNTHELABO, INC., AVENTIS PHARMACEUTICALS, INC.,**Defendants:**LIZA M. WALSH,***LEAD ATTORNEY,***AGNIESZKA ANTONIAN,** CONNELL FOLEY, LLP, ROSELAND, NJ.

**JUDGES:** Katharine S. Hayden, United States District Judge.

**OPINION BY:** Katharine S. Hayden

**OPINION**

**KATHARINE S. HAYDEN, U.S.D.J.**

**I. Introduction and Statement of Facts**

Joseph Piacentile ("Piacentile"), the plaintiff in this action, brings claims under the federal False Claims Act ("FCA"), as well as numerous state false claims acts. Underlying his claims are three related courses of conduct by the defendants, Aventis Pharmaceuticals, Inc. ("Aventis") and Sanofi Synthelabo, Inc. ("Sanofi"), to increase their profits and market share, allegedly through improper means. The defendants move to dismiss Piacentile's Second Amended Complaint [D.E. 35].

For the purposes of deciding the motion, all of the [*2] facts alleged in the complaint and all reasonable inferences that can be drawn therefrom are accepted as true. See *Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 161 (3d Cir. 2010).*

**A. Aventis' Off-Label Marketing**

Aventis is a pharmaceutical manufacturer based in New Jersey whose products include Taxotere, a cancer drug. (Second Am. Compl. ¶¶ 21-22, 54.) Before May 2004, Taxotere was only approved for treating advanced forms of breast and lung cancer. (*Id.* ¶ 54.) On May 19, the drug was approved for treating advanced prostate cancer, and on August 19, 2004, it was approved for treatment of operable, early stage breast cancer. (*Id.* ¶ 55.) Despite the fact that Taxotere's approved uses were limited, Aventis's sales force promoted to doctors so-called off-label uses of the drug--uses the FDA had

not approved. Former Aventis sales representatives told Piacentile that Aventis employed 30 managers whose sole purpose was to promote off-label uses of Aventis drugs. (*Id.* ¶¶ 64-65.) Once an Aventis drug is approved for a previously off-label use, the salespeople move on to promote another off-label use. (*Id.* ¶ 67.)

Aventis sponsored educational conferences to discuss off-label [*3] uses, and they invited high-prescribing physicians to these events. (*Id.* ¶¶ 61-62.) Though the conferences were purportedly educational, they were in actuality commercial promotional events which physicians are paid to speak at and attend, and which were used by Aventis salespeople to promote the off-label use of Taxotere and other Aventis drugs. (*Id.* ¶ 66.) In particular, one of the Aventis salespeople Piacentile spoke to said that Dr. Paul Kline of St. Vincent's Hospital in New York City was paid to give presentations on off-label uses of Taxotere; sales representatives then targeted attendants of these presentations to promote Taxotere's off-label uses. (*Id.* ¶ 82.) In addition, Aventis arranged for Drs. Clifford A. Huddis and Naiyer A. Rizvi of Memorial Sloan-Kettering Cancer Center to give presentations and assist Aventis's off-label marketing efforts. (*Id.* ¶ 83.) Aventis's Taxotere market share at Sloan-Kettering then doubled within one year. (*Id.*) According to the complaint, whenever a physician or medical institution submitted a claim to a government program for reimbursement for an off-label use that Aventis had promoted, a false claim was submitted in violation of the FCA. [*4] (*Id.* ¶ 78.)

**B. Aventis's Kickback Scheme**

Piacentile alleges that Aventis conducted a three-pronged kickback scheme, under which it provided physicians with money, property, and services to induce them to prescribe Aventis drugs, including Taxotere and Anzemet, which is used to control nausea induced by chemotherapy. (*Id.* ¶ 56.)

First, Piacentile alleges that Aventis paid doctors money to induce prescriptions. Aventis salespeople had budgets of up to $36,000, referred to as a "martini budget," to use induce doctors to prescribe Aventis drugs. (*Id.* ¶ 91.) Aventis also paid a handful of high-prescribing physicians more than $2,000 each year to speak at lavish dinners attended by other physicians and tailored sham research grants to physicians as rewards for prescribing the company's drugs. (*Id.* ¶¶ 92-93.) One physician who received a grant was Huddis; Piacentile claims that

Huddis helped to increase Sloan-Kettering's purchases of Taxotere from 170 vials per month to nearly 400 vials per month, mostly for off-label use. (*Id.* ¶ 94.) Drs. Mark Kris and Nadir Rizby of Sloan-Kettering, and Dr. Michael Kane of the Cancer Institute of New Jersey also received grants, and Dr. Kline received $3,500 [*5] to give her presentations. (*Id.* ¶¶ 95, 97.) In addition, Aventis maintains lists of doctors who use Aventis drugs off-label and pays them between $750 and $1,000 to attend conferences where such uses are discussed. (*Id.* 98-99.) According to the complaint, whenever a physician who had received money from Aventis submitted a claim to the government seeking reimbursement for an off-label use, a false claim was submitted in violation of the FCA. (*Id.* ¶ 104.)

Second, Piacentile alleges that Aventis provided millions of dollars of free drugs to physicians, including free samples and overfilled vials, to induce them to prescribe Aventis drugs. According to Piacentile's sources, 116 Aventis sales representatives each provided up to 1,200 free samples a year, totaling more than $50 million in market value over a five-year period. (*Id.* ¶ 108.) Aventis also provided doctors with vials of product that exceeded the necessary dosage, which doctors then used on other patients; this extra product totaled more than 100 vials per month. (*Id.* ¶ 109.) One salesman told Piacentile that he gave Dr. Richard Burke of Mount Sinai Hospital free samples for 15 to 20 patients and that Burke could collect $30,000 [*6] on each of these samples by billing Medicare and Medicaid for them. (*Id.* ¶ 110.) The salesman also provided free samples to oncologists at Salick Health Care, including Dr. Arthur Goldberg and Dr. William Grace. (*Id.* ¶ 111.) Aventis also gave discounts to health care formulary groups based on Aventis's market share of the groups' prescriptions. (*Id.* ¶ 112.) Dr. Burke brought $750,000 per year to Aventis in Anzemet sales from Mount Sinai, and both Drs. Goldberg and Grace increased their use of Anzemet. (*Id.* 113.) According to the complaint, each time one of these doctors sought reimbursement from the government for Anzemet, a false claim was submitted. (*Id.*)

Third, Piacentile alleges that Aventis provided free services to doctors, including practice management consulting services and lessons in how to mix Taxotere and Anzemet prescriptions to "get the most out of the vials" by capturing excess product. (*Id.* ¶¶ 117-19.) According to the complaint, each time a doctor received free services from Aventis and then sought

reimbursement for Aventis drugs from the government, a false claim was submitted. (*Id.* ¶ 122.)

## C. Sanofi's Kickback Scheme

Sanofi is also a manufacturer of pharmaceuticals[1]; [*7] relevant to this motion, it produces Plavix, which is used to reduce the risk of heart attack, stroke, or vascular death associated with arterial disease, and Avapro, which is used to treat hypertension. (*Id.* ¶¶ 57-58.) Piacentile interviewed a Sanofi marketing representative who told him that sales representatives selected approximately 165 high-prescribers of Sanofi drugs for inclusion on lists of speakers for drug symposia. (*Id.* ¶¶ 135-137.) The selected doctors were paid between $1,000 and $2,000 for each speaking engagement. (*Id.* ¶ 138.) The sales representatives were given $36,000 a year to give as rewards to high-prescribing physicians. (*Id.*) Sanofi also provided $100 educational grants to doctors to attend lectures and lavish dinners and to prescribe Sanofi drugs, and it sometimes gave direct payments to speakers, which it classified as honoraria. (*Id.* ¶ 139.) According to the salesperson, one-third of his list of physician contacts sold Sanofi products due to Sanofi's inducements. (*Id.* ¶ 140.) In particular, Sanofi paid Dr. Michael Schloss for prescribing Avapro and paid Dr. Allen Unger between $1,000 and $2,500 to invite his colleagues to lavish dinners at which Dr. Unger [*8] discussed Plavix. (*Id.* ¶¶ 141-42.) According to the complaint, each time a doctor who had been paid by Sanofi submitted a claim for reimbursement for an off-label prescription for Sanofi drugs, a false claim was submitted. (*Id.* ¶ 147.)

> 1  Indeed, Aventis's parent corporation, Aventis SA, and Sanofi's parent corporation, Sanofi Synthelabo SA, merged in 2004 to become Sanofi-Aventis Group S.A. (Second Am. Compl. ¶ 21.)

## II. Discussion

Piacentile filed the instant action as a *qui tam* relator under *31 U.S.C. § 3730(b)*, which provides that a private person may bring an action on behalf of the government to enforce the FCA. He alleges violations of *31 U.S.C. § 3729(a)(1)* (presentation of false claims), *§ 3729(a)(2)* (making or using a false record or statement to cause a claim to be paid), *§ 3729(a)(7)* (making or using a false record or statement to avoid an obligation to refund), *§ 3729(a)(3)* (conspiracy), and numerous state false claims acts. The defendants have moved to dismiss on three

grounds: (1) Piacentile's claims against Aventis regarding Anzemet and Taxotere are barred by the FCA's first-to-file rule; (2) the complaint fails to state a claim under *Fed. R. Civ. P. 12(b)(6)*; (3) the complaint [*9] fails to plead fraud with particularity under *Rule 9(b)*. Because the Court finds that the first-to-file rule bars Piacentile's claims regarding Anzemet and Taxotere, and that the complaint fails to plead fraud with particularity, it will not address the defendants' 12(b)(6) arguments.

## A. The FCA's First-to-File Bar

### 1. The First-to-File Bar Applies in This Case

The defendants argue that Piacentile's claims against Aventis regarding its promotion of Taxotere and Anzemet are barred by the FCA's "first-to-file" rule. They claim that a relator named Yoash Gohil filed an FCA claim against Aventis on May 17, 2002, in the Eastern District of Pennsylvania, alleging substantially the same facts that underlie Piacentile's claims against Aventis. (Opp'n Br. at 6; *United States ex rel. Gohil v. Aventis Pharms., Inc.*, Civil Action No. 02-CV-2964 (E.D. Pa.)). Because Piacentile did not file his initial complaint until June 7, 2005 [D.E. 1], the defendants claim he cannot bring his claims against Aventis at all.

*Section 3730(b)(5)* provides that "[w]hen a person brings a[] [*qui tam* action], no person other than the Government may intervene or bring a related action based on the facts underlying the pending [*10] action." This "first-to-file bar" is "exception free," *United States ex rel. Lujan v. Hughes Aircraft Co., 243 F.3d 1181, 1187 (9th Cir. 2001)*, and a court must "judge whether *§ 3730(b)(5)* barred [a] *qui tam* action by looking at the facts as they existed at the time that action was brought." *Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279* (10th Cir. 2004.) In *Lujan*, the Ninth Circuit held that an earlier-filed complaint that was eventually dismissed after a subsequent complaint was filed nevertheless barred the later complaint. *Id. at 1188*. The court determined that the earlier complaint constituted a "pending action" because it was pending when the subsequent relator brought her claim and provided the government notice of the basic facts of a fraudulent scheme. *Id.*

Piacentile argues that his complaint cannot be deemed barred at this stage because the Gohil matter may soon be dismissed. (Opp'n Br. at 10-11.) According to Piacentile, "a 'first-filed' complaint will not preempt a

later filed complaint if the initial complain fails on jurisdictional grounds or under *Rule 9(b)*." (Opp'n Br. at 11.) He cites to a handful of cases from other circuits that he claims support his argument. [*11] *See United States ex rel. Poteet v. Medtronic, Inc., 552 F.3d 503, 516 (6th Cir. 2009)* (*Poteet I*), *United States ex rel. Poteet v. Lenke, 604 F. Supp. 2d 313, 323 (D. Mass. 2009)* (*Poteet II*), *and Campbell v. Redding Med. Ctr., 421 F.3d 817, 825 (9th Cir. 2005)*. The better view, however, is the one expressed in *Lujan*: that even complaints that are later dismissed have preclusive effect.

