IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

UNITED STATES OF AMERICA        :    CIVIL ACTION NO. 02-2964
ex rel. TOASH GOHIL,            :
                                :
            Plaintiff           :
                                :
                                :
                                :
            v                   :
                                :
                                :
                                :
AVENTIS PHARMACEUTICALS,        :
INC.,                           :    Philadelphia, Pennsylvania
                                :    February 19, 2014
            Defendant           :    9:14 a.m.

- - -

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE LAWRENCE F. STENGEL
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

For the Plaintiff:      CARL D. POPLAR, ESQUIRE
                        1010 Kings Highway South
                        Building Two
                        Cherry Hill, NJ  08034


                        DAVID C. KISTLER, ESQUIRE
                        NICHOLAS CARL HARBIST, ESQUIRE
                        Blank Rome LLP
                        301 Carnegie Center
                        Princeton, NJ  08540


                        STEPHEN M. ORLOFSKY, ESQUIRE
                        Blank Rome LLP
                        One Logan Square
                        130 North 18th Street
                        Philadelphia, PA  19103

*Transcribers Limited*

*17 Rickland Drive*
*Sewell, NJ 08080*
*856·589·6100 • 856·589·9005*

2

```
 1   APPEARANCES:              (Continued)

 2   For the Defendant:        RICHARD L. SCHEFF, ESQUIRE
                               MICHAEL B. HAYES, ESQUIRE
 3                             Montgomery McCracken
                               Walker & Rhoads LLP
 4                             123 South Broad Street
                               Philadelphia, PA  19109
 5

 6                             ROBERT J. McCULLY, ESQUIRE
                               Shook Hardy & Bacon LLP
 7                             2555 Grand Boulevard
                               Kansas City, MO  64108
 8
                                       -  -  -
 9

10   Audio Operator:          Laura Buenzle

11   Transcribed By:          Michael Keating

12                                     -  -  -

13           Proceedings recorded by electronic sound
     recording; transcript produced by computer-aided
14   transcription service.

15                                     -  -  -

16

17

18

19

20

21

22

23

24

25
```

3

```
 1              (The following was heard in open court at
 2     9:14 a.m)
 3              THE COURT:  Good morning.
 4              ALL:  Good morning, Your Honor.
 5              THE COURT:  Please be seated.  We are here
 6     this morning for argument on a motion to dismiss in
 7     this matter that was recently reassigned to my docket
 8     and which was the subject of a telephone conference
 9     recently, and counsel indicated they would like an
10     opportunity to present argument, and I'm very grateful
11     for that to get a chance to review these issues with
12     you.
13              Let me just make sure I know who's here.
14     Steve Orlofsky, good morning.
15              MR. ORLOFSKY:  Good morning, Your Honor.
16              THE COURT:  Carl Poplar.
17              MR. POPLAR:  Good morning, Judge.
18              THE COURT:  Good morning.  Nick Harbist.
19              MR. HARBIST:  Good morning, Your Honor.
20              THE COURT:  Good morning.  And David Kistler.
21              MR. KISTLER:  Good morning, Your Honor.
22              THE COURT:  Good morning.  And Richard
23     Scheff.
24              MR. SCHEFF:  Good morning, Your Honor.
25              THE COURT:  Good morning.  And Rob McCully.
```

4

1    MR. McCULLY:  Yes, Your Honor.

2    THE COURT:  Good morning.

3    MR. McCULLY:  Good morning.

4    THE COURT:  Daniel Donvidani (ph).

5    MR. DONVIDANI:  Good morning, Your Honor.

6    THE COURT:  Good morning.  And Michael Hayes.

7    MR. HAYES:  Good morning, Your Honor.

8    THE COURT:  Good morning.  Well, this is the

9  defendant's motion to dismiss, so will you be

10  beginning, Mr. Scheff?

11    MR. SCHEFF:  I will be --

12    THE COURT:  Okay.

13    MR. SCHEFF:  -- but I won't be ending.

14    THE COURT:  Okay.

15    MR. SCHEFF:  If I could, may it please the

16  Court, my name is Richard Scheff.  I'm from Montgomery

17  McCracken, along with my co-counsel, Rob McCully, who

18  is seated at counsel table, from Shook Hardy.  We

19  represent the defendants and movants, Sanofi-Aventis

20  Aventis, Inc. and Aventis Pharmaceuticals.

21    With the Court's permission, Mr. McCully and

22  I will divide the argument.  I'm going to talk about

23  the case and factual chronology.  I'll be addressing

24  our motion to dismiss based on Mr. Gohil's release --

25    THE COURT:  Right.

1    MR. SCHIFF:  -- which we believe bars him

2  from being a relator in this case.  I will mention very

3  briefly another release argument that we made in our

4  brief relating to the drug Anzemet, which really was

5  the subject of the original qui tam complaint and the

6  first amended complaint.

7    I will argue our subject matter jurisdiction

8  arguments on original source, saying that the cause of

9  certain public disclosures that were made, Mr. Gohil is

10  not the original source of the information upon which

11  the second amended complaint is based.

12    Mr. McCully is going to address the argument

13  under Federal Rule of Civil Procedure 9(B), that is

14  pleading with particularity, as well as Mr. Gohil's

15  inability to state a claim under 12(b)(6) and address

16  the conspiracy argument or conspiracy claim.

17    So, let me start with just some factual

18  background, if I could, please.  As the Court is aware,

19  the second amended complaint purports to allege a

20  nationwide fraudulent scheme whereby Aventis sales

21  representatives marketed Taxotere, which is a cancer

22  drug, off-label and encouraged doctors to prescribe the

23  drugs off-label by offering them grants and other forms

24  of money which the relator says are kickbacks.

25    The second amended complaint alleges that

1  scheme from the period 1996 to 2004.  Mr. Gohil,

2  however, admits that he only began promoting Taxotere

3  in late 1999, I think November or December of 1999, and

4  this occurred after the merger of two other companies,

5  Hoechst, Marion and Roussel, the company that Mr. Gohil

6  worked for as a sales rep, and Rhone-Poulenc Rorer

7  merged to form Aventis.

8          Now, the rights to Taxotere, which is the

9  drug really prominently featured in the second amended

10  complaint was brought to Aventis by Rhone-Poulenc

11  Rorer, which was not the company that Mr. Gohil worked

12  for.  And the company that Mr. Gohil worked for

13  marketed the drug Aventis -- I'm sorry -- marketed the

14  drug Anzemet --

15          THE COURT:  Right.

16          MR. SCHIFF:  -- and that's what he brought to

17  the table.  Mr. Gohil resigned from Aventis on June

18  10th, 2002.

19          So the second amended complaint addresses a

20  fraudulent scheme that supposedly starts approximately

21  four years before Mr. Gohil became responsible to

22  promote Taxotere and extended for two years after he

23  left the employ of Aventis.  So the first four years of

24  the so-called scheme, 1996 through 1999, as I said, Mr.

25  Gohil was not even employed by the company that sold

7

1  Taxotere.

2          The original qui tam complaint filed by Mr.

3  Gohil was filed on May 17th, 2002, and that was before

4  he left the employ of Aventis because he resigned on

5  June 10th.  On July 23rd, he filed his first amended

6  complaint.  In looking at those complaints --

7          THE COURT:  July 23rd of what --

8          MR. SCHIFF:  -- and focusing --

9          THE COURT:  -- year again?

10         MR. SCHIFF:  2002.

11         THE COURT:  Right.

12         MR. SCHIFF:  In looking at those complaints

13  and focusing on the first amended complaint, virtually

14  every factual allegation is limited to the two-year

15  time period of his employment at Aventis, and the only

16  allegation which supposedly pre-dates his employment at

17  Aventis is paragraph 125 of the first amended complaint

18  where there is a general allegation regarding a

19  multi-year grant to a breast oncology division of a

20  local hospital here.  Those payments supposedly were

21  made prior to the merger of Hoechst, Marion and

22  Rhone-Poulenc.

23         If you also look at the first two complaints

24  that were filed, the original qui tam complaint as well

25  as the first amended complaint, the emphasis was on the

8

1  drug Anzemet, not Taxotere, and that makes sense

2  because that was the drug that Mr. Gohil brought to the

3  table and had promoted for years before Aventis even

4  came into existence.

5      The allegations regarding Taxotere in the

6  first amended complaint were limited to isolated

7  instances of grants being given to one doctors group

8  and to a hospital supposedly in return for

9  prescriptions for Taxotere.

10      Now, around this same time in August of 2002,

11  so this is after Mr. Gohil resigns, after Mr. Gohil

12  files he qui tam complaint, and after he files the

13  first amended complaint, he files an action under New

14  Jersey law for retaliation, a CEPA action, claiming

15  that Aventis had retaliated against him for raising

16  certain objections to sales promotional activities, and

17  that complaint in the CEPA case is Exhibit 2 to our

18  motion to dismiss.

19      Now, the CEPA case was very actively

20  litigated, and Mr. Gohil was represented by one of the

21  counsel in this case, Mr. Poplar.  And following

22  extensive discovery, that is document production,

23  multiple depositions, and a full briefing on a motion

24  for summary judgment that had been filed by Aventis,

25  the CEPA case eventually settled.  The date of that

9

1   settlement and the date of the broad release that Mr.

2   Gohil signed was October 19th, 2005.

3         Now, of course, all along while the CEPA case

4   was pending and after it concluded, Mr. Poplar was in

5   regular contact with the government in an attempt to

6   convince the government to intervene in Mr. Gohil's

7   still sealed qui tam complaint, but notwithstanding

8   those efforts, the government formally declined to

9   intervene in that case on August 15th, 2006, almost a

10  year after the CEPA case resolved.

11        A month later in September of 2006, the seal

12  was lifted on the first amended complaint and Mr. Gohil

13  was ordered to serve that complaint.  But rather than

14  do that, he filed a motion for leave to file his second

15  amended complaint based on "new evidence."  Those are

16  Mr. Gohil's words, not our words, and at the same time,

17  he asked the government for the same reason to

18  reconsider its decision not to intervene.

19        Now, I want to give the Court some dates, and

20  I know I've been doing that, but this is sort of a

21  date-intensive case, if you will.

22        THE COURT:  Well, when was --

23        MR. SCHIFF:  So --

24        THE COURT:  When was the complaint unsealed?

25        MR. SCHIFF:  Complaint --

10

1          THE COURT:  This is the first --

2          MR. SCHIFF:  The --

3          THE COURT:  -- amended complaint, right.

4          MR. SCHIFF:  The first amended complaint was

5    ordered to be unsealed in August of 2006.

6          THE COURT:  Right, okay.

7          MR. SCHIFF:  The seal was lifted in September

8    -- I'm sorry, September of 2006.

9          THE COURT:  This is about a month after the

10   government --

11         MR. SCHIFF:  Declined.

12         THE COURT:  -- declines to intervene?

13         MR. SCHIFF:  That is correct.

14         THE COURT:  Okay.

15         MR. SCHIFF:  Now, what is apparent -- and the

16   motion seeking to leave to file the second amended

17   complaint based on new evidence was filed November 7th,

18   2006, so approximately two months later.  If the Court

19   looks at Exhibit 7 to our motion to dismiss, and I know

20   this is a very voluminous record, Your Honor.

