# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex. rel. YOASH GOHIL,<br><br>Plaintiff/Relator,<br><br>vs.<br><br>SANOFI-AVENTIS U.S. INC.; AVENTIS, INC., AVENTIS PHARMACEUTICALS, INC., and JOHN DOES #1-50, FICTITIOUS NAMES,<br><br>Defendants. | No. 02-cv-2964 (LFS) |

## DECLARATION OF YOASH GOHIL

1. I am the Plaintiff/Relator in this matter and have personal knowledge of the facts set forth below.

2. I was employed by Aventis from the fall of 1999 until June 2002 as a Senior Oncology Sales Specialist in the Oncology Division of Aventis Pharmaceuticals, Inc -- the primary United States subsidiary of Aventis. I had been employed by predecessor entities to Aventis since February 1982, when I joined Hoechst Roussel Pharmaceutical (which later became Hoechst Marion Roussel in 1995 through a merger).

3. Beginning in the fall of 1999, in my capacity as a Senior Oncology Sales Specialist, I was responsible for Aventis' sales efforts in the Philadelphia territory and on Aventis' behalf to market Taxotere (chemotherapy agent) and Anzemet (anti-ametic agent), two of the defendants' oncology products to healthcare providers.

4. Based upon my employment, I was directly privy to Aventis' sales and marketing strategies and activities for both of these oncology products.

5. I was not only trained on how Aventis promoted Taxotere off-label through the use of kickbacks during the initial stages of my employment at Aventis; but I was also told that this is how Aventis had conducted business in the past and obtained information about the fraudulent marketing scheme that pre-dated my employment with Aventis through conversations with my trainers, fellow employees, supervisors and health care providers. (*See* Brief in Opposition to Defendants Motion to Dismiss at 25; Ex. A to Opposition Brief at 126:8-19; Ex. 4 to Motion to Dismiss Brief at 9-10). In addition, based on my employment, I acquired knowledge and was directly involved with a four year grant given to the University of Pennsylvania for $100,000, the last installment payment of which was made in 2000. (Ex A to Opposition Brief at 131:17-132:9).

6. After personally observing the implementation of the fraudulent marketing scheme during the course of my employment, I was forced out after complaining about the illegal marketing strategy. Following my departure from Aventis, I personally witnessed the continuation of the scheme based upon my continued work in the field of oncology. (Ex. A to Opposition Brief at 31:1-34:15).

7. In or about March 2002, I met with attorney Carl Poplar, Esq. and his associate, Cheryl Cooper, Esq., and discussed my experiences at Aventis.

8. On May 9, 2002, Mr. Poplar, Ms. Cooper and I met with the Chief of the Civil Division for the Eastern District of Pennsylvania, James Sheehan, in Philadelphia, Pennsylvania for approximately two hours and I voluntarily disclosed the information on which I made the allegations in my *Qui Tam* Complaint dated May 17, 2002.

9. During the course of that meeting, I voluntarily provided Mr. Sheehan with information on various topics involved in Defendants' fraudulent marketing scheme relating to the cancer drugs, Taxotere and Anzemet, including the following:

    a. Kickbacks offered to health care providers by Aventis including, but not limited to, unrestricted grants, study grants, preceptorships, honorariums, entertainment, trips, samples, volume discounts and rebates.

    b. Off label promotion outside the approved drug uses, dosages and indications, including a nationwide sales and marketing strategy set forth in sales training materials, sales promotional materials and practice presentations.

    c. Submission of incomplete, preliminary, unpublished and unauthorized materials to physicians and health care providers.

10. I remember generally discussing each of these topics Mr. Sheehan and providing Mr. Sheehan with the information that formed the basis of the allegations in the *Qui Tam* Complaint and Amended *Qui Tam* Complaint.

11. With respect to unrestricted grants, I specifically remember informing Mr. Sheehan that I had personally witnessed various Aventis sales personnel offer and provide unrestricted grants ranging from $10,000 to $275,000 for the purpose of inducing the health care providers to utilize Taxotere and Anzemet more frequently. I further identified for Mr. Sheehan other health care providers who were offered, but rejected, these types of unrestricted grants from Aventis, which were part of Aventis' national marketing strategy.

12. I also specifically remember providing Mr. Sheehan with my direct knowledge of the lavish trips to places such as Arizona, California, New Orleans, Florida and New York (as well as spending money) that Aventis provided to health care providers for the purpose of inducing those health care providers to utilize Taxotere and Anzemet more frequently.

13. I also specifically recall explaining to Mr. Sheehan Aventis' "preceptorship program" that it developed in which its sales personnel would pay health care providers between $750 to $1,000 to follow that health care provider around the hospital and/or office for a couple of hours in order to promote the use of Taxotere and Anzemet.

14. I also discussed the role of Aventis' Reimbursement Department. We frequently submitted EOBs when reimbursement was denied for using Taxotere off label. Aventis strategically promoted its Reimbursement Department services to assure either reimbursement or indirect financial support to health care providers.

I declare that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I may be subject to punishment.

_____
YOASH GOHIL

Dated: February 28, 2014