# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA : 
ex rel. YOASH GOHIL :
:
       Plaintiff/Gohil, :       NO. 02-CV-2964
:
      v. :
:
SANOFI-AVENTIS U.S., INC., AVENTIS, INC., :
AVENTIS PHARMACEUTICALS, INC., :
and JOHN DOES #1-50, FICTITIOUS :
NAMES, :
:
      Defendants. :

## DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

On December 15, 2010, Defendants sanofi-aventis U.S. Inc., Aventis Inc., and Aventis Pharmaceuticals, Inc. (collectively "Aventis") moved to dismiss Relator Yoash Gohil's Second Amended Complaint ("SAC"). Aventis' bases for dismissal included Relator's failure to plausibly state a claim upon which relief could be granted, in violation of Fed. R. Civ. P. 12(b)(6); and failure to plead his fraud claims with particularity, in violation of Fed. R. Civ. P. 9(b). The parties concluded their formal briefing on the Motion to Dismiss on February 2, 2011. That briefing included a Statement of Interest filed by the United States, self-identified as "the real party in interest in this action," on January 18, 2011. (Docket No. 93). In its Statement of Interest, the United States stated that it "takes no position on whether relator's complaint satisfied here does indeed satisfy" federal pleading standards. (Docket No. 93, at 1-2).

On February 19, 2014, the Court convened a hearing in this matter, at which time the Court heard the parties' respective arguments on Aventis' Motion to Dismiss. Because more than three years had elapsed since the formal briefing had concluded, both sides used a portion of their arguments to update the Court on recent authority and legal developments. On

Rule 9(b) standard recognized in the Fourth Circuit. TC Opinion, at 1, 3-4 attached as Exhibit D. But the district court did not end its analysis there. It noted that Relator was asking that a less demanding standard be used that would permit the Complaint to proceed, so long as it combined factual or statistical evidence to strengthen the inference of fraud beyond possibility. TC Opinion, at 4. The district court reviewed the Complaint, with all of its affidavits and all of its statistics, and held that the Complaint failed to "supply the needed specificity under Rule 9(b), [did] not satisfy *Iqbal* and *Twombly,* and [did] not raise an inference of fraud beyond mere possibility." TC Opinion, at 10-11.

The *Nathan* Complaint, as reviewed by the district court, contained four separate groupings of facts and statistics urged by Relator as satisfying his pleading requirements in the absence of any direct evidence of either presentment of a false claim, or a causal link between Takeda's alleged conduct and the improper payment of a reimbursement claim. The district court found pleading deficiencies in each of those four groupings:

(1)     Relator alleged that rheumatologists would not treat any medical conditions for which the product had been approved. Therefore, any prescriptions written by a rheumatologist for the product would be for an off-label use. Relator then alleged that two rheumatologists in his sales territory did write prescriptions for the product in July 2009, extrapolating his one month's worth of sales territory evidence to tens of thousands of rheumatologist prescriptions nationally over a 28-month period of time. Relator then concluded that it was without question that some of those prescriptions were reimbursed by government programs, given other statistical evidence submitted by Relator regarding the percentage of Kapidex prescriptions overall that were submitted for government program reimbursement. The district court found the following deficiencies:  (a) Relator did not plead anything to establish

*beyond a possibility* that tens of thousands of Kapidex prescriptions were written by rheumatologists, with some then being presented for reimbursement; (b) as to the two prescriptions submitted with the Complaint, Relator made no allegation that either of them had been submitted for reimbursement; (c) as for the two prescriptions submitted, Relator provided no allegation regarding the condition for which they were prescribed; and (d) a rheumatologist is not precluded from prescribing the product for an approved condition at an approved dosage. TC Opinion, at 6-7.

(2) Relator next identified 16 primary care physicians from his sales territory who received 60 mg samples of the product, and who also wrote 98 prescriptions for Kapidex that were submitted to Medicare for reimbursement. Relator alleged that primary care physicians do not treat medical conditions for which the 60 mg dose is appropriate, making all 60 mg prescriptions written by primary care physicians off-label. The district court again found deficiencies: (a) Relator did not identify which, if any, of the 98 prescriptions were for a 60 mg dose; (b) Relator submitted evidence that more than 90% of Takeda's overall sales of the product were at the 60 mg dose, with a request that the Court infer that the same or similar percentage applied to the 98 prescriptions. The district court found Relator's allegations insufficient. TC Opinion, at 6-7.

(3) Relator then identified more than 9,000 Kapidex prescriptions that were submitted for federal reimbursement in two particular sales districts in 2008 and 2009. The district court identified the following shortcomings: (1) Relator failed to allege the dosages of the prescriptions; (b) there was an inadequate basis to assume that 90% of the prescriptions were at the 60 mg dose; (c) Relator did not identify the types of doctors writing these prescriptions;

(d) Relator did not identify the medical conditions being treated; and (e) Relator could not link any of these 9,000 prescriptions to the complained-of marketing practices. TC Opinion, at 7.

(4)    Finally, Relator identified several physicians who attested in sworn statements that they had each prescribed 60 mg doses of the product to Medicare patients over the age of 65 years for medical conditions for which the 60 mg dose was not FDA-approved. The district court again identified deficiencies in Relator's pleadings: (a) Relator did not include allegations regarding when the prescriptions were issued; and, more significantly, (b) no allegations that any claims for payment were actually submitted to Medicare in connection with any of these prescriptions. The district court recognized that doctors who prescribe a drug for off-label uses as a result of alleged illegal marketing practices may not seek federal reimbursement, or that such prescriptions might be written only in instances where patients paid for the product themselves or with private insurance. TC Opinion, at 7-8.

Given these findings, the district court found that Relator had satisfied neither Rule 9(b) particularity requirements nor Rule 12(b)(6) plausibility requirements, and dismissed the complaint, denying leave to further amend. TC Opinion, at 11. The Fourth Circuit Court of Appeals affirmed, 707 F.3d 451 (4th Cir. 2013), holding that Relator's Complaint failed to satisfy Fed. R. Civ. P. 12(b)(6) as it failed to plausibly allege the presentment of a false or fraudulent claim for payment or approval. *Id.* at 453, 455. The Fourth Circuit followed essentially the same route taken by the district court, noting that fraud claims under the FCA must meet both particularity and plausibility standards. *Id.* at 455. The Court held that, because "liability under the [FCA] attaches only to a claim actually presented to the government for payment," a relator must "plead plausible allegations of presentment." *Id.* at 456.

The Court reviewed again each of the four groupings of facts and statistics employed by Relator's Complaint, and "conclude[d] that, individually as well as collectively, Relator's allegations fail to allege an essential element of a claim under the [FCA]." *Id.* at 452. The Fourth Circuit agreed with each of the deficiencies in pleading identified by the district court, ultimately stating: "We therefore hold that Relator has failed to plead with particularity a plausible claim that any off-label prescriptions were presented to the government for payment." *Id.* at 461.

Relator petitioned the United States Supreme Court for review on May 10, 2013. The Supreme Court invited the Solicitor General to file a brief "expressing the views of the United States." Order of October 7, 2013, at 7 (attached as Exhibit E). On February 25, 2014, the United States filed its amicus brief on the issue of whether Relator's petition for a writ of certiorari should be granted.

In its brief, the United States expressed its view that the petition should be denied. The United States stated:

> This case…is not a suitable vehicle for resolving the question [of whether a qui tam relator must identify specific false claims submitted for payment in order to plead fraud with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b)]. The court below *correctly held* that petitioner's complaint failed to satisfy the requirements of both Rule 9(b) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), because it did not plausibly allege that false claims were presented to the government. Because the complaint failed not merely for lack of specificity, but also for lack of plausibility, *this suit could not go forward even under the pleading standard most favorable to relators.*

Amicus Brief, at 11 (emphasis added). The United States added: "Petitioners' suit therefore could not go forward under the pleading standard adopted by any court of appeals." Amicus Brief, at 16.

6200957 v1

In so concluding, the United States recognized that the court of appeal's decision to affirm the dismissal of Relator's Complaint "rested chiefly on the complaint's lack of *plausibility*, not its lack of *particularity*," *id.* at 12 (emphasis in original), and the United States further stated that a review of Relator's Complaint showed that to be the right decision. *Id.* at 19. At the petition for certiorari stage, the Relator elected only to use his allegations of 98 prescriptions written by 16 primary care physicians as evidence that he had satisfied the required pleading standards. In its amicus brief, the United States described the other three sets of allegations reviewed by the lower courts as "more general allegations." *Id* at 7 n.3.

With respect, then, to what it described as the most specific of the allegations regarding presentment of false claims for payment, the United States agreed with the findings of the trial court and the Fourth Circuit – an allegation that 16 primary care physicians wrote 98 Kapidex prescriptions that were ultimately submitted to Medicare for reimbursement, even when coupled with nationwide statistics showing that 93% of all Kapidex prescriptions are for 60 mg doses and general allegations that primary care physicians do not regularly treat any conditions for which a 60 mg dose of Kapidex is indicated fails under any pleading standard. *Id* at 19-21. The United States specifically stated:

> As the First Circuit explained in rejecting an analogous FCA action against a manufacturer that had allegedly marketed one of its drugs for unapproved uses, "it is a possible but not a necessary or even strong inference that doctors" wrote prescriptions for Kapidex for unapproved uses and that "some false claims for [Kapidex] reimbursement were submitted to the government" as a result.

Amicus Brief, at 20-21 (brackets in original).

Gohil's allegations regarding presentment of claims for reimbursement for prescriptions of Taxotere for conditions not recognized as a medically accepted indication (i.e., not included in the product label or in an approved compendia listing) are far more general and

speculative than those found in the *Nathan* complaint.  Specifically, Gohil's allegations differ in quality from the *Nathan* allegations as follows:

(1) Gohil's Complaint fails to identify any specific prescribers by name;

(2) Gohil's Complaint contains no affidavits attesting to any of the general facts alleged as to prescribing practices;

(3) Gohil's Complaint does not contain any allegations that any specific physician wrote a prescription for Taxotere, let alone the dosage amount, whether it was written in combination with other product prescriptions, or the medical condition for which it was written;

(4) Gohil's Complaint does not identify any specific individual as having submitted a claim for reimbursement related to a prescription for Taxotere;

(5) Gohil's Complaint contains no affidavits attesting to any facts alleged as to presentment of claims for reimbursement;

(6) Gohil's Complaint contains no statistical evidence whatsoever regarding prescribing practices at national, regional or local level;

(7) Gohil's Complaint contains no statistical evidence whatsoever regarding the percentage of Taxotere prescriptions submitted for government program reimbursement;

(8) Gohil's Complaint contains no allegation of any particular Taxotere prescriptions being submitted for federal reimbursement;

(9) Gohil's Complaint fails to identify any individuals as having prescribed Taxotere to Medicare patients.

Each and every one of the above items was included in the *Nathan* complaint pertaining to Kapidex.  The district court found them insufficient to satisfy the required pleading standards of Fed. R. Civ. P. 9(b) and 12(b)(6).  The Fourth Circuit found likewise.  And, now, the United States itself, the real party in interest in any FCA qui tam case, agrees.  *Nathan's* allegations, even though far more developed and specific in nature than those of the instant case, failed under

federal pleading standards adopted by any court of appeals. Gohil's allegations are vastly more inadequate, and should be dismissed as failing to comply with Rule 9(b) particularly and Rule 12(b)(6) plausibility standards.


Dated: March 14, 2014

s/ Richard L. Scheff
Richard L. Scheff (PA I.D. # 35213)
Michael Hayes (PA I.D. # 84985)
MONTGOMERY, MCCRACKEN,
 WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, PA 19109

Robert J. McCully
Shook, Hardy & Bacon, LLP
2555 Grand Boulevard
Kansas City, MO 64105
(816) 559-2191

*Counsel for Defendants sanofi-aventis U.S., Inc.,
Aventis, Inc., and Aventis Pharmaceuticals Inc.*

9

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically and is available for viewing and downloading from the ECF system; it has been sent to the following persons via the Court's electronic filing system on this 14th day of March, 2014:

Susan Bricklin
Assistant United States Attorney
United States Attorney's Office
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Susan.bricklin@usdoj.gov

Stephen M. Orlofsky
Nicholas Harbist
David Kistler
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998
orlofsky@blankrome.com

Carl D. Poplar
Carl D. Poplar, P.A.
1010 Kings Highway South, Building 2
Cherry Hill, NJ 08034
cpoplar@poplarlaw.com

s/ Richard L. Scheff
Richard L. Scheff

6200957 v1

# EXHIBIT A

No. 12-1349

# In the Supreme Court of the United States

UNITED STATES EX REL. NOAH NATHAN, PETITIONER

*v.*

TAKEDA PHARMACEUTICALS NORTH AMERICA, INC.,
ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT*

## BRIEF FOR THE UNITED STATES AS AMICUS CURIAE

DONALD B. VERRILLI, JR.
  *Solicitor General
    Counsel of Record*
STUART F. DELERY
  *Assistant Attorney General*
MALCOLM L. STEWART
  *Deputy Solicitor General*
BRIAN H. FLETCHER
  *Assistant to the Solicitor
    General*
MICHAEL S. RAAB
JOSHUA WALDMAN
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

## QUESTION PRESENTED

Whether a relator in a *qui tam* action under the False Claims Act, 31 U.S.C. 3729 *et seq.*, must identify specific false claims submitted for payment in order to plead fraud with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b).

(I)

# TABLE OF CONTENTS

Page

Interest of the United States ........................................................... 1
Statement ......................................................................................... 1
Discussion ...................................................................................... 10
Conclusion ..................................................................................... 22

# TABLE OF AUTHORITIES

Cases:                                                                     Page

*Arkansas Dep't of Health & Human Servs. v. Ahl-
born*, 547 U.S. 268 (2006) ........................................................ 4

*Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009) .............................. 8, 11

*Baycol Prods. Litig., In re*, 732 F.3d 869 (8th Cir.
2013) .............................................................................................. 14

*Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U.S.
341 (2001) ..................................................................................... 4

*Chesbrough* v. *VPA, P.C.*, 655 F.3d 461 (6th Cir.
2011) ............................................................................................. 13

*Ebeid* v. *Lungwitz*, 616 F.3d 993 (9th Cir.), cert. de-
nied, 131 S. Ct. 801 (2010) .............................................. 12, 19

*Hopper* v. *Solvay Pharm., Inc.*, 588 F.3d 1318 (11th
Cir. 2009), cert. denied, 130 S. Ct. 3465 (2010) ........... 13, 18

*Thomas Jefferson Univ.* v. *Shalala*, 512 U.S. 504
(1994) ............................................................................................. 4

*United States ex rel. Bledsoe* v. *Community Health
Sys., Inc.*, 501 F.3d 493 (6th Cir. 2007) .............................. 12

*United States ex rel. Clausen* v. *Laboratory Corp. of
Am.*, 290 F.3d 1301 (11th Cir. 2002), cert. denied,
537 U.S. 1105 (2003) ................................................... 8, 14, 17

*United States ex rel. Duxbury* v. *Ortho Biotech
Prods., L.P.*, 579 F.3d 13 (1st Cir. 2009),
cert. denied, 130 S. Ct. 3454 (2010) .............. 9, 12, 13, 14, 18

IV

Cases—Continued: Page

*United States ex rel. Eisenstein* v. *City of N.Y.*,
556 U.S. 928 (2009) ..............................................................2

*United States ex rel. Grubbs* v. *Kanneganti*,
565 F.3d 180 (5th Cir. 2009) ...................9, 11, 12, 13, 15, 19

*United States ex rel. Joshi* v. *St. Luke's Hosp., Inc.*,
441 F.3d 552 (8th Cir.), cert. denied, 549 U.S. 881
(2006) .............................................................................13, 18

*United States ex rel. Karvelas* v. *Melrose-Wakefield
Hosp.*, 360 F.3d 220 (1st Cir.), cert. denied, 543 U.S.
820 (2004) ..............................................................................14

*United States ex rel. Lemmon* v. *Envirocare of Utah,
Inc.*, 614 F.3d 1163 (10th Cir. 2010) ....................................13

*United States ex rel. Lusby* v. *Rolls-Royce Corp.*,
570 F.3d 849 (7th Cir. 2009) ...............................12, 13, 15, 19

*United States ex rel. Rost* v. *Pfizer, Inc.*, 507 F.3d
720 (1st Cir. 2007) ........................................................12, 19, 21

*United States ex rel. Sikkenga* v. *Regence BlueCross
BlueShield*, 472 F.3d 702 (10th Cir. 2006)...........................13

*United States ex rel. Walker* v. *R&F Props. of Lake
Cnty., Inc.*, 433 F.3d 1349 (11th Cir. 2005),
cert. denied, 549 U.S. 1027 (2006)........................................14

*Washington Legal Found.* v. *Henney*, 202 F.3d 331
(D.C. Cir. 2000) ......................................................................4

Statutes, regulations and rule:

False Claims Act, 31 U.S.C. 3729 *et seq.*:
31 U.S.C. 3729(a)(1)(A).....................................................1, 7
31 U.S.C. 3729(b)(2) .............................................................2
31 U.S.C. 3730(a)...................................................................2
31 U.S.C. 3730(b)(1) .............................................................2
31 U.S.C. 3730(b)(2) .............................................................2

V

Statutes, regulations and rule—Continued:        Page

31 U.S.C. 3730(b)(3) ............................................................2
31 U.S.C. 3730(c)(3) ............................................................2
31 U.S.C. 3730(d) ................................................................2
Federal Food, Drug, and Cosmetic Act, 21 U.S.C.
301 *et seq.*:
   21 U.S.C. 331(a) ..............................................................3
   21 U.S.C. 352(f) ...............................................................3
   21 U.S.C. 355(a) ..............................................................3
   21 U.S.C. 355(b)(1)(F) .....................................................3
   21 U.S.C. 355(d) ..............................................................3
Fraud Enforcement and Recovery Act of 2009,
   Pub. L. No. 111-21, § 4(a), 123 Stat. 1621 ............................2
42 U.S.C. 1395w-102 (2006 & Supp. V 2011) .........................4
42 U.S.C. 1395w-102(e)(1) (2006 & Supp. V 2011)................4
42 U.S.C. 1395w-102(e)(4) (Supp. V 2011) ............................4
42 U.S.C. 1396b(i)(10) ........................................................4
42 U.S.C. 1396r-8 (2006 & Supp. V 2011) .............................4
42 U.S.C. 1396r-8(g)(1)(B)(i) ..............................................4
42 U.S.C. 1396r-8(k)(3) ......................................................4
42 U.S.C. 1396r-8(k)(6) ......................................................4
21 C.F.R.:
   Section 201.5 ...................................................................3
   Section 201.5(b) ...............................................................3
   Section 201.55-201.57 .......................................................3
   Section 201.128 ................................................................3
Fed. R. Civ. P. 9(b) ................................................*passim*

Miscellaneous:                                              Page
  59 Fed. Reg. (Nov. 18, 1994):
    p. 59,820 ................................................................................4
    p. 59,821 ................................................................................4

# In the Supreme Court of the United States

No. 12-1349

UNITED STATES EX REL. NOAH NATHAN, PETITIONER

*v.*

TAKEDA PHARMACEUTICALS NORTH AMERICA, INC.,
ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT*

## BRIEF FOR THE UNITED STATES AS AMICUS CURIAE

### INTEREST OF THE UNITED STATES

This brief is submitted in response to the order of the Court inviting the Solicitor General to express the views of the United States. In the view of the United States, the petition for a writ of certiorari should be denied.

### STATEMENT

1. The False Claims Act (FCA), 31 U.S.C. 3729 *et seq.*, provides for the imposition of civil penalties and treble damages against any person who, *inter alia*, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. 3729(a)(1)(A). The "claims" subject to the FCA include "any request or demand * * * for money or property" that is "presented to an officer, employee, or agent of the United States," as well as certain

claims presented to entities that receive federal funds. 31 U.S.C. 3729(b)(2).[1] The Attorney General may bring a civil action if he finds that a person has violated the FCA. 31 U.S.C. 3730(a). Alternatively, a private person (known as a relator) may bring his own suit (commonly referred to as a *qui tam* action) "for the person and for the United States Government." 31 U.S.C. 3730(b)(1); see *United States ex rel. Eisenstein* v. *City of New York*, 556 U.S. 928, 930 (2009).

If a relator brings a *qui tam* action, the complaint is initially filed under seal and served upon the government, together with "substantially all material evidence and information the [relator] possesses." 31 U.S.C. 3730(b)(2). "The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information," *ibid.*, and the district court may extend the 60-day period upon a showing of good cause, 31 U.S.C. 3730(b)(3). If the government declines to intervene, the relator "shall have the right to conduct the action," but the district court "may nevertheless permit the Government to intervene at a later date upon a showing of good cause." 31 U.S.C. 3730(c)(3). If a *qui tam* action results in the recovery of damages or civil penalties, the award is divided between the government and the relator. 31 U.S.C. 3730(d).

---

[1] Section 3729 was amended while the conduct at issue in this case was ongoing. See Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(a), 123 Stat. 1621. The changes are not material to the question presented, and the parties and the courts below appear to have agreed that the amended statute governs this case. See Pet. App. 2a, 24a.

2. This *qui tam* action alleges that a pharmaceutical company caused false claims to be presented to the federal Medicare and Medicaid programs by promoting one of its drugs for uses that have not been approved by the Food and Drug Administration (FDA).

a. Under the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. 301 *et seq.*, a new drug may not be introduced into interstate commerce unless FDA has approved a new drug application based on the agency's determination that the drug is safe and effective for its intended use. 21 U.S.C. 355(a) and (d). FDA must also approve the drug's labeling, which specifies, *inter alia*, the FDA-approved uses and dosages for the drug. 21 U.S.C. 355(b)(1)(F) and (d); 21 C.F.R. 201.5(b), 201.55-201.57.

Because a drug that is safe and effective for one use may be neither safe nor effective for others, FDA approval extends only to the uses specified in a drug's approved application and labeling. 21 U.S.C. 355(d). A new drug that is distributed for an intended use that has not been approved by FDA is "misbranded," and the FDCA prohibits its distribution in interstate commerce. 21 U.S.C. 352(f); 21 C.F.R. 201.5; see 21 U.S.C. 331(a). A drug's "intended uses" are determined by the objective intent of the drug manufacturer, which may be demonstrated by the drug's "advertising" and by other "oral or written statements" by the manufacturer or its representatives. 21 C.F.R. 201.128. Accordingly, a manufacturer's promotion of a drug for unapproved uses may constitute evidence that the manufacturer has violated the FDCA's misbranding provisions by distributing a drug for an intended use that has not been approved by FDA. See

*Washington Legal Found.* v. *Henney*, 202 F.3d 331, 332-333 (D.C. Cir. 2000).

FDA does not, however, attempt to regulate the practice of medicine. Once a drug is approved for one use at one dosage, doctors are free to prescribe it for unapproved uses or at other dosages—a practice that is sometimes called "off-label" prescribing. See 59 Fed. Reg. 59,820, 59,821 (Nov. 18, 1994); *Washington Legal Found.*, 202 F.3d at 332-333; cf. *Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U.S. 341, 350-351 (2001) (discussing the similar statutory scheme governing medical devices).

b. Although prescriptions for unapproved uses are not prohibited by the FDCA, they may be ineligible for reimbursement under the federal Medicare and Medicaid programs. "Medicare is a federally funded health insurance program for the elderly and disabled." *Thomas Jefferson Univ.* v. *Shalala*, 512 U.S. 504, 506 (1994). Medicaid is a cooperative federal-state program that funds medical care for needy individuals. *Arkansas Dep't of Health & Human Servs.* v. *Ahlborn*, 547 U.S. 268, 275 (2006). Both programs provide coverage for certain prescription drugs. See 42 U.S.C. 1395w-102 (2006 & Supp. V 2011) (Medicare); 42 U.S.C. 1396r-8 (2006 & Supp. V 2011) (Medicaid). To be eligible for reimbursement, however, a drug generally must be prescribed for an FDA-approved use or for another "medically accepted indication" listed in one of several statutorily specified compendia. 42 U.S.C. 1395w-102(e)(1) (2006 & Supp. V 2011); 42 U.S.C. 1395w-102(e)(4) (Supp. V 2011); 42 U.S.C. 1396b(i)(10), 1396r-8(k)(3) and (6); see 42 U.S.C. 1396r-8(g)(1)(B)(i) (identifying compendia).

c. Petitioner Noah Nathan is a sales manager employed by respondent Takeda Pharmaceuticals. Pet. App. 2a. Respondent manufacturers and sells a drug known as Kapidex, which suppresses the production of stomach acid. *Id.* at 3a.[2] FDA has approved Kapidex for three indications: (1) for the healing of erosive esophagitis (EE), a condition in which refluxed stomach acid causes ulcers in the throat, with a recommended dose of 60 milligrams daily; (2) for the maintenance of healed EE, with a recommended dose of 30 milligrams daily; and (3) for the treatment of non-erosive gastroesophageal reflux disease (GERD), commonly known as heartburn or acid reflux, with a recommended dose of 30 milligrams daily. *Id.* at 4a. Petitioner alleged that the relevant compendia do not specify any other medically accepted indications for Kapidex, and that these three FDA-approved uses are therefore the only ones eligible for reimbursement under Medicare and Medicaid. *Id.* at 77a.

Petitioner contended that respondent had violated the FCA by knowingly causing Kapidex prescriptions written for unapproved uses to be presented to Medicare and Medicaid for reimbursement. Specifically, petitioner alleged that respondent had urged doctors to prescribe 60-milligram doses of Kapidex to GERD patients because respondent believed that a 60-milligram dose was more effective in treating GERD than the 30-milligram dose specified in the FDA-approved labeling. Pet. App. 3a-4a. For example, petitioner alleged that respondent had offered samples of Kapidex exclusively in the 60-milligram dose and had provided those samples to primary care phy-

---

[2] Kapidex is now known as "Dexilant." Pet. App. 3a n.3. Like the decisions below, this brief refers to the drug as Kapidex.

sicians and other doctors who treat GERD but generally do not treat active EE, the only condition for which a 60-milligram dose is approved. *Id.* at 4a. Petitioner alleged that respondent's actions had caused doctors to write prescriptions for unapproved uses; that some of those prescriptions had gone to patients covered by Medicare and Medicaid; and that false claims had resulted when those patients or their health care providers sought reimbursement from the federal health care programs. *Id.* at 41a, 44a-45a.

3. Petitioner filed his *qui tam* complaint in September 2009. The government declined to intervene, and petitioner amended his complaint twice after it was unsealed. The district court dismissed the complaint without prejudice, finding it deficient in several respects. Pet. App. 17a-18a & n.10. Petitioner then filed a third amended complaint, which the district court dismissed with prejudice on two alternative grounds. *Id.* at 19a-31a.

a. The district court first held that the complaint failed to satisfy Federal Rule of Civil Procedure 9(b), which provides that a complaint alleging fraud "must state with particularity the circumstances constituting fraud." See Pet. App. 22a-28a. The court noted that petitioner's complaint "failed to identify any specific instances in which [respondent] caused a pharmacist or other healthcare provider to submit a claim for reimbursement to the government based on a non-reimbursable prescription." *Id.* at 24a. Instead, the complaint relied on "a combination of statistics and general allegations." *Ibid.*

The district court held that this "statistics-based" approach failed to satisfy Rule 9(b). Pet. App. 24a. In particular, the court rejected petitioner's reliance on

98 Kapidex prescriptions written by 16 primary care physicians. Petitioner's complaint identified the 16 doctors by name, listed the month in which each prescription was written, and further alleged that each of the 98 prescriptions was submitted to Medicare for reimbursement. *Id.* at 26a-27a; see *id.* at 105a-109a. Petitioner did not, however, "allege that the prescriptions issued were in fact for 60 milligram doses." *Id.* at 26a. Instead, petitioner argued that it was reasonable to infer that more than 90% of the 98 prescriptions were for 60-milligram doses because the 16 doctors had received 60-milligram samples of Kapidex, and because more than 90% of respondent's overall sales of Kapidex are at the 60-milligram dose. *Ibid.* The district court rejected that inference as too speculative, concluding that petitioner had not "allege[d] any basis on which to assume that the overall level of 60 milligram doses, as a percentage of overall Kapidex sales, corresponds to the prescriptions that were actually issued by these [16] primary care physicians." *Id.* at 26a-27a.[3]

b. The district court also held, in the alternative, that petitioner's complaint lacked plausible allegations that respondent had "caused" the presentation of false claims within the meaning of Section 3729(a)(1)(A). Pet. App. 28a-29a. The court concluded that, even if Kapidex prescriptions for unapproved uses were submitted to Medicare and Medicaid for reimbursement, petitioner had failed to plead facts supporting a plau-

---

[3] In the lower courts, petitioner unsuccessfully argued that other, more general allegations in his complaint independently satisfied Rule 9(b). Pet. App. 11a-16a, 24a-28a. His petition for certiorari, however, relies only on the 98 prescriptions written by 16 primary care physicians. See Pet. 9-10, 30-31.

sible inference that those prescriptions were caused by respondent's actions rather than by the independent judgment of the prescribing physicians. *Id.* at 29a.

4. The court of appeals affirmed. Pet. App. 1a-18a. The court held that petitioner's complaint did not satisfy Rule 9(b) and the plausibility standard set forth in *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009), because petitioner had "failed to plausibly allege that any false claims had been presented to the government for payment." Pet. App. 2a.

The court of appeals first addressed the pleading standards governing FCA complaints, which must satisfy Rule 9(b) and must "state a claim to relief that is plausible on its face," *Iqbal*, 556 U.S. at 678. See Pet. App. 5a-6a. The court held that, because "liability under the Act attaches only to a claim actually presented to the government for payment," a relator must "plead plausible allegations of presentment." *Id.* at 8a. The court further held that, under both Rule 9(b) and "the general plausibility standard of *Iqbal*," "'some indicia of reliability' must be provided in the complaint to support the allegation that an actual false claim was presented to the government." *Id.* at 8a-9a (quoting *United States ex rel. Clausen* v. *Laboratory Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002), cert. denied, 537 U.S. 1105 (2003)).