In addition to the cases noted above, Piacentile cites to *United States ex rel. Ortega v. Columbia Healthcare, 240 F. Supp. 2d 8, 13 (D.D.C. 2003)* for the proposition that *Rule 9(b)*'s requirements limit the preclusive effect of a first-filed complaint. *Ortega*, in turn, cited *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc., 149 F.3d 227, 234 (3d Cir. 1998)*, which stated that *Rule 9(b)*'s requirement that "plaintiffs . . . plead fraud with particularity . . . provides sufficient deterrence against overly broad allegations." Notwithstanding the holding in *Ortega*, this Court is satisfied that the Third Circuit's concern in *LaCorte* was with would-be relators bringing unsupported claims merely to preempt others and stake a claim to a *qui tam* windfall. The court did not say that later [*12] claimants need not worry about earlier inadequate pleadings; it said that those who file inadequate pleadings will not be rewarded.

The ramifications of providing an exception to the first-to-file rule are highlighted by *Walburn v. Lockheed Martin Corp., 431 F.3d 966 (6th Cir. 2005)*, which is also cited by Piacentile. In *Walburn*, the Sixth Circuit held that a prior filing that is defective under *Rule 9(b)* has no preclusive effect under the first-to-file rule; it then went on to analyze a pleading then before the District Court of Maryland and find it insufficient under *Rule 9(b)*, and therefore non-preclusive. *Id. at 972*. In a footnote, the Sixth Circuit noted that while the *Walburn* appeal was pending, the Maryland case was dismissed for failure to plead fraud with particularity. *Id. at 972 n.5*. The court stated that it based its decision on the preclusive effect of the Maryland case not on the ultimate outcome, but on its own view of the sufficiency of the Maryland pleading, "because the ultimate fate of an earlier-filed action does not determine whether it bars a later action under *§ 3730(b)(5)*; rather, the question is only whether the earlier action was 'pending' at the time the later [*13]

action was filed." *Id.*

Setting aside the seemingly contradictory nature of the latter statement and the peculiarity of a court opining on the sufficiency of a pleading pending before another court, the Six Circuit's reasoning suggests that even if the Maryland case had been allowed to proceed, it would still have found the Maryland case to have no preclusive effect and would have allowed the *Walburn* action to proceed, as well. Such a result would undermine the first-to-file rule, which serves to prevent repetitive suits once a whistleblower "provides the government notice of the essential facts of an alleged fraud." *Lujan, 243 F.3d at 1187*. The *Walburn* court stated that because the purpose of the pleading requirements of *Rule 9(b)* is to provide the defendant notice of the fraud alleged, any *qui tam* claim that fails to meet the *Rule 9(b)* standard would not give the government adequate notice. *431 F.3d at 973*. However, the court failed to account for the FCA's unique procedure, under which a complaint is sealed--and not served on the defendant-- for at least 60 days while the government investigates the relator's claims and decides whether to intervene. *31 U.S.C. § 3730(b)(2)-(4)*; Donald [*14] H. Caldwell, Jr., Qui Tam *Actions: Best Practices For Relator's Counsel*, 38 J. Health L. 367 (2005); *cf. LaCorte, 149 F.3d at 234* (noting that in many cases, a prolonged government investigation may be necessary). After an extensive investigation of a relator's claim, the government is likely to have ample notice of the underlying facts, regardless of whether the complaint is later dismissed.

On its face, *§ 3730(b)(5)* is "exception free." *Lujan, 243 F.3d at 1187*. Because allowing an exception in the event of first-filed claims that may be later dismissed would run counter to the purpose of the first-filed bar, the Court declines to grant an exception in this case.

*2. Piacentile's Claims Against Aventis Regarding Anzemet and Taxotere Are Precluded by the First-to-File Bar*

Under *§ 3730(b)(5)*, a later-filed complaint is barred if it arises "from events that are already the subject of existing suits." *LaCorte, 149 F.3d at 232*. The later case "need not rest on precisely the same facts as a previous claim to run afoul of this statutory bar. Rather, if a later allegation states all the essential facts of a previously-filed claim, the two are related and *section 3730(b)(5)* bars the later claim, [*15] even if that claim incorporates somewhat different details." *Id. at 232-33*.

As the Third Circuit noted in *LaCorte*, "duplicative claims do not help reduce fraud or return funds to the federal fisc, since once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds." *Id. at 234*.

The complaint in the Gohil matter alleges the essential facts of the fraudulent scheme Piacentile alleges. Counts Three and Four of the Gohil complaint allege that Aventis distributed to physicians overfilled vials and free samples of Anzemet for which the physicians received reimbursement from the government. (Gohil Complaint, attached to Antonian Certif. as Ex. C, ¶¶ 56-64, 65-76.) Counts Five, Seven, Eight, and Eleven allege that Aventis paid doctors in the form of money and property, including sham research grants, to induce them to prescribe Anzemet and Taxotere. (*Id.* ¶¶ 77-89, 105-121, 122-134, 179-192.) Count Nine of the Gohil complaint alleges that Aventis sales representatives were instructed to encourage the use of Taxotere for non-approved uses. (*Id.* ¶¶ 135-160.) Count Twelve alleges that Aventis provided valuable services to doctors to assist [*16] them in obtaining reimbursement. (*Id.* ¶¶ 193-207.) All of this conduct is also alleged in Piacentile's complain. (Second Am. Compl. ¶¶ 60-83, 85-105, 106-116, 117-124.) Piacentile argues that his complaint provides details about the doctors and hospitals involved in the scheme, the "martini budget" Aventis's sales representatives were given, and the amount of the kickbacks the doctors were given. (Opp'n Br. at 13.) However, this information merely "incorporates somewhat different details" of the scheme and is insufficient to save Piacentile's claims. *See LaCorte, 149 F.3d at 232-33*. Piacentile also contends that his complaint adds state law claims and should not be barred; however, the underlying facts of the alleged scheme remain the same. Therefore, Piacentile's claims against Aventis regarding Anzemet and Taxotere are barred by the first-to-file rule.

## B. Piacentile's Complaint Fails to Plead Fraud with Particularity

Even if this Court were to decide that the first-to-file rule did not bar Piacentile's claims against Aventis, those claims, as well as the claims against Sanofi, would nevertheless be dismissed for failure to plead fraud with particularity.

*1. Sections 3729(a)(1)-(2)*

To [*17] state a claim under *§ 3729(a)(1)*, a plaintiff must plead three elements: "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 242 (3d Cir. 2004)* (*Schmidt I*) (quoting *Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 182 (3d Cir. 2001)*. "In order to prove a claim under *§ 3729(a)(2)*, a plaintiff must also show that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved." *Id.*

FCA claims must be plead with particularity under *Rule 9(b)*. *Id.* n.9 (citing *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc., 149 F.3d 227, 234 (3d Cir. 1998)*. More specifically, *Rule 9(b)* commands that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *Fed. R. Civ. P. 9(b)*. Pursuant to this heightened pleading standard, [*18] plaintiffs must "plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3d Cir. 1984)*. This requires a description of the "'who, what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Props. Secs. Litig., 311 F.3d 198, 217 (3d Cir. 2002)*.

While the Third Circuit has not squarely addressed how *Rule 9(b)* interacts with the elements of claims under *§§ 3729(a)(1)-(2)*--particularly the requirement that a defendant present or cause to be presented a claim for payment--other courts have. In granting a motion to dismiss, the 11th Circuit, in *United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1311 (11th Cir. 2002)*, held that a plaintiff must plead the existence of at least one specific claim that was submitted to the government. The court stated that

> *Rule 9(b)*'s directive that "the circumstances constituting fraud or mistake shall be stated with particularity" does not permit a False [*19] Claims Act

plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.

*Id.* Underlying this holding was the court's recognition that without some allegation of the presentment of a false claim to the government, even if a defendant's acts are improper, no damage has been done to the public fisc. *Id.* Relying on *Clausen*, the Third Circuit held in *United States ex rel. Quinn v. Omnicare, 382 F.3d 432, 440 (3d Cir. 2004)* that an FCA action requires the identification of at least one specific claim and that a relator's theory that false claims "must have been" submitted could not survive summary judgment. The *Quinn* court stated that an FCA relator must come to court with a "claim in hand." *Id.* While *Quinn* was decided on summary judgment, the point still stands: "relators must identify with particularity the precise claims submitted to the government that are alleged to be false or fraudulent." *United States ex rel. Schmidt v. Zimmer, Inc., 2005 U.S. Dist. LEXIS 15648, 2005 WL 1806502, at *1 (E.D. Pa. July 29, 2005)* (*Schmidt* [*20] *II*).

Piacentile points to *Schmidt I* as being very similar to the case at bar and suggests that *Schmidt I* militates toward allowing his action to proceed even without any allegations of a specific false claim. In *Schmidt I*, Zimmer, an orthopedic implant manufacturer, entered into contractual arrangements with hospitals to provide them incentives for ordering Zimmer products. *Id. at 237.* The complaint alleged that approximately 1,600 hospitals were part of Zimmer's scheme, but only named one of them. *Id.; Schmidt II, 2005 U.S. Dist. LEXIS 15648, 2005 WL 1806502, at *1.* Piacentile's reliance on *Schmidt I* is misplaced. The Third Circuit's decision in that case held that the relator's complaint against the one named hospital was sufficient under *Rule 9(b)*, but assumed without deciding that the relator's claims against Zimmer were insufficient under *Rule 9(b)*. *Schmidt I, 386 F.3d at 242 n.9.* On remand, the district court confirmed the Third Circuit's assumption, determining that the alleged fraud was not pleaded with particularity as to Zimmer's contracts with the unnamed hospitals because only an actually submitted claim could connect Zimmer's

allegedly illegal marketing campaign to FCA liability, and no claim was even [*21] suggested. *Schmidt II, 2005 U.S. Dist. LEXIS 15648, 2005 WL 1806502, at *3.* In contrast, it was clear that the named hospital had submitted at least one claim because, as the court noted, the hospital was required to submit annual cost reports to the government in order to reconcile its costs with the government funds it received. *Schmidt I, 386 F.3d at 237.*

Other courts have stated that "where the alleged false claims were submitted not by the defendant, but by a third party instead, . . . the relator need not allege the details of particular claims, so long as 'the complaint as a whole is sufficiently particular to pass muster under the FCA,'" *In re Pharm. Indus. Average Wholesale Price Litig., 538 F. Supp. 2d 367, 390 (D. Mass. 2008)* (quoting *United States ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 732 (1st Cir. 2007))*; *see also Underwood, 720 F. Supp. 2d at 679.* Even under this more lenient standard, a relator must provide particular details "of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted," *United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)*, and on this basis, Piacentile's complaint still fails.

Piacentile [*22] claims that Aventis and Sanofi promoted their drugs off-label and paid kickbacks to doctors in the form of free drug samples, overfilled prescriptions, educational grants, and speaker's fees. Yet his allegations of the claims that were submitted to the government are conclusory, as are his allegations that the doctors actually prescribed Aventis's and Sanofi's drugs off-label to patients covered by government health programs. For example, Piacentile claims that "Aventis's aggressive marketing of the off-label uses of Taxotere to treat prostate cancer and early stage breast cancer caused prescriptions for Taxotere to be written based upon that off-label marketing, and consequently caused false claims to be submitted to Medicaid and other government health programs." (Second Am. Compl. ¶ 72.) He also states that on each occasion where Aventis or Sanofi either promoted their drugs off-label or paid a kickback and a doctor prescribed those drugs, a false claim was submitted. (*Id.* ¶¶ 78, 100, 104, 115, 122, 130, 134, 147.) Piacentile identifies doctors whom he claims received speaker's fees, including Drs. Paula Kline, Clifford A. Huddis and Naiyer A. Rizvi, and then states that when those [*23] doctors and the doctors who attended their presentations sought reimbursement from the government

for Taxotere, false claims were submitted. (*Id.* ¶¶ 82, 83.) Yet the only allegation that any of these doctors actually prescribed Taxotere states that "Dr. Huddis played a central role in boosting Sloan Kettering's purchases of Taxotere from 170 vials a month to as many as 400 vials a month, mostly for off-label use." (*Id.* ¶ 94.) The complaint makes no mention of how Piacentile knows these vials were used off-label, but baldly states that they were. The complaint also baldly states that the overfilled prescriptions Aventis provided to physicians resulted "in the physicians' billing the government for an additional 100 or more vials per month." (*Id.* ¶ 109.) Tellingly, the complaint alleges that "[t]hese additional drugs, like the free drug samples, *could be* billed by the physicians or medical institutions to a government-funded insurer for full reimbursement . . . ," but does not allege that they actually were. (*Id.* (emphasis added).) Other allegations that certain doctors increased their use of Aventis and Sanofi drugs are similarly conclusory. (*Id.* ¶¶ 113, 140.)