21         THE COURT:  Go ahead.

22         MR. SCHIFF:  That letter is dated November

23   9th, 2006, so it's two days after the motion for leave

24   to file the second amended complaint.  It's from a

25   lawyer at the Justice Department named Jamie Yavelberg,

11

1  and what she is doing is she is informing Mr. Poplar

2  that Mr. Gohil is not going to be "first to file" with

3  respect to Anzemet, which really was the subject, the

4  primary subject, of the original qui tam in the first

5  amended complaint.  And she's saying to him you're not

6  going to be first to file.

7            And what that means is -- and there was a

8  settlement that Aventis was closing with the government

9  relating to promotional activities of Anzemet at that

10  very same time, and we've included a copy of the

11  anzemet release as Exhibit 6 of the -- to the motion to

12  dismiss.

13            The importance of this letter because it ties

14  into why the second amended complaint is filed and why

15  it is based on so-called new evidence is that Ms.

16  Yavelberg is telling Mr. Poplar your client is not

17  first to file on Anzemet.  And what that means is he's

18  not going to get any money from the settlement.  He's

19  not going to be a relator who qualifies for money in

20  that settlement.

21            And so what has to happen in order for Mr.

22  Gohil to go forward, the government's now declined to

23  intervene, is he's got to find a new theory because

24  he's got to be the first to file.

25            And so he files the motion with the Court for

12

1  leave to file the second amended complaint, which we

2  contend is a new theory at that same time, contending

3  that it's based on new evidence.  So that's the factual

4  backdrop to why the second amended complaint is filed.

5       The government has declined to intervene.

6  The government has told Mr. Poplar that his client is

7  not first to file so he's out of the money and they've

8  got to come up with a new theory, and this is based on,

9  in their words, new evidence.

10       So in early 2007, the second amended

11  complaint was filed under seal.  The government, after

12  a request by Mr. Gohil to review that, again, declined

13  to intervene.

14       Now, the new evidence that was referred to by

15  Mr. Gohil to this Court and to the government was

16  evidence that Mr. Gohil and his counsel obtained during

17  the discovery of the CEPA case, the New Jersey case

18  that had settled in 2005.

19       Specifically, what was provided to the

20  government was a lengthy statement of facts in

21  opposition to the motion for summary judgment, as well

22  as five accompanying volumes of documents from the CEPA

23  case and deposition testimony from Mr. Gohil.

24       If you look at the statement of facts that

25  was submitted in opposition to the motion for summary

13

1   judgment and compare that to the second amended

2   complaint, they are strikingly similar, and it is from

3   that statement of facts filed in the CEPA case that the

4   scope of the complaint in this case, as alleged in the

5   second amended complaint, expands dramatically in time

6   early to 1996 and then ending in 2004, and the

7   substance of that second amended complaint as well

8   shifts entirely to Taxotere from Anzemet because he's

9   not first to file on Anzemet so he's not in the money,

10  and now alleges a new scheme of off-label promotion,

11  all coming from the discovery in the CEPA case.

12          So the documents, that is the release from

13  the CEPA case, the statement of facts files in the CEPA

14  case in opposition of the motion for summary judgment,

15  and the letters to the Justice Department from Mr.

16  Poplar, are very important in this case, both with

17  respect to the release argument that I'm about to make

18  and the original source argument that I will make in a

19  moment.

20          So, let me turn to the release argument.

21  November 19th, 2005, Mr. Gohil files or signs a broad

22  release in order to settle the CEPA case.  It is on the

23  basis of that document, Your Honor, that this case must

24  be dismissed as to him and he cannot be a relator.

25          He signed that release, it is Exhibit 3 to

14

1   our motion.   It contains broad language releasing any

2   claims that Mr. Gohil has against Aventis based on any

3   and all claims, charges, causes of actions, or

4   liabilities of any nature whatsoever.   The release by

5   its terms are controlled by New Jersey law.

6         The case of Isetts versus Roseland, which is

7   cited in our brief, interprets virtually identical

8   language and says that the any and all broad language

9   of the release allows for no exception and it includes

10  everything.

11        Now, notably, in response to our release

12  argument in our motion to dismiss, Mr. Gohil does not

13  challenge at all the broad scope of that document, and

14  so I would say, Your Honor, that he has conceded that

15  that document is broad in scope and that New Jersey law

16  says that it releases any and all claims.

17        So the enforceability of that document as to

18  Mr. Gohil is government by the Supreme Court case of

19  Rumery.   In Rumery, the Supreme Court says a case by

20  case analysis has to be conducted, but the release

21  should be enforceable unless outweighed by public

22  policy considerations.   In this case, there are no

23  public policy considerations that weigh in favor of not

24  enforcing that release against Mr. Gohil.

25        Now, there is no Third Circuit case directly

15

1   on point concerning the application of the <u>Rumery</u>

2   standard to releases in qui tam claims.  But other

3   circuits have addressed our facts and, essentially,

4   what it comes down to is whether the government had a

5   full and fair opportunity to investigate the claims at

6   issue in the qui tam case.

7           Here, Mr. Gohil brought his contentions to

8   the government first in the spring of 2002, actually on

9   May 29th, 2002, and, in fact, at that time and in the

10  months that succeeded the spring of 2002, Mr. Gohil

11  provided more than 12,000 pages of documents to the

12  government, 11 CDs containing information, and five

13  videotapes that he had collected during his two-year

14  tenure with Aventis.  He gave that all to the

15  government in connection with his original filing and

16  with the first amended complaint in 2002.

17          Now, we only learned that that occurred in

18  2010 when we finally got some discovery that we were

19  entitled to, but that was the volume of information

20  presented to the government in 2002.

21          In addition, in March of 2005, the Department

22  of Health and Human Services Office of Inspector

23  General subpoenaed from Mr. Gohil any additional

24  evidence or information that he obtained during the

25  discovery in the CEPA case, and that subpoena is

1   attached to our motion as Exhibit 5.

2        So as of mid-2005, the government had all of

3   Mr. Gohil's documents that he had obtained during his

4   employment, the 12,000 pages, 11 CDs, and five

5   videotapes, and they had all of the evidence from the

6   CEPA case.

7        So, the government had this information for

8   three and a half to four years while they considered

9   whether or not to intervene in this case, and they

10  decided first in 2006 not to intervene, and then

11  decided again in 2007 after a request was made again,

12  again, not to intervene.

13       So it cannot be disputed that the government

14  had more than sufficient time to investigate Mr.

15  Gohil's allegations of fraud and they chose not to

16  proceed.

17       So, under the cases, and, again, not Third

18  Circuit cases, but under the cases, and they're all

19  cited in our brief, about the enforceability of

20  releases in qui tam cases, the government had a full

21  and fair opportunity to review the claims.  They

22  elected not to and, therefore, there is no public

23  policy that should bar the enforcement of the release.

24       Now, Mr. Gohil, in response, argues that the

25  Longhi case from the Fifth Circuit controls because he

17

1    filed his qui tam case before he executed the release

2    and under the False Claims Act, the statute, therefore,

3    precludes him from dismissing the qui tam action

4    without the government and the Court's approval, and,

5    therefore, he says the release -- the release cannot

6    effectively dismiss the qui tam.

7            As we explained in our reply, and I'll say it

8    to the Court again, we're not trying to bar the

9    government from proceeding in this qui tam case.  All

10   we are trying to do is bar Mr. Gohil from proceeding in

11   the qui tam case.

12           So the government's statement of interest,

13   the only position that it takes with respect to the

14   release issue is that if the claims are dismissed, that

15   they be dismissed without prejudice.  We have no

16   argument with that.  All we are seeking to do is

17   enforce the release against Mr. Gohil and bar him as

18   the qui tam relator.

19           So that's our release argument, broad

20   release, government had adequate opportunity,

21   sufficient opportunity to review the allegations, they

22   twice chose not to intervene, no public policy reason

23   not enforce it, and the claim should be dismissed

24   without prejudice.  If the government wants to proceed,

25   the government can elect to proceed.

18

1        Now, we also argued -- and this will take

2   about ten seconds hopefully.  We argued in our brief

3   that to the extent that the second amended complaint

4   raised claims with respect to the drug Anzemet that

5   those claims also were released because the government

6   and Aventis had settled a case as to Anzemet, thereby

7   releasing the government's claims.

8        Mr. Gohil's reply to that was that they

9   weren't seeking any damages based on the promotion of

10  Anzemet in the second amended complaint.  With that

11  representation, Your Honor, we don't believe that issue

12  is any longer on the table.  If they're not seeking

13  damages based on Anzemet, there's nothing for them to

14  proceed on.  So that's the anzemet argument.

15       So let me get to the last argument that I'm

16  going to make, which is a jurisdictional argument,

17  subject matter jurisdiction.  There are really two

18  components to this.

19       One is raised in our brief, and one we

20  recognized actually the other day as we were preparing

21  for this oral argument.  And because it's a subject

22  matter jurisdiction argument it's not waived and can be

23  raised at this time and certainly raised sua sponte by

24  the Court.

25       With respect to original source, Your Honor,

19

1    the Court does not have subject matter jurisdiction

2    over Mr. Gohil's claims because his second amended

3    complaint is based on public disclosures and he is not

4    the original source of the information.

5          31, U.S.C., Section 3730(e)(4)(A) says that a

6    qui tam action cannot be based on publicly disclosed

7    information unless the relator is also an original

8    source of the information.

9          An original source must have direct and

10   personal knowledge of the information upon which the

11   allegations are based and he must or she must

12   voluntarily provide that information to the government

13   before the filing of the qui tam action.

14         Now, I want to just repeat that last phrase

15   because that is the new basis for no subject matter

16   jurisdiction in this court.  The relator has to be the

17   original source and they have to voluntarily provide

18   that information to the government before filing the

19   qui tam action.  That didn't happen here.

20         The qui tam action was filed first and the

21   information submitted later, and I'll provide the dates

22   to the Court and the references in the record where

23   that is the case and so there is no subject matter

24   jurisdiction in this case because Mr. Gohil did not

25   comply with the statute.

20

1      So let me turn to original source subject

2  matter jurisdiction.  There's a twofold analysis with

3  original source.  Number one, are the claims based on

4  publicly disclosed information and, if so, is Mr. Gohil

5  an original source?

6      So, let me again just sort of refresh the

7  Court on the chronology.  Original qui tam complaint

8  filed May 17th, 2002.  First amended complaint filed

9  July 23rd, 2002.  The first amended complaint does not

10  allege a nationwide off-label promotion scheme for

11  Taxotere.  The focus is on Anzemet promotion and there

12  are isolated grants mentioned with respect to Taxotere.

13      It does not allege any claims before Mr.

14  Gohil's employment or after his employment.  He

15  litigates the CEPA case from 2002 to 2005.  He obtains

16  extensive discovery.  He gives all that evidence to the

17  government.  And if I can refer the Court to Exhibits 9

18  and 10 attached to our motion to dismiss, they are

19  letters from Mr. Poplar to the Assistant US Attorney,

20  Paul Shapiro, in I believe May of 2005 and July of

21  2005, providing all of the evidence from the CEPA case.