The court of appeals identified some prior judicial decisions holding that "Rule 9(b) can be satisfied in the absence of particularized allegations of specific false claims." Pet. App. 9a. In the view of the court below, those cases involved circumstances in which "specific allegations of the defendant's fraudulent conduct necessarily led to the plausible inference that

false claims were presented to the government." *Id.* at 9a-10a (citing *United States ex rel. Grubbs* v. *Kanneganti*, 565 F.3d 180, 192 (5th Cir. 2009); *United States ex rel. Duxbury* v. *Ortho Biotech Prods., L.P.*, 579 F.3d 13, 30 (1st Cir. 2009), cert. denied, 130 S. Ct. 3454 (2010)). The court concluded, however, that where the defendant's alleged conduct *"could* have led, but *need not necessarily* have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government." *Id.* at 10a. The court of appeals added that, "[t]o the extent that other cases apply a more relaxed construction of Rule 9(b)," the court "disagree[d] with that approach." *Ibid.*

The court of appeals then applied this standard to petitioner's allegation that 16 primary care physicians had written 98 Kapidex prescriptions that were submitted to Medicare. The court explained that, although petitioner "allege[d] that these [98] claims were presented to the government for payment," he did not "plausibly allege that the prescriptions were written for off-label uses." Pet. App. 13a. The court of appeals rejected as too "speculative" petitioner's contention that, because more than 90% of *all* Kapidex prescriptions are for the 60-milligram dose, a comparable percentage of these 98 specific prescriptions likely were for that dose. *Id.* at 13a-14a. The court also noted that, even if some of the 98 prescriptions had been for the 60-milligram dose, those prescriptions were not necessarily ineligible for reimbursement because they could have been written to treat

active EE, a condition for which the 60-milligram dose is approved. *Id.* at 14a.[4]

## DISCUSSION

Although the disagreement is not as clearly defined as petitioner contends, lower courts have reached inconsistent conclusions about the precise manner in which a *qui tam* relator may satisfy the requirements of Rule 9(b). Several courts of appeals have correctly held that a *qui tam* complaint satisfies Rule 9(b) if it contains detailed allegations supporting a plausible inference that false claims were submitted to the government, even if the complaint does not identify specific requests for payment. Other decisions, however, have articulated a per se rule that a relator must plead the details of particular false claims—that is, the dates and contents of bills or other demands for payment—to overcome a motion to dismiss.

This per se rule is unsupported by Rule 9(b) and undermines the FCA's effectiveness as a tool to combat fraud against the United States. Indeed, even those circuits that initially endorsed the per se rule have issued subsequent decisions that appear to adopt a more nuanced approach. The disagreement among the circuits therefore may be capable of resolution without this Court's intervention. If that disagreement persists, however, this Court's review to clarify the applicable pleading standard may ultimately be warranted in an appropriate case.

---

[4] Because it affirmed the dismissal of petitioner's complaint based on the failure to plausibly allege that false claims were presented to the government, the court of appeals did not consider the district court's alternative holding that petitioner had failed adequately to allege causation. Pet. App. 5a.

This case, however, is not a suitable vehicle for resolving the question presented. The court below correctly held that petitioner's complaint failed to satisfy the requirements of both Rule 9(b) and *Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009), because it did not plausibly allege that false claims were presented to the government. Because the complaint failed not merely for lack of specificity, but also for lack of plausibility, this suit could not go forward even under the pleading standard most favorable to relators. Particularly because the issue continues to percolate in the lower courts, this Court's consideration of the question presented should await a case in which it would be outcome-determinative.

1. The lower courts have reached conflicting results about the application of Rule 9(b) in the FCA context. Recent decisions, however, create some uncertainty about the extent of the disagreement.

a. Although a plaintiff "must state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), several courts of appeals have correctly recognized that pleading the details of a specific false claim presented to the government is not an indispensable requirement of a viable FCA complaint. Even at trial, "a plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted." *United States ex rel. Grubbs* v. *Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009). To demand those details to survive a motion to dismiss is "significantly more than any federal pleading rule contemplates." *Ibid.* Accordingly, several courts have held that a relator's complaint satisfies Rule 9(b) if it "alleg[es] particular details of a scheme to submit false

claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ibid.*; see *Ebeid* v. *Lungwitz*, 616 F.3d 993, 998-999 (9th Cir.) (same), cert. denied, 131 S. Ct. 801 (2010); *United States ex rel. Lusby* v. *Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009) (Easterbrook, C.J.) ("We don't think it essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit.").

The First and Fourth Circuits have also declined to adopt a per se rule requiring relators to plead specific false claims. The First Circuit has held that where—as in this case—a *qui tam* complaint alleges that "the defendant induced *third parties* to file false claims with the government," the complaint can "satisfy Rule 9(b) by providing 'factual or statistical evidence to strengthen the inference of fraud beyond possibility' without necessarily providing details as to each false claim." *United States ex rel. Duxbury* v. *Ortho Biotech Prods., L.P.*, 579 F.3d 13, 29 (2009) (quoting *United States ex rel. Rost* v. *Pfizer, Inc.*, 507 F.3d 720, 733 (1st Cir. 2007)), cert. denied 130 S. Ct. 3454 (2010). In the decision below, the Fourth Circuit endorsed the results in *Grubbs* and *Duxbury* and indicated that a relator need not identify particular false claims when "specific allegations of the defendant's fraudulent conduct necessarily [lead] to the plausible inference that false claims were presented to the government." Pet. App. 9a.

b. By contrast, the Sixth, Eighth, Tenth, and Eleventh Circuits have issued decisions finding that particular *qui tam* complaints should be dismissed under Rule 9(b) because the relators failed to identify specific requests for payment. See, *e.g.*, *United States ex*

*rel. Bledsoe* v. *Community Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) ("We hold that pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation in compliance with Rule 9(b)."); *United States ex rel. Joshi* v. *St. Luke's Hosp., Inc.*, 441 F.3d 552, 560 (8th Cir.) (requiring a relator to plead "some representative examples" of false claims), cert. denied, 549 U.S. 881 (2006); *United States ex rel. Sikkenga* v. *Regence BlueCross BlueShield*, 472 F.3d 702, 727-728 (10th Cir. 2006) (affirming dismissal of a complaint that failed "to identify any specific [false] claim"); *Hopper* v. *Solvay Pharm., Inc.*, 588 F.3d 1318, 1326 (11th Cir. 2009) (holding that a relator must plead a specific false claim to avoid dismissal), cert. denied, 130 S. Ct. 3465 (2010).

These courts, however, have not consistently adhered to this rigid understanding of Rule 9(b). The Sixth Circuit recently left open the possibility "that the requirement that a relator identify an actual false claim may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted." *Chesbrough* v. *VPA, P.C.*, 655 F.3d 461, 471 (2011). The Tenth Circuit has likewise stated that an FCA complaint "need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *United States ex rel. Lemmon* v. *Envirocare of Utah, Inc.*, 614 F.3d 1163, 1172 (2010) (citing *Duxbury*, 579 F.3d at 29; *Lusby*, 570 F.3d at 854-855; *Grubbs*, 565 F.3d at 190). And both the Eighth and Eleventh Circuits have allowed *qui tam* complaints to proceed notwithstand-

ing relators' failure to identify "specific fraudulent claims for payment submitted to the government." *In re Baycol Prods. Litig.*, 732 F.3d 869, 875-877 (8th Cir. 2013); see *United States ex rel. Walker* v. *R&F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005), cert. denied, 549 U.S. 1027 (2006); see also *United States ex rel. Clausen* v. *Laboratory Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (stating that a *qui tam* complaint must contain "some indicia of reliability * * * to support the allegation of an actual false claim for payment") (emphasis omitted), cert. denied, 537 U.S. 1105 (2003).[5]

c. The current extent of the disagreement among the lower courts is thus uncertain, and the courts of appeals that have previously articulated a per se rule requiring relators to plead the details of specific false claims may have retreated from a rigid application of that rule. There is, however, at least some continuing uncertainty as to whether a *qui tam* complaint satisfies Rule 9(b) if it contains detailed allegations giving rise to a reasonable inference that false claims were submitted to the government, but does not identify specific requests for payment.

As the government explained when the Court sought the views of the United States on another petition raising the same question, a rigid rule that

---

[5] The First Circuit, too, has shifted its approach to this question. In 2004, that court appeared to adopt a per se rule that "a relator must provide details that identify particular false claims for payment." *United States ex rel. Karvelas* v. *Melrose-Wakefield Hosp.*, 360 F.3d 220, 232, cert. denied, 543 U.S. 820 (2004). But the court later narrowed that holding, making clear that specific false claims need not be identified when the relator alleges that "the defendant induced *third parties* to file false claims with the government." *Duxbury*, 579 F.3d at 29.

such complaints are inadequate would hinder the ability of *qui tam* relators to perform the role that Congress intended them to play in the detection and remediation of fraud against the United States. See U.S. Amicus Br. at 16-17, *Ortho Biotech Prods., L.P. v. United States ex rel. Duxbury*, No. 09-654 (May 19, 2010). *Qui tam* complaints are often filed by the defendants' current and former employees. Such relators may be privy to detailed information indicating that their employers are engaged in fraud against the United States, and may be well-positioned to provide valuable assistance to the government's anti-fraud efforts, even if they are not privy to the details of the defendants' billing activities.

In *Lusby*, for example, an engineer who had worked for a government contractor alleged that his former employer had falsely represented that its aircraft engines met the government's specifications. See 570 F.3d at 853-854. And in *Grubbs*, a physician alleged that other doctors at his hospital had sought to recruit him into a scheme to bill the government for services they had not provided. See 565 F.3d at 191-192. Both relators came forward with detailed, plausible allegations of fraud. Yet under a per se rule requiring *qui tam* complaints to identify specific false claims, both suits would have been dismissed because neither relator was familiar with the minutiae of his employer's billing. Because a prospective relator is unlikely to be privy to such details unless she "works in the defendant's accounting department," a rule demanding the details of specific false claims would "take[] a big bite out of *qui tam* litigation." *Lusby*, 570 F.3d at 854.

Subjecting *qui tam* relators to a per se rule requiring the identification of specific false claims is especially unwarranted because it attaches dispositive significance to the relator's awareness of details that in most instances are already known to the government. The government rarely if ever needs a relator's assistance to identify claims for payment that have been submitted to the United States. Rather, relators typically contribute to the government's enforcement efforts by bringing to light other information that shows those claims to be false. Requiring *qui tam* complaints to identify specific false claims thus would not meaningfully assist the government's enforcement efforts. To the contrary, the likely effect of such a requirement would be to discourage the filing of *qui tam* suits by relators—like those in *Grubbs* and *Lusby* —who would otherwise have the means and the incentive to expose frauds against the United States.

2. The proper application of Rule 9(b) in the FCA context is thus a significant issue. If one or more courts of appeals continue to adhere to the rigid view that petitioner attributes to the court below (but see pp. 13-14, *supra*), this Court's intervention may be warranted in a case where application of that approach appears to be outcome-determinative. This case, however, is not a suitable vehicle in which to take up the question. The court below correctly held that petitioner's complaint failed to satisfy Rule 9(b) and *Iqbal* because it does not plausibly allege that false claims were presented to the government. Petitioner's suit therefore could not go forward under the pleading standard adopted by any court of appeals.

a. Petitioner contends (Pet. 19-20; Reply Br. 3-4 & n.2) that the court of appeals found his complaint

insufficient only because that court adopted an inflexible rule requiring *qui tam* relators to identify specific false claims. But the court of appeals did not adopt that per se rule. To the contrary, it required only "'some indicia of reliability' * * * to support the allegation that an actual false claim was presented to the government." Pet. App. 8a (quoting *Clausen*, 290 F.3d at 1311). The court stated that a relator must identify specific false claims only where the "defendant's actions, as alleged and as reasonably inferred from the allegations, *could* have led, but *need not necessarily* have led, to the submission of false claims." *Id.* at 10a. Although this articulation of the pleading standard differs from the phrasing used by other circuits, it does not require that every *qui tam* complaint plead the details of specific false claims.[6]

The court of appeals' rejection of a per se rule is further confirmed by the balance of its opinion. If the court had followed the decisions demanding that a relator plead "representative examples" of specific

---

[6] Petitioner contends (Reply Br. 5) that, by requiring a relator to identify specific false claims whenever a defendant's conduct would not "necessarily" have led to the submission of false claims, the court of appeals improperly elevated *Iqbal's* plausibility requirement to a demand that relators "prov[e] falsity." But the court below did not require such proof; rather, it rejected petitioner's complaint because petitioner had failed to "plausibly allege" the presentation of false claims. Pet. App. 2a, 13a. The court of appeals explained, moreover, that a relator's complaint is sufficient if the defendant's actions "as alleged *and as reasonably inferred from the allegations*" would "necessarily have led[] to the submission of false claims." *Id.* at 10a (emphasis altered). That formulation suggests that petitioner's complaint would have satisfied the court's standard if petitioner had alleged facts sufficient to support a reasonable inference that false claims were submitted.

false claims, *Joshi*, 441 F.3d at 557, or the "dates, times, or amounts of individual false claims," *Hopper*, 588 F.3d at 1326, it would have rejected petitioner's complaint out of hand, because there is no dispute that petitioner failed to allege the details of any request for payment made to the federal government. See Pet. 29-30.[7] Despite the conceded absence of any allegation of a specific false claim, however, the court of appeals carefully examined the complaint to determine whether it provided a plausible basis for inferring that false claims were presented. Pet. App. 11a-17a. And as to the 98 Kapidex prescriptions on which petitioner now relies, the court's analysis indicates that its decision rested chiefly on the complaint's lack of *plausibility*, not its lack of *particularity*. The court characterized petitioner's allegation regarding those 98 prescriptions as resting on "speculative" and "implausible" assertions, and the court framed its holding as a conclusion that petitioner had not "plausibly allege[d] that the [98] prescriptions were written for off-label uses." *Id.* at 13a-14a.

This lack of plausible allegations that respondent's conduct led to the presentation of false claims would have doomed petitioner's complaint before every court of appeals, even those that apply the most relator-friendly pleading standards. See, *e.g.*, *Duxbury*, 579 F.3d at 29 (requiring "factual or statistical evidence to

---

[7] Petitioner provided some details concerning 98 Kapidex prescriptions, including the names of the prescribing doctors and the months in which the prescriptions were written. Pet. App. 105a-109a. He also generally alleged that all 98 prescriptions were submitted to Medicare for reimbursement. *Ibid.* He provided no dates, amounts, or other details, however, about the circumstances under which reimbursement was sought. See *ibid.*

strengthen the inference of fraud beyond possibility" (quoting *Rost*, 507 F.3d at 733)); *Lusby*, 570 F.3d at 854-855 (complaint need not "exclude all possibility of honesty," but must contain more than "vague and unsubstantiated allegations of fraud"); *Grubbs*, 565 F.3d at 190 (requiring "reliable indicia that lead to a strong inference that claims were actually submitted"); *Ebeid*, 616 F.3d at 998-999 (same). Because the deficiencies in petitioner's complaint would have resulted in dismissal in any circuit, the disagreement about the application of Rule 9(b) in FCA cases is not implicated here.

b. Petitioner contends (Pet. 28-33) that the court of appeals was wrong to find his allegations implausible. But the question whether this particular complaint plausibly alleged the presentation of false claims to the government is a factbound issue that would not warrant this Court's review even if the court of appeals had erred. In any event, the decision below is correct.

Petitioner relies on the allegation that 16 primary care physicians wrote 98 Kapidex prescriptions that were ultimately submitted to Medicare for reimbursement. Petitioner did not, however, directly allege that those prescriptions were ineligible for reimbursement. Instead, petitioner argues that general allegations and nationwide statistics about Kapidex prescriptions support an inference that these 98 prescriptions were for 60-milligram rather than 30-milligram doses, and a further inference that the prescriptions were for GERD rather than for the healing of active EE (an indication for which a 60-milligram dose is approved). As the court of appeals correctly

held, the allegations in petitioner's complaint do not support either inference.

First, the complaint does not provide a plausible basis for inferring that the 98 prescriptions were for 60-milligram doses. Petitioner contends (Pet. 31) that "there is a 'more than 90%' certainty" that these prescriptions were for 60-milligram doses because the 16 doctors received 60-milligram samples and because 93% of *all* Kapidex prescriptions are written for 60-milligram doses. As the court of appeals observed, however, the complaint fails to "connect[] these general statistics to the 98 prescriptions identified." Pet. App. 14a. Although petitioner's theory of the case assumes that these 98 prescriptions were representative of Kapidex prescriptions nationwide, "it is logical to assume that a much lower-than-average percentage of the 98 prescriptions were written for 60 mg doses" given the complaint's allegation that primary care physicians generally "do not treat the condition for which the higher 60 mg dose is indicated." *Ibid.*

Second, the complaint does not provide a plausible basis for inferring that the 98 prescriptions were written to treat GERD rather than EE. Pet. App. 14a-15a. Petitioner alleged that, in general, primary care physicians "do not regularly treat EE." *Id.* at 84a. But he did not allege that primary care physicians *never* treat EE, and he also did not allege anything about the patient populations or practices of the 16 specific primary care physicians who wrote the prescriptions at issue here. *Id.* at 14a.

As the First Circuit explained in rejecting an analogous FCA action against a manufacturer that had allegedly marketed one of its drugs for unapproved uses, "it is a possible but not a necessary or even

strong inference that doctors" wrote prescriptions for Kapidex for unapproved uses and that "some false claims for [Kapidex] reimbursement were submitted to the government" as a result. *Rost*, 507 F.3d at 732. Like the complaint in *Rost*, petitioner's pleading "contained no factual or statistical evidence to strengthen the inference of fraud beyond possibility." *Id.* at 733. Accordingly, petitioner's suit would fail under the pleading standard adopted by any court of appeals.[8]

---

[8] It is also unclear whether petitioner's complaint would ultimately survive respondent's motion to dismiss even if this Court granted certiorari and reversed the court of appeals' judgment. The district court dismissed petitioner's complaint on the independent ground that petitioner had failed adequately to plead causation. Pet. App. 28a-29a. The court of appeals found it unnecessary to address that alternative holding. See *id.* at 5a; note 4, *supra*. Even if this Court granted certiorari and held that petitioner had pleaded facts sufficient to create an inference that false claims were submitted, petitioner's suit could not go forward if the court of appeals on remand were to agree with the district court on the issue of causation.

## CONCLUSION

The petition for a writ of certiorari should be denied.

Respectfully submitted.

DONALD B. VERRILLI, JR.
*Solicitor General*
STUART F. DELERY
*Assistant Attorney General*
MALCOLM L. STEWART
*Deputy Solicitor General*
BRIAN H. FLETCHER
*Assistant to the Solicitor General*
MICHAEL S. RAAB
JOSHUA WALDMAN
*Attorneys*

FEBRUARY 2014

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES EX REL.
NOAH NATHAN,
On Behalf of The United States
Government and the States,

                RELATOR,

    v.

TAKEDA PHARMACEUTICALS
NORTH AMERICA, INC.,

and

TAKEDA PHARMACEUTICALS
AMERICA, INC.,

                DEFENDANTS.

CIVIL ACTION NO. 09-cv-1086

JURY TRIAL DEMANDED

## THIRD AMENDED COMPLAINT

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. §3729 et seq.]; CALIFORNIA FALSE CLAIMS ACT [Cal. Govt. Code §12650 et seq.]; CONNECTICUT FALSE CLAIMS ACT [September Special Session, Public Act No. 09-5 § 1 et seq.]; DELAWARE FALSE CLAIMS AND FALSE REPORTING ACT [6 Del. C. §1201 et seq.]; FLORIDA FALSE CLAIMS ACT [FL Stat. § 68.081 et seq.]; GEORGIA FALSE MEDICAID CLAIMS ACT [Ga. Code Ann. §49-4-168 et seq.]; HAWAII FALSE CLAIMS ACT [Haw. Rev. Stat. §661-21 et seq.]; ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT [740 Ill. Comp. Stat. §175/1 et seq.]; INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT [Ind. Code Ann. §5-11-5.5-1 et seq.]; LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW [Louisiana Rev. Stat. §46:437.1 et seq.]; MASSACHUSETTS FALSE CLAIMS LAW [Mass Gen Laws ch.12 §5A et seq.]; MICHIGAN MEDICAID FALSE CLAIMS ACT [Mich. Comp. Laws §400.601 et seq.]; MONTANA FALSE CLAIMS ACT [Mont. Code Ann. §17-8-401 et seq.]; NEVADA FALSE CLAIMS ACT [Nev. Rev. Stat. Ann. §357.010 et seq.]; NEW HAMPSHIRE FALSE CLAIMS ACT [N.H. Rev. Stat. Ann. §167.61-b et seq.]; NEW JERSEY FALSE CLAIMS ACT [N.J. Stat. §2A:32C-1 et seq.]; NEW MEXICO MEDICAID FALSE CLAIMS ACT [N.M. Stat. Ann. §27-14-1 et seq.]; NEW MEXICO FRAUD AGAINST TAXPAYERS ACT [N.M. Stat. Ann. §44-9-1 et seq.]; NEW YORK FALSE CLAIMS ACT [N.Y. State Fin. §187 et seq.];

NORTH CAROLINA FALSE CLAIMS ACT [NC Gen. Stat. §1-607(a) et seq.]; OKLAHOMA MEDICAID FALSE CLAIMS ACT [Okla. Stat. tit. 63 §5053 et seq.]; RHODE ISLAND FALSE CLAIMS ACT [R.I. Gen. Laws §9-1.1-1 et seq.]; TENNESSEE MEDICAID FALSE CLAIMS ACT [Tenn. Code Ann. §71-5-181 et seq.]; TEXAS MEDICAID FRAUD PREVENTION LAW [Tex. Hum. Res. Code Ann. §36.001 et seq.]; VIRGINIA FRAUD AGAINST TAXPAYERS ACT [Va. Code Ann §8.01-216.1 et seq.]; WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE LAW [Wis. Stat. §20.931 et seq.]; and DISTRICT OF COLUMBIA FALSE CLAIMS ACT [D.C. Code Ann. §2-308.13 et seq.]

**TABLE OF CONTENTS**

PAGE

I.      INTRODUCTION...................................................................................................1

II.     COMPLAINT OVERVIEW....................................................................................2

III.    JURISDICTION AND VENUE ............................................................................6

IV.     PARTIES.................................................................................................................6

V.      BACKGROUND.....................................................................................................8

        A. Overview: Drug Coverage under Federal Healthcare Programs ...................8
        B. The FDA Regulatory System.......................................................................10
        C. The False Claims Act....................................................................................12
        D. Prescription Drug Payment Under Federal Health Care Programs ..............13
           1. The Medicaid Program ............................................................................13
           2. The Medicare Program ............................................................................17
           3. Reimbursement Under Other Federal Health Care Programs...................21

VI.     APPROVAL OF KAPIDEX AND KAPIDEX LABELING............................................22

VII.    TAKEDA'S OFF-LABEL PROMOTION OF KAPIDEX TO
        RHEUMATOLOGISTS..............................................................................................26
        A. Equating Kapidex with Prevacid .................................................................26
        B. Promotion of Prevacid to Rheumatologists.................................................29
        C. Promotion of Kapidex to Rheumatologists..................................................31

VIII.   TAKEDA'S SAMPLING OF 60 MG KAPIDEX....................................................35
        A. Kapidex 60 mg for Non-Erosive GERD is Not a "Medically Accepted
           Indication" ....................................................................................................35
        B. Overview of Takeda's Off-Label Promotion of the 60 mg Kapidex Dose...........36
        C. Through its Sampling Practices, Takeda Has Promoted Kapidex to Various
           Types of Physicians Off-Label......................................................................40
        D. Sales Representatives Have Promoted Kapidex at a 60 mg Dose........................42

IX.     TAKEDA'S ILLEGAL MARKETING PRACTICES HAVE CAUSED THE
        SUBMISSION OF FALSE CLAIMS............................................................................ 44
        A. Takeda is Encouraging Its Sales Force to Promote Kapidex Prescriptions That
           are Not for "Medically Accepted Indications" to Increase Market Share............44
        B. Takeda's Sales Force HAS Promoted Kapidex Off-Label in Accordance
           with the Company's Directive.......................................................................46
        C. Physicians Are Often Unaware of the Indications for the Prescriptions They
           Write and Do Not Generally Read Drug Labels ("Package Inserts") ...................48

D. Physicians Are Highly Influenced by the Sampling Practices of
Pharmaceutical Companies ...................................................................................52
E. Physicians Are Writing Kapidex Prescriptions That are Not for "Medically
Accepted Indications" Because of Takeda's Illegal Promotional Practices..........54
    1. Doctors Corlin and Bedord....................................................................54
    2. Doctor Michael Yaffe ...........................................................................57
    3. Doctor "A".............................................................................................58
F. Significant Numbers of Kapidex Prescriptions Have Been Submitted to
Government Reimbursement Programs.................................................................60
G. Aggressive Marketing of Kapidex....................................................................71
H. Takeda's Sales of Kapidex/Damages to Federal Government.........................72
I. Significant Health Risks Associated with PPI Use.............................................74
J. Relator Has Presented Particularized Allegations of the Fraudulent Scheme......75

COUNT I - Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)..................................76

COUNT II - Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)................................. 78

COUNT III - California False Claims Act, Cal. Govt. Code § 12651(a)(1) and (2) ...................80

COUNT IV - Delaware False Claims And Reporting Act, 6 Del. C. § 1201(a)(1) and (2)..........81

COUNT V - Florida False Claims Act, Fla. Stat. Ann. § 68.082(2)(a) and (b)............................82

COUNT VI - Georgia False Medicaid Claims Act, Ga. Code Ann.
§ 49-4-168.1(a)(1) and (2) .....................................................................................84

COUNT VII - Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(1) and (2) .......................85

COUNT VIII - Illinois Whistleblower Reward And Protection Act, 740 Ill. Comp. Stat.
§ 175/3(a)(1) and (2)...............................................................................................86

COUNT IX - Indiana False Claims And Whistleblower Protection Act,
Ind. Code Ann. § 5-11-5.5-2(b)(1), (2) and (8)..........................................................87

COUNT X - Louisiana Medical Assistance Program Integrity Law, La. Rev. Stat. § 46:437
(A) and (B)...............................................................................................................88

COUNT XI - Massachusetts False Claims Law, Mass. Gen. Laws Ch. 12 § 5b(1) and (2) .........90

COUNT XII - Michigan Medicaid False Claims Act, Mich. Comp. Laws.
§ 400.603 and 607....................................................................................................91

COUNT XIII - Montana False Claims Act, Mont. Code Ann. § 17-8-403(1)(a) and (b)..............92

COUNT XIV - Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.040(1)(a) and (b) ...........93

COUNT XV - New Hampshire False Claims Act, N.H. Rev. Stat. Ann.
§ 167:61-B(I)(a) and (b) ............................................................................................95

COUNT XVI - New Jersey False Claims Act, N.J. Stat. §2A:32C-3(a) and (b).....................96

COUNT XVII - New Mexico Medicaid False Claims Act, N.M. Stat. Ann.
§ 27-14-4(A), (B) and (C)..........................................................................................97

COUNT XVIII - New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann.
§44-9-1(A)(1) and (2)................................................................................................98

COUNT XIX - New York False Claims Act, N.Y. State Fin. §189(1)(a) and (b)......................99

COUNT XX - Oklahoma Medicaid False Claims Act, Okla. Stat. Tit. 63
§5053.1B(1) and (2).................................................................................................101

COUNT XXI - Rhode Island False Claims Act, R.I. Gen. Laws §9-1.1-3(a)(1) and (2)..........102

COUNT XXII - Tennessee Medicaid False Claims Act, Tenn.Code Ann.
§71-5-182(a)(1)(A) and (B).......................................................................................103

COUNT XXIII - Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code
Ann. § 36.002(1), (2) and (13) .................................................................................104

COUNT XXIV - Virginia Fraud Against Taxpayers Act, Va. Code Ann.
§ 8.01-216.3(a)(1) and (2) ........................................................................................105

COUNT XXV - Wisconsin False Claims For Medical Assitance Act, Wis. Stat.
§20.931(2)(a) and (b) ...............................................................................................107

COUNT XXVI - District of Columbia False Claims Act, D.C. Code Ann.
§2-308.14(a)(1) and (2)............................................................................................108

COUNT XXVII - Connecticut False Claims Act, September Special Session,
Public Act No. 09-5 §2(a)1 and 2..............................................................................109

COUNT XXVIII - North Carolina False Claims Act, NC Gen. Stat.
§1-607(a)(1) and (2)................................................................................................110

PRAYER FOR RELIEF ............................................................................................111

DEMAND FOR JURY TRIAL ..................................................................................117

## I.    INTRODUCTION

COMES NOW Relator Noah Nathan, bringing this *qui tam* action on behalf of the United States of America, the States of California, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Wisconsin and the District of Columbia (collectively "the States"), in the name of the United States Government and the States, complaining of the fraudulent acts of Defendants Takeda Pharmaceuticals North America, Inc. and Takeda Pharmaceuticals America, Inc. (collectively "Takeda") and alleging as follows:

1.    This is an action to recover damages and civil penalties on behalf of the United States of America and the States relating to the fraudulent actions of Takeda and/or its agents and employees in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended ("the FCA" or "the Act") in causing false claims to be presented under the Federal Medicare and Medicaid Programs, as well as the TRICARE (formerly CHAMPUS), CHAMPVA and Federal Employee Health Benefit Programs (collectively the "Federal Reimbursement Programs").

2.    As set forth below, Takeda's acts also constitute violations of the California False Claims Act, Cal. Govt. Code §12650 et seq.; the Connecticut False Claims Act, September Special Session, Public Act No. 09-5; the Delaware False Claims and False Reporting Act, 6 Del. C. §1201 et seq.; the Florida False Claims Act, FL Stat. § 68.081 et seq.; the Georgia False Medicaid Claims Act, Ga. Code Ann. §49-4-168 et seq.; the Hawaii False Claims Act, Haw. Rev. Stat. §661-21 et seq.; the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §175/1 et seq.; the Indiana False Claims and Whistleblower Protection Act, Ind. Code Ann.