In sum, the complaints [*24] allegations are inadequate to provide the who, what, when, where and how of the defendants' alleged fraud and do not place them on notice of the exact misconduct with which they are charged. Therefore, Piacentile's claims under *§§ 3729(a)(1)-(2)* are dismissed.

*2. Section 3729(a)(3) and (a)(7)*

To allege a conspiracy under *§ 3729(a)(3)*, a plaintiff must plead "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Acc. Ins. Co., 721 F. Supp. 1247, 1259 (S.D. Fla. 1989)*. "The essence of a conspiracy under the Act is an agreement between two or more persons to commit a fraud." *Id.*

Under *§ 3729(a)(7)*, a plaintiff must plead a "reverse false claim." The complaint must allege that "the defendant made or used (or caused someone else to make or use) a false record in order to avoid or decrease an obligation to the federal government." *386 F.3d at 242.* [*25] "The plaintiff must prove that the defendant did not pay back to the government money or property that it was obligated to return." *Quinn, 382 F.3d at 444*. This means that the defendant must have had an existing legal

obligation to give money or property to the government. *Kennard v. Comstock Resources, Inc., 363 F.3d 1039, 1048 (10th Cir. 2004)*. As with all claims under the FCA, conspiracies and reverse false claims must be pleaded with particularity. *Palladino ex rel. United States v. VNA of S.N.J., Inc., 68 F. Supp. 2d 455, 462 (D.N.J. 1999)*; *United States ex rel. Vallejo v. Investronica, Inc., 2 F. Supp. 2d 330, 336 (W.D.N.Y. 1998)*.

In this case, the complaint fails to plead the alleged conspiracy and the alleged reverse false claim with particularity. Significantly, Piacentile has failed to allege any meeting of the minds between the defendants and the doctors who prescribed their drugs. In his opposition brief, he does not refer the Court to any portion of the complaint that alleges an agreement with particularity; he merely cites to references to doctors who received speaker's fees and other purportedly improper benefits. (Opp'n Br. at 22.) Furthermore, he does not allege any [*26] existing obligation on the part of the defendants, and in his opposition brief, he states, without any analysis, that Third Circuit precedent supports his position. (Opp'n Br. at 23.) For the foregoing reasons, Piacentile's claims under *§§ 3729(a)(3)* and *(a)(7)* are dismissed.

*3. A Relaxed Pleading Standard Is Not Available to Piacentile*

Piacentile argues that he is entitled to a relaxed standard for pleading fraud because factual information regarding claims that have been submitted to the government is within the defendants' knowledge or control. "Where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control, the rigid requirements of *Rule 9(b)* may be relaxed." *United States ex rel. Monahan v. Robert Wood Johnson Univ. Hosp. at Hamilton, 2009 U.S. Dist. LEXIS 38898, 2009 WL 1288962, at *5 (D.N.J. May 7, 2009)*. In order to reap the benefit of a relaxed standard, a plaintiff must allege that the information lies exclusively in the defendants' control. *Shapiro v. UJB Fin. Corp., 964 F.2d 272, 285 (3d Cir. 1992)*. Moreover, a plaintiff "must accompany such an allegation with a statement of facts upon which their allegation is based." *Id.* In any event, if a third [*27] party or the government possesses information that plaintiffs allege is held by the defendants, relaxing the *Rule 9(b)* standard is inappropriate. *In re Tellium Inc., Sec. Litig., 2005 U.S. Dist. LEXIS 19467, 2005 WL 1677467, at *13 (D.N.J.*

*June 30, 2005)*. In *United States ex rel. Russell v. Epic Healthcare Mgmt. Grp., 193 F.3d 304, 308-09 (5th Cir. 1999)*, the Fifth Circuit declined to relax *Rule 9(b)* where information was possessed by third parties, including the Healthcare Financing Administration, which was the precursor to the current agency that processes federal government health care reimbursements. As in *Russell*, the federal government would possess information regarding claims filed by the doctors and institutions listed in Piacentile's complaint, as would the doctors themselves. Moreover, Piacentile has not alleged any facts in support of his claim that the defendants exclusively possess material information. Instead, he uses boilerplate language. (Second Am. Compl. ¶¶ 84, 124, 131, 151.) Piacentile is therefore not entitled to a relaxed pleading standard.

## III. Conclusion

With Piacentile's federal claims dismissed, the only remaining claims are those brought under the various state false claims acts. The [*28] Court declines to exercise jurisdiction as to those claims, and Piacentile's Second Amended Complaint is therefore dismissed. *28 U.S.C. § 1367*; *see also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)* ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

December 31, 2010

/s/ Katharine S. Hayden

Katharine S. Hayden, U.S.D.J.

# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>STATE OF CALIFORNIA,<br>STATE OF DELAWARE,<br>STATE OF FLORIDA,<br>STATE OF GEORGIA,<br>STATE OF HAWAII,<br>STATE OF ILLINOIS,<br>STATE OF INDIANA,<br>STATE OF LOUISIANA,<br>STATE OF MICHIGAN,<br>STATE OF NEVADA,<br>STATE OF NEW HAMPSHIRE,<br>STATE OF NEW JERSEY,<br>STATE OF NEW MEXICO,<br>STATE OF NEW YORK,<br>STATE OF OKLAHOMA,<br>STATE OF RHODE ISLAND,<br>STATE OF TENNESSEE,<br>STATE OF TEXAS,<br>STATE OF WISCONSIN,<br>COMMONWEALTH OF MASSACHUSETTS,<br>COMMONWEALTH OF VIRGINIA, and<br>DISTRICT OF COLUMBIA,<br><br>*EX REL.* JOSEPH PIACENTILE,<br>　　　　　　　Plaintiffs,<br><br>　　vs.<br><br>SANOFI SYNTHELABO, INC. and AVENTIS<br>PHARMACEUTICALS, INC.,<br><br>　　　　　　Defendants. | Civil Action No. 05-cv-2927 (KSH)(PS)<br><br><br><br>JURY TRIAL DEMANDED |

## SECOND AMENDED COMPLAINT

Relator Joseph Piacentile, M.D. ("Relator" or "Dr. Piacentile"), on behalf of the United

States of America and on behalf of the sovereign states of California, Delaware, Florida,

Georgia, Hawaii, Illinois, Indiana, Louisiana, Michigan, Nevada, New Hampshire, New Jersey,

New Mexico, New York, Oklahoma, Rhode Island, Tennessee, Texas, Wisconsin and the

Commonwealths of Massachusetts and Virginia and the District of Columbia (the "Certain

States"), pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729-

3733 (2004) (the "FCA"), and the false claims acts of the Certain States (the "state false claims

acts"), files this Second Amended Complaint against Defendants Sanofi Synthelabo, Inc.

("Sanofi") and Aventis Pharmaceuticals, Inc. ("Aventis") (collectively, "Defendants") and

alleges as follows:

**INTRODUCTION**

1.       This is an action to recover treble damages and civil penalties on behalf of the

United States of America and the Certain States, arising from false or fraudulent claims for

reimbursements submitted or caused to be submitted or by failing to provide the Best Price by

Sanofi and Aventis to federal government-funded programs including, without limitation,

Medicaid, Medicare, the Federal Employees Health Benefits Program ("FEHBP") and

TRICARE/CHAMPUS, for prescription drugs, in violation of the FCA and the state false claims

acts.  The FCA specifically prohibits the Defendants' conduct involving kickbacks and price

discounts, and causing the submission of non-reimbursable claims to Medicaid and other

government-funded health programs.

2.       The state false claims acts are modeled after the FCA and seek to prevent similar

harms to state treasuries.  *See* the California False Claims Act, Cal. Gov't Code §§ 12650-12655;

the Delaware False Claims Act, Del. Code. Ann. tit. 6, §§ 1201, *et seq.* (2004); the Florida False

Claims Act, Fla. Stat. Ann. §§ 68.081, *et seq.* (2004); the Georgia False Medicaid Claims Act,

Ga. Code. Ann. §§ 49-4-168.1 *et seq.*; the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-22,

*et seq.* (2004); the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. Ann.

§§ 175/1, *et seq.* (2004); the Indiana False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 *et seq.*; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:439.1, *et seq.* (2004); the Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5(A)-(O) (2004); the Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601 *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 , *et seq.* (2004); the New Hampshire Medicaid Fraud and False Claims Law, N.H. Rev. Stat. Ann. §§ 167:61, *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1, *et seq.* (2004); the New York False Claims Act, N.Y. Fin. Law §§ 187, *et seq.* (2007); the Oklahoma Medicaid False Claims Act, 63 Okla. St. Ann. §§ 5053 *et seq.*; The State False Claims Act (Rhode Island), R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181, *et seq.* (2004), and the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101, *et seq.* (2004); the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001, *et seq.* (2004); the Wisconsin False Claims for Medical Assistance Law, Wisc. Stat. § 20.931; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1, *et seq.* (2004); and the District of Columbia False Claims Act, D.C. Code §§ 2-308.03, *et seq.* (2004).

3.      Defendants have violated and continue to violate federal anti-kickback and related statutes, as well as corresponding provisions of the state false claims acts, by routinely paying kickbacks to physicians in order to induce those physicians to prescribe approved and non-approved uses of Sanofi and Aventis prescription drugs, including Taxotere (generic name docetaxel), Anzemet (generic name dolasetron), Plavix (generic name clopidogrel bisulfate) and Avapro (generic name ibersartan), and to induce physicians to recommend those same drugs to their fellow physicians.

4.      The illegal kickbacks paid by the Defendants come in many forms, including free

drug samples for which the physician or medical institution bills the government at full cost, cash

payments, sham "research grants," and other benefits to high-prescribing physicians who attend

lavish "meetings."  By paying illegal kickbacks to physicians which are not disclosed to the

government in violation of 42 U.S.C. § 1320a-7b(b) (the "Medicare Fraud & Abuse/Anti-

Kickback Statute"), the Defendants caused false or fraudulent claims to be filed by physicians

and medical institutions for reimbursement for Sanofi and Aventis drugs from federal

government-funded health programs.  The Defendants' conduct, as such, violated the FCA and

the state false claims acts.

5.      By paying illegal kickbacks and offering price discounts to physicians which are

not disclosed to the government in violation of 42 U.S.C. § 1396r-8 (the "Medicaid Rebate

Statute"), Sanofi and Aventis caused and/or induced physicians and medical institutions seeking

reimbursement for Sanofi and Aventis drugs from federal government-funded health programs to

file false or fraudulent certifications in violation of the FCA and the state false claims acts.

6.       Aventis further waged an illegal "off-label" marketing campaign to promote its

prescription drug Taxotere for uses unapproved by the United States Food and Drug

Administration ("FDA").[1]  Rather than awaiting FDA approval for the drug's alternate uses,

Aventis chose to promote off-label uses of Taxotere despite its awareness of the FDA's

prohibition on off-label marketing.  Aventis's off-label marketing scheme caused physicians and

medical institutions to submit and receive payment for false or fraudulent claims in violation of

the FCA, causing government-funded health programs, in turn, to pay reimbursements that

otherwise would not have been paid.  Moreover, Aventis's off-label marketing scheme corrupted

---

[1] The FDA reviews a pharmaceutical manufacturer's application for approval of a new drug to determine
whether the drug's intended use is safe and effective.  21 U.S.C. § 355.  "Off-label" use refers to
prescriptions of a drug for a *use* that has not been approved by the FDA.

4

the independent medical judgment of physicians and risked patients' health by improperly influencing physicians' decisions whether to prescribe Taxotere and whether to disclose its harmful side effects to patients.

7.      The Defendants' schemes illegally increased the market share for their products by inducing physicians to prescribe medications they would not otherwise have prescribed but for the receipt of the kickbacks and/or other illegal marketing efforts.  The Defendants' unlawful kickback schemes caused false, fraudulent and improper billings to be made to Medicare, Medicaid, and other government-funded health programs.  The federal government and the Certain States consequently paid enormous sums for reimbursement claims they would have rejected had they been aware of the Defendants' illegal actions.  Moreover, as a result of the Defendants' illegal promotions, the public overutilized Sanofi and Aventis drugs, prescription drug costs to the federal government and the certain states soared, and, in turn, the Defendants reaped illegal profits.

8.      Because of the Defendants' unlawful promotion schemes, patients receiving Sanofi and Aventis prescription drugs for unapproved and unproven uses received no assurance that their doctors were exercising their independent and fully-informed medical judgment.