22      The CEPA case then settles.  The government

23  does not intervene.  I'll reference the Court again to

24  that Exhibit 7, the letter from Ms. Yavelberg of the

25  Department of Justice telling Mr. Poplar your client is

21

1  not first to file with Anzemet so you're out of the

2  money, and that's why they have to come up with a new

3  theory on the second amended complaint.  So the new

4  evidence, which is used as the basis for the second

5  amended complaint, is the evidence for the CEPA case.

6      Now, how do we know that beyond comparing all

7  the documents, and you can compare the statement of

8  facts for the summary judgment motion.  You can compare

9  the second amended complaint to see how they track each

10 other.  You can see the differences from the first

11 amended complaint.  You obviously can see the

12 difference in scope of time, the shift of focus of the

13 scheme from Anzemet to Taxotere.

14     But Exhibit 10, it's a July 20th, 2005,

15 letter from Mr. Poplar to Mr. Shapiro, and it's

16 apparent that they're in contact.  And Mr. Poplar

17 refers to the employment lawsuit, that is the CEPA

18 lawsuit, and he says we have discovered information

19 responsive to your subpoena that refers to Aventis' use

20 of grants to influence medical professionals to

21 purchase Aventis products.  That's arguably in the

22 first amended complaint.

23     This letter will briefly discuss some of the

24 discovery that documents this action.  He then goes on

25 to say "We should point out that this information was

22

1  learned through the discovery we obtained in the

2  context of the employment lawsuit."  So it's through

3  the lawsuit, not for Mr. Gohil, because, and this is

4  important language, Your Honor, the second sentence of

5  the second paragraph, "Because that lawsuit primarily

6  involves the separate issue of off-label marketing, our

7  ability to inquire about Aventis' use of grants was

8  limited."

9          The theory in the second amended complaint is

10  that off-label marketing scheme, coming directly from

11  the CEPA case, and Mr. Poplar is acknowledging that it

12  is a separate issue of off-label marketing, which is

13  the subject of the CEPA case, and it is that

14  information which forms the basis for the second

15  amended complaint.  So that information goes to the

16  government.  Of course, the government declines the

17  case again, as we know.

18          So under the Zizic case, Z-I-Z-I-C, from our

19  circuit, the standard by which the Court must evaluate

20  this jurisdictional issue is are there public

21  disclosures?  Do the facts come from public

22  disclosures, and in doing so the Court can examine

23  evidence outside the pleadings.  And once those public

24  disclosures are established, then it is Mr. Gohil's

25  burden of persuasion to establish jurisdiction.

23

1          Under the <u>Ducksberry</u> case, again, cited in

2    our brief, this is a District of Massachusetts case,

3    district court, the False Claims Act is supposed to be

4    strictly construed with doubts resolved against

5    jurisdiction.

6          Again, back to our circuit, the <u>Atkinson</u> case

7    and the <u>Feldstein</u> case, the Court must follow the

8    following procedure.  First, determine that a previous

9    public disclosure exists, then determine whether the

10   latest qui tam complaint is "based upon" the public

11   disclosures.  And the case law is clear that "based

12   upon" means even based on -- based upon or

13   substantially similar.

14         If that is the case, then the action can

15   proceed only if Mr. Gohil has direct and personal

16   knowledge and has voluntarily provided the information

17   to the government before the qui tam action is filed.

18         So the public disclosures in this case, I'm

19   going to break this up, for the pre-employment time

20   period you've got two public disclosures.  You've got

21   all the discovery from the CEPA case, from the New

22   Jersey employment case.  Information obtained in

23   litigation is a public disclosure.  It's not direct and

24   personal knowledge.

25         And there was a 1997 Wall Street Journal

1   article, and that is also attached as an exhibit to our

2   motion where it discloses another lawsuit that was

3   filed regarding a scheme of off-label promotion and the

4   giving of grants connected to Lovenox and Taxotere.  So

5   that's the pre-employment time frame.  Both qualify as

6   public disclosures, a media report, litigation, or

7   discovery in litigation.

8        For the post-employment time period, that is

9   after June of 2002, again, we have the discovery from

10  the employment case, the CEPA case, we have letters

11  from the FDA, from what's called DDMAC, and DDMAC --

12  and it's now called something else.  But DDMAC was a

13  division within the FDA that monitored the promotional

14  activities of pharmaceutical companies.

15       And when DDMAC had information that a

16  pharmaceutical company was not complying with the rules

17  relating to promotion they had two types of letters

18  they could issue, one was called an untitled letter and

19  the other was called a warning letter.  And we've got

20  DDMAC letters in this case as well.  They're detailed

21  in the second amended complaint.

22       Those DDMAC letters are available publicly on

23  the FDA website.  So they are public disclosures as

24  well.  We also have an admission with respect to the

25  DDMAC letters that they were obtained by counsel during

25

1   counsel's investigation, certainly not direct and

2   personal knowledge for Mr. Gohil.

3          Lastly, again, post-employment, we have a

4   brochure, an Aventis brochure that allegedly Mr. Gohil

5   saw in a doctor's office somewhere in South Jersey.

6   That brochure was sitting on a table in a reception

7   area, certainly a public disclosure.

8          All of these materials, the media reports,

9   the brochure, the DDMAC letters, the discoveries from

10  the CEPA case, all under the statute qualify as public

11  disclosures.

12         Again, if you track or if you look at the

13  second amended complaint and look at the statement of

14  facts from the CEPA case, they are remarkably similar.

15  The second amended complaint alleges a completely new

16  scheme that is not detailed in the original complaint

17  or the first amended complaint.  It expands the time

18  period dramatically.

19         Completely different emphasis, not on

20  Anzemet, now on Taxotere, and that scheme actually that

21  you see alleged in the original qui tam complaint and

22  the first amended complaint I would also argue is

23  disclosed in that Wall Street Journal article as well.

24  And so that would be a public disclosure as to the

25  original and the first amended complaint if they were

1    active in this case, which they are not.

2            The icing on the cake for all of this is, of

3    course, that Exhibit 10, the July 20th letter from Mr.

4    Poplar to Mr. Shapiro where he says the employment case

5    is a separate off-label marketing issue.  That's

6    certainly a concession by Mr. Poplar that even he

7    viewed it as a separate issue than what had been

8    alleged in the first qui tam complaint and the first

9    amended complaint.

10            Now, what Mr. Gohil does in response is he

11    does what he calls a claim by claim analysis, which is

12    referred to in the cases, and he says I raised the same

13    claims in the first amended complaint as I did in the

14    second amended complaint.

15            The problem is is if you look at the facts,

16    they are significantly different from one complaint to

17    the other.  And what the case law says, and I think

18    it's the Rockwell case, is that you can't allege a

19    scheme in a conclusory manner sort of as a place holder

20    to preserve a claim and then find out facts later from

21    a public disclosure and then file an amended complaint

22    and then all of a sudden allege a new scheme.  That's

23    not what the False -- that's not what the False Claims

24    Act is all about.

25            And that's exactly what Mr. Gohil tried to do

27

1  in this case.  He tried to assert a trivial claim of

2  fraud with respect to Taxotere in an attempt to

3  preserve that claim, but in examination of the first

4  amended complaint, the second amended complaint, the

5  statement of facts, and Mr. Poplar's admission

6  demonstrate it's a separate scheme, and it's a scheme

7  that Mr. Gohil does not have direct and personal

8  knowledge of.

9       So, he doesn't have direct and personal

10 knowledge of the information and the discovery from the

11 CEPA case.  He doesn't have direct and personal

12 knowledge from the information that comes out of the

13 Wall Street Journal article.  The DDMAC records are on

14 the public record.  And the brochure is sitting in a

15 doctor's office, again not direct and personal

16 knowledge.

17      Mr. Gohil says with respect to the time

18 period before he was employed that he learned that the

19 conduct was the same from speaking with other

20 employees.  Again, that doesn't qualify as direct and

21 personal knowledge.

22      Remember, at that point in time, he did not

23 even work for the company that promoted Taxotere.  So

24 for those reasons, the Court must dismiss this case

25 because Mr. Gohil is not an original course.

1          So let me circle back to the argument that we

2     did not raise in our brief, and, again, we recognized

3     it as we were preparing for this oral argument.  Part

4     of that original source, statute, the False Claims Act,

5     requires that the relator disclose his information

6     forming the basis of his allegations to the government

7     before he files his qui tam complaint.  His qui tam

8     complaint was filed or his original qui tam complaint

9     was filed May 17th, 2002.

10          The disclosures were made on May 29th, 2002,

11    12 days later.  We know that because we have a letter

12    to Mr. Sheenan, who then I believe was the chief of the

13    Civil Division at the US attorney's office.  From

14    someone in Mr. Poplar's office, Mr. Paron (ph), we

15    obtained that through discovery and we also know that

16    because in supplemental answers to interrogatories

17    provided by Mr. Harbist in October of 2010, he says in

18    response to interrogatory number two and then

19    thereafter provides dates that the first disclosure was

20    May 29th, 2002, which is consistent with the letter

21    from Mr. Poplar's office that we got through discovery.

22    So, again, on that basis alone there is no subject

23    matter jurisdiction in this case and the case must be

24    dismissed.

25          Now, obviously, counsel has all lived with

1  this case for a long time and this case is just coming

2  to the Court.  But, there is one other sort of

3  chronology I want to share with the Court because it

4  explains, in addition, why this all happened the way it

5  happened.

6          We know that Mr. Gohil is told he's out of

7  the money on Anzemet so there has to be a shift of

8  theory.  We fought hard to get that information and it

9  took us years to get that information from Mr. Gohil in

10 this case.  We did not come on that evidence easily.

11         We are asked for original source discovery

12 through written discovery originally in 2008.  We got

13 no meaningful responses.  We got broad objections and

14 privilege assertions.  We filed a motion to compel with

15 Judge Tucker.  She denied it.  She said you can file

16 this motion again, but I want you to take Mr. Gohil's

17 deposition first.  She ordered that on July 2nd, 2008.

18         We took Mr. Gohil's deposition on July 30th,

19 2008, and we were met with the same assertions of

20 privilege and vague and contradictory responses.  We

21 renewed our motion to dis -- our motion to compel.

22         Judge Tucker reviewed Mr. Gohil's disclosure

23 statements, all the letters, all the information that

24 was provided to the government in camera, the ones that

25 he claimed were privileged, and found no privilege, and

1  also said that Mr. Gohil had stonewalled us.  That was

2  her language, not ours.

3          Mr. Gohil then appealed that to the Third

4  Circuit.  That appeal was dismissed as non-appealable.

5  And, finally, in 2010, we completed the original source

6  discovery and got the documents which demonstrate that

7  Mr. Gohil is not an original source.

8          We got the key letters, we got the key

9  communications with the government, we got the

10  description from Mr. Poplar showing that it was a

11  different issue that he was presenting when he was

12  presenting evidence from the second amended complaint,

13  and we finally got the timing of when the information

14  was provided to the government, May 29th, 2002, 12 days

15  after the qui tam complaint was filed.