§5-11-5.5-1 et seq.; the Louisiana Medical Assistance Programs Integrity Law, Louisiana Rev. Stat. §46:437.1 et seq.; the Massachusetts False Claims Law, Mass Gen. Laws ch. 12 §5 et seq.; the Michigan Medicaid False Claims Act, Mich. Comp. Laws §400.601 et seq.; the Montana False Claims Act, Mont. Code Ann. §17-8-401 et seq.; the Nevada False Claims Act, Nev. Rev. Stat. Ann. §357.010 et seq.; the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. §167.61-b et seq.; the New Jersey False Claims Act, N.J. Stat. §2A:32C-1 et seq.; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §27-14-1 et seq.; the New Mexico Fraud Against Taxpayers Act §44-9-1 et seq.; the New York False Claims Act, N.Y. State Fin. §187 et seq.; the North Carolina False Claims Act, NC Gen. Stat. §1-607(a) et seq.; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §5053 et seq.; the Rhode Island False Claims Act, R.I. Gen. Laws §9-1.1-1 et seq.; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §71-5-181 et seq.; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §36.001 et seq.; the Virginia Fraud Against Taxpayers Act, Va. Code Ann §8.01-216.1 et seq.; the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. §20.931 et seq.; and the District of Columbia False Claims Act, D.C. Code Ann. §2-308.14 et seq.

## II.    COMPLAINT OVERVIEW

3.      In May 1995, TAP Pharmaceuticals, a predecessor of Takeda, received approval from the Food and Drug Administration (the "FDA") for Prevacid, a medication classified as a proton pump inhibitor ("PPI"). Prevacid is used primarily to treat gastroesophageal reflux disease ("GERD"), commonly known as heartburn or acid reflux. Patent protection for Prevacid expired in November of 2009.

4.      For each of the five years prior to the expiration of its patent protection, Prevacid's sales were in excess of $3 billion, placing it among the top ten pharmaceutical

2

products in the world.  The total annual sales of PPIs in the United States currently exceed $15 billion.

5.     Also prior to the expiration of patent protection for Prevacid, Takeda developed a new drug to take its place -- Kapidex, which has since been renamed Dexilant.  Kapidex and Dexilant will hereinafter be referred to solely as "Kapidex".

6.     In its efforts to replace its Prevacid sales with Kapidex sales, Takeda is promoting Kapidex inappropriately in at least two significant ways: First, Takeda is promoting Kapidex to rheumatologists, whose patients have conditions for which Kapidex has not been approved for treatment by, *inter alia,* suggesting to doctors and sales representatives that Kapidex is equivalent to Prevacid, despite the fact that Kapidex has not been approved for ten of the thirteen indications that Prevacid had obtained, including the two indications treated by rheumatologists. Second, Takeda is exclusively promoting the 60 mg dosage form of Kapidex to gastroenterologists, rheumatologists, otolaryngologists and primary care physicians, despite the fact that the great majority of these doctors' patients have conditions for which there is no approved dosage of Kapidex or for which the only approved dosage of Kapidex is 30 mg.

7.     Although Takeda sought approval from the FDA for Kapidex at a 60 mg dosage strength for the treatment of non-erosive Gastroesophageal Reflux Disease ("GERD"), the FDA expressly refused this indication.  The FDA only approved Kapidex at a 30 mg dose except for patients healing from Erosive Esophagitis ("EE"), a condition diagnosed through endoscopy and diagnosed and treated by gastroenterologists ("GIs").

8.     And although Prevacid was approved for 13 indications including "risk reduction of NSAID-associated gastric ulcer" and "healing of NSAID associated gastric ulcer," Kapidex did not receive these two indications.

3

9.     Notwithstanding the foregoing, Takeda is aggressively promoting the 60 mg dose of Kapidex by, *inter alia,* exclusively sampling Kapidex at the 60 mg dose, including to physicians who do not treat EE, the only condition for which a 60 mg dose is appropriate.

10.     As set forth herein, several physicians, including Dr. Richard Corlin, a board-certified gastroenterologist and the former president of the American Medical Association, have attested, that Takeda's illegal promotion of Kapidex induced them to write 60 mg prescriptions of Kapidex for GERD.   Indeed, these physicians have attested that they did not know that 60 mg Kapidex was not indicated for GERD and that they were not aware of a 30 mg Kapidex dose at all.

11.     Takeda is also promoting Kapidex to rheumatologists for "risk reduction of NSAID-associated gastric ulcer" and "healing of NSAID associated gastric ulcer," although Kapidex is not indicated for either condition.

12.     Due to Takeda's fraudulent promotional campaign, hundreds of thousands of prescriptions have been written for Kapidex in a manner inconsistent with its FDA-approved label (i.e. off-label).   Moreover, the treatment of Kapidex 60 mg for non-erosive GERD and the treatment of Kapidex for gastric protection are not only "off-label" but they are not supported by any of the statutorily recognized compendia and as such they are not "medically accepted indications".

13.     As a result of Takeda's fraudulent marketing practices, Federal Reimbursement Programs have been caused to pay fraudulent claims for reimbursement of Kapidex prescriptions for indications that are not within the definition of "medically accepted indications" pursuant to federal statute and regulations and that would not have been paid but for Takeda's fraudulent promotional activities.

4

14.     The number of prescriptions generally, and the number of Kapidex prescriptions specifically as detailed below, that are submitted to Federal Reimbursement Programs are significant. Indeed, as reported in an August 2008 article in Nature Biotechnology at least 50% of biologics in the United States are paid for by the Centers for Medicaid and Medicare Services ("CMS"), either through Medicare or Medicaid. As such, Takeda was well aware that a significant portion of the Kapidex prescriptions that it promoted off-label would be submitted to the government for reimbursement.

15.     Also as a direct result of Takeda's fraudulent promotional campaign, state health programs have been caused to pay false or fraudulent claims for reimbursement of Kapidex prescriptions that are not reimbursable pursuant to the respective state programs and that would not have been paid but for Takeda's fraudulent promotional activities.

16.     Mr. Nathan seeks through this action to recover damages and civil penalties arising from Takeda's making or causing to be made false or fraudulent records, statements and/or claims in connection with its marketing of Kapidex.

17.     Takeda knew and intended its false and fraudulent promotional practices to cause the submission of hundreds of thousands of claims to federal and state health insurance programs for Kapidex prescriptions that were not for "medically accepted indications" and were potentially harmful to the patients taking them.

18.     As a result of Takeda's scheme, every single primary care physician, rheumatologist or otolarygologist who receives 60 mg samples from Takeda (the only type of samples it produced) is being subjected to Takeda's off-label promotion scheme, since these physicians neither diagnose nor treat erosive esophagitis the only on-label condition treated by 60 mg Kapidex. As such, Relator's claims against Takeda are unique in that the off-label

5

scheme hatched by the defendants is so far-reaching that virtually none of its promotional sampling is being conducted **on-label**.

19.     Relator has personal knowledge of Takeda's conduct as set forth herein.

### III.     JURISDICTION AND VENUE

20.     This action arises, *inter alia*, under the provisions of the False Claims Act, 31 U.S.C. § 3729 et seq. As such, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. § 3730(b).   In addition, 31 U.S.C. § 3732 (b) specifically confers jurisdiction on this Court over the state law claims asserted in this Amended Complaint.

21.     Personal jurisdiction and venue for this action are predicated on 31 U.S.C. § 3732(a) which provides that "any action brought under § 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant, can be found, resides, transacts business or in which any act proscribed by § 3729 occurred."

22.     Defendants Takeda Pharmaceuticals North America, Inc. and Takeda Pharmaceuticals America, Inc. transact substantial business in the Eastern District of Virginia.

### IV.     THE PARTIES

23.     Relator Noah Nathan ("Relator") is an individual citizen of the Commonwealth of Virginia.   Relator is bringing this civil action for violations of the False Claims Act for himself and for the United States Government, pursuant to the provisions of 31 U.S.C. § 3730(b)(1) and on behalf of the States pursuant to the state statutes cited above.

24.     Relator Noah Nathan is currently employed by Takeda as a Territory Manager and has been employed by Takeda and/or TAP Pharmaceuticals (the entity succeeded by Takeda after TAP Pharmaceuticals dissolved in 2008) ("TAP") since 2002.   Last July, prior to the

6

unsealing of this lawsuit, Mr. Nathan was appointed by his District Manager to serve as Takeda's Kapidex "Lead" for his District. On May 13, 2011, Mr. Nathan received a letter confirming his reappointment to the position of Kapidex "Lead."

25.    Defendant Takeda Pharmaceuticals North America, Inc. is a corporation doing business in the Eastern District of Virginia. Defendant Takeda Pharmaceuticals North America, Inc. employs numerous sales representatives and other personnel in the Eastern District of Virginia and conducts other business in this district.

26.    Defendant Takeda Pharmaceuticals America, Inc. is a corporation doing business in the Eastern District of Virginia. Defendant Takeda Pharmaceuticals America, Inc. employs numerous sales representatives and other personnel in the Eastern District of Virginia and conducts other business in this district.

27.    Takeda manufactures, markets and sells oral diabetes, insomnia, rheumatology, blood pressure and gastroenterology treatments.

28.    According to the Annual Report for Takeda's parent company, Takeda Pharmaceutical Company Limited, Takeda's sales in the United States for the last fiscal year were in excess of $6 billion.

29.    According to its own website, Takeda is among the top 15 pharmaceutical companies in the United States. Unfortunately, however, this is not the first time that Takeda has acted in reckless disregard of governmental regulation in order to maximize pharmaceutical sales.

30.    In this regard, it is important to note that, as set forth above, Takeda is a successor to TAP which was a joint venture of Abbott Labs and Takeda Pharmaceutical Company Ltd.

31.    As disclosed in an October 3, 2001 press release from the United States

7

Department of Justice, TAP agreed to pay $875,000,000, including "$559,483,560 to settle its federal civil False Claims Act liabilities and to pay the U.S. Government for filing false and fraudulent claims with respect to the Medicare and Medicaid program."

32.     Moreover, as part of that settlement, TAP "agreed to comply with the terms of a sweeping corporate integrity agreement which, among other things, significantly changes the manner in which TAP supervises its marketing and sales staff."

33.     This corporate integrity agreement ("CIA") was expressly made binding on "the successors, assigns and transferees of TAP," and required TAP to implement measures "to promote marketing and sales practices that conform with all statutes, regulations and requirements applicable to Government Reimbursed Products." Notably, this CIA was in place for a period of seven years and expired only months before the Kapidex launch.

## V.     BACKGROUND

### A. Overview: Drug Coverage under Federal Healthcare Programs

34.     Congress has the authority to decide which drugs and uses will be paid for by federal healthcare programs.

35.     As alleged below, Congress has exercised this authority in very specific and considered ways regarding each federal program.

36.     For "covered outpatient drugs" (Medicaid) or "covered Part D drugs" (Medicare), as those terms are defined by statute with respect to *inter alia* Medicaid and Medicare, Congress has integrated FDA drug restrictions into federal health program restrictions regarding what drugs will be covered and paid.

37.     Congress has not delegated authority to the FDA to decide which drugs and uses will be paid by federal healthcare programs. Instead, the FDA's primary function with respect

to drugs and their uses is to receive, evaluate and approve specific labels under the 1966 Fair Packaging and Labeling Act, 15 U.S.C. § 1451.

38.     Another FDA function is to monitor and enforce manufacturers' compliance with advertising and promotional restrictions under the Food, Drug, and Cosmetics Act ("FDCA") and the Food and Drug Administration Modernization Act of 1997 ("FDAMA").

39.     Under the FDCA, pharmaceutical drug companies cannot distribute a drug in interstate commerce unless the FDA has approved its use. 21 U.S.C. §§ 355(a) & (d).

40.     After extensive testing, the FDA will approve a pharmaceutical drug for use according to the label.

41.     Use of an approved drug outside of the label (which specifies indication, usage, dose and route of administration) is referred to as an "off-label" use. The FDCA does not prohibit physicians from prescribing an FDA approved drug for off-label uses.

42.     The FDCA does, however, prohibit drug manufacturers from marketing or promoting a drug for off-label uses. 21 U.S.C. §§ 331 & 352.

43.     Federal and state health care programs establish conditions under which they will pay for prescription drugs dispensed to beneficiaries. As alleged more specifically below, these conditions incorporate the FDCA restrictions to define the drugs which will be covered and reimbursed by public healthcare programs.

44.     The cost of drugs prescribed for off-label uses are not reimbursable under Federal and state health care programs unless such uses are supported in certain statutorily recognized compendia. As such, the knowing and undisclosed failure to comply with FDCA regulations regarding the marketing of approved uses and doses of drugs will cause the

9

government, directly or through subcontracted health or drug plans, to pay out benefits it did not intend for noncovered and nonreimburseable drugs.

45.     The details of each of the relevant statutory and regulatory systems are included below.

### B. The FDA Regulatory System

46.     Under the FDCA, 21 U.S.C. §§ 301-97, new pharmaceutical drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the satisfaction of the FDA that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a), (d).

47.     Approval of the drug by the FDA is the final step in a multi-year process of study and testing.

48.     The FDA does not approve a drug for treatment of sickness in general. Instead, a drug is approved as safe and effective for treatment of a specific condition, for which the drug has been tested in patients. The specific approved use includes a range of specifications including indications and usage, dose and route of administration.

49.     The indication and dosages approved by the FDA are set forth in the drug's labeling, the content of which is also reviewed by the FDA. 21 U.S.C. §§ 352, 355(d). An example of the drug's labeling is the printed insert in the drug's packaging. The FDA only approves the new drug application if the labeling conforms to the uses and dosages that the FDA has approved. 21 U.S.C. § 355(d).

50.     Under the FDAMA, if a manufacturer wishes to market or promote an approved drug for additional uses – i.e., uses not listed on the approved label – the manufacturer must resubmit the drug for another series of clinical trials similar to those which supported the initial

approval. 21 U.S.C. § 360aaa(b), (c).   Until subsequent approval of the new use has been granted, the unapproved use is considered to be "off-label."

51.    Off-label marketing restrictions are a safety-related feature of the FDAMA because these restrictions maintain a sponsor's incentive to apply for additional approved uses rather than skirt FDA review.

52.    "Off-label" refers to the use of an approved drug for any purpose, or in any manner, other than the indications and dosages approved by the FDA and described in the drug's labeling.  Off-label use includes treating beyond the indications and use, treating the indicated condition at a different dose or frequency than specified in the label, or treating a different patient population (e.g., treating a child when the drug is approved to treat adults).

53.    Although the FDA is responsible for ensuring that a drug is safe and effective according to the specifications on the label, the FDA does not regulate the practice of medicine. Therefore, once a drug is approved for a particular use, the FDA does not prohibit doctors from prescribing the drug for uses that are different than those approved by the FDA.

54.    Although physicians may prescribe drugs for off-label usage, the law prohibits drug manufacturers from marketing or promoting a drug for a use or at a dosage that the FDA has not approved. Specifically, a manufacturer illegally "misbrands" a drug if the promotion of that drug is not in accordance with the drug's labeling.  21 U.S.C. §§ 331, 352.

55.    The FDCA provides that a "sample" is a unit of a drug that is not intended to be sold and is "intended to promote the sale of the drug." 21 U.S.C. § 353(c)(1). Thus, the distribution of 60 mg Kapidex samples to doctors was by definition promotion and, when provided to doctors who did not treat EE, constituted off-label promotion.

11

56.     The off-label regulatory regime protects patients and consumers by ensuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific governmental body – the FDA.

57.     While the FDA has authority to enforce compliance with its advertising and promotional restrictions for the purpose of protecting the public, it has no authority to enforce compliance for the purpose of protecting federal healthcare programs against false claims or remedying such claims already submitted.

### C. The False Claims Act

58.     Although there is no private right of action to enforce the FDCA, when off-label promotion leads to the knowing presentment, or the causing to be presented of false or fraudulent claims for payment to the government, it constitutes a violation of the False Claims Act.

59.     The False Claims Act is the federal government's "primary litigative tool for combating fraud." See Senate Judiciary Committee, False Claims Amendments Act of 1986, S. REP. NO. 345 *reprinted in* 1986 U.S.C.C.A.N. 5266.

60.     Moreover, over the last decade, the scope of the False Claims Act ("FCA") has been broadened considerably by the adoption of the Fraud Enforcement and Recovery Act of 2009 ("FERA"), reflecting the clear intention of Congress to expand the reach of the FCA.

61.     Indeed, FERA made clear that "intent' to submit a false claim is irrelevant, and that liability attaches even if an innocent third party submitted the actual false claim (e.g. physicians, pharmacists or patients).

62.     When a drug is prescribed for a use that is not covered by Medicare and Medicaid, the resulting claim is "false" under the FCA.

### D. Prescription Drug Payment Under Federal Health Care Programs

### 1. The Medicaid Program

63.     Medicaid is a public assistance program providing for payment of medical expenses for approximately 55 million low-income patients. Funding for Medicaid is shared between the federal government and state governments.

64.     The Medicaid program subsidizes the purchase of more prescription drugs than any other program in the United States.

65.     Federal reimbursement for prescription drugs under the Medicaid program is limited to "covered outpatient drugs" with a narrow exception, not relevant in this case, for certain drugs that have been determined to be "essential to the health of beneficiaries." 42 U.S.C. §§ 1396b(i)(10) and 42 U.S.C. § 1396r-8(a)(3).

66.     Under the Medicaid statute, a "covered outpatient drug" includes a drug dispensed by prescription and approved as safe and effective under the FDCA, 21 U.S.C. §§ 355 & 357, but does not include "a drug or biological used for a medical indication which is not a medically accepted indication." 42 U.S.C. § 1396r-8(k)(2), (3).

67.     The statute defines "medically accepted indication" as any use for a "covered outpatient drug" which is approved under the [FDCA], or the use of which is supported by one or more citations included or approved for inclusion in any of the compendia described in subsection 42 U.S.C. § 1396r-8 (g)(1)(B)(i). 42 U.S.C. § 1396r-8(k)(6).

68.     The three compendia described in subsection (g)(1)(B)(i) are the American Hospital Formulary Service Drug Information, the United States Pharmacopeia-Drug Information (and its successor publications), and the Drugdex Information System. 42 U.S.C. § 1396r-8(g)(1)(B)(i).

69.     Thus, setting aside on-label uses, whether an FDA-approved drug is listed in one or more of these three compendia for a particular indication determines whether a prescription for that use may be reimbursed under Medicaid.

70.     In order to participate in the Medicaid program, a State must have a plan for medical assistance that has been approved by the CMS, which administers the program on behalf of the Secretary of Health and Human Services in partnership with states. The state plan must specify, among other things, the specific kinds of medical care and services that will be covered. 42 U.S.C. §§ 1396a(a)(10),(17).

71.     If the plan is approved by the Secretary, the State thereafter is eligible for federal financial participation, i.e., reimbursement by the federal government for a specified percentage of the amounts that qualify as medical assistance under the state plan.  42 U.S.C. at §§ 1396b(a)(1), 1396d(b).  States are accorded a broad measure of flexibility in tailoring the scope and coverage of their plans to meet the particular needs of their residents and their own budgetary and other circumstances.

72.     While the Medicaid Act requires States to provide certain basic services, the Act permits, but does not require, States to cover prescription drugs, although most States choose to do so. 42 U.S.C. § 1396d(a)(12).

73.     States may provide services directly or through subcontracting Medicaid managed care organizations.  42 U.S.C. §1396u-2.

74.     In 1990, Congress enacted the Medicaid Drug Rebate Statute, codified at 42 U.S.C. §1396r-8, to "establish a rebate mechanism in order to give Medicaid the benefit of the best price for which a manufacturer sells a prescription drug to any public or private purchaser." H.R. Rep. No. 881, 101st Cong., 2d Sess. 96 (1990).

75.     That statute prohibits federal financial participation for covered outpatient drugs unless there is a rebate agreement in effect under section 1396r-8. 42 U.S.C. §§ 1396b(i)(10)(A) and 1396r-8(a)(1). Once a drug manufacturer has entered into a rebate agreement for a covered outpatient drug, a State is generally required to cover that drug under the state plan.

76.     The Medicaid Act permits a State to use prior authorization in order to exclude or otherwise restrict coverage of a drug where "the prescribed use is not for a medically accepted indication," i.e., a use which is not listed in the labeling approved by the FDA, or which is not included in one of the drug compendia identified in the Medicaid statute. 42 U.S.C. § 1396r-8(k)(6); § 1396r-8(d)(1)(B)(i). Some states use this authority to require prior authorization for Kapidex, while other states including, but not limited to, Vermont, Kansas, Connecticut, Maine and Utah, do not.

77.     State Medicaid agencies directly or through their subcontracting Medicaid managed care organizations administer Medicaid and reimburse pharmacies for drugs, which submit claims on behalf of individual Medicaid beneficiaries. The State agencies in turn submit information on the cost of covered outpatient drugs furnished to Medicaid beneficiaries to the United States for federal financial participation ("FFP").

78.     Medicaid claims, depending on the circumstances, may be submitted by pharmacies electronically or on paper, but in most cases must be submitted using a standard form (in Florida and many other states, for example, the National Council for Prescription Drug Programs "Universal Claim Form" is used for paper claims) which records among other things, the identity of the beneficiary, the provider, and the drug.

79.   Neither paper nor electronic claims by pharmacies distinguish between on-label and off-label uses.

80.   By offering Federal financial participation for a limited time, the Department of Health and Human Services ("HHS") encouraged each State Medicaid agency to establish, as its principal means of processing claims for covered outpatient drugs, a point-of-sale electronic claims management system, for the purpose of performing on-line, real time eligibility verifications, claims data capture, adjudication of claims, and assisting pharmacists (and other authorized persons) in applying for and receiving payment. 42 U.S.C. § 1396r-8(h).

81.   Many states process claims for outpatient prescription drugs through such point-of-sale claims management systems.

82.   Claims submitted electronically through such point-of-sale systems must comply with HIPAA rules regarding standard transactions. The National Council for Prescription Drug Programs (NCPDP) version 5.1 or D.0 is the HIPAA compliant transaction set that is used for transmission of pharmacy claims. While there is a field for diagnosis code, NDCDP has characterized this field as optional. States or other payors may determine whether or when such a field is to be completed.

83.   The diagnosis field is also optional on NCPDP's "Universal Claim Form" for paper claims. Similarly, states or other payors may determine whether or when such a field is to be completed.

84.   Because claims forms do not distinguish between on-label and off-label uses and frequently do not contain diagnosis information, states may not have the information to determine whether a claim is for a "covered outpatient drug" eligible for reimbursement under Medicaid.

16

## 2. The Medicare Program

85.     The Medicare Prescription Drug Improvement and Modernization Act of 2003 added coverage for outpatient prescription drugs that were not previously covered under the Medicare program. Medicare serves approximately 43 million elderly and disabled Americans.

86.     The first stage of the Medicare prescription drug program, from May 2004 through December 2005 permitted Medicare beneficiaries to enroll in a Medicare-approved drug discount card program. In addition, low-income beneficiaries, defined as those whose incomes did not exceed 135% of the poverty line (no more than $12,569 for a single person or $16,862 for a married couple in 2004) qualified for a $600 credit (funded by Medicare) on their drug discount card for 2004 and again for 2005.

87.     Starting in January 2006, Part D of Title XVIII (the Medicare Program) of the Social Security Act (or the "Act") provided subsidized drug coverage for all beneficiaries, with low-income individuals receiving the greatest subsidies.

88.     For those beneficiaries with dual eligibility under both Medicare and Medicaid, their prescription drugs are covered under Medicare Part D with the exception of a few drugs identified in §1927(d)(2) of the Act that may not be covered under Medicare Part D, but which States have the discretion to cover under Medicaid. Thus, the responsibility for providing almost all pharmacy benefits for dually eligible beneficiaries was transferred from Medicaid to Medicare Part D on January 1, 2006.

89.     The Part D prescription drug program provides comparable benefits and exclusions as the Medicaid program. Specifically, a Part D covered drug is available only by prescription, if approved by the FDA (or is a drug described under section 1927(k)(2)(A)(ii) or

(iii) of the Social Security Act), used and sold in the United States, and used for a "medically accepted indication" (as defined in § 1927(k)(6) of the Act).

90.   The definition of a covered Part D drug specifically excludes drugs or classes of drugs, or their medical uses, which may be excluded from coverage or otherwise restricted under Medicaid under § 1927(d)(2) of the Act, with the exception of smoking cessation agents.

91.   Medicare Part D is administered through the Centers for Medicare & Medicaid Services ("CMS") with coverage provided through private prescription drug plans.   Plan sponsors are authorized to negotiate independently pharmacy reimbursement and price concessions with manufacturers and pharmacies, and then to seek reimbursement from Medicare.

92.   Plan sponsors provide outpatient prescription drugs to their members through pharmacies under contract ("network pharmacies") either directly with the Plan sponsor or through a subcontracting organization commonly referred to as a pharmacy benefit manager or PBM.

93.   CMS requires plan sponsors to establish policies and procedures to restrict the use of paper claims to situations in which on-line claims processing is not available to the member at the point of sale.   Section 50.4 of Chapter 14 of the Prescription Drug Benefit Manual ("PDBM").   In other words, CMS requires that claims be submitted electronically at the time the member is at the pharmacy to allow for a decision whether the drug will be covered by the plan sponsor prior to the dispensing of the drug.

94.   When a member of a plan sponsor brings a prescription to a network pharmacy to be filled, the plan sponsor is required to adjudicate electronic claims "real time", i.e., make a

18

decision to cover or not cover the drug, unless CMS has approved a delay in making the decision.   Section 50.4 of Chapter 14 of the PDBM.

95.   A delay in making a decision may occur if CMS has approved for the requested drug that prior authorization by the plan sponsor be obtained or that the member follow a step therapy process.   A step therapy process may require that the member has used another drug unsuccessfully in advance of trying the requested drug.   CMS also permits a delay in making the decision and dispensing the drug if patient safety issues arise.

96.   The plan sponsor is required to pay clean claims submitted by the pharmacy for the drug within 14 days of the date an electronic claim is received (or 30 days after a paper claim is received).   42 CFR §423.520(a).

97.   The prescription provided to the pharmacy does not distinguish between on-label and off-label uses and does not include information that would allow a determination as to whether the drug has been prescribed for an impermissible off-label purpose.   Therefore, the only way in which a plan sponsor might ascertain that the prescription is for an impermissible off-label purpose prior to a decision to cover the drug is if the impermissible purpose is identified during a prior authorization or step therapy review.   Thus, as a practical matter, off-label Kapidex prescriptions that are submitted as a result of Takeda's off-label promotion will continue unless Takeda ends its off-label promotion.

98.   Based on a review of a major metropolitan market, only a small proportion of plan sponsors require prior authorization as a condition of coverage of Kapidex.

99.   For example, of the 34 plan sponsors in Chicago that include Kapidex on their formularies, only six had prior authorization and/or step therapy requirements for Kapidex. Source: CMS plan finder website at www.medicare.gov and individual plan sponsor websites.

100.    Because an off-label use that is not supported by one of the compendia does not qualify as a covered outpatient drug, a plan sponsor is not permitted to cover such a use through an exceptions process or a prior authorization process.

101.    Providing further support that Medicare Part D does not permit reimbursement for drugs not for "medically accepted indications" if such use is supported by peer reviewed medical literature, is the fact that in July 2010, two members of Congress introduced a bill to amend the definition of "medically accepted indication" in 42 U.S.C. 1395w-102(e)(4). That bill, the "Part D Off-Label Prescription Parity Act: (H.R. 5732), which would expand coverage under the Medicare Part D prescription drug program to allow Medicare prescription drug plans (Part D plans) to cover drugs used for "off-label" indications if such use is supported by peer-reviewed medical literature, as is the case under Medicare Part B and for Medicare Part D cancer drugs, was not adopted by Congress.

102.    All plan sponsors are required to have a comprehensive plan to detect, correct and prevent fraud, waste and abuse. 42 CFR 423.504(b)(4)(vi). The specific requirements of the compliance program for the Part D benefit includes directions to specific kinds of fraud and abuse in violation of program requirements, such as payment for non-compendia drugs.

103.    For example, the PDBM issued by CMS identifies an example of Sponsor fraud, waste and abuse as "Non-compendia payments: Payments for Part D drugs that are not for a 'medically accepted indication.'" PDBM, Ch. 9, § 70.1.1.

104.    The PDBM further specifically identifies an example of pharmaceutical manufacturer fraud, waste and abuse as "Illegal Off-Label Promotion: Illegal promotion of off-label drug usage through marketing, financial incentives, or other promotional campaigns." PDBM, Ch. 9, § 70.1.6.

### 3. Reimbursement Under Other Federal Health Care Programs

105.    In addition to Medicaid and Medicare, the federal government reimburses a portion of the cost of prescription drugs under several other federal health care programs, including but not limited to programs administered by the Department of Defense (the "DOD"), the Department of Veteran's Affairs (the "VA") and the Office of Personnel Management (the "OPM").

106.    Specifically, DOD administers TRICARE (formerly CHAMPUS), a health care program for individuals and dependents affiliated with the armed forces. The VA administers its own health program, along with CHAMPVA (a shared cost program) for the families of veterans with 100 percent service-connected disabilities.  OPM administers the Federal Employee Health Benefit Program, a health insurance program for federal employees, retirees, and survivors.

107.    Conditions for, and payment of claims for off-label prescription drugs under these programs are comparable to coverage under the Medicaid program. See 32 C.F.R. § 199.4(g) (15); TRICARE Policy Manual 6010.47-M, Chapter 8, Section 9.1 (February 1, 2008); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II (A)(2) (June 6, 2002) (coverage considered for off-label usage only upon review for medical necessity and demonstration of a nationally-accepted standard of practice and other reliable evidence).

108.    Reimbursement for drugs under these programs may occur either through direct purchase of drugs later administered at government facilities, or through coverage of drugs administered by other providers to veterans and members of the armed forces eligible for benefits under these programs.

## VI.  APPROVAL OF KAPIDEX AND KAPIDEX LABELING

109.    Takeda's predecessor, TAP (hereinafter referred to as "Takeda"), submitted its

New Drug Application ("NDA") for Kapidex in December 2007.  In its NDA, it sought approval

of 30, 60 and 90 mg dosages of Kapidex.  See FDA Summary Review, Excerpt of Clinical

Review of Safety and Excerpt of Clinical Review, attached hereto as Exhibit 1.

110.    In the Clinical Review of Safety by Dr. Tamara Johnson of the FDA dated

January 27, 2009 (the "Safety Review") which was conducted in connection with Takeda's

NDA for Kapidex, Dr. Johnson notes that Kapidex "provides no additional benefit over the 5

currently marketed PPIs." Id. at Clinical Review of Safety p. 4 (emphasis added).

111.    Moreover, in the Safety Review Dr. Johnson indicates that "fracture/injury-

related adverse events . . . occurred at greater incidence with [Kapidex] than its comparators"

and that other safety issues include "rebound acid secretion post PPI discontinuation leading to

dependency . . . [and] elevated liver enzymes and abnormal liver function tests." Id.