9.      The Defendants have engaged in their wrongful conduct since they first introduced Taxotere, Anzemet, Plavix and Avapro to the market.  The Defendants' wrongful conduct has continued through to the present.

10.      The Defendants concealed their unlawful conduct by, among other actions, never disclosing that they were engaged in illegal off-label marketing and the payment of kickbacks to physicians.

11.     By this action, Relator seeks to recover on behalf of the United States of America and the Certain States damages and civil penalties arising from the false or fraudulent claims that the Defendants submitted or caused to be submitted to government health programs.

## I.  JURISDICTION AND VENUE

12.     Relator brings this action on behalf of himself and on behalf of the United States of America for violations of the FCA, 31 U.S.C. §§ 3729-3733 and on behalf of the Certain States for violations of the state false claims acts.  *See also* The Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301 *et seq.*; The Food and Drug Administration and Modernization Act of 1997, 21 U.S.C. §§ 351 *et seq.* and 21 U.S.C. §§ 360aaa *et seq.*; the Medicare/Medicaid Fraud & Abuse Anti-Kickback Statute, 42 U.S.C. §§ 1320a *et seq.*; and the Medicaid Rebate Statute, 42 U.S.C. § 1396r-8.

13.     This Court has jurisdiction over the subject matter of this action pursuant to § 28 U.S.C. § 1331, and 31 U.S.C. § 3732(a), which specifically confers this Court with jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  This Court also has subject matter jurisdiction over the counts relating to the state false claims acts pursuant to 31 U.S.C. § 3732(b), as well as supplemental jurisdiction over the counts relating to the state false claims acts pursuant to 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because acts prohibited by 31 U.S.C. § 3729 occurred in the State of New Jersey within this judicial district.  Section 3732(a) authorizes nationwide service of process.  *Id.*

15.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because at least one act proscribed by 31 U.S.C. § 3729 occurred in this District.

16.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed under seal and will remain under seal for a period of at least 60 days from its filing date, and shall not be served upon the Defendants until the Court so orders.

17.     Pursuant to 31 U.S.C. § 3730(b)(2), Relator must provide the government with a written disclosure of substantially all material evidence and material information in his possession contemporaneous with the filing of the Complaint.  Relator has previously complied with this provision by serving copies of his original Complaint upon the United States Attorney for the District of New Jersey, and upon the United States Attorney General.

18.     This suit is not based upon prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation, in a Government Accountability Office or Auditor General's report, hearing, audit, investigation, from the news media, or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. § 3730 (e)(4)(A).

19.     To the extent that there has been a public disclosure of the information upon which the allegations of this Complaint are based that is unknown to Relator, Relator is an original source of this information as defined in 31 U.S.C. § 3730(e)(4)(B).  Relator possesses direct and independent knowledge of the information, which he acquired in the course of conducting an undercover investigation of Sanofi and Aventis.  Relator voluntarily provided the government with this information prior to filing this action.  *See* 31 U.S.C. § 3730(e)(4).

## II.     PARTIES

20.     Relator, Joseph Piacentile, M.D., resides in the state of New Jersey and is a licensed, non-practicing physician.  Relator has direct and independent personal knowledge of the Defendants' practices as a result of an extensive independent investigation he personally conducted into Sanofi and Aventis's wrongdoing during which he secured admissions from key

marketing executives of Sanofi and Aventis regarding the allegations set forth herein.  Relator

brings this action for violations of the FCA on behalf of himself and the United States of

America, and on behalf of the Certain States for violations of the state false claims acts.

21.     Defendant Aventis Pharmaceuticals, Inc. is a corporation incorporated in

Delaware, headquartered at 300 Somerset Corporate Blvd., Bridgewater, New Jersey 08807-

2854, and is a U.S. affiliate of the Sanofi-Aventis Group SA.  On October 13, 2004, Sanofi

Synthelabo SA, headquartered in Paris, France, along with its U.S. affiliate Sanofi Synthelabo,

Inc. ("Sanofi"), incorporated in Delaware and headquartered in New York, New York, merged

operations with Aventis SA, headquartered in Strasbourg, France, as part of the newly-formed

Sanofi-Aventis Group SA.  Until that merger, the Bridgewater offices served as the U.S.

headquarters of Aventis SA.  Following the merger, the Sanofi-Aventis Group SA became the

third largest drug company in the world.

22.     Aventis is engaged in the business of manufacturing, marketing and selling

prescription drugs throughout the United States of America.  Among its many products, Aventis

manufactures and markets the oncology drug Taxotere, the antiemetic drug Anzemet and various

leading vaccines.  In 2003, Aventis generated revenues of approximately $7.21 billion in the

U.S., due in part to the robust sales of Taxotere and Anzemet.

23.     Sanofi Synthelabo, Inc. is incorporated in Delaware and headquartered at 90 Park

Avenue, New York, N.Y. 10016.  On October 13, 2004, Sanofi Synthelabo merged with Aventis

SA to become the Sanofi Aventis Group, S.A., headquartered in Paris, France.

24.     Sanofi is engaged in the business of manufacturing, marketing and selling

prescription drugs throughout the United States of America.  Sanofi, the seventh largest drug

manufacturer in the U.S., produces the anti-clotting medication Plavix, the cardiovascular drug

Avapro and the rectal cancer drug Eloxatin, among other leading drugs.  In 2002, Sanofi sold

more than $4.5 billion in drugs in the U.S., in part because Plavix sales increased 40 percent.[2]

25.     The federal and state governments, through their Medicaid and Medicare

programs, are among the principal purchasers of Sanofi and Aventis products.

### III.     BACKGROUND

**A. The False Claims Act**

26.     Originally enacted in 1863, the Federal False Claims Act (the "FCA"), 31 U.S.C.

§§ 3729, *et seq.*, was substantially amended in 1986 by the False Claims Amendments Act.  The

1986 amendments enhanced the Government's ability to recover losses sustained as a result of

fraud against the United States.  Further clarifying amendments were adopted in May 2009.

27.     The FCA imposes liability upon any person who "knowingly presents, or causes

to be presented [to the Government] a false or fraudulent claim for payment or approval"; or

"knowingly makes, uses or causes to be made or used, a false record or statement material to a

false or fraudulent claim"; or "knowingly makes, uses, or causes to be made or used, a false

record or statement material to an obligation to pay or transmit money or property to the

Government, or knowingly conceals or knowingly and improperly avoids or decreases an

obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(A),

(B), (G).  Any person found to have violated these provisions is liable for a civil penalty of up to

$11,000 for each such false or fraudulent claim, plus three times the amount of the damages

sustained by the Government.

_____

[2] Bristol-Meyers Squibb Company ("BMS") is a pharmaceutical manufacturer, organized and
existing under the laws of the state of Delaware.  According to BMS's 2004 10-K, Sanofi drugs
Plavix and Avapro were jointly developed and marketed pursuant to a joint venture between
BMS and Sanofi.

28.     The Act empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery.  The complaint must be filed under seal without service on any defendant. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to join the action.  31 U.S.C. § 3730(b).

29.     Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information," and further clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).

30.     The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property . . . that . . . is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

31.     Payment of kickbacks or undisclosed price discounts to physicians to induce them to prescribe a reimbursable drug, and promotion of off-label uses of such drugs, by a person who seeks reimbursement from a federal government health program for the drug, or who causes another to do so, while certifying or impliedly certifying compliance with the Medicare Fraud & Abuse/Anti-Kickback Statute, the Medicaid Rebate Statute and the Food, Drug and Cosmetics Act, or while causing another to do so, constitutes a violation of the FCA.

B.      **Federal Government Health Programs**

32.     Medicare is a federal government health program primarily benefiting the

elderly that Congress created in 1965 when it adopted Title XVIII of the Social Security

Act.  Medicare is administered by the Centers for Medicare and Medicaid Services

("CMS").  Medicare will not pay for over-the-counter drugs or most self-administered

prescription drugs until the Medicare Prescription Drug Improvement and Modernization

Act of 2003 is fully implemented.  Under certain conditions, however, Medicare Part B

covers drugs used in association with chemotherapy treatments such as Taxotere and

Anzemet, and with hypertension treatments, such as Plavix and Avapro.

33.     Congress created Medicaid at the same time it created Medicare in 1965 when

Title XIX was added to the Social Security Act.  Medicaid is a public assistance program that

provides payment of medical expenses to low-income patients.  Funding for Medicaid is shared

between the federal government and those state governments choosing to participate in the

program.  The federal government also separately matches certain state expenses incurred

administering the Medicaid program.  While specific Medicaid coverage guidelines vary from

state to state, Medicaid's coverage is generally modeled after Medicare's coverage, except that

Medicaid usually provides more expansive coverage than Medicare.

34.     Medicaid coverage for prescription drugs is significantly more expansive than that

provided by Medicare.  Nearly every state has opted to include basic prescription drug coverage

in its Medicaid plan.

35.     TRICARE is the health care system of the United States military, designed to

maintain the health of active duty service personnel, provide health care during military

operations, and offer health care to non-active duty beneficiaries, including dependents of active

duty personnel and military retirees and their dependents.   The program operates through

various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers. TRICARE is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations and fee-for-service benefits. Five managed care support contractors create networks of civilian health care providers. Military prescription drug benefits are provided through three programs: military treatment facility outpatient pharmacies, TRICARE contractor retail pharmacies, and a national contractor's mail-order service.

36.    The FEHBP provides health insurance coverage for nearly 8.7 million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plan. FEHBP plans are managed by the Office of Personnel Management.

C.    **FDA Regulation of Pharmaceuticals**

37.    Pursuant to the Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301, *et seq.*, the FDA strictly regulates, among other things, the content of direct-to-physician product promotion and drug labeling information used by pharmaceutical companies in promoting and selling FDA-approved prescription drugs.

38.    The FDA regulates drugs based on the "intended uses" for such products. A manufacturer who wishes to market any new drug must demonstrate to the FDA that the product is safe and effective for each intended use. 21 U.S.C. §§ 331(d), 355(a) and 360b(a).

39.    The FDA reviews a pharmaceutical manufacturer's application for approval of a new drug to determine whether the drug's intended use is safe and effective. *See* 21 U.S.C. § 355. "Off-label" refers to the marketing of an FDA-approved drug for uses that have not undergone FDA scrutiny and approval.

40.     Once a drug is approved for a particular use, the FDA allows doctors to prescribe the drug for medical uses that are different from those approved by the FDA.  The FDA also allows doctors to request information from drug manufacturers about off-label uses of FDA-approved drugs.  However, with very few exceptions, the FDA prohibits drug manufacturers from marketing or promoting a drug for a use that the FDA has not approved.

41.     Any failure to fairly and accurately represent the approved uses, safety and other required information about a prescription drug is considered misbranding and is, as a matter of law, a false and fraudulent statement.  *See* 21 U.S.C. §§ 331(a)-(b), 352(a),(f),(n).

42.     Any presentations, promotions, or marketing to physicians for products for use other than that approved for labeling purposes by the FDA is considered off-label marketing and is prohibited by the FDA.  *See* 21 U.S.C. §§ 331(a)-(b), 352(a),(f).

**D.      The Medicare Fraud & Abuse/Anti-Kickback Statute**

43.     The Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), which also covers Medicaid, provides penalties for individuals or entities that knowingly and willfully offer, pay, solicit or receive remuneration to induce the referral of business reimbursable under a federal health benefits program.  The offense is a felony punishable by fines of up to $25,000 and imprisonment for up to 5 years.

44.     In accordance with the Anti-Kickback Statute, Medicare regulations directly prohibit any provider from receiving remuneration paid with the intent to induce referrals or business orders, including the prescription of pharmaceuticals, or that takes into account the volume or value of any referrals or business generated.  *See* 42 C.F.R. § 1001.952(f).  Such remuneration amounts to a kickback when it is paid to induce or reward the drug prescriptions written by physicians.  Kickbacks are harmful to the public because they increase the expenditures paid by government-funded health benefit programs by inducing medically

unnecessary overutilization of prescription drugs and excessive reimbursements.  Such kickbacks also reduce a patient's healthcare choices as unscrupulous or unknowing physicians steer their patients to various drug products based on the physician's own financial interests rather than the patient's medical needs.

45.     The Medicare Anti-Kickback Statute contains eight statutory exceptions from its statutory prohibitions, and certain regulatory "safe harbors" have been promulgated to exclude certain types of conduct from the reach of the statute.  *See* 42 U.S.C. § 1320a-7(b)(3).  None of the statutory exceptions or regulatory safe harbors protects the Defendants' conduct in this case.