16          So it was hard fought, but we found the

17  evidence.  Mr. Gohil is not an original source.  This

18  Court has no subject matter jurisdiction and the case

19  has to be dismissed.

20          So unless the Court has questions of me, I

21  will then turn this over to Mr. McCully to address the

22  9(B) issues, the 12(b)(6) issue, and the conspiracy

23  claim.

24          THE COURT:  Thank you, Mr. Scheff.

25          MR. SCHEFF:  Thank you, Your Honor.

1          MR. ORLOFSKY:  Your Honor, if I may?

2          THE COURT:  Yes.

3          MR. ORLOFSKY:  It might be a good idea for

4   me, before Mr. McCully goes forward for me to address

5   this portion of the argument so that Your Honor hears

6   our response --

7          THE COURT:  I'd be happy to do that.

8          MR. ORLOFSKY:  -- rather than wait.

9          THE COURT:  Yes.  Let's hear from the

10  plaintiff on the original source and the release.

11         MR. ORLOFSKY:  I think it might be helpful

12  for Your Honor to hear my response sooner rather than

13  later to Mr. Scheff's arguments?

14         THE COURT:  Yes, I think that's fine.  Thank

15  you, Mr. Orlofsky.

16         MR. ORLOFSKY:  Thank you.

17         (Pause in proceedings.)

18         THE COURT:  Will you be addressing the

19  release and the --

20         MR. ORLOFSKY:  Yes.

21         THE COURT:  -- original source issues?

22         MR. ORLOFSKY:  I'll be --

23         THE COURT:  Okay.

24         MR. ORLOFSKY:  -- addressing the arguments

25  which --

1          THE COURT:  Very good.

2          MR. ORLOFSKY:  -- which Mr. Scheff made.

3          THE COURT:  Okay.

4          (Pause in proceedings.)

5          MR. ORLOFSKY:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          (Pause in proceedings.)

8          MR. ORLOFSKY:  Your Honor, you won't be

9    surprised this morning to learn that I disagree with

10   Mr. Scheff on just about every point that he made this

11   morning, and let me -- let me first start with the --

12   with the release.

13          I think that as with any analysis, we first

14   return to the statutory language.  And the statutory

15   language of the False Claims Act which governs the

16   release, is found in 31, U.S.C., Section 37(b)(1).

17          And in relevant part, that provides that, "A

18   person may bring a civil action for violation of

19   Section 3729 for the person and for the United States.

20   The action shall be brought in the name of the

21   government."

22          And the relevant language is, "The action may

23   be dismissed only if the Court and the attorney general

24   give written consent for the dismissal and the reasons

25   for consenting."

1    Now, as Mr. Scheff pointed out, there is no

2  Third Circuit law directly on point.  The only case in

3  the Third Circuit which alludes to this, as Mr. Scheff

4  pointed out. is <u>Rodriquez v Our Lady of Lourdes Medical</u>

5  <u>Center</u>, 552 F.3d 297 at page 301, and what the Third

6  Circuit mentions there is that, "Although this court

7  has not yet ruled on the matter, most courts have held

8  that the government retains the right to veto any

9  settlement agreement reached by a private False Claims

10  Act plaintiff."

11    And it refers three circuit court decisions.

12  It refers to <u>United States Ex Rel Ridenour</u>,

13  R-I-D-E-N-O-U-R, <u>v Keyser Hill Co., LLC</u>, a Tenth

14  Circuit 2005 decision which says in relevant part,

15  "Even where the government has declined to intervene,

16  relators are required to obtain government approval

17  prior to entering a settlement or voluntarily

18  dismissing the action."

19    The second case is <u>United States v. Health</u>

20  <u>Possibilities, PSC</u>, 207 F.3d 355 339, a Sixth Circuit

21  case cited in 2000, which holds that Section 3730(b)(1)

22  provides the government with an absolute veto of any

23  proposed qui tam settlement because the plain language

24  of the statute does not limit this right.

25    And, finally, it refers to <u>Searcy</u>,

34

1   S-E-A-R-C-Y, <u>v The Phillips Electronics North American</u>

2   <u>Corp</u>, 117 F.3d 154 at pages 159 and 160, a Fifth

3   Circuit 1977 decision which holds that Section

4   3730(b)(1) is "unambiguous as one can expect" and that

5   the statute plainly requires the government's consent

6   to settlements and dismissals of Federal Claims Act

7   actions.

8          THE COURT:  Mr. Orlofsky, do those cases

9   involve qui tam cases where the government has chosen

10  to intervene?

11         MR. ORLOFSKY:  They do not.

12         THE COURT:  Okay.

13         MR. ORLOFSKY:  They do not.  But let me --

14         THE COURT:  As with this case?

15         MR. ORLOFSKY:  That's correct, Your Honor,

16  but let me --

17         THE COURT:  Okay.

18         MR. ORLOFSKY:  -- let me finish my thought.

19         THE COURT:  Okay.

20         MR. ORLOFSKY:  The cases which Aventis relies

21  upon, <u>United States Ex Rel Holley (ph) v. Teledyne</u> and

22  <u>United States Ex Rel Radcliffe v. Perdue Farm, LLP</u>, a

23  Ninth Circuit 1997 decision and a Fourth Circuit 2010

24  decision, involved cases where the relator had signed

25  releases prior, and this is important, Your Honor,

1    prior to filing a qui tam action, not after a qui tam

2    action was filed.  And so the courts in both instances

3    found the releases to be effective.

4         Now, the statute does not talk about releases

5    signed prior to the filing of a qui tam action.  Now,

6    Aventis may not like it, but that's -- I think that

7    Aventis and for that matter, Mr. Gohil, are stuck with

8    the language of the statute.  And as one of the courts,

9    one of the circuit courts which I just cited says, the

10   language is unambiguous and that the government must

11   consent to the dismissal or the release of the qui tam

12   action.

13        And I'm -- and the release here was signed,

14   and I don't think -- I think it's undisputed -- over

15   three years after the qui tam action has been filed.

16   And so I think that the release just as a matter of

17   statutory interpretation is just ineffective.

18        Notwithstanding the arguments which Mr.

19   Scheff advanced about what the government knew and when

20   it knew it, it just, as a matter of statutory

21   interpretation, the release was ineffective.

22        And the release itself, which is attached to

23   the papers which have been filed by Aventis, and nobody

24   disputes that the release was signed and what the

25   release says, the release says it's governed by New

36

1   Jersey -- by New Jersey law, and I submit that the

2   release -- whether the release is effective is a

3   question of federal law, not state law.

4           And so regardless of what New Jersey law may

5   say about the scope of releases and whether the release

6   is effective as a matter of state law don't matter,

7   that it's a matter of federal law and there are three

8   circuit courts upon which -- to which I've just

9   referred Your Honor which have said that a release

10  which is signed after a qui tam case has been filed are

11  simply not effective unless -- unless the government

12  consents.

13          Now, I'm sure that Your Honor knows after

14  having read the -- read the briefs that there is

15  certainly a vigorous disagreement between the parties

16  about what happened and what legal conclusions are to

17  be drawn from the facts in this case.

18          I don't think the facts are really -- are

19  really in dispute.  And I -- you know, what's

20  interesting about this is, you know, the timing.  I

21  don't think there's any dispute about when the CEPA --

22  the CEPA action was filed and when the first amended

23  complaint was filed.  The CEPA action was filed on

24  August 23rd, 2002, and the first amended complaint was

25  filed on July 23rd, 2002.

1        Aventis contends that the -- the CEPA action

2   was used by Mr. Gohil as a discovery device in support

3   of the qui tam case.  And we contend and we -- and we

4   said this if you -- in footnote 18, which appears at

5   page 15 of our brief, that -- that just -- that it's

6   just disingenuous for Aventis to make the argument that

7   -- that the discovery which was taken in the CEPA

8   action was used to conduct discovery in support of the

9   qui tam action.

10        First of all, as a matter of -- as a matter

11   of timing, that couldn't have happened because the

12   first amended complaint had already been filed shortly

13   after -- hadn't -- no discovery had occurred in the

14   CEPA action when the -- when the first amended

15   complaint has been filed.

16        Now, I think -- I'd like to hand up -- if I

17   may approach, Your Honor, I'd like to hand up Exhibit H

18   to our brief.

19        (Pause in proceedings.)

20        MR. ORLOFSKY:  May I approach, Your Honor?

21        THE COURT:  Yes, sure.

22        (Pause in proceedings.)

23        THE COURT:  Thanks.

24        (Pause in proceedings.)

25        MR. ORLOFSKY:  Your Honor, I'd hate to say

1    that a picture is worth 1,000 words because this is a

2    word picture which contains much more than 1,000 words,

3    and Your Honor had a lot of -- a lot of words before

4    you in the various briefs and exhibits which have been

5    filed in this case by both sides.

6            But, what Exhibit H is an attempt to do is to

7    compare the allegations of the amended qui tam

8    complaint with the first amended qui tam complaint to

9    demonstrate to Your Honor what was contained in the two

10    complaints.

11            Now, Mr. Scheff, you know, very eloquently

12    and somewhat, if I may say, cavalierly said that

13    basically they're the same and that having been turned

14    down by the government with respect to Anzemet, Mr.

15    Gohil regrouped and focused on Taxotere.

16            And this is an effort to demonstrate to Your

17    Honor that -- essentially, that there were very few

18    changes substantively between -- between the two

19    complaints, and we went through that analysis in our --

20    in our brief.

21            As Your -- as Your Honor is aware, the -- God

22    help us, the Third Circuit has adopted an algebraic

23    formulation to determine whether there has been a

24    public disclosure.

25            It appears in the Dunleavy case and was taken

1  by the Third Circuit from a DC circuit case.  It's if X

2  plus Y equals Z, where Z represents the allegation of

3  fraud and X and Y represents essential elements, in

4  order to disclose the fraudulent transaction publicly,

5  the combination of X and Y must be revealed.

6        And we have gone -- we've taken -- we've gone

7  through the analysis in the brief with respect to the

8  four counts of the complaint, and I won't take Your

9  Honor through that because it's a tedious, time

10  consuming process, but we've undertaken -- we've

11  undertaken that analysis.

12        And as you can see, Your Honor, we come -- we

13  come to a different conclusion than does Mr. --

14  respectfully, than does Mr. Scheff with respect to --

15  with respect to what the second amended complaint says.

16        Now, you know, what I think -- what I think

17  is important -- what I think is important for Your

18  Honor to understand is that we have -- obviously, we

19  have not had the benefit of any discovery.  You know,

20  Mr. Scheff sort of says that, you know, we -- we, Gohil

21  and his lawyers, have stonewalled him.  I mean this --

22        I think it's fair to say that yes, this case

23  has been litigated ferociously, not just by Mr. Gohil's

24  lawyers, but by Mr. Scheff and his colleagues.  I don't

25  think -- you know, I don't think Mr. Scheff has been

40

1  shy about litigating this case either, and I'm not --

2  certainly not being critical, but I think both sides

3  have been zealous in representing their respective

4  clients, and that's just the way these cases proceed.