112.    With respect to distinguishing between the Kapidex indications, Dr. Johnson

notes in the Safety Review that Kapidex would treat GERD and EE and that "EE distinguishes

itself by the formation of painful erosions and ulcerations in the esophageal mucosa, and is

diagnosed by endoscopy" and that whereas "GERD may be treated with antacids, H2receptor

antagonists (such as Tagamet and Zantac) and short-term PPI use, treatment of EE requires more

intense and long-term treatment with PPI's." Id. at Clinical Review of Safety p. 5.

113.    In the Clinical Review by Dr. Keith Amand of the FDA dated August 19, 2008

(the "Clinical Review") which was conducted in connection with Takeda's NDA for Kapidex,

Dr. Amand also distinguished between the Kapidex indications and directed that the GERD

indication for Kapidex should be reworded to "treatment of heartburn associated with <u>non-erosive</u> GERD." <u>See</u> Exhibit 1 at Clinical Review p. 5 (emphasis added).

114.    In the Clinical Review, Dr. Amand also states that "[A]lthough [Kapidex] is effective for all 3 indications being sought, the reviewer <u>strongly</u> believes that no convincing evidence of additional benefit over existing therapies has been demonstrated in the current application." <u>Id.</u> (emphasis added). And further notes that "[d]ue to the lack of additional benefit along with the safety concerns . .. the reviewer believes that the benefit/risk profile for [Kapidex] is <u>unfavorable</u> at this time, and that future studies should be required . . . <u>before</u> any approval for marketing is granted." <u>Id.</u> (emphasis in original).

115.    Furthermore, with respect to the different doses tested with respect to the treatment of heartburn in non-erosive GERD, Dr. Amand noted in the Clinical Review that "[n]o significant difference was seen between any two [Kapidex] doses" (i.e. 30 mg versus 60 mg and 60 mg versus 90 mg). <u>Id.</u> at Clinical Review p. 29.

116.    Promoting drugs for uses and dosages that are not "medically accepted indications" is not only illegal but implicates significant safety concerns. As Brian L. Strom, a professor of public health and preventative medicine at the University of Pennsylvania states in a 2005 article in the New England Journal of Medicine regarding the safety concerns of new drugs, "Misuses and overuse of new drugs is the centerpiece of the [safety] problem . . . [t]he risk-benefit analysis for a new drug is much more acceptable if it is used only in the people who need it."

117.    These concerns, and the importance of Kapidex promotion and use in accordance with the drugs approval as reflected in the label, are clearly implicated here, where not only did the FDA <u>specifically</u> <u>reject</u> an indication for non-erosive GERD at a 60 mg Kapidex dose, but

Dr. Amand concluded that the risk-benefit analysis, especially in light of the comparator PPI medications already on the market which were deemed equally effective, was such that Kapidex should not be approved at all.

118.    Moreover, during the NDA review process proposed labeling was submitted to the FDA for the 30, 60 and 90 mg dosages of Kapidex for which Takeda sought approval, including proposed labeling for "professional samples."

119.    Indeed, the FDA directed Takeda to change the color of the sample packaging so that different dosages could be "undoubtedly distinguishable from one another." See FDA Discipline Review, attached hereto as Exhibit 2.

120.    Although Takeda sought approval for a 60 mg dosage for the treatment of non-erosive GERD, the FDA only approved the 30 mg dose for non-erosive GERD, and did not approve a 90 mg Kapidex dose at all.

121.    As is clearly set forth in the Kapidex label, the approved dose for non-erosive GERD is "30 mg once daily for 4 weeks", and the "60 mg was studied and provided no additional clinical benefit over [the] 30 mg." See Kapidex Label, attached hereto as Exhibit 3 at pp. 1 and 9 (highlighted for ease of reference).

122.    Moreover, the FDA only approved a 60 mg dose of Kapidex for a very limited purpose – the healing of erosive esophagitis ("EE"), and even then only for only 8 weeks. Exh. 3 at 1. Moreover, the label makes clear that the studies performed by the company in securing FDA approval for the 60 mg dose for EE were "conducted in patients with endoscopically confirmed EE." Id. at p. 8.

123.    However, as set forth in detail below, Takeda made a strategic decision to sample Kapidex exclusively in the 60 mg dosage form, despite its intention to target its marketing to GERD patients for whom a 60 mg dose was not a "medically accepted indication."

124.    Moreover, in or about August, 2009, seven months after Takeda had begun marketing Kapidex and had conveyed to its sales force its intention to sample Kapidex only at the 60 mg dose, Takeda amended its printed labeling, including the "professional sample" packaging for 30 mg Kapidex, and submitted this new labeling to the FDA, despite the fact that it was not manufacturing these 30 mg samples, and as set forth below, had no intention of doing so. See Kapidex August 2009 Label, attached hereto as Exhibit 4.

125.    In May 2010, due to safety concerns, the FDA issued a class-wide labeling change for all PPIs.  In or about June 2010, Takeda notified its entire sales force of this class wide labeling change.

126.    Specifically, the FDA was requiring that all PPI labels -- including the label for Kapidex -- be modified "to include information about a possible increased risk of bone fractures, and recommending that prescribing physicians consider whether a lower dose or shorter duration of therapy would adequately treat the patient's condition." See FDA Safety Alert, attached hereto as Exhibit 5.

127.    As a result of this alert, the Kapidex label was modified to include the following warning: "Patients should use the lowest dose and shortest duration of PPI therapy appropriate to the condition being treated." See Exhibit 3 at p. 2. This warning remains in the current Kapidex label.

128.    On a national conference call held on July 20, 2010, Takeda management

indicated that ██% of Kapidex was being prescribed at 60 mg, but there were no plans to begin

sampling Kapidex at the 30 mg dose, despite this class-wide labeling change.

## VII.  TAKEDA'S OFF-LABEL PROMOTION OF KAPIDEX TO RHEUMATOLOGISTS

### A. Equating Kapidex with Prevacid

129.    Takeda's strategy has been unabashedly to have Kapidex replace Prevacid.  Even

the Annual Report for Takeda's parent company describes the launch of Kapidex as being

"positioned as the successor" to Prevacid "which has been one of Takeda's international strategic

products."  Moreover, Takeda's written materials distributed to its sales force have directed sales

representatives to stock Kapidex samples to "fill [the] Prevacid void on shelves."  See Kapidex

Slides sent by Christopher Caggiano, Sr. Manager, Marketing and Sales Coordination, to

Takeda's entire specialty sales force, and copied to scores of others employees, attached hereto

as Exhibit 6, previously placed under seal.

130.    Although Prevacid and Kapidex are similar in some respects, Prevacid has ten

more FDA-approved indications than Kapidex.

131.    Specifically, Prevacid was approved by the FDA for 13 indications: 1) Treatment

of GERD; 2) Treatment of erosive esophagitis; 3) Maintenance of healed EE; 4) Long-term

treatment of pathological hypersecretory conditions, including Zollinger-Ellison syndrome; 5)

Risk reduction of NSAID-associated gastric ulcer; 6) Healing of NSAID associated gastric ulcer;

7) Short-term treatment of active duodenal ulcer; 8) Maintenance of healed duodenal ulcers; 9)

Short-term treatment of active benign gastric ulcer; 10) H. pylori eradication to reduce the risk of

duodenal ulcer recurrence with triple therapy (PREVACID/amoxicillin clarithromycin); 11) H.

pylori eradication to reduce the risk of duodenal ulcer recurrence with dual therapy

(PREVACID/amoxicillin); 12) Pediatric short-term Treatment of GERD and of EE for patients 1-11 years old; and 13) Pediatric short-term treatment of GERD and EE for patients 12-17 years old.

132.    Critically, however, the FDA only approved Kapidex for three indications: 1) Treatment of symptomatic non-erosive GERD; 2) Healing of EE; and 3) Maintenance of healed EE.

133.    Despite Kapidex's limited approved indications, by equating Prevacid and Kapidex, Takeda is encouraging the off-label use of Kapidex for each of the 10 approved Prevacid indications for which Takeda has either not sought or not received approval for from the FDA, including to rheumatologists for the indications for "risk reduction of NSAID-associated gastric ulcer" and "healing of NSAID associated gastric ulcer," conditions treated by rheumatologists which were properly treated by Prevacid "on-label" but may only be treated by Kapidex "off-label." Such uses are also not supported by the statutorily recognized compendia and as such are not "medically accepted indications."

134.    Despite Kapidex's limited approved indications, Takeda has promoted these prescriptions by rheumatologists through a larger scheme to encourage its sales representatives, doctors, and patients, to equate Prevacid and Kapidex and promote Kapidex for uses that are not "medically accepted indications."

135.    For example, Takeda sales representatives have been provided training materials from Takeda encouraging them to compare Kapidex and Prevacid when promoting to doctors, and Takeda's training materials emphasize the relationship between Prevacid and Kapidex.

136.    Takeda sales representatives have been directed to communicate to doctors that Kapidex is "90 percent Prevacid" and has the "same safety profile as Prevacid."

137.    In or about the time of the Kapidex launch, Mr. Michael Fouchie, a District Manager for Takeda, directed Mr. Nathan to tell physicians "that Kapidex was 90 percent Prevacid" in order to alleviate any safety concerns the physicians might have about the new drug. Mr. Nathan repeated this message numerous times in his communications with physicians for a period of approximately 6 month, until he learned that this statement constituted off-label promotion. Upon information and belief, Mr. Fouchie directed all of the sales representatives within the district he managed to make the same misrepresentation.

138.    Takeda is also directly fostering the impression that patients who have been prescribed Prevacid may appropriately be switched to Kapidex.

139.    For example, to this day visitors to Prevavid.com are presented with a split screen with Prevacid on one side and Kapidex on the other, which leads consumers to believe that if they were seeking information about Prevacid that they could appropriately take Kapidex.

140.    Takeda aggressively attempted to convert Prevacid patients to Kapidex, regardless of whether those patients were prescribed Prevacid for an indication approved for Kapidex. For example, Takeda sought conversion of each Prevacid patients who participated in Prevacid's "Beyond the Burn" ("BTB") rebate program to the new Kapidex Advantage Program ("KAP") by directly contacting all participants in Prevacid's BTB program to provide them with information about Kapidex.

141.    However, the BTB program was not targeted only towards GERD sufferers. Indeed, the BTB program brochure specifically identified the following conditions in promoting the BTB program: gastric ulcers, duodenal ulcers and NSAID protection, none of which have been approved by the FDA for treatment with Kapidex. Indeed, in a document to its sales force addressing "Frequently Asked Questions" regarding the Kapidex launch, Takeda indicated that

there were "Over 800,000 members in the [BTB] program. Many of those members use Prevacid today, and <u>all</u> members will receive communications about Kapidex upon approval. Any such "direct to consumer" ("DTC") advertising to non-GERD, non-EE sufferers was necessarily off-label and impermissible pursuant to FDA statutes and regulations.

142.   Moreover, although the FDA has only approved Kapidex treatment for limited durations: for treatment of non-erosive GERD for up to 4 weeks; for healing of EE for up to 8 weeks; and for maintenance of healed EE for up to 6 months, KAP members are encouraged to remain on Kapidex indefinitely.  For instance the Kapidex Instant Savings Card is "[g]ood for <u>unlimited</u> refills," "a patient may use the savings card <u>for years</u>," and the program includes "[m]onthly and <u>seasonal emails</u> with lifestyle modification tips." (emphasis added).

### B. Promotion of Prevacid to Rheumatologists

143.   As set forth above, although Kapidex has not been approved by the FDA for NSAID gastric protection, Prevacid had been approved for gastric protection and the treatment of gastric ulcers due to NSAID use.

144.   Although Prevacid had originally been promoted mostly for GERD, in November of 2000, the FDA approved additional indications for Prevacid relating to gastric protection associated with the use of NSAIDs.  NSAID -- which stands for "non-steroidal anti-inflammatory drug" -- is a class of drugs used to alleviate pain and inflammation.  Advil® (ibuprofen) and Aleve® (naproxen) are well-known NSAIDs.

145.   A significant problem with NSAID therapy, however, is that NSAIDs erode the protective lining of the stomach.  As such, an individual who suffers from chronic pain, and therefore regularly takes NSAIDs, is at a significantly higher risk for developing a gastric ulcer. Securing the gastric protection indication from the FDA enabled TAP, Takeda's predecessor, to

lawfully promote Prevacid to physicians treating patients who regularly take NSAIDs, as a means of protecting these patients from developing gastric ulcers, a potential adverse effect of their use of pain medication.

146.    With this approved indication for gastric protection, TAP began to promote Prevacid to rheumatologists. A rheumatologist is a medical specialist who treats rheumatic diseases -- diseases characterized by pain and inflammation in the joints and associated structures, and muscle soreness and stiffness. Since rheumatologists treat pain and inflammation, rheumatologists commonly treat patients who are regularly taking NSAIDs. TAP sales representatives, including Mr. Nathan, were trained regarding the promotion of Prevacid to rheumatologists, and were only trained to promote Prevacid to rheumatologists for gastric protection.

147.    Mr. Nathan personally attended such training in Annapolis, Maryland in or about 2003, and at this training he and his colleagues were instructed to detail rheumatologists regarding gastric protection. Mr. Nathan was never trained or otherwise told to promote Prevacid to rheumatologists to treat GERD. Takeda had promoted Prevacid to rheumatologists only for gastric protection which was the only approved Prevacid indication relevant to rheumatologists' practice.

148.    Although rheumatologists frequently prescribe gastric protection medication to their patients in connection with their treatment of pain and inflammation to counteract side effects of certain pain and inflammation drugs, they do not regularly treat patients for GERD.

30

### C. Promotion of Kapidex to Rheumatologists

149.  Instead of limiting its sales promotions to the FDA-approved indications for Kapidex, Takeda has vigorously pursued off-label prescriptions by rheumatologists despite the absence of and any support for such use by statutorily recognized compendia.

150.  Beginning in January 2009 and continuing through the present, Takeda has embarked on a campaign to maximize its sales of Kapidex by encouraging and incentivizing Takeda's sales representatives to promote Kapidex to rheumatologists for gastric protection despite the fact that it is not a "medically accepted indication". Takeda failed to direct sales representatives to disclose that gastric protection is not an approved indication for Kapidex.

151.  In February 2009, Takeda held a Kapidex launch meeting in Anaheim, California, during which Takeda's agents encouraged its sales representatives to market Kapidex to rheumatologists. For instance, a sales trainer at the meeting, David Holmes, stated that during office visits sales representatives should promote Kapidex to rheumatologists in the "second position" (after promoting Kapidex's gout drug Uloric, in the "first position"), despite the fact that rheumatologists had prescribed Prevacid only for NSAID related conditions, indications for which Kapidex lacked approval, and rheumatologists do not treat GERD or EE, the only indications for which Kapidex was approved.

152.  Takeda sales management, including sales trainers, made it clear that sales representatives are expected to "detail" or promote Kapidex when visiting rheumatologists' offices, despite the lack of any approved use of Kapidex for gastric protection or any use relating to rheumatology that has been approved by the FDA or supported by the statutorily recognized compendia. Takeda failed to direct sales representatives to disclose that gastric protection is not an approved indication for Kapidex.

153.    Takeda has failed to provide its sales force with any appropriate guidance regarding promoting Kapidex to rheumatologists, and in fact, Takeda training materials make no distinction between how a sales representative should promote to different categories of specialists, which also encourages off-label promotion.

154.    Specialty sales representatives are promoting Kapidex to rheumatologists for a use that is not a "medically accepted indication" and management is aware and has encouraged this promotion.

155.    For instance, during an October 2009 training meeting on October 13, 2009, Kate Sharp, a specialty sales representative within the district of Michael Venanzi, a district manager, commented that she had only been promoting Kapidex to rheumatologists for NSAID gastric protection, which is not a "medically accepted indication".   Mr. Venanzi acknowledged Ms. Sharp's comment and nodded his head.   Mr. Venanzi did not, however, correct Ms. Sharp or provide any guidance to her or to the rest of those present at this meeting as to whether the sales representatives should promote Kapidex to rheumatologists for NSAID gastric protection.

156.    Takeda specifically directs sales representatives to promote Kapidex to certain rheumatologists by assigning these rheumatologists a numerical "Takeda Value" and instructing sales representatives to direct their promotional efforts based on those values.

157.    Takeda has also aggressively promoted the use of Kapidex for gastric protection by measuring the performance of its sales force on the basis of the number of prescriptions written by rheumatologists, who as set forth above, are necessarily writing prescriptions that are not for a "medically accepted indication".

158.    Senior Takeda management have confirmed in writing that credit is being given to sales representatives for Kapidex prescriptions written by rheumatologists. Indeed, on January

32

29, 2009, the entire specialty sales force was notified, via electronic mail messages from Lou Savant, Carlos Noronha and Jay Tuazon, that they would be compensated for each and every Kapidex prescription written by rheumatologists within their respective territories.

159.    From January 2009 through September 2009, through the "Kapidex Launch Incentive Plan," Takeda provided a cash commission payment to its sales representatives for each and every prescription written by a rheumatologist. This payment has ranged from $1.70 to as much as $14.00 for each Kapidex prescription.

160.    Through electronic mail messages to its entire specialty sales force in July 2009 and October 2009, Takeda reconfirmed its decision to pay sales representatives for each Kapidex prescription written by rheumatologists.

161.    From October 2009 through the present, Takeda has provided a commission payment to its sales representatives based upon the number of Kapidex prescriptions written by the physicians within each sales representative's territory, including rheumatologists, and the relationship of that number of prescriptions to the sales representative's company-established Kapidex prescription goal.

162.    Sales representatives' compensation is significantly affected by sales of Kapidex, as Kapidex makes up a large component of a sales representative's bonus compensation. For instance, from January 2009 through September 2009 Kapidex accounted for 40 percent of each specialty sales representative's bonus and beginning in October 2009 Takeda increased the Kapidex bonus portion to 45 percent and the percentage was in place through the first quarter of 2010.

163.    Currently, 30% of Relator's commissions are based on sales of Kapidex within his territory.

164.    Since rheumatologists do not treat GERD or EE, the only conceivable reason that a rheumatologist would write a prescription for Kapidex is for gastric protection which is not a "medically accepted indication".

165.    Takeda's intent is to promote such use by marketing Kapidex to rheumatologists, despite the lack of an indication approved by the FDA for Kapidex relevant to their specialty or the support for such use in the statutorily recognized compendia.

166.    Sales representatives are being directed to provide 60 mg samples to rheumatologists, despite the lack of any "medically accepted indication" for Kapidex relevant to rheumatology patients.

167.    Takeda is directing its sales representatives to provide Kapidex coupons to all physicians, including rheumatologists, despite the lack of any "medically accepted indication" for Kapidex relevant to rheumatology patients.

168.    Takeda is also encouraging off-label promotion by providing advertising support for "articles" which explicitly reference off-label usages of Kapidex including the off-label NSAID gastric protection use.  See screenshot of http://gerd.emedtv.com/dexilant/dexilant-uses-p2.html, attached hereto as Exhibit 7.

169.    Takeda, by and through its officers, agents, and employees, have through its actions as described above, caused rheumatologists to write prescriptions for Kapidex that are not for "medically accepted indications" and as such are not properly reimbursable pursuant to the Federal Reimbursement Programs.

## VIII.  TAKEDA'S SAMPLING OF 60 MG KAPIDEX

### A. Kapidex 60 mg for Non-Erosive GERD is Not a "Medically Accepted Indication"

170.    As explained above, Kapidex was approved by the FDA for only the following conditions and only for the specified approved dosages: a) for the treatment of symptomatic non-erosive GERD: 30 mg once daily for 4 weeks;  b) for the healing of EE: 60 mg once daily for up to 8 weeks; and c) for the maintenance of healed EE: 30 mg once daily for up to 6 months.

171.    Accordingly, the FDA has only approved Kapidex in a 60 mg dosage form for the "Healing of Erosive Esophagitis" and even then for a limited time period of 8 weeks.  As such, the prescribing of Kapidex 60 mg for non-erosive GERD is off-label, and since such use is not supported by either the American Hospital Formulary Service Drug Information, the United States Pharmacopeia-Drug Information (and its successor publications), and the Drugdex Information System, the only statutorily recognized compendia, the prescribing of 60 mg Kapidex for non-erosive GERD is not a "medically accepted indication."

172.    Moreover, as set forth in the affidavits of Dr. Corlin and Dr. Bedford and described below, the prescribing of Kapidex 60 mg for non-erosive GERD is also not supported by the peer reviewed medical literature, and even if it were, as set forth above, such use would only be relevant with respect to Medicare Part B, and cancer treatments under Medicare Part D, neither of which is at issue in this action.

173.    The vast majority of patients treated with Proton Pump Inhibitors ("PPIs") the class of drugs to which Kapidex belongs, are treated for GERD.  See Affidavit of Dr. Raynard Cheung at ¶ 2, attached hereto as Exhibit 8.  Moreover as attested by Doctors Corlin and Bedford, Kapidex is not distinguishable from the broader class of PPIs in this respect. See

Affidavit of Dr. Richard F. Corlin, M.D ("Corlin Aff.") ¶ 6, attached hereto as Exhibit 9; Affidavit of Dr. Rudolph A. Bedford, M.D ("Bedford Aff.") ¶ 6, attached hereto as Exhibit 10.

174.   Only a small percentage of patients being treated with PPIs have been diagnosed with Erosive Esophagitis. The incidence of GERD in the general population is much higher than the incidence of Erosive Esophagitis in the general population. See Exhibit 8 at ¶¶ 3-5.

175.   EE is diagnosed through an endoscopy of the esophagus, which is a procedure almost exclusively performed by gastroenterologists and their staff. As such, the only physicians who write 60 mg Kapidex prescriptions for a "medically accepted indication" are gastroenterologists who write Kapidex 60 mg for the treatment of EE.

176.   All 60 mg Kapidex prescriptions written by gastroenterologists for the treatment of non-erosive GERD, and all prescriptions by primary care physicians, rheumatologist and otolaryologist – who do not treat EE – are off-label and not for a "medically accepted indication" as that term is defined for purposes of Federal Reimbursement Programs.

### B. Overview of Takeda's Off-Label Promotion of the 60 mg Kapidex Dose

177.   A major part of Takeda's promotional strategy for Kapidex is the provision of samples of Kapidex to physicians, who are encouraged to give these samples to patients they are treating.

178.   Takeda is relying heavily on sampling in its promotional plan for Kapidex and planned to distribute more than 77 million samples of Kapidex in 2009 alone. The retail value of these 2009 samples was approximately $360 million.

179.   The only samples of Kapidex which are available for sales representatives to provide to physicians are blister packs of 60 mg capsules.

180.    Immediately after the Kapidex launch, sales representatives were also provided with stock bottles of samples to distribute to physicians. The stock bottles of Kapidex were also available only in the 60 mg dosage form.

181.    During the Kapidex launch, sales representatives were directed to have 60 mg Kapidex samples on display on the table when meeting with physicians.

182.    Takeda has trained its sales representatives to use various techniques to help doctors "remember" to prescribe Kapidex. One of these techniques involves showing doctors how to write a Kapidex prescription. Materials distributed to Takeda's sales force directed that sales representatives "always show doctors how to prescribe Kapidex RX."

183.    Moreover, in training materials provided to specialty sales representatives to assist them with this task, Takeda illustrated a sample Kapidex prescription with an example of a 60 mg prescription. In a font considerably smaller than that used for the remainder of the training aid, is written "for the treatment of EE." See Exhibit 6.

184.    Although the focus by Takeda for and since the launch has always been Kapidex in a 60 mg dosage form, Takeda has also focused on non-erosive GERD, and promotion to physicians who do not treat EE, the only "medically accepted indication" for which Kapidex 60 mg is the appropriate dose.

185.    Indeed, shortly before the Kapidex launch, a "Strategy Guide" for District Managers was sent to Relator's entire region by Louis Savant, a then Senior Regional Sales Director, and copied to Jon Oswald, a National Sales Manager of Takeda. This document states that Takeda's target patients for Kapidex are "████████████ ████████████" The document later specifies that

37

"Kapidex will only be sampled at the 60 mg strength." Thus the patient targeting and sampling policies taken together underscore a clear intent by Takeda to promote Kapidex off-label.

186.    In the Strategy Guide, Takeda describes its decision to sample Kapidex exclusively at the 60 mg strength as one of its "Tactical Strategies," and Takeda justifies its decision to sample exclusively at 60 mg as follows: "Kapidex will only be sampled at the 60 mg strength. ████████ ████████████████████████████████████████ ██████████████████████████████████" See DM Strategy Guide, attached hereto as Exhibit 11, previously placed under seal.

187.    Takeda maintains this "Tactical Strategy" despite the fact that the patients it is trying to reach – (i.e. the "Kapidex Patient Targeting" -- are "███████████████████████████ ████████████████████████" not patients suffering or healing from EE - the only patients appropriately prescribed the 60 mg dosage form of Kapidex.

188.    This purported justification for only sampling Kapidex at a 60 mg dose (a) does not make Takeda's off-label promotion legal; and (b) fails to take into account that such dosing is "on-label" for other PPIs. For example, Nexium, the market leader for prescription PPIs and thus Kapidex' biggest competitor, has three dosage strengths -- 10 mg, 20 mg and 40 mg. However, Nexium is indicated for GERD at both the 20 mg and 40 mg dosage strengths.

189.    Moreover, Takeda expressly directs its sales representatives to promote Kapidex off-label, through the message flow it trains its sales representatives to use to "close" their sales calls. Specifically, sales representatives are directed to use the following close: "Ask physicians to try Kapidex on any patient seeking heartburn relief and patients who are not truly satisfied with their current PPI therapy. Show the physician how to prescribe Kapidex and what the sample pack looks like."

38

190.    An annotated version of this message below, clearly demonstrates why this sales "close" is off-label:

**Ask physicians to try Kapidex on any patient seeking heartburn relief** [these are GERD patients for whom only a 30 mg dosage of Kapidex is appropriate] **and patients who are not truly satisfied with their current PPI therapy** [this includes patients taking their current PPI for an indication not treated on-label by Kapidex, including the 10 Prevacid indications not indicated for Kapidex]. **Show the physician how to prescribe Kapidex** [using a sample of a 60 mg Kapidex prescription, the only sample prescription Takeda provides to its sales representatives] **and what the sample pack looks like** [necessarily a 60 mg Kapidex sample pack since Takeda chose not to manufacture 30 mg samples].

191.    One reason why Takeda's exclusive sampling of Kapidex at the 60 mg dose causes the off-label prescribing of Kapidex is unique to the PPI market. This is due to the fact that the success of a PPI, unlike for other medications, is largely determined by a patient's experience with the drug. For example, if a physician puts a patient on a "statin" – the class of drugs used to control elevated cholesterol – the physician will likely determine whether the drug is successful based on monitoring of the patient's cholesterol levels.

192.    However, with respect to heartburn relief associated with non-erosive GERD, the patient is in pain. Moreover, patients suffering from heartburn will likely have tried over-the-counter remedies, and will know on their own whether a PPI they try has worked to alleviate their symptoms. Thus the patients experience with the drug will determine its success and whether the prescription will be filled.

193.    This is clearly distinguishable from the healing of EE, where a GI will have performed an endoscopy to diagnose EE, by finding the presence of lesions in the patient's

esophagus and may perform a follow-up endoscopy to determine whether the lesions have healed after treatment with the PPI. Indeed, this was precisely how the 60 mg dose was evaluated and approved by the FDA with respect to the Kapidex NDA. The testing submitted to the FDA by Takeda in support of the EE indication included before and after endoscopies demonstrating the effectiveness of Kapidex in healing the lesions.

194.    For GERD however, physicians frequently put patients on a "PPI Trial," in which they contemporaneously provide a sample of a PPI to the patient together with a prescription for the PPI, and instruct the patient to try the sample, and then fill the prescription if the sample works for them. When employing this practice, doctors tend to prescribe the same dosage as the patient received for the sample, leading to the over medication of all patients receiving Kapidex for GERD. See Exhibits 8, 9 and 10.

### C. Through its Sampling Practices, Takeda Has Promoted Kapidex to Various Types of Physicians Off-Label

195.    Takeda has directed its sales representatives to provide 60 mg samples of Kapidex to several types of physicians, including otolarnygologists. However, otolaryngologists only treat the effect of GERD on the pharynx ("gastro-pharyngo-laryngeal reflux") and otolaryngologists do not treat EE at all.

196.    Relator Noah Nathan was directed by Takeda management to provide 60 mg samples of Kapidex to otolaryngologists.

197.    By directing its sales representatives to provide 60 mg samples to otolaryngologists, who do not treat patients for the healing of EE, Takeda is encouraging otolaryngologists to provide an excessive and off-label dosage of Kapidex to their patients without disclosing that 60 mg Kapidex is not indicated for their patients.

198. Takeda has also directed its sales representatives to provide 60 mg samples of Kapidex to rheumatologists.

199. Relator Noah Nathan was directed by Takeda management to provide 60 mg samples of Kapidex to rheumatologists.

200. Rheumatologists do not treat patients for the healing of EE.

201. By directing its sales representatives to provide 60 mg samples to rheumatologists, who do not treat patients for the healing of EE, Takeda is encouraging rheumatologists to provide an excessive and off-label dosage of Kapidex to their patients without disclosing that 60 mg Kapidex is not indicated for their patients.

202. Takeda has directed its sales representatives to provide 60 mg samples of Kapidex to gastroenterologists.

203. Relator Noah Nathan was directed by Takeda management to provide 60 mg samples of Kapidex to gastroenterologists.

204. Gastroenterologists treat both GERD and EE, however, EE is only diagnosed through endoscopy of the esophagus, therefore only a small percentage of gastroenterologists' patients have been diagnosed with EE and are appropriate candidates for the 60 mg dosage of Kapidex.

205. By directing its sales representatives to provide 60 mg samples to gastroenterologists, most of whose patients are being treated for GERD, Takeda is encouraging gastroenterologists to provide an excessive and off-label dosage of Kapidex to the great majority of their patients without disclosing that 60 mg Kapidex is not indicated for most of their patients.

206. Takeda has directed its sales representatives to provide 60 mg samples of Kapidex to primary care physicians.

207.    Relator Noah Nathan has been directed by Takeda management to provide 60 mg samples of Kapidex to primary care physicians.