46.     The Medicare and Medicaid Patient and Program Protection Act of 1987 authorizes the exclusion of an individual or entity from participation in the Medicare and Medicaid programs if it is determined that the party violated the Medicare Anti-kickback Statute. In addition, the Balanced Budget Act of 1997 amended the Act to include an administrative civil money penalty provision for violating the Medicare Anti-Kickback Statute.  The administrative sanction is $50,000 for each act and an assessment of not more than three times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of such remuneration was offered, paid, solicited, or received for a lawful purpose.  *See* 42 U.S.C. § 1320a-7a(a)(7).

**E.     The Medicaid Rebate Statute**

47.     The Medicaid Rebate Statute, 42 U.S.C. § 1396r-8, is designed to return money to the Medicaid program in the form of rebates from drug manufacturers.  Federal law provides that drug manufacturers must pay rebates to the states to ensure that the Medicaid program is paying the lowest price at which the manufacturer sells a covered outpatient drug to any purchaser in the United States, inclusive of cash discounts, free goods, kickbacks, volume discounts, and rebates.

The "best price" provision is intended to ensure that the government is being provided the lowest price on drugs.

48.     To have their drugs eligible for Medicaid payment, all drug manufacturers must provide "best price" information to CMS.  CMS uses this "best price" information to calculate rebates payable to the Medicaid program.

49.     Drug manufacturers provide both "best price" information and Average Manufacturer Price information to CMS.  CMS then calculates a unit rebate amount, and provides that information to state Medicaid agencies.  The states then consider utilization data provided by pharmacies, and the unit rebate amount, to calculate the rebate owed to them by the manufacturer.  The entire system, however, is based upon manufacturers honestly conveying to CMS correct "best price" information and Average Manufacturer Price ("AMP") information. Any overstatement of the best price, intentional or unintentional, will cause an underpayment in rebate amounts.

50.     The Medicaid Rebate Statute states, in part, that the term "best price" shall be inclusive of cash discounts, free goods that are contingent on any purchase requirement, volume discounts, and rebates (other than rebates under this section).  *See* 42 U.S.C. § 1396r-8(c)(1)(c)(ii).

51.     The federal government has great financial interest in the program. The Medicaid Rebate Statute provides that amounts received by the states under the "best prices" program "shall be considered to be a reduction in the amount expended under the State plan in the quarter for medical assistance for purposes of" calculating the federal contribution to state Medicaid programs.  *See* 42 U.S.C. § 1396r-8(b)(1)(B).

52.     As a result of pervasive "best price" fraud, the Office of Inspector General promulgated compliance materials on May 5, 2003 which observed that manufacturers have "a strong financial incentive to hide *de facto* pricing concessions" (in particular, kickbacks and price discounts) that could affect "best price" calculations and trigger increased Medicaid rebates. *See* OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 FEDERAL REGISTER 23731, 23735 (May 5, 2003).  Moreover, the Office of Inspector General instructed manufacturers to report "best prices" which "accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to some or all purchasers." *Id.* at 23733-23734.  In sum, according to the Office of Inspector General, "pharmaceutical manufacturers are responsible for ensuring the integrity of data they generate that is used for government reimbursement purposes." *Id.*

53.     The Medicaid program reimburses doctors only for "covered outpatient drugs" for which a rebate is paid by the drug's manufacturer.  42 U.S.C. § 1396b(i)(10).  Each state Medicaid program has the power to exclude any drug from coverage if the prescription is not issued for a "medically accepted indication."  42 U.S.C. § 1396r-8(d)(1)(B).  A "medically accepted indication" includes only those indications approved by the FDA, and those "off-label" uses that are "supported by one or more citations included or approved for inclusion in any of the compendia" listed in the statute.  42 U.S.C. § 1396r-8(k)(6).[3]

---

[3] Similarly, Medicare will cover the off-label use for a prescription drug only if that off-label use is properly supported by a major medical compendium and is approved for such use by the Centers for Medicare and Medicaid Services.  *See* Section 1861(t)(1) of the Social Security Act, 42 U.S.C. § 1395x.

## IV.  SUBSTANTIVE ALLEGATIONS

### A. Aventis Prescription Drugs Taxotere and Anzemet; Sanofi Drugs Plavix and Avapro

54.     Docetaxel, an antineoplastic cancer drug manufactured and marketed by Aventis under the brand name "Taxotere," is principally used to treat metastatic or advanced breast cancer.  Prior to May 2004, the FDA had approved Taxotere only for the treatment of locally advanced or metastatic breast cancer after failure of prior chemotherapy, and for locally-advanced or metastatic non-small cell lung cancer, under certain conditions.  Until May 2004, Aventis was prohibited from marketing and promoting Taxotere for treatment of prostate cancer. Until August 2004, Aventis was prohibited from marketing and promoting Taxotere for treatment of forms of breast cancer other than locally advanced or metastatic breast cancer.

55.     On May 19, 2004, the FDA approved the use of Taxotere, in conjunction with prednisone (a steroid), for the treatment of advanced stage or metastatic prostate cancer, adding to the drug's previously approved uses for treatment of advanced states of breast cancer and lung cancer.  On August 19, 2004, the FDA approved the use of Taxotere, in combination with doxorubicin and cyclophosphamide, for adjuvant (post-surgery) treatment of patients with operable, node-positive, early stage breast cancer.  Since that time, the FDA has not approved the drug for any new, alternative uses.

56.     Dolasetron, an antiemetic cancer drug manufactured and marketed by Aventis under the brand name "Anzemet," is used to control nausea and vomiting caused by chemotherapy treatment.  The FDA has approved Anzemet for treatment of nausea and vomiting associated with emetogenic cancer chemotherapy and for the treatment of post-operative nausea and/or vomiting.

57.    Clopidogrel bisulfate, an antiplatelet drug manufactured and marketed under the brand name "Plavix," is used to reduce the risk of heart attack, stroke, or vascular death associated with arterial disease.  Plavix is manufactured and marketed in the U.S. by Sanofi.  The FDA has approved Plavix for use in patients with a history of recent heart attack, recent stroke, or established peripheral arterial disease (poor circulation in the legs which may cause pain), as well as in patients with acute coronary syndrome.

58.    Ibersartan, an antihypertensive agent used to treat hypertension, is marketed under the brand name "Avapro."  Avapro is manufactured and marketed in the U.S. by Sanofi.  The FDA has approved Avapro for treatment of certain forms of nephropathy in patients with type 2 diabetes and hypertension.

59.    By paying kickbacks to physicians to induce them to prescribe Taxotere, Anzemet, Plavix and Avapro, and by promoting off-label uses of Taxotere, Sanofi and Aventis violated a series of applicable statutes and regulations, including, without limitation, the Medicare Anti-Kickback Statute, the Medicaid Rebate Statute, the FDCA and the FCA.  In violating these statutes, Aventis and Sanofi encouraged doctors to overutilize potentially inappropriate, risky or unnecessary prescription drugs, induced excessive payments from federal government health programs, and thereby reaped improper profit through their illegal inducements.  Further, Aventis corrupted the independent medical judgment of physicians and risked patients' health by improperly influencing physician's decisions whether to prescribe Taxotere and whether to disclose its harmful side effects to patients.

**B.    Aventis's Unlawful Off-Label Marketing Scheme**

60.    During relevant periods, Aventis's efforts to market Taxotere off-label were intended to increase Aventis's sales of the drug, and violated the FDCA and other FDA regulations that prohibit off-label marketing.

18

61.     While aware of the illegality of marketing prescription drugs for non-FDA-approved uses, Aventis knowingly marketed Taxotere for such off-label, unapproved purposes as prostate cancer (before it was approved in May 2004), and early stage breast cancer (before a limited use was approved in August 2004), from as early as 1996.  Specifically, prior to the FDA's approval of Taxotere for treatment of prostate cancer and operable node-positive, early stage breast cancer, Aventis sponsored purportedly educational conferences discussing these off-label uses, for which physicians would receive Continuing Medical Education ("CME") credit.

62.     Aventis's sponsorship of CME and other conferences regarding prostate cancer and early-stage breast cancer constituted improper off-label marketing because, irrespective of whether physicians had prescribed Taxotere off-label for treatment of these conditions, the activities of Aventis sales professionals regarding the conferences were in substantial part promotional rather than educational in nature.  For example, prior to the arrangement of one of these conferences, a marketing representative asked Aventis's sales force for a list of "heavy hitters," *i.e.*, high-prescribing physicians, to invite to the event.

63.     In the course of his investigation, Relator learned that Aventis marketed Taxotere for prostate cancer well before the FDA approved such a use.  Likewise, Aventis marketed Taxotere for early-stage breast cancer long before that use was approved by the FDA.  Further, on information and belief, Aventis marketed Taxotere for other non-FDA-approved uses during relevant periods, and has continued such conduct through to the present.  Furthermore, upon information and belief, Aventis has engaged in the illegal marketing and promotion of Taxotere on a nationwide basis, resulting in a substantial quantity of off-label prescriptions for Taxotere.

64.     Relator learned of specific examples of Aventis's illegal off-label marketing campaign through his investigation, and in particular through conversations with former Aventis

employees Mark Campbell and Rohan Ramharack.  Mr. Campbell and Mr. Ramharack were responsible for marketing the Company's products to physicians in the New York and New Jersey area under the direction of Aventis management.  Relator's conversations with these individuals took place between November 7, 2003 and May 23, 2004.

65.     Through these conversations, Relator learned that Aventis had regularly engaged in the illegal practice of off-label marketing.  To carry out this unlawful practice, Aventis employed and continues to employ approximately 30 regional "Professional Oncology Education Managers" ("POEMs"), who exist solely to promote the prescription of Aventis drugs for off-label uses through conferences, conventions, and other promotional efforts.  POEMs usually consist of former physicians or nurses who lend their credibility and expertise to the promotion of Aventis drugs.  Each POEM assembles lists of physicians who are likely to prescribe Taxotere for off-label uses, and pays those physicians to attend speaker events, such as Taxotere Advisory Board symposia, for which they are also typically eligible to receive CME credit.

66.     Although the advertised purpose of these events is strictly educational and non-promotional, the role of POEMs at these events is blatantly commercial in nature.  In addition to paying physicians both to speak at and to attend these promotional events, Aventis also illegally assists the speakers in presenting materials on off-label uses for Taxotere.  Mr. Campbell explained that Aventis assigns one POEM to each of the Company's regional sales districts, and that all of them are involved in similar work with respect to off-label marketing.  Relator thus learned that Aventis engages in a nationwide illegal off-label marketing campaign.

67.     Aventis enlisted POEMs to wage aggressive campaigns to market their products for targeted non-FDA approved purposes, one of which Mr. Campbell identified on May 25, 2004 as early stage breast cancer, a use for which Taxotere was not FDA-approved until August

2004**.**  Once the FDA approves an Aventis drug for a previously off-label purpose, the POEMs'

work on that particular product is concluded, and they then move on to a new project or

"program."

68.      Relator learned from Mr. Campbell that members of Aventis's sales force were

engaged in, and continue to be engaged in, efforts to persuade doctors to use Taxotere "in more

tumor types" other than its limited FDA-approved uses.

69.      Aventis engaged in a marketing campaign to promote off-label prescriptions for

its drugs, in violation of the FDCA, FDA regulations, the FCA and the state false claims acts.  In

doing so, Aventis caused physicians and other healthcare providers to submit claims for

reimbursement to government-funded health insurers for drugs that the government would not

have paid had it known the truth about the Aventis's illegal off-label marketing efforts.

70.      Upon information and belief, Aventis actively concealed its off-label marketing to

preserve the flow of federal and state funds to reimburse prescription claims for its drugs that

were improperly submitted due to the off-label marketing of Aventis drugs.

**(1) Non-Reimbursable Claims**

71.      Federal Medicaid regulations prohibit the payment of Medicaid claims for

prescriptions for many off-label uses of pharmaceutical drug products.  *See also* 42 U.S.C.

§ 1395(a)(1), (g)(1).

72.      Aventis's aggressive marketing of the off-label uses of Taxotere to treat prostate

cancer and early stage breast cancer caused prescriptions for Taxotere to be written based upon

that off-label marketing, and consequently caused false claims to be submitted to Medicaid and

other government health programs.