5      So -- but I, you know, no quarter has been

6  asked and no quarter has been given and yes, we did --

7  you know, we did litigate vigorously and I think Mr.

8  Scheff ultimately got whatever the courts ordered Mr.

9  Gohil to provide.

10      So, I don't think he can say that he didn't

11  get whatever he ultimately sought, whatever the courts

12  ultimately directed us to provide.  So he's --

13  whatever -- whatever jurisdictional discovery he sought

14  he ultimately received from the courts.

15      Now, he's made -- he's made a couple of

16  arguments here about some other things.  I'd like to

17  show Your Honor -- he made reference to a public

18  disclosure contained in a Wall Street Journal article

19  which I would like to hand up to Your Honor.

20      (Pause in proceedings.)

21      MR. ORLOFSKY:  This is the so-called -- I

22  only have one copy, Judge.  This is the so-called

23  September 15th, 1997, article, which appeared in the

24  Wall Street Journal.

25      THE COURT:  Thank you.

41

1          MR. ORLOFSKY:  I have one extra copy.  This

2     is about a different drug, Lovenox, and there's a one

3     sentence reference in here to Taxotere.  And when Your

4     Honor takes the time to read it, as I did the first

5     time, you'll have trouble finding the reference to

6     Taxotere.  I had to read it once or twice.  Your Honor

7     is probably more perceptive than I am, but it took me

8     one or two readings to find it.  But, you know, I was

9     scratching -- frankly, I was scratching my head to find

10     out, you know, what this was all about when I read it.

11     I'll let Your Honor obviously be the Judge of it, but

12     it hardly, you know -- I couldn't understand what all

13     the shouting was about.  But I'll let Your -- I'll let

14     Your Honor decide that.

15          So it is what it is, Judge.  I -- you know, I

16     found that I was somewhat startled when I looked at it

17     to see what -- what all the -- what all the fuss was

18     about.  But that's what it is.

19          Now, you know, there's also a reference to

20     poor Mr. Poplar, who Mr. Scheff -- Mr. Scheff is trying

21     to throw under the bus here today --

22          (Pause in proceedings.)

23          MR. ORLOFSKY:  -- who wrote some letters to

24     the Department of Justice.  There's a July 20th, 2005,

25     letter and there is a May 18th, 2005, letter, which

42

1    I'll hand up to --

2              THE COURT:  Sure.

3              MR. ORLOFSKY:  -- Your Honor if I may

4    approach.  Do you have copies for --

5              MR. SCHIFF:  I think we have all the copies.

6              MR. ORLOFSKY:  I think Mr. Scheff has them.

7              THE COURT:  Okay.

8              MR. ORLOFSKY:  He's probably been

9    highlighting them for years in anticipation of making

10   this argument.

11             THE COURT:  Thank you.

12             (Pause in proceedings.)

13             MR. ORLOFSKY:  Judge, those letters and the

14   language contained in those letters are not

15   dispositive, regardless of what Mr. Poplar may have

16   said.  Mr. Scheff, you know, characterizes them as

17   admissions.  That's -- you know, that's -- that's a

18   lawyer's argument.  It's not dispositive.

19             Your Honor is going to have to undertake the

20   analysis that the Third Circuit requires in Dunleavy to

21   see if, you know, they are an admission.  I

22   respectfully submit that regardless of what language

23   Mr. Poplar used, that it's the Third Circuit's analysis

24   that ultimately -- ultimately will govern.

25             I'm a little bit taken -- oh, one other

1    thing.  Mr. Scheff made reference to the Supreme

2    Court's decision in the famous Rockwell case, which

3    involved the engineer out in Colorado who was a relator

4    who was at a nuclear power plant involving concrete

5    blocks and he predicted that the concrete blocks would

6    fail for a particular reason, and, ultimately, they

7    failed for a different reason.

8         And the Supreme Court ultimately concluded

9    that he had not stated a false claim because the

10   failure -- the ultimate fail -- the case was tried and

11   the jury found that the concrete blocks and the leakage

12   failed for a different reason than the reason than the

13   reason that he originally had predicted.

14        Well, that's not this case, Judge.  It just

15   isn't.  And you could understand why the Supreme Court

16   reached the conclusion that it reached.  Rockwell is

17   certainly distinguishable from this case.

18        Now, I heard an argument today, and I'm

19   certainly not being critical of Mr. Scheff, because as

20   he points out correctly, jurisdiction can be raised at

21   any time.  And I'm not being -- I'm not suggesting that

22   he stole the march or that he did anything untoward,

23   but I'm hearing for the first time the argument that

24   there was a 12-day discrepancy about when Mr. Gohil

25   disclosed the information to the government.

1          I certainly -- I would like an opportunity to

2    review that and submit a short supplemental letter to

3    the Court about it --

4          THE COURT:  Sure.

5          MR. ORLOFSKY:  -- because I'm -- I just --

6    I'm not -- you know, I'm not complaining because he has

7    the right to raise a jurisdictional issue at any time,

8    as does Your Honor, but I simply would -- I'm not in

9    the position to respond to it because I'm hearing it --

10   I'm hearing it for the first time.  So with respect to

11   that, I --

12         THE COURT:  Can you get me a letter

13   addressing that?

14         MR. ORLOFSKY:  Yeah, a short letter, Judge,

15   if I may, one or -- one or two pages, and we'll get it

16   to you in the next few days.  And if -- obviously, Mr.

17   Scheff is free to disagree with me once again about --

18   about the import of it, but I certainly would like to

19   have an opportunity to look at the interrogatories he's

20   talking -- he's talking about and that he referenced in

21   his oral argument -- that he referenced in his oral

22   argument today.

23         We said in our brief that Anzemet is not --

24   we're not seeking relief in the second amended

25   complaint against Aventis for any claims based on

1  anzemet.  We conceded that in the brief.

2          I'm not so -- you know, I guess today Mr. --

3  Mr. Scheff is saying well, you know, Mr. Gohil is

4  essentially seeking a second bite at the apple.  Having

5  been turned down for Anzemet, he's now attempting to

6  assert a false claim based on Taxotere while Mr. -- Mr.

7  Gohil had exposure at Aventis both with respect to

8  Anzemet and Taxotere.  I don't know that his status is

9  an original source for Taxotere.

10          Taxotere should be -- is fatal simply because

11  he also had exposure to Anzemet.  I think that our

12  position with respect to his status as an original

13  source with -- for Taxotere is not necessarily tainted

14  because he also had exposure for Taxotere.

15          And I might add that, you know, they --

16  essentially, in their papers, although it's not clear

17  from what Mr. Scheff said this morning, in their papers

18  they seemed to at least concede that he was an original

19  source with respect to the period of time when he was

20  employed at Aventis before he left for Taxotere.

21          Now, they do contest whether he could be an

22  original source, whether he had personal and

23  independent knowledge with respect to his

24  pre-employment and post-employment for Taxotere.

25          And I think on those issues, Judge, I don't

1  know if you have to actually reach that today.  We're

2  at the pleading stage here.  And what the courts have

3  said is that, you know, first of all, Mr. Gohil was

4  trained on what we contend are Aventis' fraudulent

5  marketing tactics and how Aventis conducted its

6  business in the past, and he can have direct and

7  independent knowledge, which would qualify him as an

8  original source, for acts that occurred after he left

9  his employment.  And there's certainly case law in this

10  circuit that talks about that.  The Stinson (ph) case

11  is one such case.

12       What's key is is does he have direct and

13  independent knowledge of the key elements of the

14  fraudulent scheme, and that doesn't necessarily require

15  him to have been present.  There could have been key

16  elements that occurred before he got there and there

17  could have been key elements that occurred after he

18  left.

19       I just don't -- just don't think that Your

20  Honor's in a position, nor are we, to make that

21  determination today.  And since they've essentially

22  conceded, at least in their papers, that he was an

23  original source certainly with respect to the time for

24  which he was employed while -- the time that he was

25  employed at Aventis.

47

1          I don't think you have to reach that issue

2    and, you know, if Your Honor denies their motion, I

3    think it will come known as no great shock to Your

4    Honor that if the complaint proceeds, we're going to be

5    back before Your Honor at some point in this case on

6    summary judgment, and that issue I'm sure will be

7    raised again.  But I don't think that Your Honor

8    necessarily has to reach that -- that issue today.

9          So I think I -- I've addressed all of the

10   points that -- well, there's one other point.  There

11   was some -- there was some discussion by Mr. Scheff

12   about the DDMAC letters, and I think -- I think we

13   talked about that in our brief.  Mr. Gohil was -- was

14   actually deposed about that during his -- during the

15   jurisdictional discovery that was taken in this case.

16   Give me a moment here.

17          (Pause in proceedings.)

18          MR. ORLOFSKY:  He was certainly deposed about

19   the DDMAC letters and the sham disciplinary proceedings

20   against his superior.  And I think he talked --

21   although he didn't have them or he may have -- he may

22   have come across them during the discovery in the CEPA

23   case, he testified that he was certainly aware of them

24   while he was employed at Aventis, and he was aware of

25   the sham disciplinary proceedings against -- against

48

1    Buffone (ph) and the DDMAC -- DDMAC letters.

2         And I think that -- we did attach those as

3    Exhibit E to our brief, and I think he -- what he did

4    say is that -- that he -- that that information he did

5    obtain during the course -- during the course of the

6    discovery in the CEPA case, but he was certainly aware

7    of that while he was employed, employed at Aventis.  So

8    he knew about that stuff, he just didn't have it and he

9    came across it -- he came across it in the CEPA case.

10        I might add, Judge, that that's not

11   necessarily a transaction or allegation within the

12   meaning of the Federal False Claims Act.  It's

13   information, and information does not trigger the

14   jurisdictional bar.

15        It's only transactions or allegations that

16   trigger the jurisdictional bar, and we describe that I

17   think in our papers as evidentiary materials in support

18   of the claim.

19        So I think that's the only other thing that

20   Mr. -- you know, Mr. Scheff talked about that being on

21   the -- on the website, and I just don't think that

22   that's critical here.  So unless Your Honor has any

23   questions, I think I've covered, or I certainly hope

24   I've covered Mr. Scheff's presentation.

25        THE COURT:  Thank you, Mr. Orlofsky.

49

1              MR. ORLOFSKY:  Thank you, Your Honor.

2              THE COURT:  We're going to take just a short

3    break.  I know you're dying to respond to what he said.

4              MR. SCHIFF:  Only for three or four minutes,

5    Judge.  We can obviously take a break as the Court

6    desires.

7              THE COURT:  Let's take a -- let's take a

8    short break.  We've been in here about an hour and a

9    half.

10             MR. SCHIFF:  Sure.

11             THE COURT:  And we'll just take a five to ten

12   minute break.

13             MR. ORLOFSKY:  Thank you, Your Honor.

14             THE COURT:  All right, thank you.

15             (Recess, 10:21 a.m. to 10:32 a.m.)

16             MR. SCHEFF:  -- ... 2002 because Mr. Gohil

17   didn't comply with the statutes.  He filed he qui tam

18   case first on May 17th and then he made his disclosures

19   to the government on May 29th.