208.    Primary care physicians do not regularly treat EE.

209.    By directing its sales representatives to provide 60 mg samples to primary care physicians, who do not regularly treat EE, Takeda is encouraging primary care physicians to provide an excessive and off-label dosage of Kapidex to their patients without disclosing that 60 mg Kapidex is not indicated for their patients.

210.    Takeda sales representatives have been encouraged to provide 60 mg Kapidex samples to all targeted physicians and have not been told to advise such physicians that the 60 mg dosage is only indicated for EE.

211.    Takeda sales representatives have been directed to emphasize "symptom relief" during the promotional detailing to doctors, which often coincides with the provision of samples to doctors. "Symptom relief" is associated with GERD, not with the healing of EE.

### D. Sales Representatives Have Promoted Kapidex at a 60 mg Dose

212.    Takeda has taken numerous steps to encourage sales representatives, and therefore doctors and patients, to consider the 60 mg dosage of Kapidex to be the standard appropriate dosage of Kapidex.

213.    Takeda has directed its sales representatives to provide an explanation to doctors for the decision to only provide 60 mg samples, which further encourages doctors to distribute inappropriate sample dosages and prescribe inappropriate dosages.

214.    Specifically, Takeda has directed its sales representatives to justify the 60 mg sample dosage by referencing the sample availability and sample usage of Prevacid and advising

doctors that based on that experience Takeda is "presuming that everyone is going to use 60 mg."

215.   One sales representative, as set forth in greater detail below, states when asked about the Kapidex dosage they were instructed to "shrug [it] off or not answer the question."

216.   During an October 2009 training meeting, a specialty sales representative stated that a doctor had raised an objection to prescribing the 60 mg dosage of Kapidex because of potential adverse effects.  In explaining how she overcame the doctor's objection to prescribing Kapidex, the sales representative made clear that she had been promoting the 60 mg dosage of Kapidex as the default dosage, but that to overcome this specific objection she suggested to the doctor that as an alternative to the 60 mg dosage the doctor consider the 30 mg dosage.

217.   Encouraging doctors to give patients a higher dosage of Kapidex than the dosage approved by the FDA results in patients receiving excessive amounts of medication.

218.   During the approval process for Kapidex, Takeda sought approval to treat GERD with a 30 mg dosage and a 60 mg dose, but the FDA rejected the latter.

219.   During the approval process for Kapidex, Takeda was also directed by the FDA to change the packaging color for these sample packets so that the different dosages could be more easily distinguished.

220.   Despite Takeda's failure to gain approval for a higher dosage treatment for the most common condition treated by PPIs, GERD, Takeda made a decision to exclusively sample 60 mg dosages of Kapidex in order to encourage doctors to provide and prescribe the 60 mg dosage form to GERD patients.

221.    Takeda, by and through its officers, agents, and employees, promoted off-label uses of Kapidex to gastroenterologists, rheumatologists, otolaryngologists and primary care physicians.

222.    As a result of Takeda's off-label promotion of Kapidex, gastroenterologists, rheumatologists, otolaryngologists, and primary care physicians have provided off-label dosages to patients through samples and have written prescriptions for off-label dosages for Kapidex, many of which were submitted to Federal Reimbursement Programs.

### IX. TAKEDA'S ILLEGAL MARKETING PRACTICES HAVE CAUSED THE SUBMISSION OF FALSE CLAIMS

223.    Takeda has directed its sales representatives to promote Kapidex unlawfully for uses and dosages that are not in accordance with the FDA-approved Kapidex label and that are not supported by the statutorily recognized compendia, and are therefore not "medically accepted indications".

#### A. Takeda is Encouraging Its Sales Force to Promote Kapidex Prescriptions That are Not for "Medically Accepted Indications" to Increase Market Share

224.    These unlawful promotional practices have indeed caused physicians to write prescriptions for Kapidex that are off-label and not for "medically accepted indications". Takeda's motivation for directing its sales force to promote Kapidex "off-label" and for uses and doses that are not "medically accepted indications" is clear – to increase market share.

225.    Page 6 of the Kapidex label shows that the "mean plasma concentration" is higher for 60 mg Kapidex than for 30 mg.  Presumably it is for this reason that Takeda sought an indication for a 60 mg dosage for GERD -- because Takeda believes that the 60 mg dose has greater efficacy.

226.    However, the FDA specifically rejected this 60 mg dose for non-erosive GERD, as the FDA not only considers the effectiveness of different dosages but also must weigh other competing factors, including product safety, in determining what drugs to approve and at what dosages.

227.    Takeda's rationale for sampling only the 60 mg dose of Kapidex is clear – and equally clearly in direct contravention of the drug's FDA approval – "We want patients to have the greatest opportunity for success." See Kapidex FAQ's, attached hereto as Exhibit 12. Takeda believes that the success of patients and its market share will be better with a 60 mg dose. As set forth above, Kapidex is a drug that sells or does not sell based on patient experience. Patients are seeking relief from painful heartburn symptoms. Such patients are likely to have tried over the counter medications for their heartburn prior to seeing a doctor and deemed them ineffective. If a patient is provided 30 mg Kapidex samples, and the samples do not alleviate their symptoms (or are not better in alleviating their symptoms than over-the-counter medications) then such patient will likely ask their physician to try a different prescription or may decide to continue using over-the-counter treatments.

228.    If this were to happen – a patient were to deem 30 mg Kapidex innefective (or no more effective than other less expensive treatments) – Takeda loses market share – but the government most likely saves money because the prescription is not filled at all, or a less expensive alternative is provided to the patient. So as not to take this chance, Takeda has promoted Kapidex in such a way that the vast majority of patients, indeed 93% receive the 60 mg dose.

229.    Takeda's exclusive sampling of 60 mg Kapidex, purportedly because it wants "patients to have the greatest opportunity for success" – and despite the FDAs specific

45

disapproval of Kapidex at 60 mg for GERD, after the weighing of all relevant factors – is motivated by its desire for patients to have greater success with the 60 mg sample than it believes the patient would have with a 30 mg sample so that more patients will fill Kapidex prescriptions and its market share will increase.

230.    As such, Relator does not allege that Takeda is attempting to seek greater profits from the spread between the cost of a 30 mg versus 60 mg Kapidex prescription (as there generally is none) – Takeda is seeking to increase its market share by promoting Kapidex in a manner that will increase the number of Kapidex prescriptions being written – as it believes that patients are more likely to be successful on Kapidex 60 than Kapidex 30 and therefore more likely to fill those prescriptions.

231.    Takeda's motivation in this regard is clear from the Declaration of Heather Dean, submitted by Takeda in connection with a filing in this case.  Ms. Dean, one of Takeda's top marketing executives, notes that annual sales for PPIs in the United States are $15 billion. Takeda is motivated to seek a greater share of that market by promoting 60 mg for non-erosive GERD despite the FDA's refusal to approve that dose.

### B. Takeda's Sales Force Has Promoted Kapidex Off-Label in Accordance with the Company's Directive

232.    Takeda's strategy has worked – and worked from the very beginning.  In electronic mail messages broadly disseminated soon after the launch of Kapidex and entitled "Kapidex Strategy Success," various sales staff set forth how they promoted Kapidex off-label in accordance with Takeda's directives.

233.    For instance, in one electronic mail message sent by Michael Fouchie (at the time a District Manager for Takeda) and sent to several other District Managers, to a then Regional Sales Manager, Louis Savant, and to a National Sales Manager, John Oswald, Mr. Fouchie

describes a "success story" whereby he and two sales representatives had a lunch with several physicians and the physicians were detailed on the use of Kapidex for GERD (when sales representatives visit physicians and discuss with them the drugs they are promoting, such visits are called "detailing"). The physician "agreed to give Kapidex an honest try in his next GERD patients. He took 2 stock bottles [sample bottles of 60 mg Kapidex] with him." This "success story" widely disseminated among Takeda's sales force as an example of how to promote Kapidex off-label, clearly demonstrates how this sales representative's off-label promotion of 60 mg for GERD would result in off-label 60 mg Kapidex prescriptions. See Emails dated March 16, 2009, attached hereto as Exhibit 13.

234. Another electronic mail message attached to the first, and thus broadly disseminated as well, described how the sales representative "was able to position Kapidex as a solution for his GERD patients" and that this led to the physician, Dr. Victor Witten, to write a Kapidex prescription and provide 60 mg samples to his patients. See Exhibit 13.

235. Another sales representative, hereinafter referred to as Sales Representative A ("SRA"), was a specialty sales representative for Takeda in Virginia. SRA promoted Kapidex 60 mg to Rheumatologists, ENT's and GIs, including by leaving samples at their offices.

236. Some of the doctors SRA promoted Kapidex to are Dr. Mark Dooley, Dr. Ed Ramsey, Dr. Irvin Seeman, Dr. Henry Ellett, Dr. Rufus Davis, Dr. Ray Keate and Lorie Shelton (physician's assistant.)

237. SRA left samples very frequently to help patients, so that they could "try it out first for free before wasting money on it" and SRA confirmed that PPI trials were very prevalent and that all samples distributed were for Kapidex 60 mg.

238.   SRA indicated that some doctors asked why Takeda was only sampling 60 mg and not 30 mg and that the answer "which we were 'coached' to give [was that] most patients have already tried a lower dosage either from their primary care physician or over the counter and now they need a higher dosage."

239.   Some of the doctors to whom SRA told that "most patients have already tried the lower dosage either from their primary care physician or over the counter and they now need a higher dosage" to are Dr. Mark Dooley, Dr. Ed Ramsey, Dr. Irvin Seeman, Dr. Henry Ellett, Dr. Rufus Davis, Dr. Ray Keate and Lorie Shelton (physician's assistant.)

240.   SRA confirmed that GI's were giving out 60 mg samples for GERD, and that doctors were prescribing 60 mg for GERD after samples ran out.  SRA states: "nobody used 30" we "generally just assumed everyone was using 60."

241.   SRA indicated that some doctors started to ask about 30 mg for their older patients, women, and osteoporosis patients after the bone density concerns were raised and that she received advice from management about how to handle these concerns.  Dr. Ray Keate was the physician who was most concerned about this in SRA's territory.

242.   SRA "was also coached to compare Prevacid to Kapidex while detailing doctors. and was coached to say that "Kapidex is like Prevacid with a twist."

243.   Another sales representative, hereinafter Sales Representative B ("SRB"), was also a sales representative for Takeda in Virginia.  SRB promoted Kapidex to primary care physicians and to GIs, and left samples of Kapidex for these physicians.

244.   SRB believes that physicians write more prescriptions for drugs they have samples of, which is why they provided the samples, "if you get a patient on a drug before having to pay for it, [the doctor is] more likely to prescribe."

245.   SRB confirmed that PPI trials are extremely prevalent and that the reasoning behind them is that different PPI's have different side effects in different individuals and sometimes cause adverse reactions.

246.   SRB confirmed that most doctors sampled "were giving out the 60 mg samples for GERD because that is what they were primarily prescribing for." SRB also stated that doctors "definitely" stated that they were prescribing 60 mg Kapidex for GERD.

247.   SRB also confirmed that physicians detailed in the course of the promotion done in the territory wrote prescriptions that were submitted to Medicare and Medicaid for reimbursement.

248.   Another sales representative, hereinafter Sales Representative C ("SRC"), was a sales representative for Takeda in Oregon.

249.   SRC left Kapidex 60 mg samples with primary care physicians and GIs so patients could try them out. SRC believes that doctors write more prescriptions if they have samples for the drug. SRC said that when a physician asked about the dosage they were instructed to "shrug [it] off or not answer the question." SRC indicated that when doctors did mention their concerns about safety, specifically when doctors mentioned bone density concerns, they were trained to steer the discussion to the "benefits/risk" balance of pharmaceuticals.

250.   Another sales representative, in West Virginia, hereinafter Sales Representative D ("SRD"), was also coached to compare Prevacid to Kapidex while detailing doctors and was coached to say that "Kapidex is like Prevacid with a twist." SRD provided doctors in his territory with 60 mg Kapidex samples that he believes were given to patients for the treatment of GERD and that these doctors also prescribed 60 mg Kapidex for the treatment of GERD. SRD believes that sales representatives had significant influence over doctors' prescribing habits.

251.    Finally, a Takeda sales representative in California, hereinafter Sales
Representative E ("SRE"), visited a gastroenterology practice in May 2011, and made statements
regarding the effectiveness of treating GERD with 60 mg Kapidex.   When the physician, who
had just recently learned from another source about the existence of a 30 mg dosage, questioned
the sales representative regarding the efficacy of the 30 mg versus 60 mg Kapidex dose, the
Takeda sales representative denied knowledge that Takeda made a 30 mg dose.

### C. Physicians Are Often Unaware of the Indications for the Prescriptions They Write and Do Not Generally Read Drug Labels ("Package Inserts")

252.    Physicians generally do not have the time to read the labels for the drugs they
prescribe and rely on pharmaceutical sales representatives to provide information to them
regarding the drugs they promote that is accurate and not misleading.

253.    In a national survey conducted by physicians from the University of Virginia and
the University of Chicago and published in the journal of Pharmacoepidemiology and Drug
Safety in 2009 (the "Indication Study"), the researchers surveyed 1199 physicians regarding their
knowledge of FDA approved indications of medications (i.e. physicians were asked "Is this an
FDA-approved indication [for a specific drug]?" With the answer options "Yes," "No" and
"Don't Know."

254.    Although 79% of the physicians reported that the importance of FDA labeling as
a general factor guiding their prescribing was either "very important" or "somewhat important,"
the data showed that the average respondent accurately identified the FDA-approval status in
only 55% of the drug indications queried.  Moreover, the accuracy of primary care physicians
was even lower – with only 42% of such physicians responding correctly regarding drug
indications.

255.    The authors of the Indication Study concluded that:

"a significant minority of physicians also prescribe some drugs for off-label indications, in the belief that they are approved for such uses, despite uncertain or no supporting evidence. These results indicate an urgent need for effective methods of disseminating information to physicians about the level of evidence supporting off-label drug uses, with specific attention to common off-label uses known to be ineffective or to carry unacceptable risk of harm."

256.    Indeed, a 2006 study published by the American Medical Association in the Annals of Internal Medicine concluded that almost three quarters (73%) of off-label prescriptions are written for conditions "for which there is little or no scientific support for efficacy."

257.    The fact that physicians are frequently unaware of prescription drug indications is not surprising in light of data that the vast majority of physicians do not read drug labels. The New York Times reported in 2006 that "fewer than one in 10 physicians routinely read drug labels."

258.    More recently, Dr. Califf, a practicing cardiologist and Professor of Cardiology at Duke University and the Vice Chancellor for Clinical Research and Director of the Duke Translational Medicine Institute, stated in a 2009 interview that "less than 1 percent of physicians have seen a label in the last year." (emphasis added).

259.    Further, as stated in an article in the Journal of the American Medical Association, physicians who must "evaluate, diagnose, and initiate treatment for a patient within the limits of a 12-minute office visit have inadequate time to effectively counsel patients about their medications."  Indeed, Dr. Janet Woodcock, the director of the Center for Drug Evaluation and Research (CDER), the division of the FDA responsible for approving new drugs and ensuring the safety and effectiveness of all drugs, has publicly stated her concern about

physicians review of drug labels indicating that doctors have only "30 seconds to make that prescribing decision."

260.    Further supporting this conclusion – even by high level officials in the FDA – Dr. William Hubbard, a former FDA associate commissioner stated in an August 2008 journal article that "I think the FDA would love for doctors to read the package inserts . . . [b]ut they don't."

261.    And another former FDA associate commissioner, Peter Pitts states that "for better or worse, doctors don't have the time to sit down and carefully read medical articles discussing off-label use, or even physician package inserts."

### D. Physicians Are Highly Influenced by the Sampling Practices of Pharmaceutical Companies

262.    Moreover, the sampling practices of pharmaceutical companies have a strong influence on physician prescribing practices.

263.    In a 2009 article by Susan Chimonas from the Center on Medicine as a Profession at Columbia University and Jerome P. Kassirer from Tufts University School of Medicine, the authors note that the "prime motivation behind the provision of free samples is marketing."

264.    Samples constitute an enormous promotional outlay by the pharmaceutical industry, and between 1996 and 2000, they accounted for slightly more than half of the total promotional dollars spent by pharmaceutical companies.  An analysis of 2004 figures sets the retail value of samples at approximately $16 billion.  Indeed, as set forth above, Kapidex samples – for 2009 alone – had an approximate retail value of  $360 million.

265.    The Authors concluded that "Samples have a major influence on physicians' prescribing habits.  Samples are one of the most effective ways sales representatives get their foot in the door to pitch their companies' products. The technique is effective; the availability of samples is associated with rapid prescription of the new drug."

266.   Indeed, the Authors cite a study demonstrating that residents with access to samples were more likely than their counterparts without samples "to prescribe heavily advertised products and less likely to suggest an over-the-counter alternative."

267.   This data is significant with respect to the sampling of Kapidex, for as explained above and below, if an over-the counter medicine were suggested – instead of a Kapidex sample offered with a prescription – then the government would incur no cost since over-the counter medicines are not reimbursable pursuant to federal health programs.

268.   And the cost issue is underscored by another article published in the Journal of General Internal Medicine, entitled "A Physician Survey of the Effect of Drug Sample Availability on Physicians' Behavior which found "particularly noteworthy" that samples "may actually increase the overall cost of prescription medications" because "a significant proportion of self-reported sample users subsequently would write a prescription for the more expensive sampled medication."

269.   According to Verispan's Sales Force Effectiveness 2006: The Physician Perspective, a biennial study which surveyed over 4,000 physicians about the quality of their interactions with pharmaceutical sales representatives -- physicians indicated that with respect to their interactions with pharmaceutical sales representatives, the provision of samples had the most influence on their prescribing habits.

270.   Moreover, a 2003 Blue Cross Blue Shield industry survey found that more than half of "high-prescribing" doctors cited pharmaceutical sales representatives "as their main source of information about new drugs." (emphasis added).

**E. Physicians Are Writing Kapidex Prescriptions That are Not for "Medically Accepted Indications" Because of Takeda's Illegal Promotional Practices**

271.    Physicians who prescribe Kapidex are similar to physicians generally in that they frequently are unaware of a drug's specific indications and they generally do not read the package insert for the prescriptions they write. They are also more likely to write prescriptions for medications for which they have samples.

272.    As such, and as set forth below, Takeda's unlawful promotional practices have indeed caused physicians to write prescriptions for Kapidex that are off-label and not for "medically accepted indications".

### 1. Doctors Corlin and Bedford

273.    Dr. Richard F. Corlin and Dr. Rudolph A. Bedford are both board-certified gastroenterologists practicing in Santa Monica, CA as part of the Southern California Medical Gastroenterology Group.

274.    Dr. Corlin established UCLA's first Gastrointestinal Endoscopy Unit, and became the first director of the unit.   Dr. Corlin was later appointed by the Governor of California to serve on that state's Board of Medical Quality Assurance, and from 1994 to 1998, Dr. Corlin served on the Advisory Committee to the Director of the National Institutes of Health.

275.    Dr. Corlin also served as President of the California Medical Association from 1992 to 1993, and served as Speaker of the American Medical Association ("AMA") House of Delegates for five years. Dr. Corlin served as the President of the AMA in 2001 and 2002.

276.    Dr. Bedford is a renowned endoscopist in the West Los Angeles medical community. Dr. Bedford completed his Internal Medicine internship and residency at the New York Hospital Cornell Medical Center and Memorial Sloan-Kettering Cancer Center in New

York, NY, and he completed his gastroenterology fellowship at the Cleveland Fellowship program.

277. In 1992, Dr. Bedford was accepted to the prestigious St. Luke's Hospital Advance Fellowship Program for therapeutic Endoscopy, and presently, Dr. Bedford serves as the President of the Southern California Society of Gastroenterology.

278. Until Drs. Corlin and Bedford were contacted by Relator's counsel in connection with this case, they were unaware that Kapidex was available in a 30 mg dosage form and that Kapidex 60 mg was not indicated for non-erosive GERD. Through their affidavits attached hereto, Drs. Corlin and Bedford have attested to the following:

(a) doctors are unlikely to write new prescriptions for PPIs, including Kapidex, unless a sample is available;

(b) doctors writing new prescriptions for PPI's, including Kapidex, typically conduct a "PPI trial," in which they provide a sample of a PPI to a patient, along with a prescription to fill if the patient has a positive experience with taking the samples;

(c) sampling influences doctors prescribing of PPIs, including Kapidex, and the exclusive availability of samples in a certain dosage makes it much more likely that a doctor would write a prescription at the sampled dosage, rather than another dosage;

(d) Takeda's exclusive sampling of Kapidex at 60 mg is likely to influence doctors to write more prescriptions at 60 mg than they otherwise would, because of the practice of conducting PPI trials, and because the exclusive sampling at 60 mg suggests to doctors that 60 mg is the only dosage available;

(e) Kapidex is no different than the PPI market generally in that the majority of Kapidex prescriptions are written to treat GERD (not erosive esophagitis);

55

(f)     erosive esophagitis is diagnosed by gastroenterologists, who conduct endoscopies;

(g)     Primary care physicians, ENTs and rheumatologists do not generally conduct endoscopies and do not diagnose EE;

(h)     The fact that 93% of Kapidex scripts are being written at 60 mg is not proof that 60 mg is medically indicated for GERD, but instead a function of the market created by Takeda, especially by their sampling practices;

(i)     medical literature does not support the use of 60 mg Kapidex for GERD;

(j)     the class-wide labeling change made by the FDA in May 2010 states that patients should use the lowest dose of PPIs appropriate to the condition being treated, including Kapidex, to avoid safety risks, and Takeda's attempts to influence doctors to write 60 mg Kapidex for conditions that should be treated with 30 mg is inconsistent with this directive;

(k)     statistics indicating that doctors often do not know the limitations of the indications for medicines they are writing prescriptions for are equally applicable in the context of PPIs – especially for Kapidex which is a relatively new drug;

(l)     doctors do not regularly read the package inserts for drugs;

(m)     their [Dr. Corlin and Bedford's] office received Kapidex samples from Takeda sales representatives;

(n)     they are more likely to prescribe a PPI if they have a sample, so that they can allow a patient to try it out for tolerance and symptom relief before filling a prescription;

(o)     because of Takeda's marketing of 60 mg Kapidex, including the exclusive sampling of 60 mg Kapidex, they were not aware Kapidex had a 30 mg dose;

(p)     they have prescribed Kapidex in 60 mg dose for GERD patients;

(q)     their decision to prescribe 60 mg rather than 30 mg for GERD patients was

56

significantly influenced by the fact that Takeda does not sample 30 mg; and

(r)     some of the individuals that they prescribed 60 mg Kapidex to for GERD were over 65 years of age and were Medicare participants.

See Exhibits 9 and 10.

## 2. Doctor Michael Yaffe

279.    Dr. Michael E. Yaffe, M.D. is a board-certified physician practicing internal medicine in Columbus, OH.

280.    Dr. Yaffe completed his internship and residency at the University of North Carolina in Chapel Hill, NC.

281.    Until Dr. Yaffe was contacted by Relator's counsel in connection with this case, he was unaware that Kapidex was available in a 30 mg dosage form. Through his affidavit attached hereto, Dr. Yaffe has attested to the following:

(a)     he is a primary care physician who treats patients for GERD and has received Kapidex samples from Takeda sales representatives;

(b)     he does not conduct endoscopies and therefore, does not diagnose EE;

(c)     doctors writing new prescriptions for PPI's, including Kapidex, typically conduct a "PPI trial," in which they provide a sample of a PPI to a patient, along with a prescription to fill if the patient has a positive experience with taking the samples;

(d)     sampling influences doctors prescribing of PPIs, including Kapidex, and the exclusive availability of samples in a certain dosage would make it much more likely that a doctor would write a prescription at the sampled dosage, rather than another dosage;

(e)     Takeda's exclusive sampling of Kapidex at 60 mg is likely to influence doctors to write more prescriptions at 60 mg than they otherwise would have, because of the practice of

57

conducting PPI trials, and because the exclusive sampling at 60 mg suggests to doctors that 60 mg is the only dosage available;

(f)     Dr. Yaffe is more likely to prescribe a PPI if he has a sample, so that he can allow a patient to try the PPI out for tolerance and symptom relief before filling a prescription;

(g)     because of Takeda's marketing of 60 mg Kapidex, including the exclusive sampling of 60 mg Kapidex, Dr. Yaffe was not aware Kapidex had a 30 mg dose;

(h)     he has prescribed Kapidex in the 60 mg dose for GERD patients;

(i)     his decision to prescribe 60 mg rather than 30 mg for GERD patients was significantly influenced by the fact that Takeda does not sample 30 mg; and

(j)     some of the individuals that he prescribed 60 mg Kapidex to for GERD were over 65 years of age and were Medicare participants.

See Affidavit of Michael Yaffe, attached hereto as Exhibit 14.

### 3. Doctor "A"

282.    Dr. A practices in the San Francisco Bay Area. He is board-certified in internal medicine and gastroenterology. Dr. A attended medical school at the University of Pennsylvania School of Medicine.

283.    Until Dr. A was contacted by Relator's counsel in connection with this case, he was unaware that Kapidex was available in a 30 mg dosage form. Dr. A informed Relator's counsel that he believes the following to be true:

(a)     doctors are unlikely to write new prescriptions for PPIs, including Kapidex, unless a sample is available;

(b)     doctors writing new prescriptions for PPI's, including Kapidex, typically conduct a "PPI trial," in which they provide a sample of a PPI to a patient, along with a prescription to fill if the patient has a positive experience with taking the samples;

(c)     sampling influences doctors' prescribing of PPIs, including Kapidex, and the exclusive availability of samples in a certain dosage makes it much more likely that a doctor would write a prescription at the sampled dosage, rather than another dosage;

(d)     Takeda's exclusive sampling of Kapidex at 60 mg is likely to influence doctors to write more prescriptions at 60 mg than they otherwise would have, because of the practice of conducting PPI trials, and because the exclusive sampling at 60 mg suggests to doctors that 60 mg is the only dosage available;

(e)     Kapidex is no different than the PPI market generally in that the majority of Kapidex prescriptions are written to treat GERD (not erosive esophagitis);

(f)     erosive esophagitis is diagnosed by endoscopy;

(g)     erosive esophagitis is diagnosed by gastroenterologists, who conduct endoscopies;

(h)     Primary care physicians, ENTs and rheumatologists do not generally conduct endoscopies and do not diagnose EE;

(s)     Dr. A received Kapidex samples from Takeda sales representatives;

(t)     Dr. A is more likely to prescribe a PPI if he has a sample, so that he can allow a patient to try it out for tolerance and symptom relief before filling a prescription;

(u)     because of Takeda's marketing of 60 mg Kapidex, including the exclusive sampling of 60 mg Kapidex, Dr. A was not aware Kapidex had a 30 mg dose;

(v)     Dr. A has prescribed Kapidex in 60 mg dose for GERD patients;

(w)     Dr. A's decision to prescribe 60 mg rather than 30 mg for GERD patients was

significantly influenced by the fact that Takeda does not sample 30 mg; and

(x)     some of the individuals that Dr. A prescribed 60 mg Kapidex to for GERD were over 65 years of age and were Medicare participants.

### F. Significant Numbers of Kapidex Prescriptions Have Been Submitted to Government Reimbursement Programs

284.    As detailed above and below, after being subjected to Takeda's off-label promotional practices, physicians have written prescriptions for Kapidex that are not for "medically accepted indications" and many such prescriptions have been submitted to federal government programs for reimbursement.

285.    Relator conducted an analysis of a small amount of data from his territory (which is only 1 of 500 Takeda sales territories in the United States), for a limited time period (6 months) relating to one type of doctor (primary care physicians).  From this data, Mr. Nathan identified 16 primary care physicians who received 60 mg samples at Takeda's direction, that each of these doctors prescribed Kapidex during the relevant period, and that these prescriptions resulted in 98 claims for Medicare reimbursement.

286.    Dr. Michael Kim wrote 33 prescriptions that were submitted to Medicare for reimbursement during this 6-month period, including 2 prescriptions for Kapidex in July 2010, 3 prescriptions in August 2010, 3 prescriptions in September of 2010, 4 prescriptions in October 2010, 7 prescriptions in December 2010, and 14 prescriptions in January 2011.  Dr. Kim received 60 mg samples of Kapidex on July 14, 20, and 21, 2010, August 16, 2010, September 7, 10, 16, 17, and 29, 2010, October 4, and 26, 2010, November 11, and 15, 2010, December 17, 2010 and January 5, 14 and 20, 2011.

287.    Dr. John Kim wrote 1 prescription that was submitted to Medicare for reimbursement during this 6-month period, writing 1 prescription in January 2011. Dr. Kim

received 60 mg samples of Kapidex on May 12, 2010, August 23, 2010, September 16, and 30, 2010, October 11, 19, and 26, 2010, November 5, and 30, 2010, December 9, and 16, 2010, and January 6, 17, and 31, 2010.

288.    Dr. Connie Le wrote 2 prescriptions that were submitted to Medicare for reimbursement during this 6-month period, including 1 prescription for Kapidex in July 2010 and 1 in January 2011. Dr. Le received 60 mg samples of Kapidex on April 8, 2010, May 27, 2010, July 9 and 19, 2010, September 2, 28 and 30, 2010, October 13 and 25, 2010, and January 17, 2011.

289.    Dr. Kerry Lewis wrote 5 prescriptions that were submitted to Medicare for reimbursement during this 6-month period, including 2 prescriptions for Kapidex in October 2010, 1 in December 2010, and 2 in January 2011. Dr. Lewis received 60 mg samples of Kapidex on August 16, 2010, September 17 and 20, 2010, October 26 and 27, 2010, November 5, 2010, December 9, 2010, and February 7, 2011.

290.    Dr. Quan Nguyen wrote 4 prescriptions that were submitted to Medicare for reimbursement during this 6-month period, including 1 prescription for Kapidex in July 2010, 1 in August 2010, 1 in September 2010, and 1 in January 2011. Dr. Nguyen received 60 mg samples of Kapidex on April 8, 2010, May 6 and 27, 2010, June 3 and 10, 2010, July 9 and 19, 2010, August 12, 2010, September 2, 9, 23, and 28, 2010, October 13, 21, and 28, 2010, November 4 and 23, 2010, December 2 and 16, 2010, and January 4, 2010.