73.      Prescriptions written for Taxotere and paid for by Medicaid and other government

health programs due to Aventis's aggressive off-label marketing of Taxotere constitute false

claims.  Had the government known of Aventis's illegal off-label marketing campaign, it would

not have reimbursed prescriptions written for the illegally promoted drugs.

74.     Both the Medicare and Medicaid programs include detailed statutory and

regulatory provisions concerning reimbursement for prescription drugs, drug utilization review,

eligibility of various drugs for full federal and state participation, price controls on prescription

drugs, and drug manufacturer rebate agreements.

75.     The government would not have reimbursed physicians and medical institutions

for off-label use of Aventis drugs if it had known the truth about Aventis's illegal marketing

scheme, as Aventis knew or should have known.

76.     In determining whether to reimburse physicians and medical institutions for

prescription drugs, government-funded health programs rely upon physicians and medical

institutions to provide them with information regarding the uses for which the drugs were

prescribed.

77.     Because Aventis knew that physicians and medical institutions would seek

reimbursement from the government for off-label prescriptions of Aventis drugs, and would do

so without disclosing Aventis's illegal promotion of those off-label uses, Aventis caused

physicians and medical institutions to submit false or fraudulent claims for reimbursement to the

government.

78.     On every occasion in which a physician or medical institution requested

reimbursement from government-funded health programs for an Aventis drug that was

prescribed for an unauthorized, off-label use that Aventis had illegally promoted or marketed,

Aventis caused a false or fraudulent claim to be submitted.

79.     On every occasion in which a physician or medical institution submitted a false

claim by billing for medicine prescribed for an unauthorized, off-label use that Aventis illegally

promoted or marketed, Aventis knew or acted in reckless disregard of the fact that a false claim

would be submitted, and is itself liable for the false claim.

80.     In addition, because Aventis knew or had reason to know that several of its drugs

were being prescribed for non-approved uses (pursuant to its illegal marketing), it was obligated

by law to provide adequate labeling for its drugs to cover such unapproved uses.  Upon

information and belief, it did not do so.

81.     Specifically, Mr. Campbell admitted in substance and in part that one of

Defendants' primary purposes in entering into supply agreements with medical practice groups

such as U.S. Oncology was to get affiliated doctors to use Taxotere off-label for tumor types

besides breast cancer, including prostate cancer and lung cancer.

82.     Mr. Campbell further admitted in substance and in part that Paula Kline, M.D. of

St. Vincent's Hospital in New York, New York, gave presentations on off-label uses of Taxotere

(for, among other things, early stage breast cancer) at, among other places, Union Hospital in

New Jersey.  The presentations were given under the guise that they were "educational," not

"promotional" in nature; however, they were sponsored, organized and funded by Defendants'

marketing department, and Aventis' teaching bureau prepared some of Dr. Kline's presentation

materials.  Following Dr. Kline's presentations, sales reps including Mr. Campbell would pay

sales calls on doctors who attended and would ask them what they thought about what Dr. Kline

said about using Taxotere for off-label conditions.  Because of this unlawful off-label marketing,

every time government reimbursement was sought for Taxotere used off-label by doctors who

attended presentations given by Dr. Kline, a false claim was submitted.

83.     Mr. Campbell further admitted in substance and in part that Clifford A. Hudis, M.D., the Chief of Breast Cancer Medicine Service at Memorial Sloan-Kettering Cancer Center in New York, New York, was a frequent compensated speaker for Aventis.   For example, Aventis arranged for Dr. Hudis to speak at the 2004 convention of the American Society of Clinical Oncology (ASCO).  Dr. Hudis assisted Defendants' off-label marketing efforts for Taxotere at Sloan-Kettering, specifically getting affiliated oncologists to prescribe the drug off-label for early breast cancer.  According to Mr. Campbell, Dr. Hudis's efforts helped Defendants "turn the corner" at Sloan-Kettering; Defendants' Taxotere market share doubled at that institution within one year.  Mr. Campbell also stated that Aventis employed Naiyer A. Rizvi, M.D. of Sloan, a lung cancer specialist, to do off-label presentations.  Therefore, any and all claims that Sloan-Kettering, Dr. Hudis, Dr. Rizvi, and/or any Sloan-affiliated doctor submitted or caused to be submitted for government reimbursement of Taxotere from at least in or about 2003 and thereafter were false.

84.     Upon information and belief, documentation and other information regarding the specific claims filed are within the possession of Defendants and/or third parties such as Sloan-Kettering and would be discoverable in this lawsuit; however, such documentation and other information is not available to Relator at this time, in part because disclosure could violate medical privacy laws.

**C.      Aventis's Unlawful Kickback Scheme**

85.     Aventis routinely pays kickbacks and other illegal remuneration to physicians to induce them to prescribe Aventis drugs, including Taxotere and Anzemet, to increase Aventis's prescription drug market share and ultimately its profits.  The kickbacks Aventis pays to prescribing physicians come in many forms, including cash payments, sham "research grants," free services, free equipment, drug price discounts, free samples and overfilling of prescriptions,

and other inducements.  By paying illegal kickbacks and offering price discounts to physicians which are not disclosed to the government in violation of 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute), Aventis has caused and/or induced physicians and medical institutions which sought reimbursement for Aventis drugs from federal government-funded health programs to file false or fraudulent certifications regarding compliance with the foregoing statutes in violation of the FCA and the state false claims acts.

86.    Further, Aventis targeted many kickbacks to those prominent physicians and other healthcare professionals whose stature enabled them to influence their institutions' drug purchasing decisions.

87.    On every occasion in which a physician or medical institution received a kickback or price discount from Aventis and later sought reimbursement for Aventis drugs from federal government-funded health programs, a false claim was submitted in violation of the FCA.

88.    Relator's investigation uncovered specific and substantial evidence of Aventis's payment of kickbacks to physicians to increase market share.

**1.    Kickbacks to Induce Sales**

89.    Aventis routinely pays kickbacks and other rewards to physicians to illegally influence physicians to prescribe its prescription drugs, including Taxotere and Anzemet, to increase its share of the prescription drug market.

90.    The kickbacks Aventis pays to prescribing physicians come in many forms, including free drugs that were then charged to the government as if the doctor or medical institution had paid for them, cash payments, so-called research grants, free services, overfilled prescriptions and other inducements.

91.    Relator learned through his conversations with sales representatives that Aventis provides its sales representatives with budgets of as much as $36,000 to use at their discretion to

induce physicians to prescribe the Company's drugs or to reward physicians for large purchases. Part of this discretionary budget is referred to as a "martini budget" to be spent on "customers" who show "potential" for giving more business, *i.e.*, for prescribing more Aventis drugs.

92.    Aventis also provides marketing funds to be used as "speaker fees" to reward four or five physicians a year who are high volume prescribers.  High volume prescribers are identified through examination of data from IMS Health, Inc., a service that tracks doctor prescriptions.  The sales representative proposes the doctor's bonus to his manager, and the Aventis manager then "co-sponsors" the payment.  The sponsored physicians are then paid about $2,000 to $3,000 or more, to attend lavish dinners at which they speak to other physicians about Aventis drugs.

93.    The Relator also learned through Mr. Campbell that Aventis tailors its grants to physicians as rewards for purchasing its drugs, rather than as funding for legitimate research purposes.  In addition, these grants were initiated and directed by Aventis's sales and marketing agents rather than its science division.  For teaching institutions such as NYU and Columbia, grant budgets were determined and allocated strictly based on the institution's demonstrated and potential drug purchases.

94.    For example, such "educational" grants were provided to Dr. Clifford Huddis, chief of breast cancer medicine service at Sloan Kettering Cancer Center in New York, to induce him to promote Taxotere at his hospital.  Indeed, Dr. Huddis played a central role in boosting Sloan Kettering's purchases of Taxotere from 170 vials a month to as many as 400 vials a month, mostly for off-label use.

95.    Drs. Mark Kris and Nadir Rizby of Sloan Kettering Cancer Center, and Dr. Michael Kane of the Cancer Institute of New Jersey, also received grants to induce them to

promote Aventis drugs.  Relator learned from Mr. Ramharack that medical institutions knew Aventis provided such purportedly "educational" grants to encourage sales of its prescription drugs.

96.     In addition, Aventis uses several methods to promote off-label uses for its drugs through the vehicle of kickbacks.  First, Aventis provides its sales representatives with thousands of dollars in unrestricted educational grants to pay doctors to promote the benefits of off-label use.  According to Mr. Campbell, Aventis directly provides such grants to doctors to reward the largest purchasers of Taxotere.

97.     As previously noted, Mr. Campbell explained that Aventis provided Dr. Paula Kline of St. Vincent's Hospital in New York, N.Y. with a $3,500 direct grant to speak to doctors at Union Hospital in Union, New Jersey about off-label uses for Taxotere.  Mr. Campbell also revealed that similar grants were paid to doctors at Sloan Kettering Medical Center and Staten Island Hospital.

98.     The Relator also learned that Aventis maintains lists of doctors using Aventis drugs for off-label purposes, and invites the leading off-label prescribers to conferences where such uses are actively promoted.  The individuals at Aventis charged with the responsibility of keeping these lists and helping to organize these conferences are the POEMs detailed above. One such individual in the New Jersey and New York area is named Patti Merwin.

99.     Mr. Campbell disclosed that Aventis typically invites seven to ten doctors to attend these conferences, and pays those who do attend between $750 to $1,000 in gifts as an inducement to promote Taxotere for off-label uses, and to themselves prescribe Taxotere for such use.

100.     Upon information and belief, Aventis engaged on a nationwide basis in the illegal practice of paying speaker's fees or educational grants to induce doctors to prescribe its drugs.  If officials at the government-funded health programs from whom reimbursement was sought for Aventis's drugs knew that the physicians and medical institutions seeking such reimbursement received illegal inducements from Aventis, they would not have made payment.  Thus, on every occasion where a physician received a speaker's fee or an educational grant and later sought reimbursement for Aventis drugs from federal government-funded health programs, a false or fraudulent claim was submitted.

101.     On each occasion in which a physician or medical institution submitted such a false or fraudulent claim, Aventis knew or acted in reckless disregard of the fact that such a false or fraudulent claim would be submitted.  By such conduct, Aventis caused the false or fraudulent claim to be submitted, and is itself liable for such false or fraudulent claims.

102.     Upon information and belief, Aventis engaged – on a nationwide basis – in the illegal practice of unlawfully inducing physicians to promote off-label uses for its prescription drugs.

103.     The grants and gifts Aventis provides to doctors in exchange for their prescriptions of Aventis drugs for off-label uses are illegal, both because they violate the FDCA as an illegal effort to promote an off-label use of Aventis drugs, and because they constitute kickbacks under the Medicare Anti-Kickback Statute.

104.     On each occasion that a physician or medical institution submitted a claim to a government-funded health program seeking reimbursement for an off-label prescription for Aventis drugs, which Aventis illegally promoted by providing the physician or medical

institution with an illegal gift or grant, Aventis caused a false or fraudulent claim to be submitted under the FCA.

105.    On each occasion in which a physician or medical institution submitted such a false or fraudulent claim, Aventis knew or acted in reckless disregard of the fact that such a false or fraudulent claim would be submitted.  By such conduct, Aventis caused the false or fraudulent or fraudulent claim to be submitted, and is itself liable for such false or fraudulent claims.

   **2.    Kickbacks by Providing Free Drugs Billed to the Government**

106.    One of Aventis's most common – and effective – methods of providing kickbacks to doctors is to overfill a prescription or provide free samples of its drug products.  The doctors or medical institutions receiving the surplus then bill the government for the medicine at average wholesale price or best price, so as to receive reimbursement as if they had paid for the free drugs, thereby keeping the full reimbursement as an illegal kickback from Aventis.  Mr. Campbell stated that the magnitude of such overbilling might reach 20 to 30 percent or more per vial of medicine.  Through this practice, Aventis helped doctors and medical institutions "get the most out of the vials" so as to maximize their "financial advantage."

107.    Relator had several conversations with Rohan Ramharack, who served as a clinical oncology sales manager at Aventis for the New Jersey/Northeast region since 1997, in which Mr. Ramharack disclosed the Defendant's scheme to provide the doctors with free medicines.