20             As Mr. Orlofsky says, you know, we live and

21   die by the plain language of the statute, and the plain

22   language of the statute provides for that.  So this

23   case should have been dead on arrival in 2002.  Mr.

24   Gohil is not entitled to be a relator.

25             The second reason why it applies to the

1    entire case, not just the time periods before and

2    after, although it obviously does based on the public

3    disclosures that we provided, is the Wall Street

4    Journal article because that discloses the scheme

5    relating to Taxotere (inaudible) to grants.

6            And, you know, it doesn't matter whether Mr.

7    Gohil knew of that article, didn't know of that

8    article.  It's a public disclosure.  And, honestly, it

9    doesn't matter whether it's one sentence, two

10   sentences, three sentences, but it is more than one

11   sentence.

12           So, there is no subject matter jurisdiction

13   in this case.  And the Court -- it's pretty clear that

14   the statute provides that under these circumstances.

15   We've had discovery.  This case should not be going to

16   summary judgment on that basis, discovery shouldn't go

17   forward on that basis.

18           With respect to the argument that -- this

19   claim by claim analysis argument that Mr. Orlofsky

20   makes, again, I would refer the Court to the Rockwell

21   case, and our description of the Rockwell case on this

22   particular point is located in footnote 32 of our

23   principal brief.

24           You really have to look at the facts that are

25   alleged, and it's a different scheme that is alleged in

1  the first amended complaint versus the second amended

2  complaint, and you can't have a trivial claim of fraud

3  alleged and try to preserve claims that way.  It

4  doesn't work that way, and that's what _Rockwell_ says.

5  So the first amended complaint simple comparison to the

6  second amended complaint demonstrates they are

7  different theories, different claims.

8           I'll turn very, very briefly to the release.

9  You know, we agree with Mr. Orlofsky, and it's in our

10 brief, the scope of the release is governed by New

11 Jersey law, broad, unequivocal, no exceptions.

12          The enforceability is governed by federal

13 law, that's _Rumery_.  It's a public policy analysis.

14 It's not the statutory analysis that Mr. Orlofsky

15 refers you to because we're not trying to boot the

16 government from making the claim.

17          All we're trying to say to the Court and all

18 we're saying is is that Mr. Gohil can't be a relator.

19 And we agree with the government that if the Court

20 finds that the release is effective and broad and that

21 the public policy reasons that I've argued in my

22 principal argument apply, and we think they do, the

23 government had adequate opportunity to examine the

24 facts of this case, then the Court ought to dismiss the

25 case without prejudice, and Mr. Gohil can't proceed as

52

1    the relator.  If the government wants to, then the

2    government then can choose to.  Thank you, Your Honor.

3              THE COURT:  Thank you.

4              MR. SCHIFF:  I'm going to turn this over to

5    Mr. McCully.

6              (Pause in proceedings.)

7              THE COURT:  Good morning, Mr. McCully.

8              MR. McCULLY:  Good morning, Your Honor, and I

9    will try to be brief in my remarks.  I want to switch

10   gears just a little bit here and switch from

11   discussions of jurisdiction and releases to a

12   discussion of adequacy of pleadings.

13             Although I will submit as I sat listening to

14   the argument that there are overlaps.  And one of the

15   things that we will talk about here this morning is

16   Rule 9(b)'s requirement that averments of fraud be pled

17   with particularity and that there are some courts who

18   continue to hold to a stance that that requires in a

19   False Claims Act case for actual false claims to be

20   included with the complaint.

21             Again, as I sat here listening to the

22   argument about did the first amended complaint, the

23   second amended complaint, did those -- are they the

24   same complaints?  Are they two completely different

25   ones?  I couldn't help but be struck by the notion that

53

1   if we required FCA relators to provide particular

2   allegations with respect to the entire False Claim Act

3   starting from the private scheme all the way through

4   the claim itself, we might not have some of those

5   difficulties of trying to understand exactly what it is

6   that they are claiming in the case.

7           I think we also find that we have been

8   subjected somewhat, and I'll talk about that again in

9   my remarks here today, to the notion that we're

10  sometimes toting a little bit of a moving target in

11  terms of what the allegations are.  And, again, that's

12  because we have not been provided with details of the

13  entire alleged violation all the way up to the time of

14  the claim itself.

15          So let me back up just a little bit then

16  we'll get back to that point.  The complaint falls in

17  several respects to comply with Federal Rule of Civil

18  Procedure 9(b) and with 12(b)(6), providing some

19  additional bases on which to dismiss the second amended

20  complaint.

21          Federal Rule 9(b) requires that all averments

22  of fraud or mistake that the circumstances constituting

23  the fraud or mistake shall be stated with

24  particularity.  And there's no dispute that actions

25  brought under the False Claims Act must comply with the

54

1    strictures of Rule 9(b).

2            Third Circuit law clearly states that 9(b)

3    requires at a minimum that a plaintiff supports its

4    allegations of fraud with all the essential factual

5    background, that is the who, the what, the where, the

6    when, and the how of the events at issue.  That comes

7    from the Third Circuit case <u>Rockefeller Center</u>

8    <u>Properties</u> litigation.

9            The purposes of 9(b) have been explained as

10   threefold and, again, this is -- this is from the <u>In</u>

11   <u>Re: Burlington Coat Factory</u> case, the Third Circuit

12   case back to 1997.

13           And the Third Circuit back in 1997 said that

14   we see that there are three purposes to Rule 9(b).  One

15   is to give defendants notice of the claims against

16   them.  Again, that goes a bit to the statement I made a

17   little bit earlier in terms of trying not to tilt at a

18   moving target here from the beginning, that we have

19   notice of exactly what claims are being brought against

20   us so that we can provide and mount the appropriate

21   defense.

22           Two is to provide defendants an increased

23   major protection for their reputations.  In other

24   words, make the plaintiff provide enough detail so that

25   it's not seen as just an exercise in throwing down some

55

1    words on paper at the damage to the defendant's

2    reputation.

3          I think the third one that the Third Circuit

4    stated in <u>Burlington Coat Factory</u> is also a very

5    important one to remember, and that's to reduce the

6    number of frivolous suits brought solely to extract

7    settlements.

8          These three purposes, again, to Rule 9(b)

9    require the pleading of the who, what, the where, the

10   whens, and the hows.  And in the context of an FCA, a

11   false claims case, the allegations of fraud to be

12   stated with particularity must include the false claims

13   themselves.  That is statements that have been made by

14   numerous courts within the Third Circuit.  That is it's

15   not enough to merely describe a private scheme in

16   detail and then conclude that false claims must,

17   therefore, have been submitted.  There must be some --

18   some detail given about false claims themselves.

19         So we have two things to analyze in the Rule

20   9(b) context.  First, the alleged private scheme by

21   Aventis, and second, the means -- or excuse me -- the

22   nexus between that scheme and the filing of a false

23   claim such that we have an actual violation of the

24   False Claims Act.

25         Without that nexus, that causal connection,

56

1    and the false claim, the private scheme alleged by

2    Gohil to have existed at Aventis does not in itself

3    violate the False Claims Act.

4         So first, the alleged private scheme, it's

5    important to note and, again, this goes somewhat

6    hand-in-hand with some of the remarks made by Mr.

7    Scheff regarding Mr. Gohil's times of employment and

8    his direct and personal knowledge of  circumstances.

9         But if you look at the second amended

10   complaint, the earliest dates set forth in the

11   complaint are 2001, which makes sense, given that the

12   relator would not have had personal knowledge of events

13   at Aventis prior to his joining Aventis in December of

14   1999.

15        I didn't find allegations prior to 2001.

16   There may have been some in there in 2000.  But they

17   clearly couldn't -- there clearly were no dates given

18   of circumstances under this fraudulent marketing scheme

19   prior to 1999.

20        Mr. Gohil wants to claim damages for a period

21   of time in 1996 to 2004, but he doesn't provide any

22   sense of particularity for any actions that occurred

23   prior to his joining in 1999.  The who, the what, the

24   where, the when, and the how details just simply aren't

25   there from 1996 to 2000, and that in and of itself

57

1    violates Rule 9(b) and certainly is in itself grounds

2    to at least dismiss that part of the complaint that

3    seeks damages prior to the time in which we are given

4    details about the alleged fraud.

5         With respect to the time periods from 2000,

6    2001 forward and Gohil begins pleading some of the who,

7    what, when, where info, his second amended complaint is

8    sufficient primarily in the second part of the Rule

9    9(b) evaluation, are there actual false claims and is

10   there a causal connection between the alleged

11   activities of Aventis and these false claims?

12        Now, our briefing in this matter, and again,

13   we filed that briefing several years ago, but our

14   briefing in this matter argued for the need of the

15   presentment with a complaint of an actual false claim

16   submitted, the false claim being the signed qui non of

17   an FCA action.

18        Our brief and our reply brief detailed the

19   many courts that have adopted this holding as a part of

20   the Rule 9(b) requirement in False Claims Act cases

21   including the Eighth and Eleventh Circuits and the

22   Third Circuit in the context of a summary judgment

23   motion, that there actually be false claims submitted

24   in order to withstand the motion to dismiss or in the

25   case of the Third Circuit case to withstand the motion

58

1  for summary judgment.

2          The Third Circuit did rule in the Quinn case,

3  and it was reiterated just a couple years ago in the

4  Wilkins case that at summary judgment there will come a

5  time in any FCA action in the Third Circuit wherein

6  actual claims are going to have to be presented.  So,

7  it is not that you can rely upon the pleading of a

8  scheme and then continue to presume that false claims

9  were actually filed.  False claims are going to have to

10  be presented at some point in time.

11          We made the argument in our briefs that now

12  is the time to do that based upon the rulings of

13  numerous courts and based upon the rulings of courts in

14  the Eighth and Eleventh Circuits, based upon rulings of

15  courts in this Circuit that were in existence at the

16  time.

17          And based upon the fact that this is a case

18  that at the time we filed our motion to dismiss in 2010

19  and then replied in 2011 had been around for nine years

20  if you go all of the way back to 2002.  The second

21  amended complaint had been around for four years at

22  that point in time if you go back to its filing in

23  2007.

24          Plenty of time, under the circumstances of

25  this case, if Mr. Gohil was a true individual with

59

1    direct and personal knowledge and a true original

2    source to have gathered together at least some examples

3    of these false claims.

4         Given the fact that this is a case where the

5    defendant, Aventis, is not in possession of false

6    claims, the argument often heard is let us do discovery

7    and we will find those claims once we are able to get

8    them from the defendant, that's not going to be the

9    case in this particular matter.  This is a third party

10   filing case, Aventis does not have those claims in its

11   possession.

12        So, we made that argument back in 2010, 2011,

13   and, you know, we continue to stand by that argument

14   not so much because the cases require claims to be

15   presented to the Court, but because the cases do

16   require a pleading of particularity and the cases do

17   require that if you don't have a claim submitted that

18   you have to have satisfied this particularity

19   requirement by some alternative means of injecting

20   precision and substantiation into your allegations of

21   fraud.  And, again, there can be no fraud without the

22   ultimate filing of false claim.