291.    Dr. Kim-Dung Nguyen wrote 2 prescriptions that were submitted to Medicare for reimbursement during this 6-month period, including 1 prescription for Kapidex in September 2010 and 1 in October 2010. Dr. Nguyen received 60 mg samples of Kapidex on May 11 and 21,

2010, August 11 and 26, 2010, September 1,7 and 13, 2010, October 11, 19 and 26, 2010, November 5, 23 and 30, 2010, December 9, 2010, January 4, 7, 20 and 28, 2011.

292.   Dr. Kaveh Parvaresh wrote 9 prescriptions that were submitted to Medicare for reimbursement during this 6-month period, including 2 prescription for Kapidex in July 2010, 1 in August 2010, 1 in September 2010, 2 in October 2010, 1 in December 2010, and 2 in January 2011. Dr. Parvaresh received 60 mg samples of Kapidex on August 20 and 27, 2010, September 10, 15, 22, and 29, 2010, October 4 and 18, 2010, November 1, 10, and 29, 2010, January 5, 2011, and February 1, 2011.  ·

293.   Dr. Steven Perez wrote 3 prescriptions submitted to Medicare for reimbursement during this 6-month period, including 1 prescription for Kapidex in August 2010, 1 in September 2010, and 1 in December 2010. Dr. Perez received Kapidex 60 mg samples on the following dates: June 10, 2010, July 9, 2010, August 19, 2010, September 2, and 13, 2010, October 13, 2010, November 23, 2010, and December 16, 2010.

294.   Dr. Cissy Pottanat wrote 4 prescriptions submitted to Medicare for reimbursement during this 6-month period, including 1 prescriptions for Kapidex in August 2010, 1 in September 2010, and 2 in October 2010,. Dr. Pottanat received Kapidex 60 mg samples on the following dates: May 18, 2010, July 9, and 22, 2010, September 10, 2010, October 22, and 29, 2010, and December 10, 2010.

295.   Dr. Mark Vickers wrote 2 prescriptions submitted to Medicare for reimbursement during this 6-month period, including 1 prescription for Kapidex in August 2010 and 1 in September 2010.  Dr. Vickers received Kapidex 60 mg samples on the following dates: August 26, 2010, and November 4, 2010.

296.   Dr. Pratima Fozdar wrote 4 prescriptions submitted to Medicare for reimbursement during this 6-month period, including 2 prescriptions for Kapidex in August 2010, 1 in October 2010, and 1 in December 2010 . Dr. Fozdar received Kapidex 60 mg samples on the following dates:  May 24, 2010, July 7, 2010, August 23, 2010, October 5, 20, and 25 2010, November 12, 2010, December 13, 2010, and January 20, 2011.

297.   Dr. John Curry wrote 3 prescriptions submitted to Medicare for reimbursement during this 6-month period, including 2 prescriptions for Kapidex in July 2010, and 1 in August 2010. Dr. Curry received Kapidex 60 mg samples on the following dates:   May 10, 2010, September 1, and 27, 2010.

298.   Dr. Yared Gebreyesus wrote 5 prescriptions submitted to Medicare for reimbursement during this 6-month period, including 4 prescriptions for Kapidex in July 2010 and 1 in August 2010. Dr. Gebreyesus received Kapidex 60 mg samples on the following dates: May 10, 2010 and August 27, 2010.

299.   Dr. Zaid Khalil wrote 8 prescriptions submitted to Medicare for reimbursement during this 6-month period, including 2 prescription for Kapidex in July 2010, 2 in August 2010, 1 in September 2010, 2 in December 2010 and 1 in January 2011. Dr. Khalil received Kapidex 60 mg samples on the following dates: June 1, 2010, July 14, 2010, August 20, 2010, October 5, 2010, November 11, 2010, December 13, 2010, January 10, and 24, 2011.

300.   Dr. Sang Tran wrote 8 prescriptions submitted to Medicare for reimbursement during this 6-month period, including 1 prescription for Kapidex in July 2010, 2 in December 2010 and 5 in January 2011. Dr. Tran received Kapidex 60 mg samples on the following dates: May 5, 2010, June 7, and 29 2010, July 7, and 22, 2010, August 11, and 27, 2010, September 13,

2010, October 8, 2010, November 1, 8, and 22, 2010, December 6, 8, 13, 14and 20, 2010, January 3, 12, and 19, 2010.

301.   Dr. Adrian Uy wrote 5 prescriptions submitted to Medicare for reimbursement during this 6-month period, including 1 prescription for Kapidex in July 2010, 1 in August 2010, 1 in September 2010, and 2 in October 2010. Dr. Uy received Kapidex 60 mg samples on the following dates: May 11, 2010, September 24, 2010 and October 28, 2010.

302.   In addition to the above, Relator possesses District-wide data (for the district identified by Takeda as "D0165") for certain months regarding Kapidex prescriptions submitted for federal reimbursement. Mr. Nathan's district is one of approximately 208 Takeda districts in the United States.

303.   For D0165 in June of 2010, the following number of Kapidex prescriptions were submitted for federal reimbursement through the corresponding programs listed: Medicare Part D – 158, Medicaid – 26; Federal Employee Health Benefits Program – 167; and Department of Defense, Federal (Tricare) – 53.

304.   For D0165 in July of 2010, the following number of Kapidex prescriptions were submitted for federal reimbursement through the corresponding programs listed: Medicare Part D – 153, Medicaid – 22; Federal Employee Health Benefits Program – 177; and Department of Defense, Federal (Tricare) – 51.

305.   For D0165 in September of 2010, the following number of Kapidex prescriptions were submitted for federal reimbursement through the corresponding programs listed: Medicare Part D – 158, Medicaid – 12; Federal Employee Health Benefits Program – 152; and Department of Defense, Federal (Tricare) – 57.

306.    For D0165 in <u>October of 2010</u>, the following number of Kapidex prescriptions were submitted for federal reimbursement through the corresponding programs listed: Medicare Part D – 148, Medicaid – 20; Federal Employee Health Benefits Program – 167; and Department of Defense, Federal (Tricare)– 61.

307.    For D0165 in <u>January of 2011</u>, the following number of Kapidex prescriptions were submitted for federal reimbursement through the corresponding programs listed: Medicare Part D – 142, Medicaid – 21; Federal Employee Health Benefits Program – 190; and Department of Defense, Federal (Tricare) – 102.

308.    For D0165 in <u>February of 2011</u>, the following number of Kapidex prescriptions were submitted for federal reimbursement through the corresponding programs listed: Medicare Part D – 150, Medicaid – 14; Federal Employee Health Benefits Program – 152; and Department of Defense, Federal (Tricare) – 63.

309.    For D0165 in <u>March of 2011</u>, the following number of Kapidex prescriptions were submitted for federal reimbursement through the corresponding programs listed: Medicare Part D – 187, Medicaid – 19; Federal Employee Health Benefits Program – 174; and Department of Defense, Federal (Tricare) – 70.

310.    Although the above reflects data only for these specific months and for this specific District, Defendants possess this data for all months and for all Takeda Districts. Moreover, based on Takeda's profits and the percentage of Kapidex prescriptions being written at 60 mg, as set forth in paragraphs 345-348, one may deduce that more than 90% of these prescriptions were written at the 60 mg dose. Takeda possesses the precise breakdown between 30 and 60 mg for all of these prescriptions.

311.    Mr. Nathan also has District-wide reports for two of Takeda's Districts reflecting annual prescriptions of Kapidex for such Districts, including Kapidex prescriptions submitted to federal reimbursement programs.

312.    For the Charlottesville, VA District (identified by Takeda as D0165) and including Fairfax, Reston, Alexandria, Charlottesville, Harrisonburg, and Winchester, the following number of Kapidex prescriptions were submitted for federal reimbursement through the corresponding programs listed during the period beginning April 1, 2010 and ending March 31, 2011: Medicare Part D – 1,793, Medicaid – 218; Federal Employee Health Benefits Program – 1,942; and Department of Defense, Federal (Tricare) – 782.

313.    For the Baltimore, MD District (identified by Takeda as DMD00) and including Fairfax, VA, Reston, VA, Baltimore, MD, Wilmington, DE, Southern NJ and Central NJ, the following number of Kapidex prescriptions were submitted for federal reimbursement through the corresponding programs listed during the period beginning April 1, 2009 and ending March 31, 2010: Medicare Part D – 2,154, Medicaid – 342; Federal Employee Health Benefits Program – 1450 and for Tricare – at least 253.  The report also reflects that 789 Kapidex prescriptions were submitted for reimbursement to the State of Maryland Employees and at least 156 Kapidex prescriptions were submitted for reimbursement through Fairfax County Public Schools.

314.    Takeda possesses such annualized data for each year and for each of Takeda's more than 200 Districts.  Moreover, based on Takeda's profits and the percentage of Kapidex prescriptions being written at 60 mg, as set forth in paragraphs 344-347, one may deduce that more than 90% of these prescriptions were written at the 60 mg dose.  Takeda possesses the precise breakdown between 30 and 60 mg for all of these prescriptions.

315.    In addition to the foregoing, Relator, possesses information that the following physicians have also written Kapidex prescriptions that were submitted for reimbursement through Medicare part D:

316.    Dr. Mushtaq Awan wrote prescriptions submitted to Medicare Part D for reimbursement in February 2011. Dr Awan received Kapidex 60 mg samples on the following dates: January 21, 2011, December 17, 2010 , and November 5, 2011.

317.    Dr. Andrew Axelrad wrote prescriptions submitted to Medicare Part D for reimbursement in February 2011. Dr. Axelrad's office received Kapidex 60 mg samples on the following dates: February 10, 2011, January 7, 2011, December 6, 2010, and November 22, 2010.

318.    Dr. Nader Balba wrote prescriptions submitted to Medicare Part D for reimbursement in June 2010, September 2010, December 2010, January 2011, and February 2011. Dr. Balba received Kapidex 60 mg samples on the following dates:  November 30, 2010, October 19, 2010, October 15, 2010, September 15, 2010, August 11, 2010, July 22, 2010, July 20, 2010, May 11, 2010, and April 28, 2010.

319.    Dr. Ronald Barkin wrote prescriptions submitted to Medicare Part D for reimbursement in June 2010, July 2010, August 2010, October 2010, December 2010, January 2011 and February 2011.  Dr. Barkin received Kapidex 60 mg samples on the following dates: January 21, 2011, January 6, 2011, December 13, 2010, December 10, 2010, November 24, 2010, November 15, 2010, November 11, 2010, October 14, 2010, September 30, 2010, August 23, 2010, August 9, 2010, July 23, 2010, and June 4, 2010.

320.    Dr. Ahmed Hegab wrote prescriptions submitted to Medicare Part D for reimbursement in June 2010, July 2010, August 2010, September 2010, October 2010, January

2011 and February 2011. Dr. Hegab received Kapidex 60 mg samples on the following dates: January 12, 2011, December 1, 2010, October 25, 2010, October 7, 2010, September 23, 2010, September 14, 2010, July 6, 2010, June 8, 2010, and May 24, 2010.

321. Dr. Mu Hong wrote prescriptions submitted to Medicare Part D for reimbursement in September 2010, October 2010, December 2010, January 2011 and February 2011. Dr. Hong received Kapidex 60 mg samples on the following dates: January 6, 2011, January 4, 2011, December 17, 2010, December 2, 2010, October 25, 2010, September 23, 2010, August 26, 2010, August 25, 2010, August 19, 2010, August 12, 2010, July 19, 2010 and July 13, 2010.

322. Dr. Allen Horne wrote prescriptions submitted to Medicare Part D for reimbursement in February 2011. Dr. Horne received Kapidex 60 mg samples on the following dates: February 21, 2011, December 13, 2010, December 9, 2010, and October 28, 2010.

323. Dr. Charles Huh wrote prescriptions submitted to Medicare Part D for reimbursement in June 2010, July 2010, and August 2010. Dr. Huh received Kapidex 60 mg samples on the following dates: July 26, 2010, July 20, 2010, June 2, 2010, May 25, 2010, and April 28, 2010.

324. Dr. Saied Jamshidi wrote prescriptions submitted to Medicare Part D for reimbursement in February 2011. Dr. Jamshidi received Kapidex 60 mg samples on the following dates: February 1, 2011, January 25, 2011, January 18, 2011, and November 8, 2010.

325. Dr. Behzad Kalaghchi wrote prescriptions submitted to Medicare Part D for reimbursement in February 2011. Dr. Kalaghchi received Kapidex 60 mg samples on the following dates: November 15, 2010 and October 19, 2010.

326. Dr. Diego Kuperschmit wrote prescriptions submitted to Medicare Part D for reimbursement in September 2010, and October 2010. Dr. Kuperschmit received Kapidex 60 mg samples on the following dates: September 23, 2010, September 16, 2010, August 19, 2010, July 8, 2010, and June 30, 2010.

327. Dr. Shilen Lakhani wrote prescriptions submitted to Medicare Part D for reimbursement in February 2011. Dr. Lakhani received Kapidex 60 mg samples on the following dates: January 13, 2011, November 9, 2010, and October 21, 2010.

328. Dr. Suresh Malhotra wrote prescriptions submitted to Medicare Part D for reimbursement in June 2010, July 2010, August 2010 and February 2011. Dr. Malhotra received Kapidex 60 mg samples on the following dates: January 5, 2011, November 2, 2010, October 25, 2010, September 22, 2010, September 14, 2010, July 16, 2010, and May 5, 2010.

329. Dr. Kennith Mirkin wrote prescriptions submitted to Medicare Part D for reimbursement in February 2011. Dr. Mirkin received Kapidex 60 mg samples on the following dates: January 11, 2011, December 9, 2010, November 12, 2010, and November 2, 2010.

330. Dr. John Molaiy wrote prescriptions submitted to Medicare Part D for reimbursement in February 2011. Dr. Molaiy received Kapidex 60 mg samples on the following dates: February 21, 2011, February 14, 2011, February 4, 2011, February 2, 2011, January 26, 2011, January 24, 2011, January 10, 2011, January 6, 2011, January 4, 2011, and December 15, 2010.

331. Dr. Samir Nazam wrote prescriptions submitted to Medicare Part D for reimbursement in February 2011. Dr. Nazam received Kapidex 60 mg samples on the following dates: October 18, 2010 and September 10, 2010.

332.   Dr. Uy Nguyen wrote prescriptions submitted to Medicare Part D for reimbursement in February 2011. Dr. Nguyen received Kapidex 60 mg samples on the following dates: January 12. 2011 and November 10, 2010.

333.   Dr. Ram Nimmagadda wrote prescriptions submitted to Medicare Part D for reimbursement in February 2011. Dr. Nimmagadda received Kapidex 60 mg samples on the following dates: February 4, 2011, January 18, 2011, January 6, 2011, and December 15, 2010.

334.   Dr. Eduardo Noguera wrote prescriptions submitted to Medicare Part D for reimbursement in June 2010, July 2010, August 2010, September 2010, October 2010, December 2010, January 2011, and February 2011. Dr. Noguera received Kapidex 60 mg samples on the following dates:   January 7, 2011, November 4, 2010, October 14, 2010, September 16, 2010, September 10, 2010, August 18, 2010, July 15, 2010, July 1, 2010, June 18, 2010, May 28, 2010, and May 12, 2010.

335.   Dr. Tri Pham wrote prescriptions submitted to Medicare Part D for reimbursement in February 2011. Dr. Pham received Kapidex 60 mg samples on the following dates:   January 24, 2011, December 6, 2010, and November 8, 2010.

336.   Dr. Solomon Shah wrote prescriptions submitted to Medicare Part D for reimbursement in February 2011. Dr. Shah received Kapidex 60 mg samples on the following dates: October 5, 2010 and August 18, 2010.

337.   Dr. Marla Shuman wrote prescriptions submitted to Medicare Part D for reimbursement in February 2011. Dr. Shuman received Kapidex 60 mg samples on the following dates:  November 15, 2010 and September 20, 2010.

338.   Dr. Kantha Stoll wrote prescriptions submitted to Medicare Part D for reimbursement in February 2011. Dr. Stoll received Kapidex 60 mg samples on the following dates: December 15, 2010, November 5, 2010, and October 19, 2010.

339.   Dr. Emil Valle wrote prescriptions submitted to Medicare Part D for reimbursement in June 2010, July 2010, August 2010, September 2010, October 2010, December 2010, January 2011, and February 2011. Dr. Valle's office received Kapidex 60 mg samples on the following dates:   October 6, 2010, August 18, 2010, May 26, 2010, May 17, 2010, and May 3, 2010.

340.   Dr. Anita Wolke wrote prescriptions submitted to Medicare Part D for reimbursement in September 2010. Dr. Wolke received Kapidex 60 mg samples on the following dates:   September 23, 2010 and April 22, 2010.

### G. Aggressive Marketing of Kapidex

341.   Takeda is also involved in an aggressive campaign to market Kapidex, including through direct-to-consumer ("DTC") advertising which is exacerbating the effect of the off-label promotional practices being condoned and directed by Takeda.

342.   Takeda's marketing efforts also include providing large discounts to patients to attract new patients to Kapidex, including programs which significantly reduce or eliminate a patient's out of pocket expenses in obtaining Kapidex. In addition, Takeda is seeking to promote the use of Kapidex through the use of journal advertisements and speaker programs.

343.   Specifically, with respect to the Kapidex launch, Takeda had initially budgeted more than 5 million dollars exclusively for the placement of advertisements in scholarly journals. See Exhibit 6. Takeda is also seeking to convert physicians through speaker programs and indeed, prior to the Kapidex launch, indicated its intention to conduct approximately 3,000

programs utilizing 375 different speakers. Id. Speakers were to be provided with honorariums and were to enter a contract with Takeda agreeing to at least 2 speaker programs per year. See Exhibit 12.

344.   Takeda has also aggressively promoted Kapidex, by employing 5 Area Directors, 28 Regional Directors, 208 District Managers, and 2291 Sales Representatives, in addition to dozens of employees at its home office in Illinois employed to develop and implement its off-label marketing strategy.

### H. Takeda's Sales of Kapidex/Damages to Federal Government.

345.   The vast majority of patients treated with Proton Pump Inhibitors ("PPIs") the class of drugs to which Kapidex belongs, are treated for GERD.   Moreover as attested by Doctors Corlin and Bedford, Kapidex is not distinguishable from the broader class of PPIs in this respect.   See Affidavit of Dr. Richard F. Corlin, M.D ("Corlin Aff.") ¶ 6.

346.   As such, one would expect that the vast majority of Kapidex prescriptions would be written at the 30 mg strength.

347.   However, data released in March 2011 show that for the 12 months ending in January, Takeda's sales for 60 mg Kapidex were $261 million, but sales for 30 mg Kapidex were only $20 million.

348.   The accuracy of this data is underscored by an announcement on a nationwide conference call on July 20, 2010 that ▓▓% of Kapidex sales were at the 60 mg dose.

349.   Indeed, demand for the Kapidex at the 30 mg strength is so low that Drugstore.com, a major online pharmacy, does not even list it as available on its website.

350.     As detailed in paragraphs 224 through 231 above, Takeda's motivation for directing its sales force to promote Kapidex "off-label" and for uses and doses that are not "medically accepted indications" is to increase market share.

351.     Takeda's rationale for promoting Kapidex to rheumatologists for NSAID protection is clear – to cause physicians to write Kapidex "off-label" for NSAID protection instead of another drug for which NSAID protection is a "medically accepted indication" thus increasing its overall sales of Kapidex.

352.     However, Takeda's rationale for sampling only the 60 mg dose of Kapidex is equally clear, so that "patients to have the greatest opportunity for success" and patients will fill Kapidex prescriptions in greater numbers, despite the FDA's specific disapproval of Kapidex at 60 mg for non-erosive GERD.

353.     Takeda is seeking to increase its market share by promoting Kapidex in a manner that will increase the number of Kapidex prescriptions being written – as Takeda believes that patients are more likely to be successful on Kapidex 60 than Kapidex 30 and therefore more likely to fill those prescriptions (even though those prescriptions are not for a "medically accepted indication").

354.     As such, the federal government is damaged not by reimbursing 60 mg Kapidex prescriptions versus 30 mg Kapidex prescriptions, but by reimbursing prescriptions for 60 mg Kapidex that would not have been written at all.

355.     Indeed, if physicians were lawfully promoted Kapidex 30 mg for their GERD patients and the patients either did not find the 30 mg samples effective after a PPI trial, or no more effective than an over-the-counter medication, then the physician may have prescribed a PPI that is less expensive than Kapidex (for which a 30-day supply of 60 mg Kapidex from CVS

costs $159.99 (and incidentally, a 30-day supply of 30 mg Kapidex is $156.99), such as Omeprazole 20 mg which costs only $18.20, and Pantoprazole 20 mg which costs $102.99.

356. There are similar price differences at Drugstore.com where Kapidex costs more than $140 for a 30-day supply and other PPIs are priced significantly lower:

| | |
|---|---|
| Lansoprazole 30 mg | $99.99 |
| Omeprazole 20 mg | $98.98 |
| Pantoprazole 20 mg | $109.99 |
| Pantoprazole 40 mg | $15.99 |

357. Or, as stated above, the patient may have used an over-the-counter remedy, such as antacids, Prilosec or even Prevacid, and then the government would not have paid anything for such prescription.

358. According to Takeda's website, more than 3 million prescriptions of Kapidex have been dispensed.

359. Upon information and belief Takeda set the price of the two dosage strengths in order to encourage 60 mg prescriptions and avoid detection of their fraud.

### I. Significant Health Risks Associated with PPI Use

360. PPIs such as Kapidex can cause serious adverse health effects, which could be exacerbated by inappropriately prescribing Kapidex for off-label uses and/or providing excessive dosages of Kapidex to patients.

361. For example, studies have shown a link between adverse cardiac events and PPI use.

362. As explained above, PPI use has also been linked to an adverse effect of loss of bone density and fractures, which led to the FDA's class-wide labeling change for PPIs.

363.    Another study indicates that PPIs can become addictive, and that patients can become dependent upon PPIs after 8 weeks of use. This study also indicated that PPI users may suffer from acid rebound phenomenon, causing some patients who previously had no acid related symptoms to develop symptoms of heartburn, acid regurgitation or dyspepsia after beginning and stopping PPI use.

364.    These safety concerns call into question the prophylactic use of PPIs generally, and indicate an additional risk in the prescribing of Kapidex for off-label uses. Moreover, providing excessive dosages of Kapidex may increase the health risks associated with the use of PPIs.

**J. Relator Has Presented Particularized Allegations of the Fraudulent Scheme**

365.    The allegations, as set forth above, clearly set forth the "who, what, when, where and how" of the alleged fraud, and indeed even the "why" of the alleged fraud.

366.    Who: Relator clearly sets forth the "who" – the perpetrators of the alleged fraud – as Takeda management, who designed and implemented nationwide policies to promote Kapidex off-label and for uses that were not "medically accepted indications". The allegations as set forth in the following paragraphs clearly specify the actions taken by Takeda management generally and the actions of specific managers, with regard to the fraudulent scheme:  ¶¶ 129, 137, 151, 152, 154, 155, 158, 185, 216, 233, 238, 242, 249 and 250.

367.    Moreover, with respect to "who" the fraud was directed, the allegations as set forth above make clear that each rheumatologist, primary care physician, ENT and GI who received samples from Takeda, and each rheumatologists to whom Kapidex was promoted for NSAID protection – literally totaling thousands of doctors – were subjected to and victims of this fraudulent scheme, including, but certainly not limited to, Drs. Corlin, Bedford and Yaffe.

368. <u>What</u>: The "what" – the fraudulent scheme devised and implemented by Takeda – as the national policies with respect to Kapidex sampling and promotion of Kapidex to rheumatologists as set forth in paragraphs 6-9, 18, 123-128 and 149-169.

369. <u>When</u>: As set forth above, the fraudulent scheme as described above has been in place for the <u>entirety</u> of the time Kapidex has been on the market – from January 2009 and continuing to the current day.

370. <u>Where:</u> The fraudulent scheme was carried out in the offices of thousands of physicians as detailed above, including but not limited to the offices of Doctors Corlin, Bedford and Yaffe and the doctors identified in paragraphs 286-301 and 316-340 as having written Kapidex prescriptions that were submitted to government health programs for reimbursement.

371. <u>How</u>: The "how" of the alleged fraud was carried out through national policies with respect to the promotion of Kapidex that intended, and indeed <u>did,</u> lead to the submission of false claims for federal reimbursement and through the directives of individual managers who coached the sales representatives in their districts regarding the off-label promotion of Kapidex as set forth in paragraphs 18, 123, 129-142, 149-169, 177-222, 232-251, 278, 281, 283, and 341-344.

372. <u>Why</u>: The "why" of the alleged fraud was to replace profits lost with the expiration of patent protection for Prevacid and to increase Takeda's market share, as explained in paragraphs 224-231 and 350-359, in the $15 billion PPI market.

### COUNT I - FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(A)

373. Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

374. From January 2009 continuing to the present, Defendants by and through their officers, agents, and employees, knowingly caused to be presented to an officer or employee of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

375. Defendants caused such false or fraudulent claims to be presented, as alleged in paragraphs 223 to 359.

376. The false or fraudulent claims were presented by numerous separate entities across the United States and Relator has no control over, or dealings with such entities, and limited access to the records in their possession. Relator has referenced examples of such false or fraudulent claims in paragraphs 278, 281, 283 and 285-340.

377. Mr. Nathan has alleged a complex nationwide scheme occurring over a period of more than two years and has provided significant details regarding this scheme as alleged in paragraphs 365-372.

378. Mr. Nathan has alleged reliable indicia creating a strong inference of the submission of false claims and strong statistical evidence to support his allegation that thousands of false claims were submitted, as alleged in paragraphs 14, 18, 252-359.

379. Mr. Nathan has also provided specific examples of certain false claims, as alleged in paragraphs 278, 281, 283 and 285-340.

380. The claims that are the subject of this Complaint are false, as they are for off-label uses and not covered in the statutorily designated compendia, as alleged in paragraphs 33-108, 164-168 and 171-176.

381. Mr. Nathan has alleged that Takeda caused false claims to be submitted, as Takeda's actions were a substantial factor in producing the false claims, as alleged in paragraphs 223-283.

382. The United States was unaware of the falsity of the statements and claims made by Takeda and as a result thereby paid and continue to pay Medicare, Medicaid and TRICARE reimbursements that it would not otherwise have paid.

383. As a result of the acts of Defendants, the United States Government provided payments for prescriptions that it otherwise would not have if Defendants had not encouraged and induced physicians in an effort to promote off-label uses.

384. Defendants, by and through their officers, agents, and employees, authorized and encouraged the actions of their various officers, agents, and employees to take the actions set forth above.

385. The United States Government has sustained damages, as alleged in paragraphs 345-359, in an amount to be determined because of the acts of Defendants as a result of Defendants' knowing violations of the False Claims Act, 31 U.S.C. §3729(a)(1)(A).

386. The United States Government is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT II - FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(B)

387. Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

388. From January 2009 continuing to the present, Defendants by and through their officers, agents, and employees, knowingly, made, used, or caused to be made or used, a false

records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729 (a)(1)(B).

389.    Defendants made and caused to be made numerous false representations, including affirmative statements and omissions, as alleged in paragraphs 136, 137, 150, 152, 155, 169, 181-183, 189, 190, 197, 201, 205, 209, 210, 215, 216 and 232-251.

390.    Mr. Nathan has sufficiently pled particularized details regarding these false statements and omissions, as alleged in paragraphs 365-372.

391.    Defendants' conduct was material to government payment decisions, as Takeda's false representations had a natural tendency to influence the actions of physicians and the government, and in fact did influence such actions, [since the government would not have paid for these prescriptions with knowledge that the prescriptions were off-label and not covered in the statutorily designated compendia], as alleged in paragraphs 63-108 and 224-359.

392.    As a result of the acts of Defendants, the United States Government provided payments for prescriptions that it otherwise would not have if Defendants had not encouraged and solicited physicians in an effort to promote off-label uses.

393.    The United States was unaware of the falsity of the statements and claims made by Takeda and as a result thereby paid and continue to pay Medicare, Medicaid and TRICARE reimbursements that it would not otherwise have paid.

394.    Defendants, by and through their officers, agents, and employees, authorized and encouraged the actions of their various officers, agents, and employees to take the actions set forth above.

395.    The United States Government has sustained damages, as alleged in paragraphs 344-358, in an amount to be determined because of the acts of Defendants as a result of Defendants' knowing violations of the False Claims Act, 31 U.S.C. §3729(a)(1)(B).

396.    The United States Government is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT III - CALIFORNIA FALSE CLAIMS ACT
## CAL GOVT CODE §12651(a)(1) AND (2)

397.    Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

398.    This is a claim for treble damages and penalties under the California False Claims Act.

399.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

400.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

401.    Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement.   In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

402. The false or fraudulent claims were presented by numerous separate entities across California and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

403. The California State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

404. By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

405. The State of California is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT IV - DELAWARE FALSE CLAIMS AND REPORTING ACT
### 6 DEL C. § 1201(a)(1) AND (2)

406. Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

407. This is a claim for treble damages and penalties under the Delaware False Claims And False Reporting Act.

408. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

409. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

410. Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

411. The false or fraudulent claims were presented by numerous separate entities across Delaware and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

412. The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

413. By reason of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

414. The State of Delaware is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT V - FLORIDA FALSE CLAIMS ACT
### FL. STAT. ANN. § 68.082(2)(a) AND (b)

415. Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

416. This is a claim for treble damages and penalties under the Florida False Claims Act.

417.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

418.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

419.   Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement. Each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

420.   The false or fraudulent claims were presented by numerous separate entities across Florida and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

421.   The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

422.   By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

423.   Additionally, the Florida State Government is entitled to the maximum civil penalty of $11,000 for each and every violation alleged herein.

## COUNT VI - GEORGIA FALSE MEDICAID CLAIMS ACT
## GA. CODE ANN. § 49-4-168.1(a)(1) AND (2)

424.   Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

425.   This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

426.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

427.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

428.   Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement.   In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

429.   The false or fraudulent claims were presented by numerous separate entities across Georgia and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

430.   The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

431.   By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

432.   The State of Georgia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT VII - HAWAII FALSE CLAIMS ACT
## HAW. REV. STAT. §661-21(a)(1) AND (2)

433.   Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

434.   This is a claim for treble damages and penalties under the Hawaii False Claims Act.

435.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

436.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

437.   Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement.  In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

438.   The false or fraudulent claims were presented by numerous separate entities across Hawaii and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

85

439.    The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

440.    By reason of the Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

441.    The State of Hawaii is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT VIII - ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT
### 740 ILL.COMP. STAT. §175/3(a)(1) AND (2)

442.    Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

443.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward And Protection Act.