108.    As part of Mr. Ramharack's marketing effort, he routinely provided physicians with as many as 1,200 free samples a year.  These samples, on average, had a market value of approximately $120,000, thereby giving Mr. Ramharack alone $120,000 a year in marketing "leverage" against his competitors.  Mr. Ramharack revealed that all 116 sales representatives in

Aventis's oncology market give away samples on this magnitude.  Over a five-year period, such an effort amounted to over $50 million in illegal remuneration.

109.    Mr. Ramharack also disclosed that Aventis provided physicians with overfilled prescriptions containing excess product which the physicians would use to treat other patients, resulting in the physicians' billing the government for an additional 100 or more vials per month. These additional drugs, like the free drug samples, could be billed by the physicians or medical institutions to a government-funded insurer for full reimbursement, all of which constitutes an illegal kickback to the physicians.  Thus, such overfilled prescriptions and free samples amount to a bribe calculated to induce the physicians to prescribe Aventis drugs.

110.    Mr. Ramharack informed Relator that he provided Dr. Richard Burke, head of the formulary committee at Mount Sinai Hospital, with free samples of Anzemet for 15 to 20 patients.  Aventis was aware that by billing Medicaid and Medicare for these free samples, Dr. Burke would collect at least $30,000 each on the free samples, based on the reimbursement rate for Anzemet treatment.

111.    Salick Health Care was a leading chain of oncology clinics and affiliated oncologists.  As part of his ultimately successful effort to get on Salick's formulary, Mr. Ramharack provided free samples to Salick-affiliated oncologists, including Dr. Arthur Goldberg (who received 20) and Dr. William Grace.

112.    In a typical situation, Aventis offered a Healthcare Formulary Group prescription drugs at prices discounted in proportion to the percentage of the market share in prescriptions the Group offered Aventis for its products.  Aventis typically sought a market share from a given Healthcare Formulary in the range of 50 percent to as much as 90 percent.  Further, because Anzemet reimbursement was greater than that of competing drugs, Mr. Ramharack used that

selling point to convince healthcare institutions and businesses to include Anzemet on formulary, and high-volume oncology doctors to use Anzemet.

113.     Aventis's inducements of free samples, overfilled prescriptions, and market-share discounts, and specifically the illegal profit derived from them, succeeded in their intended effect.  These unlawful practices induced Dr. Burke to promote Anzemet at Mount Sinai's formulary committee.  Dr. Burke's endorsement, in turn, brought Aventis $750,000 a year in sales from Mount Sinai.  Dr. Grace started purchasing approximately 1,000 vials of Anzemet per month for his own practice.  Dr. Goldberg similarly increased his use of Anzemet, and Anzemet was incorporated into Salick's formulary.  To the extent reimbursement was sought from the government, the purchase and/or use of Anzemet by Mt. Sinai, Dr. Burke, and/or Salick Healthcare and its affiliated doctors including Drs. Grace and Goldberg, caused false claims to be submitted.

114.     Aventis engaged on a nationwide basis in the practice of providing physicians with free samples and/or overfilled prescriptions, to encourage physicians and medical institutions to seek reimbursement from the government for drugs for which they did not pay.

115.     On every occasion in which a physician or medical institution submitted a false claim by billing for free medicine provided by Aventis, a false claim was submitted.

116.     On every occasion in which a physician or medical institution submitted a false claim by billing for free medicine provided by Aventis, Aventis knew or acted in reckless disregard of the fact that a false claim would be submitted.  By such conduct, Aventis caused a false claim to be submitted, and is itself liable for the false claim.

**3.     Kickbacks by Providing Free Services to Doctors**

117.     Through his conversations with Mr. Campbell, Relator discovered that Aventis provides illegal free services to doctors.

31

118.    For example, Aventis operates and provides practice management consulting

services, referred to as PACT Plus, to certain physicians prescribing Aventis drugs.  Relator

learned from Mr. Campbell that, in addition to consulting services such as reimbursement and

billing assistance,  PACT Plus's services include helping doctors receive prescription drugs both

manufactured by Aventis and by other companies, and finding inexpensive or free drugs for the

doctors' indigent patients.

119.    The Relator also learned from Mr. Campbell that Aventis provides pharmacists to

teach physicians how to mix Taxotere and Anzemet prescriptions to give the doctors a financial

advantage by getting "the most out of the vials."  The pharmacists instruct the physicians on how

to capture the excess of the overfilled prescriptions so that they may use that excess on other

patients and bill the government for the new prescriptions.

120.    These extraordinarily valuable services provided by Aventis to Aventis-

prescribing physicians constitute illegal kickbacks or inducements to encourage the physicians to

prescribe Aventis drugs.

121.    Upon information and belief, Aventis engaged, on a nationwide basis, in the

practice of providing free consulting services to physicians in exchange for those physicians

buying or promoting Aventis drugs.

122.    On every occasion in which a physician or medical institution received free

services from Aventis, and later sought reimbursement for Aventis drugs from federal

government-funded health programs, false claims were submitted.

123.    On every occasion in which a physician or medical institution received free

services from Aventis, and later sought reimbursement for Aventis drugs from government

health programs, Aventis knew, or acted in reckless disregard, that a false claim was being

submitted, and therefore caused that false claim to be submitted, and is itself liable for such false claim.

124.   Upon information and belief, documentation and other information regarding the specific claims filed as the result of Aventis' kickback schemes are within the possession of Defendants and/or third parties and would be discoverable in this lawsuit; however, such documentation and other information is not available to Relator at this time, in part because disclosure could violate medical privacy laws.

**D.   Aventis's Violations of the Medicaid Rebate Statute**

125.   By paying illegal kickbacks and offering price discounts to physicians which are not disclosed to the government in violation of the Medicaid Rebate Statute, 42 U.S.C. § 1396r-8, Aventis caused and/or induced physicians and medical institutions seeking reimbursement for Aventis drugs from federal government-funded health programs to file false or fraudulent certifications in violation of the FCA and the state false claims acts.

126.   Aventis provides free prescription drug samples and overfills prescriptions in copious amounts which could be billed by physicians or medical institutions to government-funded payors for full reimbursement.  Aventis also provides prescribing physicians with pharmacists to teach them how to mix Taxotere and Anzemet prescriptions to provide doctors with a financial advantage by getting "the most out of the vials."  Through this practice, Aventis provides illegal rebates to prescribing physicians.

127.   On information and belief, Aventis engaged on a nationwide basis in the practice of providing physicians and medical institutions with free samples and/or overfilled prescriptions, to allow those physicians and medical institutions to seek reimbursement from the government for drugs for which they did not pay.  On information and belief, the doctors or medical institutions receiving the bonus drugs then bill the Government for the medicines at

"average wholesale price," or "best price," so as to receive reimbursement as if they paid for the free drugs, thereby keeping the full reimbursement as an illegal kickback.

128.    Aventis  provided Medicaid with "best price" information which excluded the additional cost of cash discounts and free goods, in the form of free samples, overfilled prescriptions, and free services calculated to maximize the product quantity, all of which Aventis illegally provided to physicians to induce them to prescribe Taxotere and Anzemet.

129.    On information and belief, by intentionally concealing both the payment of kickbacks and price discounts to physicians and medical institutions, Aventis failed to accurately report the "best price" of Medicaid covered drugs as required by the Medicaid Rebate Statute, 42 U.S.C. § 1396r-8.  This resulted in millions of dollars of Medicaid overpayments to Aventis by both the federal and state governments.

130.    On each occasion that Aventis provided "best price" information and Average Manufacturer Price information to CMS that excluded the costs of the free goods and services it provided to physicians and medical institutions, Aventis caused CMS to understate the amount of the rebate owed to the Medicaid Program.  Aventis thereby caused a false claim to be submitted under the FDA.

131.    Upon information and belief, documentation and other information regarding the specific claims filed in violation of "best price" requirements are within the possession of Defendants and/or third parties and would be discoverable in this lawsuit; however, such documentation and other information is not available to Relator at this time, in part because disclosure could violate medical privacy laws

**E.     Sanofi's Unlawful Kickback Scheme**

132.    Sanofi routinely pays kickbacks and other illegal remuneration to physicians to induce them to prescribe Sanofi drugs, including Plavix and Avapro, to increase Sanofi's

prescription drug market share and ultimately its profits.  The kickbacks Sanofi pays to prescribing physicians come in many forms, include cash payments, speaker's fees and other inducements.

133.    Further, Sanofi targeted many kickbacks to those prominent physicians and other healthcare professionals whose stature enabled them to influence their institutions' drug purchasing decisions.

134.    On every occasion in which a physician or medical institution received a kickback or price discount from Sanofi and later sought reimbursement for Sanofi drugs from federal government-funded health programs, a false claim was submitted in violation of the FCA.

135.    On December 1, 2003, the Relator interviewed Orren Taylor, a marketing representative for Sanofi, covering the New York-New Jersey metropolitan area.

136.    Mr. Taylor told the Relator that, as a matter of company policy, the sales representatives select the top-selling prescribers of Sanofi drugs.  These doctors would be recommended to an FDL Therapeutic Liaison, who would arrange to have the doctor placed on speakers list for various drug symposia.  Those symposia were ostensibly arranged and controlled by third-party vendors, Boron LePore & Associates and Cogenics, Inc.

137.    Mr. Taylor disclosed that members of Sanofi's sales force would maintain "call lists" identifying approximately 165 high-prescribing physicians whom the Company would enlist to help promote Plavix and Avapro.

138.    The doctors selected on the basis of their high sales were paid speakers fees between $1,000 and $2,000 for each engagement.  The marketing representatives are given $36,000 a year in discretionary budgets to dole out as rewards to physicians, all of it based on sales data.

139.     Similarly, Sanofi pays "speaker's fees" to physicians to attend lectures, and provides lavish dinners and cash payments.  These benefits are intended to reward physicians for prescribing Sanofi drugs, and to induce them to prescribe more Sanofi drugs in the future.  Additionally, Sanofi provides $100 "educational grants" to physicians to attend these events and induce them to purchase Sanofi drugs.  Mr. Taylor also disclosed that Sanofi would "bend the rules or choose a cheaper price" for the dinner events, so that the Company would be able to "ease the money backdoor" should they want to make direct payments to the speakers, which Sanofi would characterize as "honoraria."  The physicians accept these fees without any formal obligation on their part to provide consulting or other services in return.

140.     Approximately one-third of the doctors on Mr. Taylor's list of contacts sold Sanofi products because of these inducements.

141.      For example, Sanofi rewarded Michael Schloss, a cardiologist at New York University Medical Center, for prescribing large sales of Avapro.

142.     Similarly, Sanofi paid one high-volume prescriber of Plavix, Dr. Allen Unger, of the Mount Sinai Hospital, between $1,000 and $2,500 to invite his colleagues, including cardiologist Jose Meller, to lavish dinners at which Mr. Unger would discuss Plavix using "promotional materials" provided to him by "medical liaisons" hired by Sanofi.

143.     The Medical Liaison, Isabella Batsue, oversees Sanofi's marketing efforts from New Jersey to Boston.

144.     On each occasion in which a physician or medical institution submitted such a false or fraudulent claim, Sanofi knew or acted in reckless disregard of the fact that such a false or fraudulent claim would be submitted.  By such conduct, Sanofi caused the false or fraudulent claim to be submitted, and is itself liable for such false or fraudulent claims.

145.    Upon information and belief, Sanofi engaged – on a nationwide basis – in the illegal practice of unlawfully inducing physicians to promote off-label uses for its prescription drugs.

146.    The grants and gifts Sanofi provides to doctors in exchange for their prescriptions of Sanofi drugs for off-label uses are illegal, both because they violate the FDCA as an illegal effort to promote an off-label use of Sanofi drugs, and because they constitute kickbacks under the Medicare Anti-Kickback Statute.

147.    On each occasion that a physician or medical institution submitted a claim to a government-funded health program seeking reimbursement for an off-label prescription for Sanofi drugs, which Sanofi illegally promoted by providing the physician or medical institution with an illegal gift or grant, Sanofi caused a false or fraudulent claim to be submitted under the FCA.

148.    On each occasion in which a physician or medical institution submitted such a false or fraudulent claim, Sanofi knew or acted in reckless disregard of the fact that such a false or fraudulent claim would be submitted.  By such conduct, Sanofi caused the false or fraudulent or fraudulent claim to be submitted, and is itself liable for such false or fraudulent claims.

149.    By paying illegal kickbacks and offering price discounts to physicians which are not disclosed to the government in violation of 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute), Sanofi has caused and/or induced physicians and medical institutions which sought reimbursement for Sanofi drugs from federal government-funded health programs to file false or fraudulent certifications regarding compliance with the foregoing statutes in violation of the FCA and the state false claims acts.