23        If Mr. Gohil's complaint injected some other

24   alternative means of precision and substantiation, we

25   would not necessarily be here asking for an actual

60

1    false claim, but it does not.

2         His complaint sets forth paragraphs about the

3    alleged private scheme at Aventis and then asks this

4    Court to simply jump to the conclusion that the

5    messages supposedly given by Aventis were heard, the

6    messages supposedly given by Aventis were heard and

7    complied with, that doctors acted upon those messages

8    to the absence of any other sort of medical judgment

9    decision, and that those doctors then sought

10   reimbursements for treatment that were not medically

11   necessary.

12        That's a lot of jumps to make from one set of

13   events happening to the necessary set of events

14   happening, which is that a false claim for a medically

15   unnecessary treatment was filed by a doctor and that

16   that doctor made all of those decisions based upon any

17   sort of alleged misconduct by Aventis, and we simply

18   don't think that the complaint has that in it.

19        If Mr. Gohil had some actual false claims to

20   show us that met those things, that would be one way to

21   meet the requirement of Rule 9(b).  He has not given us

22   that.

23        We have to look at the complaint itself and

24   the complaint itself doesn't have the necessary detail

25   of particularity in it to withstand a Rule 9(b)

61

1    scrutiny and should be dismissed on those grounds.

2           And again, any argument that -- Judge, this

3    is a motion to dismiss stage, and we can do discovery,

4    it just simply does not make sense in this particular

5    aspect where, again, the information to be found is not

6    going to be in the hands of the defendant, and the

7    information that is missing is something that if Mr.

8    Gohil did, indeed, have this direct and personal

9    relationship and knowledge that these things were

10   happening could have been something that he

11   independently obtained, the government has had this

12   case for a number of years and certainly has all of the

13   tools at its disposal to conduct investigations and has

14   not come forward with any sort of ways to fill in those

15   gaps.  So, that's where we are with 9(b).

16          Let me turn real quickly to a couple of

17   12(b)(6) arguments, although again there is still some

18   9(b) that overlaps in there.  First deals with Count 1,

19   the conspiracy claim.

20          We argued in our briefs that Mr. Gohil's

21   Count 1 should be dismissed because it fails to state a

22   claim as a matter of law.  His Count 1 is that Aventis

23   conspired with its sales force, its outside consultants

24   and various healthcare providers to violate the False

25   Claims Act in violation of Section 3729(a)(3) of the

62

1    False Claims Act.  The problem with Mr. Gohil's Count 1

2    is that the notion of a conspiracy doesn't show up

3    anywhere else in the complaint.

4          In fact, the entire gravamen of the second

5    amended complaint is that Aventis engaged in this

6    fraudulent marketing scheme to unduly influence doctors

7    to make bad medical decisions and to then file claims

8    for reimbursement for those prescriptions that resulted

9    from those decisions.

10          The entire gravamen is that this was an

11   Aventis deal.  There are no specific doctors named in

12   the complaint who bought into this thing, and there

13   certainly is no statement at all in the complaint of

14   any sort of an agreement or meeting of the minds to

15   violate the False Claims Act.

16          There are no statements of a meeting

17   occurring between Aventis and healthcare providers,

18   notes and because of that, no statements about when

19   such a meeting happened, where such a meeting happened,

20   how such a meeting happened and what was decided.

21          All we have is that Aventis engaged in

22   certain events, off-label marketing and kickbacks,

23   doctors must have engaged in some certain events

24   prescribing and filing for reimbursement.  There is no

25   attempt anywhere in the complaint to connect those two

63

1    together until we get to three paragraphs in Count 1,

2    which is conspiracy.

3                THE COURT:  Who are the alleged

4    co-conspirators for Count 1?

5                MR. McCULLY:  Who are?

6                THE COURT:  Yes

7                MR. McCULLY:  Sales force and outside

8    consultants which I argue is that's simply impossible

9    to conspire with your own agents.  They enter corporate

10   conspiracy doctrine and, again, Mr. Gohil concedes that

11   that's not what he intended by his conspiracy count.

12   His conspiracy count, he states that his intent really

13   was to get to any agreement between Aventis and

14   healthcare providers.

15                There are healthcare providers named in Count

16   1 by letter, by an alpha letter, but again there is

17   nothing within the body of the complaint itself which

18   suggests that any meetings ever occurred or any

19   agreements ever existed between Aventis and these

20   healthcare providers until we get to that conspiracy

21   count.

22                THE COURT:  All right.  Thank you.

23                MR. McCULLY:  And then with respect to Counts

24   3 and 4 of Mr. Gohil's complaint, those deal with

25   violations of 3729(a)(1), false claim, 3729(a)(2), a

64

1    false statement to cause a false claim.

2            We argued in our brief again that to the

3    extent that Mr. Gohil is alleging that these violations

4    occurred because of an off-label marketing on the part

5    of Aventis, that those claims could not go forward

6    because they fail to state a claim.

7            Mr. Gohil is seeking damages for any claims

8    made for reimbursement for off-label uses of Taxotere.

9    That is not the standard.  An off-label use of a

10   product is, you know, generically understood to mean

11   something that is different than the indications listed

12   in the label.  I think that's how we all understand

13   off-label.

14           But, the Medicare statute and regulations at

15   issue here don't restrict the reimbursement for a

16   product to on-label, indicated uses.  That is one of

17   the diagnoses for which Medicare will reimburse, but it

18   will also reimburse for anything that is considered to

19   be a medically accepted indication.

20           And we can look to not only the product

21   label, but to certain published drug compendia to

22   determine whether or not the product has a medically

23   accepted indication.

24           If we look at Mr. Gohil's complaint we are

25   dealing with Taxotere.  Taxotere up until 2002 had two

65

1   labeled indications, second line treatment for

2   non-small cell lung cancer, and second line treatment

3   for breast cancer.

4          The compendia that we can use in addition to

5   the label to determine whether or not Medicare would

6   have paid these claims also included each of those two

7   treatments of cancer in a first line regimen, as well

8   as small cell lung cancer, ovarian cancer, prostate

9   cancer, bladder cancer, gastric cancer and esophageal

10  cancer, and these compendia are listed in Exhibits 14

11  to 16 of our motion to dismiss.

12         Any claim for reimbursement under which a

13  provider listed one of those diagnoses as a part of the

14  claim would have been treated by Medicare as something

15  medically accepted in terms of an indication and the

16  claim would have been paid.

17         The only two off-label promotions that Mr.

18  Gohil talks about in his complaint are first line

19  non-small cell lung cancer and ovarian cancer.  Again,

20  both of those indications were listed in medical

21  compendia as early as 1998.  That's Exhibit 14 to the

22  motion to dismiss.

23         Mr. Gohil in his response indicated that I am

24  not limiting my off-label comments to just those two

25  medical situations.  My complaint is broader than that.

1  To the extent that that's his response we once again

2  run afoul of Rule 9(b).  We see in the complaint

3  specific allegations about non-small cell lung cancer,

4  first line and ovarian cancer.

5          We argue that there is a defense to that.  We

6  are then told no, I meant more than that.  Again, it

7  comes back, it all comes full circle again.  If we had

8  particularity to begin with, if we had some claims to

9  begin with then we can start to see what it is that we

10  actually have to defend ourselves against here.

11          Viewed holistically this complaint simply

12  does not have the degree of precision in it that allows

13  Aventis to muster a defense and be assured that as it

14  puts a defense together that that target won't move on

15  it, and I think that that's a real basis for why Rule

16  9(b) exists and a real basis -- and I think we have

17  real world examples here of why it has not been

18  working.

19          Again, we anticipate that you will hear and I

20  am sure this Court is well aware that there have been a

21  number of decisions since we filed our briefing of

22  courts in this very courthouse that have determined

23  that it is not necessary to have a specific claim in

24  order to withstand a Rule 9(b) motion at the motion to

25  dismiss stage, and we are not going to argue with that.

67

1   We are suggesting that none of those courts have stated

2   that that's not a bad idea or that that's a bad idea, I

3   am sorry, to include those kinds of claims.

4           Each one of those courts has suggested there

5   has to be something additional to inject some precision

6   substantiation into the complaint to show that we've

7   got a scheme and we've got a connection there between

8   the scheme and the false claim itself.

9           We are simply suggesting that in this

10  particular case, given the amount of time that has

11  passed and given the apparent lack of this relator to

12  show personal experiences of doctors that have

13  prescribed based upon an off-label promotion or a

14  kickback scheme that false claim may be his only way to

15  get us that level of precision, substantiation.

16          Since that is missing we don't have Rule 9(b)

17  complied with.  Even if we do we've got issues with

18  Counts 1, 3 and 4, and Rule 16, excuse me, Rule

19  12(b)(6) grounds as well as we laid forth in our brief,

20  and with that I will close, Your Honor.

21          THE COURT:  Thank you, Mr. McCully.

22          MR. ORLOFSKY:  Your Honor, I say here and

23  listened attentively to Mr. McCully's presentation and

24  it took me back.  Your Honor, if you'll permit me a

25  brief historical exposition.

1    I began my career clerking, and I won't tell

2 you when, for Mitchell H. Cohen, who was the chief

3 judge in the District of New Jersey for whom the

4 courthouse across the river is now named.

5    And I began as a law clerk and the first case

6 that came across my desk was a case called <u>Connolly v.</u>

7 <u>Gibson</u>, which has now fallen into disuse.  It's a Rule

8 56 case, and it was rather liberal in terms of what the

9 standard was for granting motions for summary judgment.

10    Then as I went into private practice with

11 Blank Rome, Ed Rome, one of the greatest lawyers of the

12 republic, and I went to the United States Supreme Court

13 to argue a case called <u>Matsucha (ph)</u>, which I'm sure

14 Your Honor has heard, which we lost much to our

15 surprise, you know, in the Supreme Court five to four

16 on what was found to be and what everyone now talks

17 about as a plausibility argument.  And now we have,

18 much to my surprise, <u>Twombly</u> and <u>Iqbal</u>.

19    Today, I find myself hearing about Rule 8(b)

20 and thinking have the Federal Rules of Civil Procedure

21 closed the courthouse doors entirely?  And I

22 respectfully submit, Your Honor, that that's not the

23 case, and let me tell you why -- why I believe that

24 that's not the case.

25    First of all, we have cited in -- as Mr.

69

1    McCully pointed out, there are cases within this

2    district which adopt a much more generous standard with

3    respect to motions to dismiss based on 8(b), and

4    we've -- we've cited those cases.

5         We principally rely upon <u>Underwood</u> and

6    <u>Schuman</u> decisions by Judge Ditter and Judge Diamond,

7    and we have also pointed out to Your Honor the Third

8    Circuit's decisions -- decision in <u>Civil Industry</u>

9    <u>Machinery Corp. v. Southmost Machinery Corporation</u>,

10   which is a 1984 decision of the Third Circuit.