444.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

445.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

446.    Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement.  In addition, each claim for

86

reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

447.    The false or fraudulent claims were presented by numerous separate entities across Illinois and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

448.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

449.    By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

450.    The State of Illinois is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT IX - INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT IND. CODE ANN. §5-11-5.5-2(b)(1), (2) AND (8)

451.    Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

452.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

453.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

454. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

455. Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

456. The false or fraudulent claims were presented by numerous separate entities across Indiana and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

457. The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

458. By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

459. The State of Indiana is entitled to, at a minimum, the penalty of $5,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT X - LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW LA REV. STAT. 46:438.3(A) AND (B)

460. Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

461.   This is a claim for damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

462.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

463.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

464.   Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement.  Each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

465.   The false or fraudulent claims were presented by numerous separate entities across Louisiana and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

466.   The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

467.   By reason of the Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

468.   The Louisiana State Government is entitled to the maximum civil penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT XI - MASSACHUSETTS FALSE CLAIMS LAW
### MASS. GEN. LAWS CH. 12 §5B(1) AND (2)

469.   Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

470.   This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

471.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Commonwealth of Massachusetts Government for payment or approval.

472.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Commonwealth of Massachusetts Government to approve and pay such false and fraudulent claims.

473.   Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement.   In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

474.   The false or fraudulent claims were presented by numerous separate entities across Massachusetts and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

90

475. The Commonwealth of Massachusetts Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

476. By reason of the Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

477. The Commonwealth of Massachusetts is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XII - MICHIGAN MEDICAID FALSE CLAIMS ACT
## MICH. COMP. LAWS. §400.603 AND 607

478. Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

479. This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

480. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

481. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

482. Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for

reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

483. The false or fraudulent claims were presented by numerous separate entities across Michigan and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

484. The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

485. By reason of the Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

486. The State of Michigan is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XIII - MONTANA FALSE CLAIMS ACT
### MONT. CODE ANN. §17-8-403(1)(a) AND (b)

487. Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

488. This is a claim for treble damages and penalties under the Montana False Claims Act.

489. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

490.  By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

491.  Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement.  In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

492.  The false or fraudulent claims were presented by numerous separate entities across Montana and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

493.  The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

494.  By reason of the Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

495.  The State of Montana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XIV- NEVADA FALSE CLAIMS ACT
## NEV. REV. STAT. ANN. §357.040(1)(a) AND (b)

496.  Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

497.  This is a claim for treble damages and penalties under the Nevada False Claims Act.

498.  By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

499.  By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

500.  Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement.  In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

501.  The false or fraudulent claims were presented by numerous separate entities across Nevada and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

502.  The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

503.  By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

504. The State of Nevada is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT XV - NEW HAMPSHIRE FALSE CLAIMS ACTS
### N.H. REV. STAT. ANN. §167.61-b(I)(a) AND (b)

505. Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

506. This is a claim for treble damages and penalties under the New Hampshire False Claims Acts.

507. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or approval.

508. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

509. Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

510. The false or fraudulent claims were presented by numerous separate entities across New Hampshire and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

511. The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by

Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

512. By reason of the Defendants' acts, the State of New Hampshire has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

513. The State of New Hampshire is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XVI - NEW JERSEY FALSE CLAIMS ACT
### N.J. STAT. §2A:32C-3(a) AND (b)

514. Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

515. This is a claim for treble damages and penalties under the New Jersey False Claims Act.

516. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

517. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

518. Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

96

519.   The false or fraudulent claims were presented by numerous separate entities across New Jersey and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

520.   The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

521.   By reason of the Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

522.   Additionally, the New Jersey State Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XVII - NEW MEXICO MEDICAID FALSE CLAIMS ACT
## N.M. STAT. ANN. §27-14-4(A), (B) AND (C)

523.   Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

524.   This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

525.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

526.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

527.  Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement.  In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

528.  The false or fraudulent claims were presented by numerous separate entities across New Mexico and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

529.  The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

530.  By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

531.  The State of New Mexico is entitled to three times the amount of damages the State sustained as a result of the Defendants' illegal and false or fraudulent acts.

## COUNT XVIII - NEW MEXICO FRAUD AGAINST TAXPAYERS ACT
## N.M. STAT. ANN. §44-9-1(A)(1) AND (2)

532.  Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

533.  This is a claim for treble damages and penalties under the New Mexico Fraud Against Taxpayers Act.

534.  By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

535.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

536.   Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement.   In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

537.   The false or fraudulent claims were presented by numerous separate entities across New Mexico and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

538.   The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

539.   By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

540.   Pursuant to N.M. STAT. ANN. §44-9-1(C)(2), the State of New Mexico is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT XIX - NEW YORK FALSE CLAIMS ACT
### N.Y. STATE FIN. §189(1)(a) AND (b)

541.   Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

542.   This is a claim for treble damages and penalties under the New York False Claims Act.

543.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

544.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

545.   Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement.   In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

546.   The false or fraudulent claims were presented by numerous separate entities across New York and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

547.   The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

548.   By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

549. The State of New York is entitled to the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT XX - OKLAHOMA MEDICAID FALSE CLAIMS ACT
### OKLA. STAT. TIT. 63 §5053.1B(1) AND (2)

550. Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

551. This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

552. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

553. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

554. Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

555. The false or fraudulent claims were presented by numerous separate entities across Oklahoma and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

556. The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid

and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

557.  By reason of the Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

558.  The State of Oklahoma is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXI - RHODE ISLAND FALSE CLAIMS ACT
## R.I. GEN. LAWS §9-1.1-3(a)(1) AND (2)

559.  Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

560.  This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

561.  By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

562.  By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

563.  Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement.  In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

564. The false or fraudulent claims were presented by numerous separate entities across Rhode Island and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

565. The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

566. By reason of the Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

567. Additionally, the Rhode Island State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XXII - TENNESSEE MEDICAID FALSE CLAIMS ACT
### TENN. CODE ANN. §71-5-182(a)(1)(A) AND (B)

568. Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

569. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

570. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

571. Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for

reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

572.   The false or fraudulent claims were presented by numerous separate entities across Tennessee and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

573.   The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

574.   By reason of the Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

575.   The State of Tennessee is entitled to the maximum penalty of $25,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

<u>**COUNT XXIII - TEXAS MEDICAID FRAUD PREVENTION LAW**</u>
<u>**TEX. HUM. RES. CODE ANN. §36.002(1), (2) AND (13)**</u>

576.   Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

577.   This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

578.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

579. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

580. Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement. In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

581. The false or fraudulent claims were presented by numerous separate entities across Texas and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

582. The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

583. By reason of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

584. The State of Texas is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXIV - VIRGINIA FRAUD AGAINST TAXPAYERS ACT
## VA. CODE ANN §8.01-216.3(A)(1) AND (2)

585. Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

586.  This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

587.  By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Commonwealth of Virginia's Government for payment or approval.

588.  By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Commonwealth of Virginia's Government to approve and pay such false and fraudulent claims.

589.  Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement.  In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

590.  The false or fraudulent claims were presented by numerous separate entities across Virginia and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

591.  The Commonwealth of Virginia's, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

592.  By reason of the Defendants' acts, the Commonwealth of Virginia's Government has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

593.   The Commonwealth of Virginia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XXV - WISCONSIN FALSE CLAIMS FOR
MEDICAL ASSISTANCE ACT
WIS. STAT. §20.931(2)(a) AND (b)**

594.   Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

595.   This is a claim for treble damages and penalties under the Wisconsin Fraud Against Taxpayers Act.

596.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

597.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Wisconsin State Government to approve and pay such false and fraudulent claims.

598.   Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement.   In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

599.   The false or fraudulent claims were presented by numerous separate entities across Wisconsin and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

600.   The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

601.   By reason of the Defendants' acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

602.   Additionally, the Wisconsin State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### COUNT XXVI - DISTRICT OF COLUMBIA FALSE CLAIMS ACT
### D.C. CODE ANN. §2-308.14(a)(1) AND (2)

603.   Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

604.   This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

605.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia for payment or approval.

606.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia to approve and pay such false and fraudulent claims.

607.   Each prescription that was written as a result of Defendants' illegal marketing practices represents a false or fraudulent record or statement.   In addition, each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

608.   The false or fraudulent claims were presented by numerous separate entities across the District of Columbia and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

609.   The District of Columbia, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices.

610.   By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

611.   The District of Columbia is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXVII - CONNECTICUT FALSE CLAIMS ACT
## SEPTEMBER SPECIAL SESSION, PUBLIC ACT No. 09-5 § 2(a)1 and 2

612.   Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

613.   This is a claim for treble damages and penalties under the Connecticut False Claims Act.

614.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

615.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Connecticut State Government to approve and pay such false and fraudulent claims.

616.   Each prescription that was written as a result of Defendants' illegal marketing practices and/or illegal inducements represents a false or fraudulent record or statement.   Each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

617.   The false or fraudulent claims were presented by numerous separate entities across Connecticut and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

618.   The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices and/or illegal inducements.

619.   By reason of the Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

620.   Additionally, the Connecticut State Government is entitled to the maximum civil penalty of $10,000 for each and every violation alleged herein.

## COUNT XXVIII - NORTH CAROLINA FALSE CLAIMS ACT
### NC GEN. STAT. §1-607(a)(1) AND (2)

621.   Relator repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

622.   This is a claim for treble damages and penalties under the North Carolina False Claims Act.

623.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

624. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

625. Each prescription that was written as a result of Defendants' illegal marketing practices and/or illegal inducements represents a false or fraudulent record or statement. Each claim for reimbursement for such prescriptions submitted to a state health insurance program represents a false or fraudulent claim for payment.

626. The false or fraudulent claims were presented by numerous separate entities across North Carolina and Relator has no control over or dealings with such entities and has limited access to the records in their possession.

627. The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal off-label marketing practices and/or illegal inducements.

628. By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

629. Additionally, the North Carolina State Government is entitled to the maximum civil penalty of $11,000 for each and every violation alleged herein.

**WHEREFORE**, Relator Noah Nathan prays that judgment be entered against Defendants Takeda Pharmaceuticals North America, Inc. and Takeda Pharmaceuticals America, Inc. as follows:

630. that Defendants cease and desist from violating 31 U.S.C. §3729(a)(1)(A) and (B), and the equivalent provisions of the State statutes set forth above;

111

631. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. §3729(a)(1)(A) and (B);

632. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Cal. Govt Code §12651(a)(1) and (2);

633. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Delaware has sustained because of Defendants' actions, plus a civil penalty $11,000 for each violation of 6 Del. C. §1201(a)(1) and (2);

634. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty $11,000 for each violation of FL Stat. § 68.082(2)(a) and (b);

635. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus a civil penalty $11,000 for each violation of Ga. Code Ann. §49-4-168.1(a)(1) and (2);

636. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Hawaii has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Haw. Rev. Stat. §661-21(a)(1) and (2);

637. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of 740 Ill. Comp. Stat. §175/3(a)(1) and (2);

638. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus a civil penalty of at least $5,000 for each violation of Ind. Code Ann. §5-11-5.5-2(b)(1), (2) and (8);

639. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Louisiana Rev. Stat. §46:438.3(A) and (B);

640. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the Commonwealth of Massachusetts has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Mass. Gen. L. Ch. 12 §5B(1) and (2);

641. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Mich. Comp. Laws §400.603 and 607;

642. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Montana has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Mont. Code Ann. §17-8-403(1)(a) and (b);

643. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Nevada has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Nev. Rev. Stat. Ann. §357.040(1)(a) and (b);

113

644.   that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of N.J. Stat. §2A:32C-3(a) and (b);

645.   that this Court enter judgment against Defendants .in an amount equal to three times the amount of damages the State of New Hampshire has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of N.H. Rev. Stat. Ann. §167.61-b(I)(a) and (b);

646.   that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Mexico sustained because of Defendants' actions in violation of N.M. Stat. Ann. §27-14-4(A), (B) and (C);

647.   that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Mexico has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of N.M. Stat. Ann. §44-9-3(A)(1) and (2);

648.   that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of Defendants' actions, plus a civil penalty of $12,000 for each violation of N.Y. State Fin. §189(1)(a) and (b);

649.   that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Okla. Stat. tit. 63 §5053.1(B)(1) and (2);

650.   that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Rhode Island has sustained because of Defendants'

actions, plus a civil penalty of $10,000 for each violation of R.I. Gen. Laws §9-1.1-3(a)(1) and
(2);

651. that this Court enter judgment against Defendants in an amount equal to three
times the amount of damages the State of Tennessee has sustained because of Defendants'
actions, plus a civil penalty of $25,000 for each violation of Tenn. Code Ann. §71-5-
182(a)(1)(A) and (B);

652. that this Court enter judgment against Defendants in an amount equal to three
times the amount of damages the State of Texas has sustained because of Defendants' actions,
plus a civil penalty of $10,000 for each violation of Tex. Hum. Res. Code Ann. §36.002(1), (2)
and (13);

653. that this Court enter judgment against Defendants in an amount equal to three
times the amount of damages the Commonwealth of Virginia has sustained because of
Defendants' actions, plus a civil penalty of $11,000 for each violation of Va. Code Ann. §8.01-
216.3(A)(1) and (2);

654. that this Court enter judgment against Defendants in an amount equal to three
times the amount of damages the State of Wisconsin has sustained because of Defendants'
actions, plus a civil penalty of $10,000 for each violation of Wis. Stat §20.931(2)(a) and (b);

655. that this Court enter judgment against Defendants in an amount equal to three
times the amount of damages the District of Columbia has sustained because of Defendants'
actions, plus a civil penalty of $10,000 for each violation of D.C. Code Ann. §2-308.14(a)(1)
and (2);

656. that this Court enter judgment against Defendants in an amount equal to three
times the amount of damages the State of Connecticut has sustained because of Defendants'

actions, plus a civil penalty of $10,000 for each violation of the Connecticut False Claims Act,

September Special Session Public Act No. 09-5 § 2(a)1 and 2;

657.  that this Court enter judgment against Defendants in an amount equal to three

times the amount of damages the State of North Carolina has sustained because of Defendants'

actions, plus a civil penalty of $10,000 for each violation of NC Gen. Stat. §1-607(a)(1) and (2);

658.  that Relator be awarded the maximum amount allowed pursuant to the federal

False Claims Act 31 U.S.C. §3730(d), and the equivalent provisions of the state statutes set forth

above;

659.  that Relator be awarded all costs of this action, including attorneys' fees and

expenses; and

660.  that Relator have such other and further relief that this Court deems just and

proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Noah Nathan hereby

demands trial by jury as to all issues so triable.

DATED: May 18, 2011

Respectfully submitted,

/S/ Elaine Charlson Bredehoft
Elaine Charlson Bredehoft
Virginia Bar No. 23766
Brittany J. Sakata
Virginia Bar No. 68615
CHARLSON BREDEHOFT
COHEN & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
ebredehoft@charlsonbredehoft.com
bsakata@charlsonbredehoft.com

Jennifer C. Bell, Esquire
(Admitted Pro Hac Vice)
James A. Bell, IV, Esquire
(Admitted Pro Hac Vice)
Christopher A. Macey, Esquire
(Admitted Pro Hac Vice)
BELL & BELL LLP
1617 John F. Kennedy Blvd., Ste. 1020
Philadelphia, PA 19103
(215) 569-2500 Telephone
(215) 569-2220 Facsimile
jenniferbell@bellandbelllaw.com
jamesbell@bellandbelllaw.com
christophermacey@bellandbelllaw.com

Counsel for Relator, Noah Nathan

117

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing, Relator's Third Amended Complaint was served through the Court's ECF System on:

Susan R. Podolsky
Law Offices of Susan R. Podolsky
1800 Diagonal Road
Suite 600
Alexandria, VA 22314
*Counsel for Defendants*

William F. Cavanaugh
Claude S. Plattou
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710
*Counsel for Defendants*

Gerard Mene
Assistant U.S. Attorney
2100 Jamieson Avene
Alexandria, VA 22314
*Counsel for the United States*

Service by U.S. mail has been accomplished upon the Interested Parties set forth in the attached list.

/S/ Elaine Charlson Bredehoft
Elaine Charlson Bredehoft
Virginia Bar No. 23766
Brittany J. Sakata
Virginia Bar No. 68615
CHARLSON BREDEHOFT
 COHEN & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
ebredehoft@charlsonbredehoft.com
bsakata@charlsonbredehoft.com

Jennifer C. Bell, Esquire
(Admitted Pro Hac Vice)
James A. Bell, IV, Esquire
(Admitted Pro Hac Vice)
Christopher A. Macey, Esquire
(Admitted Pro Hac Vice)
BELL & BELL LLP
1617 John F. Kennedy Blvd., Ste. 1020
Philadelphia, PA 19103
(215) 569-2500 Telephone
(215) 569-2220 Facsimile
jenniferbell@bellandbelllaw.com
jamesbell@bellandbelllaw.com
christophermacey@bellandbelllaw.com

Counsel for Relator, Noah Nathan

## SERVICE LIST

| | |
|---|---|
| Carlotta R. Hivoral<br>California Department of Justice<br>Office of Attorney General<br>1455 Frazee Road, Suite 315<br>San Diego, CA 92108 | Robert B. Teitelman, Esq.<br>Connecticut MFCU<br>55 Elm Street<br>Hartford, CT 06067-1829 |
| Dangkhoa Nguyen, Esq.<br>District of Columbia MFCU<br>717 14th Street N.W., Suite 1100<br>Washington, DC 20005 | Dan Miller, Esq.<br>Delaware MFCU Director<br>820 N. French Street<br>Wilmington, DE 19801 |
| Stephanie A. Morse<br>Office of the Attorney General<br>Medicaid Fraud Control Unit<br>The Capitol, PL-01<br>Tallahassee, FL 32399 | Charlie Richards, Esq.<br>Georgia MFCU Director<br>2100 E. Exchange Place<br>Tucker, GA 30084 |
| Michael L. Parrish, Esq.<br>Hawaii MFCU Director<br>333 Queen Street, 10th Floor<br>Honolulu, HI 96813 | Agnes Kindred Johnson, Esq.<br>Illinois MFCU Director<br>P.O. Box 19461<br>Chicago, IL 62794 |
| Jessica Harlan, Esq.<br>Indiana MFCU<br>8005 Castleway Drive<br>Indianapolis, IN 46250 | Nicholas Diez, Esq.<br>Louisiana MFCU<br>P.O. Box 94005<br>Baton Rouge, LA 70804 |
| Robert Patten, Esq.<br>Massachusetts MFCU<br>1 Ashburton Place, Room 1813<br>Boston, MA 02018 | Ronald J. Styka, Esq.<br>Health Care Fraud Division<br>P.O. Box 30218<br>Lansing, MI 48909 |
| Mike McGrath, Esq.<br>Montana Attorney General<br>Montana MFCU<br>Justice Building, 215 N. Sanders<br>Helena, MT 59620 | Charles Hobgood, Esq.<br>North Carolina MFCU<br>Office of the Attorney General<br>3824 Barrett Drive, Suite 200<br>Raleigh, NC 27609 |
| Jeff Cahill, Esquire<br>New Hampshire MFCU, Office of the Attorney General<br>33 Capitol Street<br>Concord, NH 03301 | John Krayniak, Esq.<br>New Jersey MFCU<br>P.O. Box 085<br>Trenton, NJ 08625 |
| Elizabeth Stanley, Esq.<br>New Mexico MFCU Director<br>111 Lomas Blvd., N.W., Suite 300<br>Albuquerque, NM 87102 | Mark N. Kemberling, Esq.<br>Nevada MFCU Deputy Director<br>555 E. Washington Ave., Suite 3900<br>Las Vegas, NV 89101 |
| Kathy S. Marks, Esq.<br>New York MFCU<br>120 Broadway, 13th Floor<br>New York, NY 10271 | Susan Stallings, Esq.<br>Oklahoma MFCU<br>313 N.E. 21st Street<br>Oklahoma City, OK 73105 |
| James Dube, Esq.<br>Rhode Island MFCU<br>150 Main Street<br>Providence, RI 02903 | Valerie Smith, Esq.<br>Tennessee MFCU<br>901 RS Gass Blvd.<br>Nashville, TN 37216 |
| Paula C. Juba<br>Office of the Attorney General<br>Civil Medicaid Fraud Division<br>P.O. Box 12548<br>Austin, TX 78711-2548 | Erica Bailey, Esq.<br>Virginia MFCU<br>900 E. Main Street, 5th Floor<br>Richmond, VA 23219 |
| Thomas L. Storm, Esq.<br>Wisconsin MFCU<br>17 W. Main Street<br>Madison, WI 53703 | |

119

# EXHIBIT C

# Exhibit 8

## AFFIDAVIT OF DR RAYNARD CHEUNG

1.  My name is Dr Raynard Cheung. I am a board certified gastroenterologist. I currently practice in Philadelphia, Pennsylvania.

2.  In my experience, most patients who are treated with proton pump inhibitors (PPIs) are being treated for gastroesophageal reflux disease (GERD).

3.  Only a small percentage of patients being treated with PPIs have been diagnosed with Erosive Esophagitis.

4.  The incidence of GERD in the general population is 10-20%.

5.  The incidence of Erosive Esophagitis in the general population is low (approximately 1-2%).

6.  Erosive Esophagitis is characterized by esophageal damage with mucosal breaks or erosions.

7.  Erosive Esophagitis is diagnosed primarily by esophagogastroduodenoscopy (EGD).

8.  Gastroentrologists perform the vast majority of EGDs.

9.  Primary care physicians and rheumatologists do not perform EGDs and do not diagnose Erosive Esophagitis.

10. Otolaryngologists do not perform EGDs and only rarely diagnose Erosive Esophagitis.

11. In my practice and based on my knowledge of the practice of other gastroenterologists and primary care physicians treating GERD, patients are frequently placed on a "PPI Trial," where they are contemporaneously provided a sample of a PPI together with a prescription. Patients are instructed to use the sample and then fill the prescription if the sample provides symptom relief.

12. In my experience, when putting patients on a PPI trial, physicians prescribe the same dosage as the patient received as a sample.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Raynard Cheung MD

Date: April 13, 2011

2

# Exhibit 9

## AFFIDAVIT OF DR. RICHARD F. CORLIN, M.D., FACP

Dr. Richard F. Corlin, M.D. being duly sworn under oath, deposes and states:

1.      I am a Gastroenterologist with Southern California Medical Gastroenterology Group, Inc.

2.      Doctors are unlikely to write new prescriptions for PPIs, including Kapidex, unless a sample is available.

3.      Doctors writing new prescriptions for PPI's, including Kapidex, typically conduct a "PPI trial," in which they provide a sample of a PPI to a patient, along with a prescription to fill if the patient has a positive experience with taking the samples.

4.      Sampling influences doctors' prescribing of PPIs, including Kapidex, and the exclusive availability of samples in a certain dosage would make it much more likely that a doctor would write a prescription at the sampled dosage, rather than another dosage.

5.      Takeda's exclusive sampling of Kapidex at 60 mg. is likely to influence doctors to write more prescriptions at 60 mg. than they otherwise would have, because of the practice of conducting PPI trials, and because the exclusive sampling at 60 mg. suggests to doctors that 60 mg. is the only dosage available.

6.      Kapidex is no different than the PPI market generally in that the majority of Kapidex prescriptions are written to treat GERD (not erosive esophagitis).

7.      Erosive esophagitis is diagnosed by endoscopy.

8.      Erosive esophagitis is diagnosed by gastroenterologists, who conduct endoscopies.

9.      Primary care physicians, ENTs and rheumatologists do not generally conduct endoscopies and do not diagnose EE.

10.    The fact that 93% of Kapidex scripts are being written at 60 mg. is not proof that it is medically indicated, but instead a function of the market created by Takeda, especially with respect to their sampling practices.

11.    Medical literature does not support the use of 60 mg. Kapidex for GERD.

12.    The class-wide labeling change made by the FDA in May 2010 states that patients should use the lowest dose of PPIs appropriate to the condition being treated, including Kapidex, to avoid safety risks, and Takeda's attempts to influence doctors to write 60 mg. Kapidex for conditions that should be treated with 30 mg. is inconsistent with this directive.

13.    Statistics indicating that doctors often do not know the limitations of the indications for medicines they were writing is equally applicable in the context of PPIs – especially for Kapidex which is a relatively new drug.

14.    Doctors do not regularly read the package inserts for drugs.

15.    My practice has received Kapidex samples from Takeda.

16.    I am more likely to prescribe a PPI if I have a sample, so that I can allow a patient to try it out for tolerance and symptom relief before filling a prescription.

17.    Because of Takeda's marketing of 60 mg. Kapidex, including the exclusive sampling of 60 mg. Kapidex, I was not aware Kapidex had a 30 mg. dose.

18.    I have prescribed Kapidex in 60 mg. dose for GERD patients.

19.    My decision to prescribe 60 mg. rather than 30 mg. for GERD patients was significantly influenced by the fact that Takeda does not sample 30 mg.

20.     Some of the individuals referenced above that I prescribed 60 mg.

Kapidex to for GERD were over 65 years of age and were Medicare participants.


_____

DR. RICHARD F. CORLIN, M.D., FACP


State of California

County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this ___16___ day of

___May___, 2011, by _Richard F. Corlin,_

proved to me on the basis of satisfactory evidence to be the person(s) who

appeared before me.

(Seal)     Signature _____

A. HUERTA
COMM. # 1930710
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
MY COMM. EXP. MAR. 28, 2016

# Exhibit 10

AFFIDAVIT OF DR. RUDOLPH A. BEDFORD, M.D.,

Dr. Rudolph A. Bedford, M.D. being duly sworn under oath, deposes and states:

1.      I am a Gastroenterologist with Southern California Medical Gastroenterology Group, Inc.

2.      Doctors are unlikely to write new prescriptions for PPIs, including Kapidex, unless a sample is available.

3.      Doctors writing new prescriptions for PPI's, including Kapidex, typically conduct a "PPI trial," in which they provide a sample of a PPI to a patient, along with a prescription to fill if the patient has a positive experience with taking the samples.

4.      Sampling influences doctors' prescribing of PPIs, including Kapidex, and the exclusive availability of samples in a certain dosage would make it much more likely that a doctor would write a prescription at the sampled dosage, rather than another dosage.

5.      Takeda's exclusive sampling of Kapidex at 60 mg. is likely to influence doctors to write more prescriptions at 60 mg. than they otherwise would have, because of the practice of conducting PPI trials, and because the exclusive sampling at 60 mg. suggests to doctors that 60 mg. is the only dosage available.

6.      Kapidex is no different than the PPI market generally in that the majority of Kapidex prescriptions are written to treat GERD (not erosive esophagitis).

7.      Erosive esophagitis is diagnosed by endoscopy.

8.      Erosive esophagitis is diagnosed by gastroenterologists, who conduct endoscopies.

9.      Primary care physicians, ENTs and rheumatologists do not generally conduct endoscopies and do not diagnose EE.

10. The fact that 93% of Kapidex scripts are being written at 60 mg. is not proof that it is medically indicated, but instead a function of the market created by Takeda, especially with respect to their sampling practices.

11. Medical literature does not support the use of 60 mg. Kapidex for GERD.

12. The class-wide labeling change made by the FDA in May 2010 states that patients should use the lowest dose of PPIs appropriate to the condition being treated, including Kapidex, to avoid safety risks, and Takeda's attempts to influence doctors to write 60 mg. Kapidex for conditions that should be treated with 30 mg. is inconsistent with this directive.

13. Statistics indicating that doctors often do not know the limitations of the indications for medicines they were writing is equally applicable in the context of PPIs – especially for Kapidex which is a relatively new drug.

14. Doctors do not regularly read the package inserts for drugs.

15. My practice has received Kapidex samples from Takeda.

16. I am more likely to prescribe a PPI if I have a sample, so that I can allow a patient to try it out for tolerance and symptom relief before filling a prescription.

17. Because of Takeda's marketing of 60 mg. Kapidex, including the exclusive sampling of 60 mg. Kapidex, I was not aware Kapidex had a 30 mg. dose.

18. I have prescribed Kapidex in 60 mg. dose for GERD patients.

19. My decision to prescribe 60 mg. rather than 30 mg. for GERD patients was significantly influenced by the fact that Takeda does not sample 30 mg.

20.     Some of the individuals referenced above that I prescribed 60 mg. Kapidex

to for GERD were over 65 years of age and were Medicare participants.


DR. RUDOLPH A. BEDFORD, M.D.


State of California

County of _Los Angeles_

Subscribed and sworn to (or affirmed) before me on this _17th_ day of

_May_, 20_11_, by _Rudolph A Bedford_

proved to me on the basis of satisfactory evidence to be the person(s) who

appeared before me.

(Seal)        Signature_____

JC JOOCHANG LEE
COMM. # 1861915
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
MY COMM. EXP. AUG. 28, 2013

# Exhibit 14

## AFFIDAVIT OF DR. MICHAEL E. YAFFE, M.D.

1. I am a primary care physician.

2. I treat patients for GERD.

3. I do not conduct endoscopies and therefore, do not diagnose EE.

4. I have received Kapidex samples.

5. Doctors writing new prescriptions for PPI's, including Kapidex, typically conduct a "PPI trial," in which they provide a sample of a PPI to a patient, along with a prescription to fill if the patient has a positive experience with taking the samples.

6. Sampling influences doctors prescribing of PPIs, including Kapidex, and the exclusive availability of samples in a certain dosage would make it much more likely that a doctor would write a prescription at the sampled dosage, rather than another dosage.

7. Takeda's exclusive sampling of Kapidex at 60 mg. is likely to influence doctors to write more prescriptions at 60 mg. than they otherwise would have, because of the practice of conducting PPI trials, and because the exclusive sampling at 60 mg. suggests to doctors that 60 mg. is the only dosage available.

8. I am more likely to prescribe a PPI if I have a sample, so that I can allow a patient to try it out for tolerance and symptom relief before filling a prescription.

9. Because of Takeda's marketing of 60 mg Kapidex, including the exclusive sampling of 60 mg. Kapidex, I was not aware Kapidex had a 30 mg dose.

10. I have prescribed Kapidex in 60 mg dose for GERD patients.

11. My decision to prescribe 60mg rather than 30 mg for GERD patients was significantly influenced by the fact that Takeda does not sample at the 30 mg. dose.

12. Some of the individuals referenced above that I prescribed 60 mg. Kapidex to for GERD were over 65 years of age and were Medicare participants.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Michael E. Yaffe, M.D.

Michael E. Yaffe, M.D.