150.    By paying illegal kickbacks which are not disclosed to the government in violation of the Medicaid Rebate Statute, 42 U.S.C. § 1396r-8, Sanofi caused and/or induced physicians and medical institutions seeking reimbursement for Sanofi drugs from federal government-funded health programs to file false or fraudulent certifications in violation of the FCA and the state false claims acts.

151.    Upon information and belief, documentation and other information regarding the specific claims filed as the result of Sanofi's unlawful schemes are within the possession of Defendants and/or third parties and would be discoverable in this lawsuit; however, such documentation and other information is not available to Relator at this time, in part because disclosure could violate medical privacy laws

## V.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**(False Claims Act: Presentation of False Claims)**
**(31 U.S.C. § 3729(a)(1))**

152.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 151 of this Complaint as if fully set forth herein.

153.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendant has knowingly presented or caused to be presented to officers or employees of the United States government false or fraudulent claims for payment or approval or failure to provide the Best Price for drugs in violation of 31 U.S.C. § 3729(a)(1).

### SECOND CAUSE OF ACTION

**(False Claims Act: Making or Using False**
**Record or Statement to Cause Claim to be Paid)**
**(31 U.S.C. § 3729(a)(2))**

154.    Relator repeats and incorporates by reference the allegations contained in

Paragraphs 1 through 153 of this Complaint as if fully set forth herein.

155.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts

alleged herein the defendant has knowingly made, used, or caused to be made or used false

records or statements – i.e., the false certifications and representations made or caused to be

made by defendants, to get false or fraudulent claims paid or approved by the government in

violation of 31 U.S.C. § 3729(a)(2).

**THIRD CAUSE OF ACTION**

**(False Claims Act: Making or Using False Record
Or Statement to Avoid an Obligation to Refund)
(31 U.S.C. § 3729(a)(7))**

156.    Relator repeats and incorporates by reference the allegations contained in

Paragraphs 1 through 155 of this Complaint as if fully set forth herein.

157.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts

alleged herein the defendants knowingly made, used or caused to be made or used false records

or false statements—i.e., the false certifications made or caused to be made by defendants—to

conceal, avoid or decrease an obligation to pay or transmit money or property to the United

States.

**FOURTH CAUSE OF ACTION**

**(False Claims Act: Conspiracy)
(31 U.S.C. § 3729(a)(3)**

158.    Relator repeats and incorporates by reference the allegations contained in

Paragraphs 1 through 157 of this Complaint as if full set forth herein.

159.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts

alleged herein the defendant conspired to get false or fraudulent claims paid by the United States

39

and performed one or more acts to effect payment of false or fraudulent claims by the United

States.

## FIFTH CAUSE OF ACTION
### (California False Claims Act)
### (Cal. Govt. Code §§ 12651 *et seq.*)

160.    Relator repeats and incorporates by reference the allegations contained in

paragraphs 1 through 159 of this Complaint as if fully set forth herein.

161.    By virtue of the acts described above, Defendants knowingly presented or caused

to be presented, false or fraudulent claims to the California State Government for payment or

approval.

162.    By virtue of the acts described above, Defendants knowingly made, used, or

caused to be made or used false records and statements, and omitted material facts, to induce the

California State Government to approve and pay such false and fraudulent claims.

163.    The California State Government, unaware of the falsity of the records,

statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or

conduct of Defendants as alleged herein.

164.    By reason of the Defendants' acts, the State of California has been damaged, and

continues to be damaged, in substantial amount to be determined at trial.

165.    Pursuant to Cal. Govt. Code § 12651(a), the State of California is entitled to three

times the amount of actual damages plus the maximum penalty of $10,000 for each and every

false or fraudulent claim, record or statement made, used, presented or caused to be made, used

or presented by Defendants.

## SIXTH CAUSE OF ACTION
### (Delaware False Claims and Reporting Act)
### (Del Code Ann. tit. 6, §§ 1201 *et seq.*)

166.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

167.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

168.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

169.    The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

170.    By reason of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

171.    Pursuant to Del Code Ann. tit. 6, § 1201(a), the State of Delaware is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## SEVENTH CAUSE OF ACTION
### (Florida False Claims Act)
### (Fla. Stat. Ann. §§ 68.081 *et seq.*)

172.     Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

173.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

174.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

175.     The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

176.     By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

177.     Pursuant to Fla. Stat. Ann. § 68.082(2), the State of Florida is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**EIGHTH CAUSE OF ACTION**
**(Georgia False Medicaid Claims Act)**
**(Ga. Code. Ann. §§ 49-4-168.1 *et seq.*)**

178.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

179.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

180.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

181.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

182.    By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

183.    Pursuant to Ga. Code. Ann. § 49-4-168.1(a), the State of Georgia is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## NINTH CAUSE OF ACTION
### (Hawaii False Claims Act)
### (Haw. Rev. Stat. §§ 661-21 *et seq.*)

184.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

185.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

186.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

187.    The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

188.    By reason of the Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

189.    Pursuant to Haw. Rev. Stat. § 661-21(a), the State of Hawaii is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**TENTH CAUSE OF ACTION**
**(Illinois Whistleblower Reward and Protection Act)**
**(740 Ill. Comp. Stat. §§ 175/1 *et seq.*)**

190.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint.

191.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

192.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

193.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

194.    By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

195.    Pursuant to 740 Ill. Comp. Stat. § 175/3(a), the State of Illinois is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**ELEVENTH CAUSE OF ACTION**
**(Indiana False Claims and Whistleblower Protection Act)**
**(Ind. Code §§ 5-11-5.5-1 *et seq.*)**

196.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint.

197.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

198.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

199.    The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

200.    By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

201.    Pursuant to Ind. Code § 5-11-5.5-2(b), the State of Indiana is entitled to three times the amount of actual damages plus at least $5,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWELFTH CAUSE OF ACTION
### (Louisiana Medical Assistance Programs Integrity Law)
### (La. Rev. Stat. Ann. §§ 46:439.1 *et seq.*)

202.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

203.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

204.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

205.    The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

206.    By reason of the Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

207.    Pursuant to La. Rev. Stat. Ann. § 46:438.6, the State of Louisiana is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## THIRTEENTH CAUSE OF ACTION
### (Massachusetts False Claims Law)
### (Mass. Gen. Laws ch. 12, §§ 5A *et seq.*)

208.　Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

209.　By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts Commonwealth Government for payment or approval.

210.　By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts Commonwealth Government to approve and pay such false and fraudulent claims.

211.　The Massachusetts Commonwealth Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

212.　By reason of the Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

213.　Pursuant to Mass. Gen. Laws ch. 12, § 5B, the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**FOURTEENTH CAUSE OF ACTION**
**(Michigan Medicaid False Claims Act)**
**(Mich. Comp. Laws §§ 400.601 *et seq.*)**

214.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

215.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the State of Michigan for payment or approval.

216.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

217.    The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

218.    By reason of the Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

219.    Pursuant to Mich. Stat. § 400.612, the State of Michigan is entitled to a civil penalty equal to the full amount received by the person benefiting from the fraud plus triple the amount of damages suffered by the state as a result of the conduct by the person.

**FIFTEENTH CAUSE OF ACTION**
**(Nevada False Claims Act)**
**(Nev. Rev. Stat. §§ 357.010 *et seq.*)**

220.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

221.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

222.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

223.    The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

224.    By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

225.    Pursuant to Nev. Rev. Stat. § 357.040(1), the State of Nevada is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**SIXTEENTH CAUSE OF ACTION**
**(New Hampshire False Claims Act)**
**(N.H. Rev. Stat. Ann. § 167:61-b)**

226.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

227.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or approval.

228.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

229.     The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

230.     By reason of the Defendants' acts, the State of New Hampshire has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

231.     Pursuant to § 167:61-b, the State of New Hampshire is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**SEVENTEENTH CAUSE OF ACTION**
**(New Jersey False Claims Act)**
**(N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*)**

232.     Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

233.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

234.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

235.     The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

236.     By reason of the Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

237.     Pursuant to N.J. Stat. Ann. § 2A:32C-3, the State of New Jersey is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**EIGHTEENTH CAUSE OF ACTION**
**(New Mexico Fraud Against Tax Payers Act)**
**(N.M. Stat. Ann. §§ 44-9-1 *et seq.*)**

238.     Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

239.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

240.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

241.     The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

242.    By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

243.    Pursuant to N.M. Stat. Ann. § 44-9-3, the State of New Mexico is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**NINETEENTH CAUSE OF ACTION**
**(New York False Claims Act)**
**(N.Y. State Fin. Law §§ 187 *et seq.*)**

244.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

245.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

246.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

247.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

248.   By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

249.   Pursuant to N.Y. State Fin. Law § 189, the State of New York is entitled to three times the amount of actual damages plus the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTIETH CAUSE OF ACTION
### (Oklahoma Medicaid False Claims Act)
### (63 Okla. St. Ann. §§ 5053 *et seq.*)

250.   Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

251.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

252.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

253.   The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

254.   By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

255.    Pursuant to 63 Okl. St. Ann. § 5053.1(B), the State of Oklahoma is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### TWENTY FIRST CAUSE OF ACTION
**(The State False Claims Act (Rhode Island))**
**(R.I. Gen. Laws §§ 9-1.1-1 *et seq.*)**

256.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

257.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

258.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

259.    The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

260.    By reason of the Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

261.    Pursuant to R.I. Gen. Laws § 9-1.1-3, the State of Rhode Island is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every

55

false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTY SECOND CAUSE OF ACTION
### (Tennessee Medicaid False Claims Act)
### (Tenn. Code Ann. §§ 71-5-181 *et seq.*)

262.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

263.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

264.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

265.    The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

266.    By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

267.    Pursuant to Tenn. Code § 71-5-182(a)(1), the State of Tennessee is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**TWENTY THIRD CAUSE OF ACTION**
**(Texas Medicaid Fraud Prevention Law)**
**(Tex. Hum. Res. Code Ann. § 36.002)**

268.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

269.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

270.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

271.    The Texas State Government,  unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

272.    By reason of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

273.    Pursuant to Tex. Hum. Res. Code Ann. § 36.002, the State of Texas is entitled to two times the amount of actual damages plus the maximum penalty of $15,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**TWENTY FOURTH CAUSE OF ACTION**
**(Virginia Fraud Against Taxpayers Act)**
**(Va. Code Ann. §§ 8.01-216.1 *et seq.*)**

274.     Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

275.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Virginia Commonwealth Government for payment or approval.

276.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Virginia Commonwealth Government to approve and pay such false and fraudulent claims.

277.     The Virginia Commonwealth Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

278.     By reason of Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

279.     Pursuant to Va. Code § 8.01-216.3(A), the Commonwealth of Virginia is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTY FIFTH CAUSE OF ACTION
### (Wisconsin False Claims for Medical Assistance Law)
### (Wisc. Stat. § 20.931)

280.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint as if fully set forth herein.

281.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

282.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Wisconsin State Government to approve and pay such false and fraudulent claims.

283.    The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

284.    By reason of the Defendants' acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

285.    Pursuant to Wisc. Stat. § 20.931(2), the State of Wisconsin is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## TWENTY SIXTH CAUSE OF ACTION
### (District of Columbia False Claims Act)
### (D.C. Code Ann. §§ 2-308.03 *et seq.*)

286.    Relator repeats and incorporates by reference the allegations contained in paragraphs 1 through 159 of this Complaint.

287.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

288.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

289.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

290.    By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

291.    Pursuant to D.C. Code Ann. § 2-308.14, the District of Columbia is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

WHEREFORE, Relator Joseph Piacentile requests that judgment be entered against the Defendants, ordering that:

a.      The Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and the state false claims acts;

b.      The Defendants each pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of the Defendants' actions, plus the appropriate amount to the Certain States under similar provisions of the state false claims acts;

c.      Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the state false claims acts;

d.      Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the state false claims acts;

e.      The Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

f.      The Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

g.      The United States, the Certain States, and Relator Joseph Piacentile recover such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Joseph Piacentile hereby demands a trial by jury.

Dated:  January 26, 2010                STONE & MAGNANINI LLP

By:_____/s/_____
        David S. Stone
        Robert A. Magnanini
        150 John F. Kennedy Parkway
        4th Floor
        Short Hills, New Jersey 07078
        Telephone:  (973) 218-1111

        ***Attorneys for Relator Joseph Piacentile, M.D***

62