11        More importantly, Judge, and Mr. McCully sort

12   of referred to it but didn't say it, is the Third

13   Circuit's decision in <u>Wilkins</u>, <u>United States Ex Rel</u>

14   <u>Charles Wilkins versus United Health Group</u>, 659 F.3d

15   295, decided in 2011, which was provided to Your Honor,

16   I guess it was provided to Judge Tucker and to Your

17   Honor who succeeded her in this case by way of

18   supplemental authority, and we think <u>Wilkins</u> has

19   effectively changed the legal landscape with respect to

20   federal FCA cases.

21        What did <u>Wilkins</u> say?  Well, it said a couple

22   of things, and for one thing, it made clear and it

23   said, "But to our knowledge we have never have held

24   that a plaintiff must identify a specific claim for

25   payment at the pleading stage of a case to state a

1    claim for relief," citing Fowler versus UPMC Shadyside,

2    579 F.3d 203 213, Third Circuit, 2009.

3            So, if there was any doubt about that, the

4    Third Circuit clarified that a plaintiff at the

5    pleading stage in a -- in a FCA case does not have to

6    identify a specific claim for payment in an FCA case.

7            It went on to hold in Wilkins to adopt the

8    implied certification theory, which had never -- which

9    had been adopted by several courts of appeals, but had

10   never been adopted by the Third Circuit.  And,

11   basically, where -- what that -- what that says is that

12   if there is an allegation that a defendant violates the

13   anti-kickback statute while submitting a claim for

14   payment to the -- to the government, that is a

15   violation of the Federal Claims Act, and we have

16   alleged that, Judge.

17           And that -- if you -- if you take the time to

18   read the second amended complaint, as I'm sure you

19   will, the second amended complaint is replete with

20   violations of the anti-kickback statute.  There's no --

21   there's no surprise.  I mean that is a perceived

22   violation of the Federal Claims Act.

23           We've stated a claim and we're at the

24   pleading stage, Judge.  We're not at the summary

25   judgment stage.  And if we were at the summary judgment

71

1   stage, then perhaps Mr. McCully's argument both with

2   respect to the -- the 8(b) argument and the 12(b)6

3   argument might carry more force.  But we're not there

4   yet.

5          And the same -- the same argument is true

6   with respect to the conspiracy claims, I mean we have

7   alleged.  You know, it's -- you know, I -- you know,

8   the complaint -- a complaint, Judge, does not have to

9   be perfect.  It does not have to be a model of

10  perfection.  It simply has to put the defendant on

11  notice of the misconduct with which he, she, or it is

12  charged, and it does that.

13         If you take a look at that, there are

14  allegations of what the conspiracy is.  Now, it may not

15  be as detailed as Mr. McCully would like it.  But, for

16  example, if you look at -- just to take an example, and

17  I'm not going to go through the whole complaint.  Your

18  Honor has it and at your leisure, if you have any,

19  Judge, you can look at it.  But, just look at paragraph

20  190.  I'll just read it to you as an example.

21         "Between at least 1996 to January 2004, the

22  defendant, Aventis, various healthcare providers" --

23  now, if we knew who they were, Judge, we would identify

24  them, but this is a pleading stage, "Aventis' outside

25  consultants, and members of Aventis' sales forces,"

72

1    okay, the intercorporate conspiracy doctrinating they

2    can't conspire with themselves, but they can certainly

3    conspire with various healthcare providers and outside

4    consultants, "knowingly combined and conspired with

5    each other to violate the False Claims Act by acting in

6    concert to defraud the government by getting fraudulent

7    claims allowed and paid relating to Taxotere and

8    violation," et cetera, et cetera.

9         Then it says, paragraph 191, "The healthcare

10    providers that submitted false claims for payment to

11    the government include, but are not limited to,

12    hospitals, A-G, group practices, A-B, and the John Doe

13    defendants."  That's all that needs to be alleged in a

14    complaint, Judge.

15         It doesn't have to be perfect and it doesn't

16    have to be specific, and John Doe pleadings are

17    allowed, not only in -- certainly in conspiracy cases.

18    You know, conspirators don't, you know, stand up and

19    raise their hand and say Your Honor, I'm a conspirator,

20    I'm a co-conspirator.

21         And, you know, Mr. McCully says well, you

22    know, they can't say that they -- Aventis doesn't know.

23    They can't take discovery from Aventis and find out who

24    the conspirators are.

25         Well, you know, there's Rule 45.  We can take

1   conspir -- you know, discovery of third parties, and

2   we're entitled to do that.  So it's not -- it's not an

3   answer to say that Aventis -- even if we were to take

4   discovery of Aventis, Aventis couldn't answer those

5   questions.  Somebody could.

6         So 8(B), even though it requires pleading

7   fraud with particularity, doesn't close the courthouse

8   door.  And even in <u>Wilkins</u> the Third Circuit said that

9   at the pleading stage the standard is different.  And

10  Rule 56, okay, summary judgment, yeah, I understand.

11  And then, you know, something -- you know, the standard

12  is different, but we're not there yet.

13        We certainly overcome <u>Twombly</u> and <u>Iqbal</u>.

14  This is not a conclusory pleading.  This is not an

15  implausible pleading.  We are passed <u>Matsucha</u>, we are

16  passed <u>Twombly</u> and <u>Iqbal</u>.

17        Maybe it's not a perfect pleading, but it is

18  certainly a pleading which gets passed a motion.  And

19  for those reasons, Judge, I respectfully request that

20  you deny the motion to dismiss based on 8(b) and

21  12(b)(6).

22        THE COURT:  Thank you, Mr. Orlofsky.

23        MR. ORLOFSKY:  Thank you, Your Honor.

24        (Pause in proceedings.)

25        MR. McCULLY:  May I come up?

74

1          THE COURT:  Sure.  Sure.

2          (Pause in proceedings.)

3          MR. McCULLY:  And I will be very brief.  Two

4    points.  One, on the conspiracy argument, again,

5    there's no doubt that paragraphs 190 and 191 allege a

6    conspiracy.

7          Again, as my statements to you earlier,

8    Judge, were that that is the -- those paragraphs are

9    part of Count 1 itself, and in the preceding 189

10   paragraphs of complaint there's not one mention of an

11   agreement between Aventis and any healthcare provider

12   to commit fraud.

13         This is a fraud case, all False Claims Act

14   cases are.  Conspiracy to commit fraud is governed by

15   Rule 9(B) as well, so it requires more than a Rule 8.

16   It requires particularity, and the courts in this

17   circuit have interpreted that to include identifying

18   who, what, where.

19         The statement that if we had known who these

20   conspirators are, we would have named them speaks

21   volumes.  At this point in time, in a false claims case

22   brought by a relator with direct and personal

23   knowledge, if there is a conspiracy count, it needs to

24   be known at this point in time who those conspirators

25   are.

1      This is not a situation or should not be a

2  situation where we can throw that count out there and

3  then do discovery and see if we can come up with facts

4  to support it.  And so that's where we are in the

5  conspiracy count.  We believe it does not comply with

6  Rule 12 and with the heightened requirements of Rule 9

7  and this pleading should be dismissed.

8      With respect to the <u>Wilkins</u> case, Your Honor,

9  I did not leave <u>Wilkins</u> out of my comments to you out

10  of any sort of intent, and I just want to make certain

11  that that's clear.

12      <u>Wilkins</u> case was decided by the Third Circuit

13  in 2011.  It does contain the statement that, to our

14  knowledge, we have never required the presentment of a

15  claim to withstand a motion to dismiss on Rule 12(b)(6)

16  grounds.  That's what was in front of the <u>Wilkins</u>

17  court.

18      My Rule 9(b) argument is that the <u>Wilkins</u>

19  decision did not change the landscape of Third Circuit

20  law at all.  That is still an undecided issue, quite

21  frankly, in front of the Third Circuit, is does 9(b)

22  require the bringing forth the specific false claims to

23  withstand a motion to dismiss?

24      What the <u>Wilkins</u> court said was following

25  that statement that we're not aware of a requirement

76

1  that you bring forward a false claim to withstand

2  12(b)(6).

3          It went on in the very next paragraph to talk

4  about Rule 9(b), first noting that that issue was not

5  directly in front of them, so they were not going to

6  make a decision on it, but also noting that there is a

7  heightened standard to meet Rule 9(b) and certainly

8  leaving open the possibility that they might require a

9  claim to be presented to withstand Rule 9(b).  But they

10  didn't have to reach it that day because that was not

11  in front of them.

12          What happened to the <u>Wilkins</u> case after the

13  Third Circuit decision, it remanded back to the

14  district court for the district court to determine

15  whether or not the plaintiff relator had met 9(b)

16  requirements with respect a second count claim for

17  relief, and the district court granted the motion to

18  dismiss because there was not a single claim, false

19  claim presented as a part of the complaint.  That's how

20  the <u>Wilkins</u> case ended up, or at least as far as the

21  decisions thus far.

22          I have to admit I don't know if that case is

23  up on further appeal to the Third Circuit or not.  I do

24  know that the most current standing is it's in a

25  dismissed state as a result of the trial judge's

77

1    finding that 9(b) requires a claim.

2            We are not suggesting the courthouse doors

3    are closed, but we are suggesting that there are rules

4    to be followed and those rules apply in these False

5    Claims Act cases.

6            There have been other courts in this division

7    that have found that a single claim is not required.

8    Again, we're not suggesting that a single claim is the

9    only way that Mr. Gohil could meet his requirements

10   here.

11           We're saying that he hasn't met that

12   requirement, nor has he met any other requirement of

13   showing the necessary particularity to come from a

14   fraudulent scheme alleged to have occurred at Aventis

15   and doctors filing false claims for reimbursement based

16   upon that scheme.  Thank you, Your Honor.

17           THE COURT:  Thank you, Mr. McCully.  It's a

18   very complex case and I know you've been waiting for

19   quite some time for an answer on this motion, so we'll

20   get this on an expedited track and get a decision out

21   to you as soon as we possible can.

22           Thank you very much for your really

23   comprehensive and enlightening arguments this morning.

24   It's a great help in understanding the arguments you've

25   raised in your papers, I appreciate it.

78

1          MR. ORLOFSKY:  Judge, may we just have a few

2    days to submit a short letter on that one

3    jurisdiction --

4          THE COURT:  Well, I won't decide this in a

5    few days, so yes, you may, Mr. Orlofsky.  How long do

6    you need?  Next week?

7          MR. ORLOFSKY:  Yes, that will be fine, Judge.

8          THE COURT:  So next Friday?

9          MR. ORLOFSKY:  Yes.

10         THE COURT:  That works?

11         MR. ORLOFSKY:  That works.

12         THE COURT:  Okay.

13         MR. SCHEFF:  And, Your Honor, if we have a

14   reply, it will be very short and very prompt.

15         THE COURT:  Okay.  Thank you very much.

16         ALL:  Thank you, Your Honor.

17         (Proceedings adjourned, 11:13 a.m.)

18                    *  *  *

19

20

21

22

23

24

25

1
2
3
4
5
6                          <u>CERTIFICATION</u>
7
8       I, Michael Keating, do hereby certify that the
9   foregoing is a true and correct transcript from the
10  electronic sound recordings of the proceedings in the
11  above-captioned matter.
12
13
14  2 - 27 -14
15  Date                              Michael Keating
16
17
18
19
20
21
22
23
24
25