Date: May 16, 2011

# EXHIBIT D

**H**

Only the Westlaw citation is currently available.

United States District Court, E.D. Virginia,
Alexandria Division.
UNITED STATES of America ex rel. Noah
NATHAN, et al., Plaintiffs/Relator,
v.
TAKEDA PHARMACEUTICALS NORTH
AMERICA, INC., et al., Defendants.

No. 1:09–cv–1086 (AJT).
Sept. 6, 2011.

Brittany Jill Sakata, Elaine Charlson Bredehoft,
Charlson Bredehoft & Cohen PC, Reston, VA, for
Plaintiffs/Relator.

Susan Rebbeca Podolsky, The Law Offices of
Susan R. Podolsky, Alexandria, VA, for
Defendants.

### MEMORANDUM OPINION

ANTHONY J. TRENGA, District Judge.

*1 In this False Claims Act case, the plaintiff,
relator Noah Nathan ("Relator" or plaintiff) alleges
that defendants Takeda Pharmaceuticals North
America, Inc. and Takeda Pharmaceuticals
America, Inc. (collectively "Takeda") engaged in a
fraudulent marketing scheme that caused false
claims to be filed with the United States, namely,
requests for payment or reimbursement under the
federal Medicare, Medicaid, TRICARE,
CHAMPVA and Federal Employee Health Benefit
programs, for "off-label" prescriptions of Takeda's
drug Kapidex. By Order dated May 4, 2011, the
Court dismissed Relator's Second Amended
Complaint, with leave to amend, primarily on the
grounds that Relator failed to plead facts with
sufficient specificity to state a claim. On May 18,
2011, Relator filed a Third Amended Complaint;
and on June 9, 2011, Takeda filed a Motion to
Dismiss Relator's Third Amended Complaint [Doc.
No. 76] (the "Motion") pursuant Fed.R.Civ.P.

12(b)(6) and Fed.R.Civ.P. 9(b).

Relator's Third Amended Complaint, like his
Second Amended Complaint, fails to identify any
specific false claims or any specific prescriptions,
physicians, pharmacies, payments or
reimbursements that caused such a false claim to be
filed. *See* Relator's Opp., at 18 (acknowledging
failure to plead that specific off-label prescriptions
were submitted for reimbursement by the
government). Nevertheless, Relator opposes the
Motion essentially on the grounds that he may
satisfy the specificity requirements for fraud-based
claims, such as those under the False Claims Act,
31 U.S.C. § 3729 *et seq.* (the "FCA"), by pleading
statistics concerning the make-up of Kapidex sales,
together with other allegations concerning Takeda's
marketing campaign, the misrepresentations to
prescribing physicians by Takeda sales
representatives that were an integral part of that
marketing strategy, the patient populations served
by medical specialists to whom Takeda distributed
sample 60 milligram dosages of Kapidex, and the
medical conditions for which, and dosages at
which, Kapidex is approved by the Food and Drug
Administration (the "FDA"). Upon consideration of
the Motion, the memoranda and exhibits in support
thereof and in opposition thereto, and the
arguments of counsel at a hearing on July 8, 2011,
and for the reasons contained in this Memorandum
Opinion, the Court finds that the Third Amended
Complaint fails to state a claim on which relief may
be granted and the Court will grant the Motion.

### I. BACKGROUND

Although considerably more detailed, Relator's
126 page, 660 paragraph Third Amended
Complaint, viewed in the light most favorable to
Relator, is substantially the same in substance as
Relator's Second Amended Complaint, which this
Court dismissed by Order dated May 4, 2011. In
sum, Relator contends that Takeda is illegally
promoting Kapidex, a drug which is considered to
be in the medical category of drugs known as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

proton pump inhibitors. Specifically, Relator alleges that Takeda has caused the filing of false claims, and made and used false statements that were material to false claims, by: (1) promoting Kapidex to rheumatologists, whose patients suffer from conditions for which Kapidex has not been approved for treatment; (2) misrepresenting, through its sales representatives, the nature and efficacy of Kapidex and how it compares with Takeda's Prevacid, a predecessor drug which had been approved for certain medical conditions for which Kapidex is not approved; and (3) exclusively providing 60 milligram sample doses to gastroenterologists, rheumatologists, otolaryngologists and primary care physicians, despite the fact that the great majority of these doctors' patients have conditions for which there is no approved dosage of Kapidex or for which the only approved dosage of Kapidex is 30 milligrams. *See e.g.*3d Am. Compl., ¶¶ 6, 129–222. As in the Second Amended Complaint, the Relator's Third Amended Complaint asserts claims pursuant to the FCA (Counts I & II), and various state statutes (Counts III through XXVIII). Relator seeks injunctive relief, treble damages, civil penalties, and attorney fees, costs and expenses.

## II. *ANALYSIS*

### A. *Relevant Pleading Standard*

*2 Relator's Third Amended Complaint must satisfy both Fed.R.Civ.P. 12(b)(6) and 9(b). To satisfy Fed.R.Civ.P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal,* 129 S.Ct. at 1949 (internal quotation marks omitted). Relator's FCA claim must also be pleaded with particularity pursuant to Rule 9(b). Rule 9(b) requires Relator to plead, with specificity, the "who, what, when, where, and how

of the alleged fraud." *United States ex. rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 379 (4th Cir.2008) ("an FCA plaintiff must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby") (internal quotation marks omitted).

This Circuit adheres to a strict application of Rule 9(b) to FCA claims and both trial and appellate courts have repeatedly emphasized that Rule 9(b)'s particularity requirement must be satisfied in FCA cases. *See e.g. Wilson, supra; United States ex. rel. Elms v. Accenture LLP,* 341 Fed. Appx. 869, 873 (4th Cir.2009) (affirming dismissal of FCA case in which the plaintiff "submitted only one invoice ... and failed to allege with particularity any alleged rebate or credit" that was not reported to the government, and rejecting argument that plaintiff should be excused from pleading with specificity because requisite information is in possession of defendants); *United States ex rel. Radcliffe v. Purdue Pharma L.P.,* 582 F.Supp.2d 766, 784 (W.D.Va.2008) (dismissing complaint because it did "not describe even a single instance in which a physician was influenced to prescribe [the drug] based on [the defendant's] misrepresentations, and where a claim was made by the pharmacist to the government"); *United States ex rel. Martinez v. Virginia Urology Ctr., P.C.,* Case No. 3:09–cv–442, 2010 U.S. Dist. LEXIS 77078, at * 12–15, 2010 WL 3023521 (E.D.Va. Jul. 29, 2010) (granting motion to dismiss, and explaining "a plaintiff's conclusion that fraudulent claims were submitted must be supported by particularized allegations regarding not only time, place and content, but also the identity of the person making the misstatement and what was obtained thereby"). There have been cases in this Circuit, relied on by the Relator, that have not required at the pleadings stage the identification of specific false claims, but only where there has been an adequate description of a fraudulent scheme that makes the submission of all claims for

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

reimbursement submitted by the defendant fraudulent. *See e.g. United States ex rel. Decesare v. Americare in Home Nursing,* 757 F.Supp.2d 573, 583 (E.D.Va.2010).

*\*3 In advancing his claims, Relator relies on a less demanding standard, adopted by some courts outside this Circuit, that would permit Relator to proceed without alleging the "who, what, when, where, and how" as to specific claims submitted to the government in violation of the FCA as long as his complaint contains "factual or statistical evidence to strengthen the inference of fraud beyond possibility." *See e.g. In re Pharmaceutical Industry Average Wholesale Price Litigation,* 538 F.Supp.2d 367, 390 (D.Mass.2008) (quoting *United States ex rel. Rost v. Pfizer,* 507 F.3d 720, 733 (1st Cir.2007)). However, courts in this Circuit have clearly explained that a relator's allegation that "fraud must be occurring" is not sufficient to satisfy Rule 9(b), *see Decesare,* 757 F.Supp.2d at 583 (applying *Thus,* 341 Fed. Appx. at 873); and for the reasons discussed below, Relator's statistics-based version of this theory does not satisfy his obligation to plead his claims under the FCA with specificity.

**B. *Relator's Claim Pursuant to 31 U.S.C. § 3729(a)(1)(A) (Count I)***

The FCA creates a cause of action against any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Relator's Third Amended Complaint, like his Second Amended Complaint, fails to plead facts sufficient to establish that any specific false claims were presented to the United States for payment or approval, or that Takeda's promotional activities caused such presentment.

*1. Presentment of a False or Fraudulent Claim for Payment or Approval*

Relator has failed to identify any specific instances in which Takeda caused a pharmacist or other healthcare provider to submit a claim for reimbursement to the government based on a non-reimbursable prescription. Nevertheless, Relator

seeks to satisfy its pleading obligations through a combination of statistics and general allegations concerning the patient populations served by medical specialists to whom Kapidex was marketed, and to whom samples of Kapidex were distributed.

Relator first alleges that rheumatologists do not treat any conditions for which Kapidex has been approved, and therefore all prescriptions written by rheumatologists for Kapidex are off-label. *See e.g.,* 3d Am. Compl., ¶ 6. Then, relying on an attached affidavit, rather than allegations actually made in the Third Amended Complaint (which only contends that Takeda engaged in a campaign to promote Kapidex to rheumatologists, 3d Am. Compl., ¶¶ 149–169), Relator contends that rheumatologists in Relator's territory wrote two prescriptions during a sample month, July 2009, and that Relator's territory is one of over 500 territories in the United States. Based on these allegations, Relators contends that the two prescriptions must have been non-reimbursable under any government program and that there are "likely tens of thousands of prescriptions written by rheumatologists when all of the territories are accounted for during the 28 month period during which Kapidex has been promoted." Relator's Opp., at 13. Completing the journey he must travel, the Relator then contends that "there should be no question that some of these prescriptions were reimbursed by government programs, given the other data presented by Relator indicating that a significant percentage of prescriptions from his territory and his district were submitted for reimbursement to government programs."*Id.*

*\*4 These allegations are insufficient to establish for the purposes of the FCA either that nonreimbursable prescriptions were written or, if they were non-reimbursable, that they were submitted for reimbursement.[FN1] There is nothing about these allegations that establishes beyond a possibility that "tens of thousands of prescriptions" of Kapidex were written by rheumatologists and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 3911095 (E.D.Va.)
(Cite as: 2011 WL 3911095 (E.D.Va.))

that "some of these prescriptions were reimbursed by government programs ." In fact, even as to the two postulated prescriptions, there is no allegation that either was in fact submitted for reimbursement by a federal agency. Even if they were, there is nothing that prevents a rheumatologist from prescribing Kapidex for an approved condition at an approved dosage and Relator makes no allegations, either in or outside of his Third Amended Complaint, as to what these two prescriptions were for or for what dosage they were written. In short, these allegations are insufficient to plead an FCA violation even as to the two alleged prescriptions; and they certainly are inadequate to establish any claim as to any other prescriptions. *See e.g. Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511 (4th Cir.1994) (endorsing view that sample sizes of between five and thirteen are "too small to have any predictive value").

> FN1. As an initial matter, as this Court clearly explained in its prior Order, Relator may not avoid dismissal by attempting to plug holes in his complaint with supplemental affidavits. The Court has considered the substance of these affidavits in order to assess whether Relator should be granted further leave to amend his complaint.

Relator next points to 16 primary care physicians from his district who received 60 milligram samples from Takeda, and who wrote 98 prescriptions for Kapidex that were submitted to Medicare for reimbursement. Relator first alleges that primary care physicians do not treat conditions for which the 60 milligram dose is appropriate, thus presumably making all of the 60 milligram prescriptions by primary care physicians off-label. However, he does not allege that the prescriptions issued were in fact for 60 milligram doses. *See* 3d Am. Compl., ¶¶ 284–301. To cure this gap in proof, Relator argues that it is reasonable to infer that over 90% of these prescriptions were, in fact, issued at the 60 milligram dose because over 90% of

Takeda's overall sales of Kapidex are at the 60 milligram dose.3d Am. Compl., ¶¶ 310, 345–348. Relator does not, however, allege any basis on which to assume that the overall level of 60 milligram doses, as a percentage of overall Kapidex sales, corresponds to the prescriptions that were actually issued by these primary care physicians. There are also no factual allegations that would lead this Court to conclude that primary care physicians, generally, prescribed 60 milligram doses of Kapidex at levels that correspond to Takeda's overall rate of Kapidex sales.

Similarly, Relator contends that approximately 9,000 Kapidex prescriptions were submitted for federal reimbursement in two particular sales districts during periods in 2009 and 2010.3d Am. Compl., ¶¶ 312–313. Relator does not allege, however, the dosages of these prescriptions: and these statistics suffer from the same inadequacies as those pertaining to the 16 primary care physicians discussed above in that Relator does not explain the basis for his assumption that the overall 90% rate of 60 milligram doses can be attributed to these prescriptions as well. *See* 3d Am. Compl., ¶¶ 314, 345–348. Moreover, these statistics do not identify the types of doctors issuing the prescriptions, the types of illnesses for which they issued the prescriptions at issue, or whether the doctors were subjected to Takeda's sample distribution practices.

*5 Finally, Relator points to several physicians who attest in sworn declarations that they were not aware that Kapidex was available in a 30 milligram dosage, and whom Relator claims prescribed 60 milligram Kapidex doses to Medicare patients over the age of 65 for conditions for which the 60 milligram dosage of Kapidex was not approved by the FDA 3d Am. Compl., ¶ 278, 281, Ex. 9, 10, 14. By supplemental affidavit, one of these physicians further avers that certain of these patients contacted his office for prescription refills. Yaffe Aff. [Doc. No. 81–3], at ¶ 3. However, there are no allegations or averments as to when the alleged prescriptions were issued, or that any claims for payment were

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

actually submitted to Medicare in connection with these prescriptions. *See e.g. Rost,* 507 F.3d at 733 (explaining "[i]t may well be that doctors who prescribed [a drug] for off-label uses as a result of [the defendant's] illegal marketing of the drug withstood the temptation and did not seek federal reimbursement, and neither did their patients. It may be that physicians prescribed [the drug] for off label uses only where the patients paid for it themselves, or when the patients' private insurers paid for it"). As a result, Relator has failed to identify any false claims, or plead facts that would establish "beyond possibility" that false claims were in fact submitted, and Relator's Section 3729(a)(1)(A) claim will be dismissed for failure to state a claim.

*2. Causation*

The Third Amended Complaint, like the Second Amended Complaint, also fails to plead facts sufficient to make plausible Relator's claim that Takeda "caused" any off-label prescriptions to be issued.[FN2] Courts recognize that physicians are not unsophisticated lay persons and it is reasonable to assume that they are familiar with relevant medical literature. *See United States ex rel. Polansky v. Pfizer, Inc.,* Case No. 04-cv-0704, 2009 U.S. Dist. LEXIS 43438, at * 19, 2009 WL 1456582 (E.D.N.Y. May 22, 2009). This is not to say that off-label promotion cases cannot be prosecuted under the FCA. However, off-label FCA cases generally involve allegations that the judgment of a physician was altered or affected by the defendant's fraudulent activities, which also typically involve improper payments, benefits or inducements, or misrepresentations. *See e.g. United States ex rel. Carpenter v. Abbott Labs., Inc.,* 723 F.Supp.2d 395, 398-400 (D.Mass.2010) (involving kickbacks, misrepresenting studies, FDA approval and the efficacy of the drug, and presenting doctors with studies supporting off-label use); *United States ex rel. Franklin v. Parke Davis,* 147 F.Supp.2d 39, 45-46 (D.Mass.2001) (involving kickbacks, providing false information to doctors regarding the safety and efficacy of the drug, and

misrepresentations regarding credentials); *Strom ex rel. United States v. Scios. Inc.,* 676 F.Supp.2d 884, 888-89 (N.D.Cal.2009) (noting that the relator alleged that defendants hired ghostwriters to write and submit articles favorable to their drug in journals, but attributed the work to doctors and nurses); *In re Pharmaceutical Industry Average Wholesale Price Litigation,* 538 F.Supp.2d at 373-74 (explaining that the relator alleged the defendant paid "cash bribes" to hospitals). As this Court noted in its May 4, 2011 Order, physicians are not prohibited from prescribing drugs for off-label uses, and Relator has not made any allegations regarding kickbacks or other improper incentives or attempts to distort otherwise objective medical literature. Moreover, the Court finds, for the reasons discussed below, that Relator has failed to allege facts that would support an actionable misrepresentation claim. Accordingly, this Court finds that Relator has not pleaded facts that would articulate a plausible theory of causation, and Relator's Section 3729(a)(1)(A) claim will be dismissed on this basis as well.

> FN2. The Court notes that there appears to be a division among the courts regarding whether, to establish causation in fact, the Court must apply a "substantial factor" test or a "but for" causation test to claims under the FCA. *See e.g., United States ex rel. Franklin Parke-Davis,* Case No. 96-11651-PBS, 2003 U.S. Dist. LEXIS 15754, at *12-13 (D.Mass.2003); *United States ex rel. Hess v. Sanofi Synthelabo Inc.,* Case No. 4:05CV570MLM, 2006 U.S. Dist. LEXIS 22449, at * 23, 2006 WL 1064127 (E.D.Mo. Apr.21, 2006). The Court concludes that there is no need to determine whether the "but for" test or the "substantial factor" test applies since the Court concludes that Relator's allegations are insufficient under either test.

*C. Relator's Claim Pursuant to 31 U.S.C. § 3729(a)(1)(B) (Count II)*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*6 The FCA also imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Relator's allegations regarding the existence of affirmative misrepresentations do not, however, meet Rule 9(b)'s requirements For example, Relator alleges that a certain identified Takeda sales manager stated during an October 2009 training session that she had only been promoting Kapidex to rheumatologists for NSAID gastric protection, which is not a medically accepted indication, but does not allege what she said to the physicians, when the alleged statements to physicians were made or where the statements were made, or identify the physicians to whom she made the representations.3d Am. Compl., ¶ 155. Likewise. Relator's allegations regarding "Sales Representative E" ("SRE") do not identify the practice or the physician with whom SRE communicated, or when in May 2011 the meeting took place.3d Am. Compl., ¶ 251. Furthermore, Relator has not alleged what these physicians did as a result of these marketing efforts, or that the alleged false statements were material to a claim for payment, or even that the recipient physician(s) issued any off-label prescriptions, much less that any such prescriptions were submitted for federal reimbursement .FN3 In the absence of any alleged misrepresentations that would satisfy the requirements of Rule 9(b), the Court will also dismiss Relator's Section 3729(a)(1)(B) claim.

FN3. Relator's other allegations are even less detailed. *See e.g.*3d Am. Compl., ¶¶ 232–250.

**D. *Leave to Amend and Supplemental Jurisdiction***
Given the previous opportunities which this Court has granted Relator to file an amended complaint and to address the deficiencies that this Court identified in its May 4, 2011 Order, the Court finds that granting Relator leave to file a further amended complaint would be futile. Accordingly, this Court will dismiss Relator's FCA claims without leave to file a further amended complaint. The Court declines to exercise supplemental jurisdiction over Relator's state law claims (Counts III through XXVIII), which are hereby dismissed without prejudice.

***CONCLUSION***
For the above reasons, the Court concludes that in the absence of specific instances of false claims presented because of Takeda's conduct, and in the absence of any actionable misrepresentations, Relator fails to state a claim under the FCA. Relator's statistical and general allegations concerning what ailments are treated by what physicians, and the general nature of Takeda's promotional activities, do not supply the needed specificity under Rule 9(b), do not satisfy *Iqbal* and *Twombly*, and do not raise an inference of fraud beyond mere possibility. The Court will therefore grant Takeda's Motion, dismiss Relator's FCA claims (Counts I and II) without leave to amend, and dismiss Relator's remaining state law claims (Counts III through XXVIII) without prejudice.

An appropriate Order will issue.

E.D.Va.,2011.
U.S. ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc.
Not Reported in F.Supp.2d, 2011 WL 3911095 (E.D.Va.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT E

## CERTIORARI -- SUMMARY DISPOSITIONS

12-9499     RUIZ-SANCHEZ, JESUS V. UNITED STATES

The motion of petitioner for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Fifth Circuit for further consideration in light of *Descamps* v. *United States*, 570 U. S. ___ (2013).

12-9877     INGRAM, ALEX D. V. STEPHENS, DIR., TX DCJ

The motion of petitioner for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Fifth Circuit for further consideration in light of *McQuiggin* v. *Perkins*, 569 U. S. ___ (2013).

12-10639     SANCHEZ, EDWIN V. UNITED STATES

The motion of petitioner for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Seventh Circuit for further consideration in light of *Peugh* v. *United States*, 569 U. S. ___ (2013).

13-7     FIFTH THIRD BANCORP V. ARLINGTON VIDEO PRODUCTIONS

The petition for a writ of certiorari is granted. The

judgment is vacated, and the case is remanded to the United
States Court of Appeals for the Sixth Circuit for further
consideration in light of *Comcast Corp.* v. *Behrend*, 569 U. S.
____ (2013).

13-5059    O'NEIL, DAMON V. UNITED STATES

The motion of petitioner for leave to proceed *in forma
pauperis* and the petition for a writ of certiorari are granted.
The judgment is vacated, and the case is remanded to the United
States Court of Appeals for the Eighth Circuit for further
consideration in light of *Alleyne* v. *United States*, 570 U. S.
____ (2013).

13-5257    SMITH, FLORNOY V. UNITED STATES

The motion of petitioner for leave to proceed *in forma
pauperis* and the petition for a writ of certiorari are granted.
The judgment is vacated, and the case is remanded to the United
States Court of Appeals for the Eleventh Circuit for further
consideration in light of *Descamps* v. *United States*, 570 U. S.
____ (2013).

## ORDERS IN PENDING CASES

13A120    MANGINO, WILLIAM V. CAMERON, SUPERINTENDENT, ET AL.

The application for a certificate of appealability
addressed to Justice Sotomayor and referred to the Court
is denied.

13M1    WESSELL, KEVIN W., ET AL. V. TOPIWALA, PANKAJ, ET AL.

The motion for leave to file a petition for a writ of
certiorari under seal with redacted copies for the public record
is granted.

13M2    KARIM-SEIDOU, SALISSOU V. HOSPITAL OF SAINT RAPHAEL

The motion to direct the Clerk to file a petition for a writ of certiorari out of time is denied.

13M3    POTTS, ROSSI M. V. HOWARD UNIV. HOSPITAL, ET AL.

The motion for leave to proceed as a veteran is granted.

13M4    MOSES, ELNORA V. TX COMM'N ON ENVTL. QUALITY

13M5    RAYESS, MOHAMED B. V. ED. COMM'N FOR FOREIGN MEDICAL

The motions for leave to file petitions for writs of certiorari under seal with redacted copies for the public record are granted.

13M6    JEFFREY S. V. JENNIFER S.

13M7    SOLOMON, JULAINE V. SSA, ET AL.

13M8    LOVING, BETTYE A. V. LEW, SEC. OF TREASURY

13M9    WRIGHT, ALLEN V. WEBBER, JASON, ET AL.

The motions to direct the Clerk to file petitions for writs of certiorari out of time are denied.

13M10   MATHIS, EVONNA V. AT&T SBC COMMUNICATIONS, ET AL.

The motion to direct the Clerk to file a petition for a writ of certiorari out of time is denied.  Justice Alito took no part in the consideration or decision of this motion.

13M11   BRYANT, WELDON V. UNITED STATES

The motion to direct the Clerk to file a petition for a writ of certiorari out of time is denied.

13M12   SEALED APPELLANT V. SEALED APPELLEE 1, ET AL.

The motion for leave to file a petition for a writ of certiorari under seal with redacted copies for the public record is granted.

13M14   NOTTINGHAM, JAY A. V. RICHARDSON, SHERIFF, ET AL.

13M15  MORRIS, ROBERT C. V. STEPHENS, DIR., TX DCJ

    The motions to direct the Clerk to file petitions for writs

  of certiorari out of time are denied.

13M16  HEIL, RICHARD D. V. NEW, ROGER, ET AL.

    The motion to direct the Clerk to file a petition for a writ

  of certiorari out of time under Rule 14.5 is denied.

13M17  STOKES, MILLIS V. VA DOC

13M18  LEWIS, PETER A. V. STERNES, JERRY L., ET AL.

13M19  TORRES-CUESTA, JULIANO V. BERBERICH, FRANCIS, ET AL.

13M20  McDONALD, ERIN M. V. CARPENTER, JONATHAN H.

13M21  SABO, STEVEN A. V. STEVENSON, WARDEN

    The motions to direct the Clerk to file petitions for writs

  of certiorari out of time are denied.

13M22  WILLIAMS, ERIC V. DEPT. OF AIR FORCE

    The motion for leave to proceed as a veteran is granted.

13M23  HAIRSTON, ARTHUR L. V. UNITED STATES

    The motion for leave to file a petition for a writ of

  certiorari with the supplemental appendix under seal is

  granted. Justice Kagan took no part in the consideration or

  decision of this motion.

13M24  SCHMIDT, STEVEN R. V. WI DIV. OF VOCATIONAL REHAB.

    The motion to direct the Clerk to file a petition for a writ

  of certiorari out of time is denied.

13M25  DISMUKES, PAUL V. IL DEPT. OF EMPLOY. SEC., ET AL.

13M26  REYES, RUBEN D. V. FLANAGAN, JUDGE, ETC.

    The motions for leave to proceed as veterans are denied.

13M27  LAM, ALFRED V. HARRIS, ATT'Y GEN. OF CA, ET AL.

    The motion to direct the Clerk to file a petition for a writ

of certiorari out of time is denied.  Justice Breyer took no

part in the consideration or decision of this motion.

13M28    WILLIE, DARREN C. V. SCHULTIES, L. L.

13M29    STEVENSON, LaVERNE V. NY DOC

The motions to direct the Clerk to file petitions for writs

of certiorari out of time are denied.

13M30    JPMORGAN CHASE & CO., ET AL. V. FEDERAL HOUSING FINANCE AGENCY

The motion for leave to intervene to file a petition for a

writ of certiorari is denied.  Justice Alito took no part in the

consideration or decision of this motion.

13M31    ALONZO, ROBERT V. McDONALD, WARDEN

13M32    LEVINSON, MICHAEL S. V. McCULLOUGH, KELLY, ET AL.

The motions to direct the Clerk to file petitions for writs

of certiorari out of time are denied.

13M33    SAFOUANE, AZIZ, ET UX. V. HASSETT, STEPHEN, ET AL.

The motion for leave to proceed *in forma pauperis* with the

declaration of indigency under seal is denied.

65, ORIG.    STATE OF TEXAS V. STATE OF NEW MEXICO

The motion of the River Master for fees and reimbursement of

expenses is granted, and the River Master is awarded a total of

$6,889.03 for the period July 1, 2012 through June 30, 2013, to

be paid equally by the parties.

12-138    BG GROUP PLC V. ARGENTINA

The motion of petitioner to dispense with printing the

joint appendix is granted.

12-158    BOND, CAROL A. V. UNITED STATES

The motion of Cato Institute, et al. for leave to

participate in oral argument as *amici curiae* and for divided

5

argument is denied.

12-417    SANDIFER, CLIFTON, ET AL. V. UNITED STATES STEEL CORP.

12-574    WALDEN, ANTHONY V. FIORE, GINA, ET AL.

The motions of the Solicitor General for leave to
participate in oral argument as *amicus curiae* and for divided
argument are granted.

12-696    GREECE, NY V. GALLOWAY, SUSAN, ET AL.

The motion of Faith and Action Networks for leave to file
an *amicus curiae* brief out of time is granted.

12-794    WHITE, WARDEN V. WOODALL, ROBERT K.

The motion of respondent for appointment of counsel is
granted. Laurence E. Komp, Esquire, of Manchester, Missouri, is
appointed to serve as counsel for the respondent in this case.

12-895    ROSEMOND, JUSTUS C. V. UNITED STATES

The motion of petitioner for leave to file Volume II of the
joint appendix under seal is granted.

12-930    MAYORKAS, ALEJANDRO, ET AL. V. DE OSORIO, ROSALINA C., ET AL.

The motion of the Solicitor General to dispense with
printing the joint appendix is granted.

12-1182  ) EPA, ET AL. V. EME HOMER CITY, ET AL.
         )
12-1183  ) AMERICAN LUNG ASSN., ET AL. V. EME HOMER CITY, ET AL.

The motion of the federal parties to deem the Court of
Appeals' Joint Appendix to be Volumes 2 thru 8 of the Supreme
Court's Joint Appendix is granted. Justice Alito took
no part in the consideration or decision of this motion.

12-1226  YOUNG, PEGGY V. UNITED PARCEL SERVICE, INC.

The Solicitor General is invited to file a brief in this
case expressing the views of the United States.

12-1281    NLRB V. NOEL CANNING, ET AL.

The motion of petitioner to dispense with printing the joint appendix is granted.

12-1349    U. S., EX REL. NATHAN V. TAKEDA PHARMACEUTICALS, ET AL.

12-1351    MEDTRONIC, INC. V. STENGEL, RICHARD, ET UX.

12-1497    KELLOGG BROWN & ROOT, ET AL. V. UNITED STATES, EX REL. CARTER

The Solicitor General is invited to file briefs in these cases expressing the views of the United States.

12-8561    PAROLINE, DOYLE R. V. UNITED STATES, ET AL.

The motion of petitioner for appointment of counsel is granted. Stanley G. Schneider, Esquire, of Houston, Texas, is appointed to serve as counsel for the petitioner in this case.

12-9183    CUTAIA, THOMAS J. V. FLORIDA, ET AL.

12-9317    COBBLE, DANIEL E. V. OWENS, COMM'R, GA DOC

12-9318    COBBLE, DANIEL E. V. FIELDS, SHEVONDAH, ET AL.

12-9337    IN RE JASON A. PRESLEY, AKA ERNIE YOUNG

12-9529    IN RE DANIEL E. COBBLE

12-9807    CARR, CORINE V. UNITED STATES

The motions of petitioners for reconsideration of orders denying leave to proceed *in forma pauperis* are denied.

12-9824    CARDONA, JOSE C. V. THOMAS, WARDEN

The motion of petitioner for reconsideration of order denying leave to proceed *in forma pauperis* is denied. Justice Kagan took no part in the consideration or decision of this motion.

12-9941    ANDERSON, JOHN T. V. PRIVATE CAPITAL GROUP, ET AL.

The motion of petitioner for leave to proceed *in forma pauperis* is denied. Petitioner is allowed until October 28,

7